

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY - 6 2002

CLERK, U.S. DISTRICT COURT
By_____
                    Deputy

| | |
|---|---|
| **DAVID LEONARD WOOD,** §<br>**Petitioner** §<br> §<br>**vs.** §<br> §<br> §<br>**JANIE COCKRELL, Director,** §<br>**Texas Department of Criminal Justice** §<br>**Institutional Division,** §<br>**Respondent** | **CAUSE NO.:3:01-CV-2103-L** |

---

## PETITION FOR WRIT OF HABEAS CORPUS

### (Death Penalty Case)

Michael D. Samonek
TSBN: 00789795
2200 Ross Ave., Suite 2525
Dallas, Texas 75201-6770
(214) 979-7312 Telephone
(214) 979-7301 Facsimile


John Thomas Haughton
TSBN: 00787660
2200 Ross Ave., Suite 2525
Dallas, Texas 75201-6770
(214) 979-7313 Telephone
(214) 979-7301 Facsimile


Attorneys for the Petitioner
David Leonard Wood



## PETITION FOR WRIT OF HABEAS CORPUS

David Leonard Wood, currently confined on death row in the Polunsky Unit of the Texas Department of Criminal Justice, Institutional Division, Livingston, Texas, petitions this court to issue a Writ of Habeas Corpus ordering that his conviction for capital murder and sentence of death be vacated.

Due to extremely limited preparation time, this petition is presented pursuant to the order of the court and with the agreement of the Attorney General of the State of Texas to allow for a supplemental petition to be filed raising any and additional claims uncovered as a result of further investigation into these matters no later than July 1, 2002. Petitioner reserves the right to request additional extensions of time to develop claims which have been uncovered but not sufficiently evaluated at the time of the supplemental petition.

## STATEMENT OF THE CASE

David Leonard Wood is being incarcerated unlawfully on death row at the Polunsky Unit of the Texas Department of Criminal Justice, Institutional Division, in Livingston, Texas, pursuant to a judgment of conviction and sentence of death imposed on November 30, 1992, by the 171st Judicial District Court of El Paso County, Texas, in violation of rights, privileges and immunities guaranteed to him by the Constitution and laws of the United States, as more fully described below. Mr. Wood is indigent, and has been so throughout all prior proceedings in this case.

On July 13, 1990, David Leonard Wood was indicted in El Paso County, Texas for capital murder pursuant to the newly enacted "Serial Murder" statute. *Texas Penal Code §19.03(a)(6)(B)*, cause number 58486-171 while originally filed in El Paso County

but was transferred to Dallas County, Texas on a motion for change of venue due to pretrial publicity. The case was tried in the Dallas County Criminal District Court Number 5 under case number F-92-19891-L. The Petitioner was sentenced to death on November 30, 1992. On direct appeal to the Texas Court of Criminal Appeals (Wood v. State, No. 71,594 (Tex.Crim.App. 12/13/95) the court affirmed the conviction and sentence.

On March 24, 1997 Patrick Metze was appointed to represent the Petitioner for the purpose of prosecuting the Petitioner's state habeas corpus review pursuant to the *Texas Code of Criminal Procedure Art. 11.071*. On July 13, 2001, without hearing, the District Court entered it's Findings of fact and Conclusions of Law determining that the Petitioner failed to allege any facts that would show any violation of the Petitioner's constitutional rights. The Texas Court of Criminal Appeals, on September 19, 2001 adopted the findings and conclusions of the trial court and denied the Petitioner's petition.

On December 14, 2001 attorney Michael D. Samonek was appointed as counsel for the Petitioner and on April 2, 2002 John Thomas Haughton was appointed as co-counsel in this matter. On the same day the court ordered Petitioner to file an initial Petition on or before May 1, 2002 and granted Petitioner leave to file an amended petition on or before July 1, 2002. At the time of the filing of this petition, counsel for the petitioner have not had an opportunity to review all case documents nor have had sufficient opportunity to fully investigate all claims.

## STATEMENT OF FACTS

Petitioner, DAVID LEONARD WOOD, was tried, convicted, and sentenced to death for capital murder in the 171ST District Court of El Paso County, Texas.

Mr. Wood was arrested October 23, 1987, as a suspect in the deaths of four women who had been found buried in the desert in Northeast El Paso. Before his arrest on October 23, 1997, Mr. Wood was the prime suspect in the disappearance of several young women from El Paso between May, 1987, and August, 1987. On September 4, 1987, the first two bodies of those missing were found. Two additional bodies were found October 20, 1987, one on November 3, 1987, and the final body on March 15, 1988. During the intervening period, in an unrelated case, Mr. Wood was tried and convicted of Aggravated Sexual Assault and was given a 50 year sentence. Two times the El Paso District Attorney unsuccessfully attempted to secure an indictment upon Mr. Wood for the alleged murders.

Not surprisingly, shortly before a reward of $25,000.00 was offered by the County Commissioner's Court of El Paso County through Crime Stoppers, but before their Grand Jury testimony was used, two individuals, Randy Wells and Carl Sweeney, who had previously been cell mates with Mr. Wood came forward with stories of Mr. Wood's alleged confession. Aided by the testimony of these two men, an indictment was obtained on Mr. Wood July 13, 1990. Counsel was appointed for Mr. Wood and the initial trial was set for January 14, 1991.

At the beginning of these proceedings, the El Paso's District Attorney had an open file policy for discovery and allowed a one time inspection of six three ring notebooks by defense counsel. Animosity between the District Attorney's Office and the presiding Trial Judge became apparent. At a pretrial hearing September 21, 1990, the District Attorney withdrew his open file policy and commenced with numerous, protracted, unnecessary pretrial procedures that delayed trial of the case until September, 1992.

Jury selection began September 8, 1992, and a jury was sworn October 21, 1992. Mr. Wood entered a plea of not guilty and the jury returned a verdict of guilty on November 10, 1992. The punishment hearing was commenced immediately and the jury returned answers of "Yes" to Special Issues One and Two, and "no" to Special Issue Three. The Trial Court sentenced Mr. Wood to death. Mr. Wood's conviction and sentence were affirmed by the Court of Criminal Appeals on December 13, 1995, in an unpublished opinion. Wood v. State, No. 71,594 (Tex.Crim.App. December 13, 1995). To Petitioner's knowledge, no Motion for Rehearing or Writ of Certiorari were filed. Thereafter, David Leonard Wood moved for an order of appointment of counsel pursuant to the *Texas Code of Criminal Procedure Art. 11.071*, § 2, for the purposes of filing a timely application for a writ of habeas corpus. That motion was transmitted to the Court of Criminal Appeals by the 171st Judicial District Court of El Paso County, Texas, and said motion was granted by Order of the Court of Criminal Appeals on March 24, 1997, requiring an application for a writ of habeas corpus to be filed in the convicting court no later than the one hundred and eightieth day after the date of this appointment, being September 22, 1997. An Order of the Trial Court extended this filing deadline to December 19, 1997.

During 1987, El Paso was subject to the disappearance of as many as nine young women between the ages of 13 and 27. The political pressure upon the police and the District Attorney's Office to solve these disappearances became great. At times as many as 85 detectives and police officers were assigned to this investigation. The complete resources of the law enforcement community of El Paso were used. The pressure became so great that parents of the missing women organized and even protested on the international bridge between El Paso and its neighboring city of Juarez, Mexico, asking

for the conviction of the person involved. (S.F. p. 5474 ) It is worthy of note that the City of Juarez, Mexico was also experiencing similar disappearances.

The Northeast area of El Paso is a blue collar area with many bars, strip and topless clubs, and pawn shops frequented by those who are commonly referred to as "bikers." These individuals ride motorcycles and are stereo typically what one would think of as "bikers." Mr. Wood lived and worked in this area of town and he too had a motorcycle and frequented these bars and clubs. The Northeast area of El Paso is a community all to itself. Those that live and work in this area often have common friends, relationships, and experiences. (S.F. p. 5464, et seq. ).

September 4, 1987, two of the missing women were found in shallow graves approximately 30 feet apart in a desert area of Northeast El Paso. During the next few weeks more than one attempt was made to locate additional bodies in this area. On October 20, 1987, two additional bodies were found approximately 1/2 mile from the first two bodies. On November 3, 1987, the fifth body was found and the final sixth body was recovered March 15, 1988. These bodies were identified at trial in the order of their discovery as Angelina Frausto, Karen Baker, Dawn Smith, Desiree Wheatley, Rosa Marie Casio, and Ivy Williams.

September 22, 1987, Judith Kelling, a prostitute and heroin addict came forward alleging that Mr. Wood had raped her sometime between July 26 and August 5, 1987. The police began at that time to look at Mr. Wood as the prime suspect and he was arrested October 23, 1987, for the sexual assault of Ms. Kelling. At the time Mr. Wood was arrested for the sexual assault he was in his vehicle, a beige Nissan Pickup which was seized by the police. On that same day  police obtained a search warrant to search

Mr. Wood's truck for certain items purported to be for the purpose of investigation of the sexual assault of Ms. Kelling (or Gina Gallegos). Evidenced by the items seized, the real purpose of the search was to develop evidence to tie Petitioner to the "Northeast Desert Deaths". At a pretrial hearing September 3, 1991, Mr. Wood's counsel raised the issue of the illegally seized evidence from the Petitioner's truck. Among the items suppressed were certain orange fibers that were obtained from under the seat of Petitioner's pickup. The importance of these fibers will become clearer as these facts are developed. That suppression order was later overturned by the Texas Court of Criminal Appeals.

Petitioner cooperated with the police and steadily denied any involvement in the now infamous "Northeast Desert Deaths." As sufficiency of the evidence presented at trial against Petitioner is the basis of a claim for relief herein, the details of the evidence presented against Petitioner will be reserved for detail below. However, Petitioner's defense at trial was to be based upon the compulsion of the El Paso Police Department to find the person responsible for the missing women and to secure a conviction. Two occurrences outline what has to have been police overreaching that resulted in Mr. Wood's conviction.

First, a $25,000.00 reward was offered and contemporaneously two cell mates of Mr. Wood came forward to testify as to Petitioner's confession to them of these crimes. Whether, it was as the result of the reward or other incentives such as reduction in other charges, Mr. Wells and Mr. Sweeney aided the inevitable indictment of Mr. Wood. The details of this event will be made clear in the related claims herein.

The second and most obvious evidence of police tampering was the presentation of the orange fiber evidence against Petitioner. The El Paso police allegedly discovered

fiber evidence in the grave of Desiree Wheatley, and on her shirt after similar fibers were

recovered from a vacuum cleaner bag from the former apartment of Petitioner. The fibers

are the only physical evidence to tie Petitioner to any of the deaths of the missing women.

All these fibers were consistent with fibers recovered from under the seat of Petitioner's

pickup which was in police custody from October 23, 1987. Again, the details of this

claim will be made clear below. Suffice it to say, absent the testimony of Mr. Wells and

Mr. Sweeney and without the orange fiber testimony, not only would a conviction of

Petitioner have been impossible to obtain, an indictment would certainly never have

resulted.

**CLAIM NUMBER ONE**
**PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT
TRIAL AND ON APPEAL IN VIOLATION OF THE SIXTH AMENDMENT
BECAUSE TRIAL COUNSEL FAILED TO ASSERT THE PETITIONER'S
SPEEDY TRIAL RIGHTS AND FAILED TO PRESERVE THE VIOLATION OF
THOSE RIGHTS.**

**CLAIM NUMBER TWO**
**PETITIONER WAS DENIED A SPEEDY TRIAL IN VIOLATION OF THE
PETITIONER'S     SIXTH     AMENDMENT     RIGHTS     DUE     TO     THE
INTENTIONALLY DILITORY ACTIONS OF THE STATE**

*[note: the following general statement of law will apply to all claims of ineffective
assistance of counsel]*

A. General Statement of the Law

The standard, for determining whether a defendant has been rendered ineffective

assistance by counsel, was set out in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct.

2052, 80 L.Ed.2d 674 (1984). The Court explained in <u>Strickland</u> that a defendant making

an ineffective assistance of counsel claim must show: (1) that his counsel's assistance was

deficient; and (2) that but for his counsel's deficient performance, the result of the

proceeding would have been different. Strickland, 466 U.S., at 693, 104 S.Ct., at 2067-2068. Additionally, since the Texas constitutional and statutory provisions do not provide any greater protection than the Federal provisions, Texas has adopted the Strickland two prong test. Hernandez v. State, 726 S.W.2d 53, at 57 (Tex.Crim.App. 1986); and Hathorn v. State, 848 S.W.2d 10 1 (Tex.Crim.App. 1992).

A strong presumption exists that counsel rendered adequate assistance and made appropriate strategic decisions in the exercise of reasonable professional judgment. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Counsel's performance is judged by considering the "totality of the representation," not by isolated omissions or acts of the trial counsel. Wilkerson v. State, 726 S.W.2d 542, 548 (Tex.Crim.App.1986) (en banc) (quoting Ex parte Raborn, 658 S.W.2d 602 (TexCrim.App. 1983)), cert. denied, 480 U. S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). Counsel is not required to perform flawlessly, and ineffectiveness is not established solely by the fact that a different trial strategy may have been pursued by another attorney in hindsight. Ybarra v. State, 890 S.W.2d 98, 112 (Tex.App.-San Antonio 1994, pet. refd).

In Strickland, the Supreme Court held that in order to make out a Sixth Amendment claim of ineffective assistance of counsel, the defendant must show that his attorney was deficient, and that: [T]he deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable. Id. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Elaborating on the latter, "prejudice" prong of ineffective counsel, the Court observed that "[i]t is not

enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697. Instead, the defendant must show that: [T]here is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. The Sixth Amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." This right, made applicable to all state felony prosecutions by the due process clause of the Fourteenth Amendment, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), is the right not merely to the assistance of counsel, but rather to the reasonably effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

The test is to be applied at the time of trial, not through hindsight. Wilkerson v. State, 726 S.W.2d 542, 548 (Tex.Crim.App. 1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Stated another way, the defendant must overcome a presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

If the first prong is met, the defendant must also show that counsel's performance prejudiced the defense. Id., 466 U.S. at 692, 104 S. Ct. at 2066. It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Id., 466 U.S. at 693, 104 S.Ct. at 2067. Instead, the Strickland prejudice prong requires the defendant to show that there is "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different."
Id., 466 U.S. at 694, 104 S.Ct. at 2067. When addressing this second step of Strickland,
the reviewing court should examine counsel's errors not as isolated incidents, but in the
context of the overall record. Bridge v. State, 726 S.W.2d 558, 571
(Tex.Crim.App.1986).

At a pretrial hearing September 21, 1990, the issue of discovery to the defense
was raised. Prior to this hearing the District Attorney had allowed Trial Counsel to review
for one afternoon six three ring binders containing discovery. At the aforementioned
hearing, the District Attorney announced to the Trial Court the withdrawal of the State's
prior open file policy. The District Attorney's announcement of his changed policy
evoked an angry response from the Trial Judge, the Honorable Peter S. Peca, Jr. Therein,
the Court made two rather amazing findings and the following exchange occurred, to-wit:

> "THE COURT [Hon. Peter S. Peca, Jr.]: So you are not opening your file
> at this time?
> "MR. SIMMONS [District Attorney Steve Simmons]: No, Your Honor, it
> would be too
> expensive.
> "THE COURT: All right. Well, then, I guess the Court then  that's not my
> understanding of what we were coming here to do today.
> "MR. QUIJANO [Defense Attorney Dolph Qujano]: We're surprised, too,
> Your Honor. "Mr. GARNEY [Defense Attorney Norbert Garney]: It wasn't
> ours.
> "THE COURT: All right. Well, then, in the case of the State of Texas
> versus David Wood, the Court is going to find that the state has several
> thousand pages of material that they have previously shown to the defense
> attorneys. The Court is going to find that it would take approximately three
> months for that material to be copied by hand. The Court is going to find
> that this case is set for trial in January of 1991. The Court is going to find
> that the State of Texas spent approximately two years investigating this
> case prior to indictment. The Court is going to find that to do an adequate
> investigation for the defendant, the defendant will require approximately
> two years to do an independent investigation. The Court is going to then
> conclude, as a matter of law -- or the Court is going to further find that the

State originally had an open-file policy in this case, that subsequent to motions by the defendant to obtain copies of certain material in the State's possession, the State then closed its open-file policy. The Court is going to find that this has a chilling effect on the defense attorneys, and is in retribution to their aggressive defense of this case, and as a result -- as an action by the State of Texas in dosing the files, is denying the defendant effective assistance of counsel. The court finds that if the court is required to grant two years to the defendant to prepare for trial, that will deny him his right to a speedy trial under the Texas and U.S. Constitution. The Court finds that to put the defendant to trial any sooner would deny him a tight to effective assistance of counsel. The Court finds that as a matter of law that all material previously shown to the defense attorneys, which may or may not have been privileged information as work product, or as the case may be any privilege that may have existed to the State, has been waived. The Court finds that even if the State had been willing to allow the defense attorneys to copy the material by hand, that as pointed out by First Assistant District Attorney, Gonzalo Garcia, that may have involved a denial of effective assistance of counsel in that Mr. Norbert Garney has presented evidence as to his disability regarding to -- in regards to his ability to copy material. So the Court is going to enter the following orders. The Court is going to order that the State of Texas make copies of all material Previously -- the Court will make another finding. The Court also makes another finding, and that finding is, is that the Court has the inherent power to control its own docket and speedily move cases along for trial. The Court then is going to enter the following orders. The Court is going to order that the State of Texas copy their file, all material that's previously been shown to defense counsel, and provide it to them within ten days of the date of the Court signing the order, and I want it all typed up. The order needs to be typed up and signed.

"MR- GARCIA: Your Honor, I would like to get something on the record, first of a. First of all with regards to the Courts comments concerning my comments of effective counsel Mr. -- with regards to Mr.

"THE COURT: The court has already ruled-- GARCIA: effective assistance of counsel

"THE COURT: the Court has already ruled.

"MR- GARCIA: But I'm getting it on the record.

"THE COURT: You already put it on the record, Mr. Garcia. I have heard the hearing, and I have ruled, and I'm through with this hearing. You may all be excused.

"Mr. GARCIA: Yes, sir, I understand. But just for purposes of the record

"THE COURT: You may be excused. I have ruled.

"Mr. GARCIA: Your Honor, I understand that

"THE COURT: You may be excused. Bailiff, escort W. Gonzalo Garcia out of here."

(SF. 78-81).

After Mr. Garcia was excused three times and ordered escorted from the courtroom, the El Paso District Attorney's Office filed a mandamus action to prevent having to copy their files as the Trial Court had ruled. Simmons v. Peca 799 S.W.2d 426 (Tex.Civ.App.- El Paso, 1990). Because of the pretrial strategy of the then District Attorney's Office, in one dilatory move after another, including twenty-four pretrial hearings and two appeals, it was indeed two years from the Trial Court's findings of September 21, 1990, until on September 9, 1992, a venire panel was for the second time sworn and voir dire commenced for the final time. A jury was finally seated and testimony began October 21, 1992. Although the first mandamus action resulted in the State not having to copy its files, the net effect was a delay in the proceedings through the initial trial setting in January 14, 1991.

The next trial setting was for September 5, 1991. In early August, 1991, the District Attorney delivered three items of Brady material to the Defense, approximately one month from trial (S.F. p. 365 et seq).. The Trial Court forced the defense to continue to prepare for trial and at a pretrial hearing on September 5, 1991, the Trial Court granted a Motion to Suppress certain items obtained by the State pursuant to a search warrant. For the second time the District Attorney filed on September 23, 1991, the State's Notice of Appeal and delayed the trial further while questioning the rulings of the Trial Court. This time, however, the appeal was taken after voir dire had begun and the State lost its appeal, Trial Court's rulings suppressing the evidence being upheld. State v. Wood, 828 S.W.2d 471 (Tex.Civ.App.-El Paso, 1992). Again, the net effect was the delay of Petitioner's trial into late 1992. By 1992 when the appeal decision was returned, the publicity associated with all the trial procedures resulted in a change of venue to Dallas. Finally, the case was

set for trial in September, 1992. Although the defense struggled with discovery and constantly asked for more time in order to allow full investigation that could have been avoided with reasonable State discovery policies. Petitioner's Trial Counsel failed to raise the issues raised by the Court's findings of September 21, 1990. Trial Counsel's error in failing to move for dismissal on Speedy Trial grounds under the Texas and United States Constitutions caused Petitioner irreparable injury. The Eighth District Court of Appeals reviewed the Trial Court's findings of September 21, 1990, and found the Trial Court's actions (in ordering the State's Attorney to copy its file for the defense) in the interest of constitutional rights to due process, effective assistance of counsel and speedy trial premature. However, the Court of Appeals spoke in terms of "estimated length of delay" and anticipated violation of constitutional rights as "theoretical injuries" to Petitioner. But the injuries to Petitioner because of the two year delay to trial that Judge Peca anticipated, are not "speculative" any longer. The Trial Court knew well the time it would take to investigate and prepare for trial without the reasonable cooperation of the prosecution and as if with a crystal ball Judge Peca hit it on the nose. At the time of trial in September, 1992, had the defense raised the issue of speedy trial with the Trial Court, how could the Court have ignored its previous, "premature" findings? It could not, and in fairness it would not. What then is the standard of review on speedy trial dismissals? Cases reviewing a Trial Court's dismissal on Speedy Trial grounds use the abuse of discretion standard. Williams v. State, 464 S.W.2d 842, 845 (Tex.Crim.App.1971), and State v. Hernandez, 830 S.W.2d 631, 635 (Tex-App.--San Antonio 1992, no pet.). In the speedy trial context, the federal appellate courts review questions of law de novo and questions of fact under a clearly erroneous standard of review. United States v. Smith, 94 F. 3 d

204, 208 (6th Cir. 1996), cert. denied, 117 S. Ct. 997, 13 6 L.Ed. 2d 877 (1997) (citing United States v. Clark, 83 F. 3 d 13 50, 13 52 (11 th Cir. 1996)); United States v. Williams, 782 F.2d 1462, 1464-65 (9th Cir. 1985). Under this standard, as in the federal appellate courts, questions of law are reviewed de novo while substantial deference is accorded to the trial court's findings of fact. Cf State v. Vasquez, 937 S.W.2d 572, 573 (Tex.App.-San Antonio 1996, no pet.) (applying Texas' abuse of discretion standard to trial court's probable cause determination because federal standard and Texas' abuse of discretion standard not in conflict). Texas therefore follows Williams and Hernandez and expressly holds Texas' abuse of discretion standard applies in reviewing an order dismissing a case with prejudice on speedy trial grounds. Therefore, to establish error, the complaining party must show the trial court "applied an erroneous legal standard," misapplied the correct legal standard, or made findings of fact that are not supported by any "reasonable view of the record. "DuBose v. State, 915 S.W.2d 493, 497-98 (Tex.Crim.App. 1996).

In Petitioner's case, how could the Defense Counsel have more of a green light to insist that the Trial Court follow its previous findings and dismiss the prosecution against Petitioner. The State could not possibly have argued to the Trial Court that the delay was not particularly excessive, as the record plainly shows the State deliberately and intentionally caused the delays that led to a trial over five years from the commission of the crimes the subject of the trial.

The right to a speedy trial is guaranteed by the Sixth Amendment and imposed on the States by the Fourteenth Amendment to the United States Constitution. Barker v. Wingo, 407 U.S. 514, 515, 92 S.Ct. 2182, 2184-85, 33 L.Ed.2d 101 (1972). To invoke

this right, a defendant must first show he has been arrested, indicted, or otherwise officially accused, <u>United States v Thomas</u>, 55 F. 3 d 144, 148 (4th Cir.), cert. denied, 116 S.Ct. 266, 133 L.Ed.2d 189 (1995), and "the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial! delay.", <u>Doggett v. United States</u>, 505 U.S. 647, 651-52, 112 S.Ct. 2686, 2690, 120 L.Ed.2d 520 (1992) (quoting <u>Barker</u>, 407 U.S. at 530- 31, 92 S.Ct. at 2191-92). The lower federal courts "have generally found post-accusation delay 'presumptively prejudicial' at least as it approaches one year.,, <u>Doggett</u>, 505 U.S. at 652 n. 1, 112 S.Ct. at 2691 n. 1. "If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." Id. (citing <u>Barker</u>, 407 U.S. at 533-34, 92 S.Ct. at 2193-94).

No definite period of time has been held to be a per se violation of a defendant's right to a speedy trial; alleged violations are considered on a case by case basis. <u>Barker v. Wingo</u>, 407 U.S. 514, at 529-30, 92 S.Ct. 2182, at 2191-92, 33 L.Ed.2d 101 (1972). The length of the delay has been described as a "triggering mechanism." Id. There must be enough of a delay to be presumptively prejudicial to the defendant before it becomes necessary to consider the other three factors. Id. The clock begins to run for purposes of speedy trial analysis when the defendant has become an accused (either charged or arrested). <u>United States v. Marion</u>, 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971).

If a defendant thus establishes his right to a speedy trial inquiry, the court must determine whether the right has been violated by carefully balancing the four <u>Barker</u>

factors: (1) "whether delay before trial was uncommonly long," (2) "whether the government or the criminal defendant is more to blame for that delay," (3) "whether, in due course, the defendant asserted his right to a speedy trial," and (4) "whether [the defendant] suffered prejudice" as a result of the delay. Doggett, 505 U.S. at 651, 112 Saint. at 2690 (citing Barker, 407 U.S. at 530, 92 S.Ct. at 2191-92). "These factors are applied on an ad hoc basis as a balancing test in which the conduct of the prosecution and the defendant are weighed." State v. Kuri, 846 S.W.2d 459,461 (Tex.App.-Houston [14th Dist.] 1993, pet. Ref'd),cert. denied, 510 U.S. 1116,114S.Ct. 1064,127L.Ed.2d384(1994) (citing Barker, 407 U.S. at 530, 92 S.Ct. at 2191-92).

When a record is silent as to the cause of the delay, a trial court may properly "presume" that no valid reason for delay existed. Turner, 545 S.W.2d at 137- 38; Hernandez, 830 S.W.2d at 634. In Petitioner's situation the record is far from silent as to the reasons for delay. There is no valid reason for the two year delay between the hearing on September 21, 1990, and the plea of not guilty and jeopardy attaching October 21, 1992. There certainly would be no excuse for the delay from Petitioner's arrest October 23, 1987, and the trial date of October 21, 1992. Had Petitioner properly asserted his right to a speedy trial by filing a motion to dismiss the trial court would have been obligated to honor its prior findings and grant the motion. With the apparent animosity between the Trial Court and the then District Attorney's Office, and considering the courage of the Trial Court apparent throughout the trial record (i.e., granting a motion to suppress evidence just prior to trial), Petitioner believes this Trial Court would have done the right thing by placing the blame where it belonged upon the then District Attorney's Office for its unnecessary pretrial delay and would have granted a speedy trial motion for dismissal

An Appellate Court would have to give deference accorded a trial judge's findings of fact. The four part balancing test of <u>Barker</u> is intended to be nonexclusive: None of the four factors identified above is either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. <u>Barker</u> 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118-19. The <u>Barker</u> test contemplates that every case will be different and that the same balancing test will have to be conducted according to the unique facts of each case. Further, the Supreme Court has structured a test that is fluid enough to take into account many factors depending on the combination of facts that unfold. At least two of the factors or reasons for delay and prejudice are particularly susceptible to fact-rich scenarios. In any event, factors other than those enumerated may be considered depending on the circumstances of a case.

The trial judge, not the Appellate Court, is the initial fact finder, and the Appellate Court may not disturb the trial court's finding under an abuse of discretion standard unless no reasonable view of the record will support it. But for trial Counsel's failure to assert Petitioner's Constitutional rights to a speedy trial, the case against Petitioner would have been dismissed. See <u>Barker</u>, 407 U. S. at 531-32, 92 S.Ct. at 2192.

The test then is whether Petitioner would have suffered actual prejudice in the delay before trial. In <u>State v. Burckhardt</u>, 952 S.W. 2d 100 (Ct.App.-San Antonio 1997) the delay in trial resulted in the loss of some potentially exculpatory evidence, the Defendant lost work and several thousands of dollars in income, and suffered anxiety and

concern. "The right to a speedy trial is designed to protect three general interests[:]" (A) "to prevent oppressive pretrial incarceration;" (B) "to minimize anxiety and concern of the accused;" and (C) "to limit the possibility that the defense will be impaired." Chapman, 744 S.W.2d at 137; see also Barker, 407 U.S. at 533, 92 S.Ct. at 2193. Actual prejudice is not required. Kufi, 846 SM.2d at 466. Burckhardt need only "make 'some showing! that the delay has been prejudicial." Id. (quoting Phillips, 650 S.W.2d at 402-03). Burckhardt at p. 104. These factors are not inclusive. In the Burckhardt case he was only incarcerated for five hours and the trial court properly did not find that Burckhardt was subjected to oppressive pretrial incarceration. The trial court found and the evidence established that Burckhardt lost work. Further, the trial court found Burckhardt "suffered anxiety and concern as a result of the delay".

The State has the initial burden of justifying a lengthy delay. Turner v. State, 545 S.W.2d 133, 137-38 (Tex.Crim.App. 1976). In Barker v. Wingo, the Supreme Court discussed considerations relevant to the issue of justification for the delay. Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. Barker, 407 U.S. at 531, 92 S.Ct. at 2192.

Therefore, Petitioner must present a compelling case that he was prejudiced by the delay. Prejudice is to be considered in light of the interests that the right to a speedy trial was designed to protect. Barker, 407 U,S. at 532, 92 S.Ct. at 2193. These interests include prevention of extended pretrial incarceration, minimization of anxiety over pending charges, and most importantly the prevention of actual prejudice to the defendant's ability

to present a defense, such as the loss of exculpatory evidence. The defendant has the initial burden to make a showing of prejudice. Harris v. State, 489 S.W.2d 303, 308 (Tex.Crim.App. 1973).

So what prejudice did Petitioner, Mr. Wood, suffer as a result of the delay in trial? There are three areas of prejudice to Petitioner on evidentiary items that come to mind.

First, March 17, 1989, the El Paso FBI Office received a teletype from the FBI in Las Vegas, Nevada, inquiring into the murders between the months of May and December, 1987, of four young women who were buried in the desert off of Dyer Street in El Paso. One Edward Dean Barton had confessed to the FBI in Las Vegas that he had committed these crimes and buried the bodies in the desert because "the desert eats bodies up." Barton correctly described all the women as small, petite, and young. It was also confirmed that Mr. Barton was in El Paso during the time frame indicated. The El Paso Police got this information would have been contacted shortly after the teletype of March 17, 1989, as direct instructions therein were to contact the local police department. The State withheld this information from the defense until just before the pretrial hearing on August 1, 1991, just a month before the second trial setting of September 5, 1991. (SF. p. 365 et seq). The injury to Petitioner by this behavior is that July 9, 1991, Eddie Barton who had been in custody since March, 1989, escaped federal custody and his whereabouts in August, 1991, were unknown. Certainly this individual should have been investigated by the defense in preparation for trial as his confession could have been exculpatory in the extreme. Had the District Attorney's Office provided this information to the defense timely, the defense could have used this information as a defense had Mr. Barton been available. By delaying the trial, and by violating the Court's prior Brady Order, the State

caused the defense the unavailability of a potentially important defense witness. It should be of no wonder that this information came forward just a few weeks after Mr. Barton escaped and just a few weeks before trial. The State knew that the Trial Judge was very anxious to get this matter to trial and that efforts by the defense for time to investigate this matter would be denied-which they were.

Second, at the same time as the Brady material involving Mr. Barton was delivered in August, 1991, additional information was given the defense about a sex for drugs link out of a tattoo parlor involving young women and the "Northeast Desert Deaths." This information came in the form of a letter from Mr. Billy Smith. The resulting prejudice to Petitioner is that the owner of the tattoo parlor had only recently died in a motorcycle accident and again an important witness was made unavailable by the delay caused by the State in giving the defense discovery that it was entitled.

Third, DNA evidence from the nails of one of the victims, Angelica Frausto, was delayed over a year and one-half prior to submission to a laboratory. The results were inconclusive due to the way in which the evidence was stored (in ambient conditions, instead of frozen), and because the evidence sat in a Department of Public Safety laboratory in Lubbock, Texas, without being tested for an inordinate amount of time. (SF. p. 5485 ). Had the State not been obstinate in refusing to assist with discovery and in prosecuting unnecessary interlocutory appeals, trial of this case would have forced the quick examination of the evidence left unattended in Lubbock for over a year. The State in its careless handling of this evidence caused delay and prejudice to the Petitioner's defense.

Finally, the anxiety of waiting five years from arrest to trial with the possibility of the death penalty as a punishment must be the type of pretrial anxiety that is contemplated in Barker. Just the possibility of the death penalty and the Petitioner's insistence he was innocent caused the Petitioner great anxiety and worry.

The Appellant is entitled to a speedy and public trial, as provided for by the Sixth Amendment of the United States Constitution, and by virtue of Article 1, sec. 19 of the Texas Constitution. The length of the delay is measured from the time the defendant was accused. United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); McCarty v. State, 498 S.W.2d 212 at 215 (Tex.Crim.App. 1973). The Petitioner herein was arrested October 23, 1987, and five years passed until trial. Even though a showing of actual prejudice is not necessary, the important point is that Petitioner made some showing of prejudice Phillips v. State, 650 S.W.2d 396 (Tex.Crim.App. 1983); McCarty v. State, 498 S.W.2d at 218. The prejudice to Petitioner was the aging of important DNA evidence and the loss of two witnesses both believed to be involved in the murders of young girls in El Paso during 1987. This must be prima facie evidence of prejudice. Once a presumption of prima facie case of prejudice arises, the State must carry the obligation of proving that Petitioner suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay Courtney v. State., 472 S.W.2d 151, 154 (Tex.Crim.App.-1971). Green v. State, 760 S.W.2d 50 (Ct.App.--El Paso 1988) rehearing denied Dec. 7, 1988. The burden of excusing the delay rests with the state, and if the record is silent or contains insufficient reasons to excuse the delay, it must be presumed that no valid reason for the delay existed. State v. Hernandez, 830 S.W.2d 631 (Tex.App.--San Antonio 1992, no pet.). How can the State now give any justifiable

excuse for a five year delay. When examined in light of the totality of the claims made by Petitioner hereunder, the serious violation of Petitioner's constitutional rights to a speedy trial were violated and his counsel's failure to raise this issue at trial or on appeal denied Petitioner dismissal of the charges against him to which he was entitled.

**CLAIM NUMBER THREE**
**PETITIONER WAS DENIED DUE PROCESS PURSUANT TO THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION IN THAT THE INDICTMENT AGAINST THE PETITIONER FAILED TO ALLEGE THE OFFENSE OF CAPITAL MURDER FOR WHICH THE PETITIONER WAS CONVICTED AND AWAITS EXECUTION.**

**CLAIM NUMBER FOUR**
**TRIAL COUNSEL AND APPELLATE COUNSEL WERE INEFFECTIVE BECAUSE COUNSEL FAILED TO RAISE THE ISSUE OF THE FUNDAMENTALLY DEFECTIVE INDICTMENT AGAINST PETITIONER, AS THE INDICTMENT FAILED TO ALLEGE THE OFFENSE OF CAPITAL MURDER.**

Capital Murder, as applied to the facts of Petitioner's case, is defined in *Texas Penal Code § 19.03(a)(6)(B)* as it was written in 1987. Therein it states in relevant part, to-wit:

"*19.03.* Capital Murder (a) A person commits an offense if he commits murder as defined under *§ 19.02(a)(1)* of this code and:... (6) the person murders more than one person:...(B) during different criminal transactions, but the murders are committed pursuant to the same scheme or course of conduct." The pertinent portions of the Petitioner's indictment read as follows, to-wit:

"... that David Leonard Wood ... did then and ' there unlawfully, intentionally and knowingly caused the death of more than one person, during different criminal transactions, pursuant to the same scheme and course of conduct, by the said David Leonard Wood, to-wit: On or about the 30th day of May, 1987, the said defendant, David Leonard Wood, intentionally and knowingly caused the death of Ivy Williams by stabbing the said Ivy Williams with a sharp instrument, and; on or about the 2nd day of June, 1987, the said defendant, David Leonard Wood, intentionally and knowingly caused the death of Desiree Wheatley, in some manner and by some means, instrument or weapon, unknown to the grand jury, and; on or about the 5th day of June, 1987, the said defendant, David Leonard Wood, intentionally and knowingly caused the death of Karen Baker, in some manner and by some means, instrument or weapon, unknown to the grand jury, and; on or about the 8th day of August, 1987, the said defendant, David Leonard Wood, intentionally and knowingly caused the

death of Angelica Frausto, in some manner and by some means, instrument or weapon, unknown to the grand jury, and; on or about the 12th day of August, 1987, the said defendant, David Leonard Wood, intentionally and knowingly caused the death of Rosa Maria Casio, in some manner and by some means, instrument or weapon, unknown to the grand jury, and; on or about the 28th day of August, 1987, the said defendant, David Leonard Wood, intentionally and knowingly caused the death of Dawn Marie Smith, in some manner and by some means, instrument or weapon, unknown to the grand jury, against the peace and dignity of the State." [Emphasis added]

The subject Indictment fails to first allege that the Defendant, Petitioner herein, first committed murder as defined in the *Texas Penal Code § 19.02(a)(1)*. At the time of the trial of this case very little case law existed interpreting the new "serial" murder statute. In fact, Petitioner's Trial Counsel believed this case to be the first prosecution in Texas under *Texas Penal Code § 19.03(a)(6)*, now *§ 19.03(a)(7)*. The inclusion of the first allegation of murder plus the murder of more than one person during different criminal transactions committed pursuant to the same scheme or course of conduct is the definition of a "serial" capital murder. The capital murder is not the accumulation of more than one murder as the law accumulates property in a theft indictment to increase the level of the theft charge from misdemeanor to felony. A capital murder is a murder first and in addition at least one more murder committed during a different criminal transaction pursuant to the same scheme or course of conduct. The Indictment as alleged at best indicts the Petitioner for six separate murders. At worse, the Indictment is fundamentally defective for failing to allege a crime in Texas and certainly for failing to allege the offense of capital murder.

For over one hundred years Texas courts have held that defects of substance contained in an indictment rendered it "fundamentally defective" and could be raised at

any time. See, e.g., <u>Studer v. State</u>, 799 S.W.2d 263, 266-67 (Tex.Crim.App. 1990);

<u>American plant Food Corporation v. State</u>, 508 S.W.2d 598, 603 (Tex.Crim.App. 1974);

<u>Williams v. State</u>, 12 Tex.Ct.App. 398, 401 (1882); <u>White v. State</u>, 1 Tex.Crim.App. 211,

213 (1876); see generally George E. Dix, Texas Charging Instrument Law: The 1985

Revisions and the Continuing Need for Reform, 38 BAYLOR L.REV. 1, 13-24 (1986).

The failure of an indictment to allege all of the elements of an offense was considered a

fundamental defect, rendering an indictment and thus a conviction based thereon, void.

See, e.g., <u>Gengnagel v. State</u>, 748 S.W.2d 227, 229 (Tex.Crim.App. 1988) (indictment

that failed to allege acts constituting recklessness was fundamentally defective); <u>White</u>, 1

Tex.Crim.App. at 214-15 (indictment that faded to allege felonious intent was fatally

substantively defective); see also <u>Ex parte Cannon</u>, 546 S.W.2d 266, 268

(Tex.Crim.App.1976) (indictment that failed to allege facts to constitute all elements of

offense was fundamentally defective, void and subject to attack in application for writ of

habeas corpus). <u>Fisher v. State</u> 887 S.W.2d 49, (Tex. Cr. App. 1994).

The indictment being fundamentally defective, and not alleging an offense against

the laws of Texas, same is insufficient to support a conviction, and therefore this

conviction is void and subject to attack in an application for writ of habeas corpus. <u>Ex</u>

<u>Parte Cannon</u>, 546 S.W.2d 266 (TexCr.App. 1976). Although under the 1985 changes a

defendant waives these defects if not raised at trial, Petitioner contends the holdings in Ex

Parte Cannon as they apply to post conviction writs have not been affected and are still

law. To hold otherwise would be an unconstitutional violation of Petitioner's rights to due

process.

Trial Counsel tried on several occasions to attack the Indictment as their instincts were that a new statute must produce a defective Indictment. However, Trial Counsel wholly missed the mark. At a pretrial hearing October 11, 1990, trial counsel urged a motion to quash which was overruled without argument or comment. (SF 89) The second attempt immediately followed the first and was couched in terms of a motion to dismiss Petitioner's capital murder indictment based on the unconstitutionality of *Texas Penal Code § 19.03(6)(B),*. The position of the defense was that *§ 19.03(6)(B)* was unconstitutional in that it fails to define the phrase criminal transaction. (SF 89)

Counsel argues, "Mr. Wood has been alleged to have committed certain different criminal transactions apparently resulting in the death of six young women, and there is no way that [the defense] can properly prepare a defense for turn because we do not know what they are talking about, ... essentially it's a notice problem.... The same argument would go to the same scheme or course of conduct that is alleged in the indictment that fails to either define same scheme or course of conduct or to give us any facts or particulars in the indictment as to what the particular charges against my client are." (SF 90). The defense complains the indictment is based on an unconstitutional statute.

Trial counsel attempted again to attack the indictment through a motion to dismiss the capital murder indictment based upon the unconstitutionality of *Texas Code of Criminal Procedure Article 37.07(l),*. The defense argued that the statute was unconstitutional because it failed to provide any vehicle for the jury to consider mitigating factors when called upon to answer the special issues. Also, the statute was believed unconstitutional because it failed to define the word deliberately, failed to define

criminal acts and violence, and faded to limit or guide the jury's consideration of extraneous and adjudicated offenses. (SF 12 1)

Finally, the defense tried to quash the indictment September 3, 1991, arguing that the Indictment failed to give fair notice as to what the State's theory of actual criminal conduct Mr. Wood committed in causing the deaths of the other five individuals after the first individual alleged in the indictment. Further they complained of the lack of cause of death to these individuals.(Corpus Delicti)   The defense argued that the defense was entitled to have everything that was intended to be proved as a matter of fair notice. (SF 565-566). In closing, counsel claimed the indictment was defective because *§19.03* in defining capital murder was unconstitutionally vague and therefore violated the due process clause of the 14th Amendment for failure to give fair notice as to what the same scheme and course of conduct means and consequently the defense was unable to adequately prepare a defense. (SF 567). (see claim number Five)

On appeal, Appellate counsel failed to raise any issue in regard to this Indictment. Consequently, Appellate counsel was ineffective for failing to raise the issue of the fundamentally defective indictment and to raise the issues presented by trial counsel in their attempts to quash the indictment and force dismissal of the capital murder charges lodged against Petitioner. Trial Counsel's ineffectiveness came from failing to bring to the Court's attention the fundamental incorrectness of the indictment's language.

In general, an indictment must plead every element which must be proven at trial. Dinkins v. State, 894 S.W.2d 330, 338 (Tex.Crim.App. 1995); Whitehead v. State, 745 S.W.2d 374, 376 (Tex.Cr.App.1988) (citing Harrell v. State, 643 S.W.2d 686 (Tex.Cr.App.1982); and, Vinson v. State, 626 S.W.2d 536, 537 (Tex.Crim.App. 1981)).

The *Texas Code of Criminal Procedure Article 21.02*, provides that in an indictment, the offense must be set forth in plain and intelligible words. Further, *Texas Code of Criminal Procedure Article 21.11*, provides an indictment "shall be deemed sufficient which charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged."

In turn, the trial court's charge to the jury generally should correspond to the allegations in the indictment. Jackson v. State, 633 S.W.2d 897 (Tex.Crim.App. 1982); Booker v. State, 523 S.W.2d 413 (Tex.Crim.App. 1975).

Capital murder is committed when a person commits murder, *Texas Penal Code, § 19.02(a)(1),* with at least one of the aggravating factors contained in the capital murder statute, *Texas Penal Code, § 19.03.* Combining the elements of the two statutes, capital murder under *§ 19.03(a)(2)* is committed when a person intentionally or knowingly causes the death of an individual (murder under *§ 19.02(a) (1)*) and the person murders more than one person during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct. In a series of cases, one can review the basic principles of how to word a capital murder indictment as seen in Wilder v. State, 583 S.W.2d 349 (Tex.Crim.App. 1979), judgment vacated and case remanded on other grounds, 453 U. S. 902, 101 S. Ct. 3133, 69 L.Ed.2d 987 (1981), opinion on remand, 623 S.W.2d 650 (1981); Granviel v. State, 552 S.W.2d 107 (Tex.Cr.App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); and White v. State, 543

S.W.2d 104 (Tex.Crim.App.1976), cert. denied, 430 U.S. 988, 97 S.Ct. 1689, 52 L.Ed.2d

384 (1977).

The indictment in question did not literally follow the statute and misled

Petitioner by failing to give him fair notice of the offense charged. The indictment clearly

failed to allege that Petitioner was being charged with capital murder under *Texas Penal

Code §19.03(a)(6)*,. See <u>Richardson v. State</u>, 744 S.W.2d 65 (Tex.Crim.App. 1999) for a

discussion of an Indictment that did track the Statute and was upheld as giving "fair

notice" of the offense charged. Petitioner's trial counsel's continued efforts at attacking

the Indictment showed their uncomfortable reaction to the Indictment's language.

In <u>Corwin v. State</u>, 870 S.W.2d 23 (Tex.Crim.App. 1993), a "serial" capital

murder indictment is quoted in a more proper attempt at following the language of *Texas

Penal Code § 19.03(a)(6)*. Although it contains unnecessary and surplus language, the

indictment is reproduced here to show the proper sequence of a "serial" capital murder

indictment, to-wit:

The indictment alleged that appellant:

> "... on or about the 10th day of July, 1987, ... did then and there, while in
> the course of committing and attempting to commit kidnapping and
> aggravated sexual assault of Debra Ewing, intentionally caused the death
> of Debra Ewing by stabbing her with a knife and strangling her with a
> ligature, the exact description of which is unknown to the Grand Jury ...
> and ... that [he], during different criminal transactions and pursuant to the
> same scheme and course of conduct, murdered more than one person, to
> wit: [o]n or about July 10th , 1987, in Montgomery County, Texas, he did
> then and there, while in the course of committing and attempting to
> commit kidnapping and aggravated sexual assault of Debra Ewing,
> intentionally cause the death of Debra Ewing by stabbing her with a knife
> and strangling her with a ligature, the exact description of which is
> unknown to the Grand Jury; (o]n or about February 13, 1987 in Robertson
> County, Texas, he did then and there, while in the course of committing
> and attempting to commit kidnapping and aggravated sexual assault of

Alice Martin, intentionally cause the death of Alice Martin by stabbing her with a knife and strangling her with a ligature, the exact description of which is unknown to the Grand Jury; [a]nd, on or about October 31, 1987 in Walker County, Texas, he did then and there, while in the course of attempting to commit kidnapping and aggravated sexual assault of Mary Risinger, intentionally cause the death of Mary Risinger by stabbing her with a knife[,]"

The jury instruction at the close of the guilt phase of trial required the jury to find appellant thus murdered Debra Ewing, and that he also thus murdered either Alice Walker, or thus murdered Mary Risinger, during the same scheme or course of conduct. Oddly, the indictment effectively charges three capital murders under *Texas Penal Code, § 19.03(a)(2)*. Each of the three victims was allegedly murdered intentionally, and in the course of commission or attempted commission of at least one of the enumerated felonies therein. Nevertheless, the States avowed theory of prosecution was at all times *§19.03(a)(6)(B),* supra, and both the indictment and the jury charge require a finding that appellant killed at least two of the victims, and that those two murders were committed pursuant to the same scheme or course of conduct, in order to convict him of capital murder." <u>Corwin v. State</u>, 870 S.W.2d 23 (Tex.Crim.App. 1993). However, it is clear that the Legislature did not intend that every different-transaction multiple killing comprise a capital murder. Id. at p.28. To allege a proper "serial" capital murder the Indictment must follow the statutory scheme.

As pointed out in <u>Narvaiz v. State</u>, 840 S.W.2d 415, 415 (Tex.Cr.App.1992) a person convicted and punished for capital murder under the statutory scheme created by *§ 19.03(a)(6)(A)* and *Article 37.071(f)* is, in plain effect, convicted and punished for the murder of the first person listed in the Indictment ..., whether or not that person was the person who was murdered first in time. The interaction of these two statutes makes the

legislative intent quite clear. Thus, ..., under the statutory scheme the murder of the second person listed in the indictment is merely the aggravating circumstance that renders "capital" the murder of the person listed first. First v. State, 846 S.W.2d 836, 846 (Tex.Crim.App. 1992), reh. denied. Under *§19.03(a)(6)(A)*, the aggravating circumstance making an "ordinary" murder a capital offense is the murder of a second person during the same criminal transaction. Narvaiz at p.432.

The question then is had the defense raised the issue of the wording of the indictment would the result have been different? Yes, had the defense forced the State to use the proper language the result would have been different. The proper indictment language would have focused the jury and the prosecution on the murder of Ivy Williams first. As is stated below, the evidence is wholly insufficient to show the murder of Ivy Williams by Petitioner. As it stands, the Petitioner stands convicted and sentenced for the offense of capital murder. But, he is convicted and sentenced not in conformity with the indictment that gave him notice of the charges against him. What greater violation of due process under the State and Federal Constitutions can an accused suffer than to be charged with one crime (murder) and be convicted of another (capital murder). The only scenario that offends the Constitutions more is to be charged with a crime that does not exist as alleged and to be convicted of a crime carrying the maximum punishment allowed-death.

**CLAIM NUMBER FIVE**
***TEXAS PENAL CODE § 19.03(A)(6(B)*** **IS UNCONSTITUTIONALLY VAGUE AND THE PETITIONER'S CONVICTION UNDER THE STATUTE VIOLATED HIS DUE PROCESS RIGHTS PURSUANT TO THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION**

Criminal statutes must provide the defendant in any case with notice sufficient to allow him prepare his defense and to plea former jeopardy. Williams v. United States, 164 F. 2d 302, (5th Cir. 1947), Russell v. United States, 369 U.S. 749, 8 L.Ed. 2d 240, 82 S. Ct. 1038 (1962) Words and phrases in a statute may render it unconstitutionally vague unless those words and phrases are clearly understood concepts.

The Supreme Court in United States v. Rosenburg, 195 F. 2d 583, (1st Cir. 1952) cert. den. 344 U.S. 838, 97 L. Ed. 652, 73 S.Ct. 20 (1952) rehg den. 344 U.S. 889, 97 L. Ed 652, 73 S.Ct. 21, (1952) rehg den. 344 U.S. 889, 97 L. Ed 687, 73 S.Ct. 180, and 347 U.S. 1021, 98 L. Ed. 1142, 74 S. Ct. 860 (1954) the court considered the term, "National Defense" in the context of the *Espionage Act of 1917*. The court stated in that case, "but few word possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions." Id @ 592.

Notwithstanding the emotional and social connotations of Rosenburg, the term, "National Defense" as used in the *Espionage Act* clearly referred to a fixed and well understood concepts of military and naval establishments and the general duties and information associated with the national preparedness. Id @ 591 However, the terms "same scheme or course of conduct" and "different criminal transactions" are distinguishable. While few Texas cases have dealt directly with this issue the Texas Court

of Criminal Appeals foreshadowed the impending difficulties associated with these terms

in Coble v. State, 871 S.W.2d 192 (Tex.Crim.App. 1993) (en banc) rehg den. (1994).

That case dealt with the "mass murder" provision of *Texas Penal Code § 19.03 (a)(6)(A)*

rather than the present "serial murder" section *(B)* with which we are primarily

concerned. The defendant was accused of killing three people within a very short period

of time. The majority in footnote 10 of the opinion struggles with the continuum running

through subsections *(A)* and *(B)*. ([same criminal transaction] as contrasted with [same

scheme or course of conduct in different criminal transactions])The court concluded that

the difference is merely one of degree. Justice Clinton in dissent stated,

> " . . . the majority simply concedes, problematically, in my view, that a
> jury could have concluded the murders occurred 'during the same criminal
> transaction' This holding does indeed blur the distinction between
> subsections A and B of 19.03 (a)(6), and in the process threatens to render
> unconstitutional what until now we have scrupulously endeavored to
> preserve as constitutional, at least in its application to particular facts." Id
> @ 208.

The Court previously in Rios v. State, 846 S.W.2d 310 (Tex.Crim.App. 1992)

held that these two subsections are "mutually exclusive".

To demand that the petitioner respond to an indictment in which the specific

element is reduced to a matter of undefined degrees is to force the petitioner to defend

more than one statutory offense simultaneously. See also Vuong v. State, 830 S.W.2d 929

(Tex.Crim.App. 1992)

In Corwin v. State, 870 S.W.2d 23 at 28-29 (Tex.Crim.App. 1993) the court dealt

with subsection *(B)* specifically and stated,

> " in hypothetical cases, as time and distance between murders committed
> during different transactions increases, and as the actor's motive or modus
> operandi vary, it will become more difficult for putative defendants and

law enforcement agencies to say with certainty that the murder occurred pursuant to the same . . . course of conduct."

Justice Clinton in the Coble dissent further stated, " At some point it must be said that the statute fails to give notice that a multiple killing is in fact a capital crime under *19.03(a)(6)(A)*." <u>Coble</u> @ 209.

If the application of the statute can violate constitutional notice requirements in its application it does so here. In this case no proof of the time of death or the manner and means of death has been forthcoming from the state and the jury is left to discern these undefined competing terms without guidance.


**CLAIM NUMBER SIX**
**FAILURE OF TRIAL COUNSEL TO DEMAND A DEFINITION OF "SAME SCHEME OR COURSE OF CONDUCT" WAS CONSTITUTIONALLY INEFFECTIVE AND VIOLATED PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL PURSUANT TO THE 6TH AMENDMENT TO THE CONSTITUTION.**

**CLAIM NUMBER SEVEN**
**FAILURE OF TRIAL COUNSEL TO DEMAND A DEFINITION OF "DIFFERENT CRIMINAL TRANSACTION" WAS CONSTITUTIONALLY INEFFECTIVE AND VIOLATED PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL PURSUANT TO THE 6TH AMENDMENT TO THE CONSTITUTION.**

**CLAIM NUMBER EIGHT**
**PETITIONER WAS DENIED DUE PROCESS PURSUANT TO THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE THE JURY INSTRUCTIONS COMPLETLY FAILED TO DEFINE THE TERMS "SAME SCHEME OR COURSE OF CONDUCT" AS ALLEGED IN THE INDICTMENT AND AS SPECIFICALLY SET FORTH IN THE STATUTE BY THE TEXAS LEGISLATURE.**

**CLAIM NUMBER NINE**
**PETITIONER WAS DENIED DUE PROCESS PURSUANT TO THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE THE JURY INSTRUCTIONS COMPLETLY FAILED TO DEFINE THE TERM "DIFFERENT CRIMINAL TRANSACTION" AS ALLEGED IN THE**

**INDICTMENT AND AS SPECIFICALLY SET FORTH IN THE STATUTE BY THE TEXAS LEGISLATURE.**

*{Note: the claims made in this sections are closely related to the claim set forth in Five and should be read with those arguments in mind}*

The statute specifically states

> "(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:... (6) the person murders more than one person:...(B) during different criminal transaction, but the murders are committed pursuant to the same scheme or course of conduct."

The Indictment sets forth very specific elements of the offense for the jury to consider. However, in this instance the jury was never instructed as to the meaning of "same scheme or course of conduct". Obviously the terms have a specific and intended meaning but the jury and this attorney are at a lost to know what that term is to mean. Without a clear definition of what each element stands for the jury is charged to find that the petitioner killed one person in a way that is "kinda like" the way he killed another. In addition, the jury was never instructed as to the meaning of "different criminal transaction" Without definitions the elements of same scheme or course of conduct and different criminal transaction are meaningless because the jury has no fixed standard or definition. In short, the jury was instructed to find the petitioner guilty of capital murder because he killed more than one person. *{Note: Refer to the arguments in Claim Five above}*

Given the mutually exclusive terms in subsections *(A)* and *(B)* of the statute, such flippant treatment of the elements of the offense violate the petitioner's right to trial pursuant to the 6th amendment and due process pursuant to the 14th Amendment.

**CLAIM NUMBER TEN**
**TRIAL COUNSEL WAS INEFFECTIVE IN ASSISTING IN THE PREPARATION OF THE JURY CHARGE AT PUNISHMENT IN THEIR FAILURE TO OBJECT TO THE NON-STATUTORY SPECIAL ISSUE NUMBER THREE IN VIOLATION OF THE RIGHTS OF THE PETITIONER PURSUANT TO THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**CLAIM NUMBER ELEVEN**
**THE COURT'S USE OF THE NON-STATUTORY SPECIAL ISSUE THREE DURING THE PUNISHMENT PHASE OF THE TRIAL DENIED THE PETITIONER HIS DUE PROCESS AND EQUAL PROTECTION RIGHTS AS GUARANTEED UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**CLAIM NUMBER TWELVE**
**THE PETITIONER WAS DENIED DUE PROCESS AND PREVENTED A FAIR TRIAL IN CONTRAVENTION OF THE 14TH AMENDMENT BECAUSE THE COURT ALLOWED THE VOIR DIRE OF THE JURY TO PROCEED USING A VERSION OF SPECIAL ISSUE THREE WHICH WAS CONTRARY TO THE SPECIAL ISSUE ACTUALLY PRESENTED TO THE JURY AT THE PUNISHMENT PHASE.**

**CLAIM NUMBER THIRTEEN**
**TRIAL COUNSEL WAS INEFFECTIVE IN THEIR FAILURE TO PRESERVE THE COURT'S ERROR IN DENYING THE PETITIONER'S REQUEST FOR A PENRY INSTRUCTION IN VIOLATION OF THE RIGHTS OF THE PETITIONER PURSUANT TO THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**CLAIM NUMBER FOURTEEN**
**THE TRIAL COURT ERRED WHEN IT DENIED THE PETITIONER HIS REQUEST FOR A PENRY INSTRUCTION IN VIOLATION OF THE PETITIONER'S RIGHT TO DUE PROCESS AND EQUAL PROTECTION PURSUANT TO THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND HIS RIGHT TO PROTECTION FROM CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE 8TH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

In contrast to the indictment, which serves a notice function to the defendant, the function of the jury charge is to instruct the jury on the law applicable to the case. Abdnor v. State, 871 S.W.2d 726, 731 (Tex.Cr.App.1994); Benson v. State, 661 S.W.2d 708, 713 (Tex.Cr.App.1982); and, Williams v. State, 547 S.W.2d 18, 20, 22 (Tex.Cr.App. 1977).

Because the charge is the instrument by which the jury convicts, <u>Benson,</u> 661 S.W.2d at 715, the charge must contain an accurate statement of the law and must set out all the essential elements of the offense. Id., 661 S.W.2d at 713; and, <u>Zuckerman v. State,</u> 591 S.W.2d 495, 496 (Tex.Crim.App. 1979).

When a charge is reviewed for alleged error, the charge must be examined as a whole instead of a series of isolated and unrelated statements. <u>Holley v. State,</u> 766 S.W.2d 254, 256 (Tex.Crim.App. 1989); and, <u>Inman v. State,</u> 650 S.W.2d 417, 419 (Tex.Crim.App. 1983). <u>Dinkins v. State,</u> 894 S.W.2d 330, 339 (Tex.Crim.App. 1995).

The offense for which Petitioner was charged allegedly occurred during the summer months of 1987. During voir dire, the State and the Trial Counsel discussed legal principles with the venire members based upon the version of Art. 37.071 of the Code of Criminal Procedure which applied only to offenses occurring before September 1, 1991. A Defendant under the holding in <u>Nichols v. State,</u> 754 S.W.2d 185, 204 (Tex.Crim.App. 1988), does not have the right to elect to be prosecuted under an amended statute. Even under an Equal Protection challenge under the United States and Texas Constitutions, a Defendant is not denied Equal Protection because he was denied the broader provisions of the amended statute available to defendants who committed capital murder after September 1, 1991.

Absent Legislative intent the holding in <u>Nichols</u> held of the *Texas Code of Criminal Procedure Article 37.071 subsection (e)* could not be applied retroactively where the defendant's first trial was held before the effective date of the amendment. Id., 754 S.W.2d at 204. See also, <u>Ridyolph v. State,</u> 545 S.W.2d 784, 786-787

(Tex.Crim.App.1977). The entire rationale is developed in <u>Dinkins v. State</u>, 894 S.W.2d 330 (Tex.Crim.App 1995).

In <u>Jurek v. Texas</u>, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed. 2d 929 (1976) held that the Texas capital punishment statute was constitutionally valid because it allowed sufficient latitude in the special issues to consider <u>all</u> relevant mitigating evidence. In <u>Lockett v. Ohio</u>, 438 U.S. 586, 98 S.Ct. 2954, 57 L. Ed. 2d 973 (1978) and <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 102 S.Ct. 869, 71 L. Ed. 2d 1 (1982) the court set forth the rule that the states must allow the sentencer to consider and give effect to all evidence of character, background or circumstances which mitigate against the imposition of the death penalty pursuant to the 8th and the 14th Amendments to the United States Constitution.

Trial Counsel and the Trial Court were aware of the then new Texas case of <u>Rios v. State</u>, 846 S.W. 2d 3 10 (Tex.Crim.App. 1992), rehearing denied. In <u>Rios</u>, the trial court erred in failing to submit at the punishment phase of trial an instruction sufficient to equip the jury to exercise its "reasoned moral response" to, inter alia, evidence of his mental retardation. <u>Penry v. Lynaugh</u>, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Rios requested specific instructions and although Rios was tried after the date of decision in <u>Penry</u> error was preserved. Cf. <u>Black v. State</u>, 816 S.W.2d 350 (Tex.Crim.App. 1991) (Campbell, J., concurring, joined by five other judges).

Petitioner presented in punishment phase of trial, some evidence of his mental retardation and organic brain damage and the State made only passing refutation of this testimony. Under <u>Ex parte Goodman</u>, 816 S.W.2d 383 (Tex.Cr.App.1991), <u>Ramirez v. State</u>, 815 S.W.2d 636 (Tex.Crim.App. 1991), <u>Ex parte McGee</u>, 817 S.W.2d 77

(Tex.Crim.App. 1991), and Ex parte Williams, 833 S.W.2d 150 (Tex.Cr.App.1992), Petitioner was unquestionably entitled to an instruction empowering the jury to assess a penalty less than death, notwithstanding affirmative answers to the special issues, as a "reasoned moral response" to the fact of his mental retardation.

Petitioner requested the trial court to submit a number of instructions to the jury at the conclusion of evidence at the punishment phase of trial. The Trial Court in its wisdom and in an attempt to once again be fair to the Petitioner granted the defense an instruction consistent with Rios but inadvertently made a fatal mistake. The Court's instruction given to the jury in response to Rios read as follows, to-wit:

> "If the jury answers special issues number one and number two yes, then the jury shall answer special issue number three. There is no burden of proof on either the State or the defendant on special issue number three. Special issue number three must be answered yes or no. The jury may not answer special issue number three no unless it unanimously agrees, and may not answer special issue number three yes unless 10 or more jurors agree. However, the jurors need not agree on what particular evidence supports a yes answer. Mitigating evidence is evidence that reduces the defendant's personal or moral culpability or blameworthiness and (7784) may include, but is not limited to, any aspect of the defendant's character, record, background, or circumstances of the offense for which you have found him guilty. Our law does not specify what may or may not be considered as mitigating evidence. Neither does our law provide a formula for determining how much weight, if any, a mitigating circumstance deserves. In answering special issue number three, each juror may consider any evidence winch in his or her opinion is mitigating." (SF 7785).

Trial Counsel attempted to get two additional instructions before the jury on this issue, to wit:

> 1. "A mitigating circumstance is any evidence which in fairness or mercy calls for a sentence less than death." (SF. 7776-7777).
> 2. "When you deliberate about the questions posed in special issue number three, you must consider any mitigating circumstance supported by the evidence presented in both phases of the trial. In this case, there was presented to you evidence that the defendant suffers from organic brain

dysfunction or something to that effect -- and/or minimal brain damage. You may consider such evidence as a mitigating circumstance in deciding the answer to special issue number three." (SF. 7777).

Both of these requested instructions were denied.

The propriety of these instructions is not argued here but the Court in <u>Rios</u> in Footnote #6 sets out an instruction that would have been sufficient. Failure to request a proper instruction in this early post <u>Penry</u> era would not have been unusual. The mistake made by Trial Counsel was not in requesting an instruction but in allowing the Special Issue Number Three to be used before the Jury without objection.

In 1987, the date of the subject offenses, *Texas Code of Criminal Procedure § 37.071* stated in relevant part

> "(b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:
> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, and
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased....
> (e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on or is unable to answer any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life."

As amended and effective September 1, 1991, *Texas Code of Criminal Procedure §37.071* was amended to read:

> "(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken....

(d) The court shall charge the jury that:

(1) in deliberating on the issues submitted under Subsection (b) of this article, it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty,

(2) it may not answer any issue submitted under Subsection (b) of this article yes" unless it agrees unanimously and it may not answer any issue "no" unless 10 or more jurors agree; and

(3) members of the jury need not agree on what particular evidence supports a negative answer to any issue submitted under Subsection (b) of this article.

(e) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:...

(3) need not agree on what particular evidence supports an affirmative finding on the issue; and (4) shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

(g) If the jury returns an affirmative finding on each issue submitted under Subsection (b) of this article and a negative finding on an issue submitted under Subsection (e) of this article, the court shall sentence the defendant to death. If the jury returns a negative finding on any issue submitted under Subsection (b) of this article or an affirmative finding on an issue submitted under Subsection (e) of this article or is unable to answer any issue submitted under Subsection (b) or (e) of this article, the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life."

Trial Counsel objected to Special Issue Number Three upon its wording and asked for specific wording incorporating more language about mitigating circumstances. (SF. 7775). But as this is a case that uses *§ 37.071* in effect in 1987, a third special issue should not have been used except on the question of provocation if raised by the evidence, which it was not. By failing to lodge the proper objection to the wording of Special Issue Number Three, confusion among the jury panel was inevitable.

At voir dire, all prospective jury members were questioned by the Attorneys for the State and the Defense on the special issue questions. In doing so, a poster was designed set up in front of each prospective juror setting out the following special issues:

> Number one, whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result.

> Number two, whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. and,

> Number three, if raised by the evidence whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased. (SF. p. 3628)

In fact the three special issues given to the Jury at punishment read:

> Special issue number one: Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant, David Leonard Wood, that caused the death of Ivy Williams, was committed deliberately and with a reasonable expectation that the death of Ivy Williams or another would result? The jury will answer the question yes or no and there's a line for your answer.

> Special issue number two: Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, David Leonard Wood, would commit criminal acts of violence that would constitute a continuing threat to society? The jury shall answer yes or no and, again, there is a line for your answer.

Special issue number three: Do you find taking into consideration all of the evidence including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a mitigating circumstance or circumstances sufficient to warrant that a sentence of life imprisonment rather than a death sentence be imposed. (SF. 7787) [Emphasis added].

Each prospective juror was informed that on the three special issues if the jury returned three yes answers that the Trial Court would be bound and obligated to sentence Petitioner to death. This was not repeated just once but over and over to every person as they were qualified for jury service. In the Trial Court's Charge at punishment there were just as promised three special issues. However, the third special issue was different than that promised by the Attorneys and the Court at voir dire and no one told the jury. In fact, should the jury have voted three "yes" answers, the Trial Court would not have been obligated to sentence the Petitioner to death, but would have been sentenced the Petitioner to life in prison. In addition, as presented to the jury, the third special issue is completely without statutory authorization.

Under the findings of <u>Narvaiz,</u> trial counsel therein rendered ineffective assistance, thereby depriving his client of his Sixth Amendment right, by "failing to request a [jury] charge that would have allowed mitigating evidence to have been considered [at the punishment phase of trial], and [by] failing to introduce more mitigating evidence during the punishment phase." Appellant complained further that..."there was absolutely no vehicle for [the jury] to express [mitigation] in the verdict form." <u>Narvaiz.</u> See <u>Penry v. Lynaugh,</u> 492 U.S. 302, 109 S.Ct. 2934,106 L.Ed.2d 256 (1989).

It is therefore an adequate showing herein that Trial Counsel was ineffective in how they handled the jury charge at punishment. It is rudimentary that an individual adjudged guilty of capital murder is to be punished by death or life imprisonment. *Texas Penal Code, § 12.31*. But it is important at this point to remind the reader that the penalty to be assessed in a capital murder case is determined by the jury's answers to the special issues submitted to the jury under *Texas Code of Criminal Procedure Article 37.071*.

In Ex parte Cruz, 739 S.W.2d 53, 58 (Tex.Crim.App. 1987), the Court of Criminal Appeals held that the second prong of Strickland is not applicable to the punishment phase of trial. The courts should apply, instead, the single standard of reasonably effective assistance of counsel as gauged by the totality of the circumstances. Ex Parte Duffy 607 S.W.2d at 514. The appellant must still show the harm due to the alleged ineffective assistance. Stone v. State, 751 S.W.2d 579, 582 (Tex.App. --Houston [1st Dist] 1988, pet. ref d).

In asking the Trial Court for instructions on mitigation, Trial Counsel showed their awareness of the evolution of the special issues in capital cases. But the Trial Court in using a special issue that was not authorized by *§37.071* in effect in 1987, gave the Petitioner the option to be charged partially under then existing law and partially under the law in effect at the time of the crime. This special issue was not the proper "vehicle" necessary to give the jury the opportunity to consider mitigation under the totality of the circumstances of Petitioner's trial. Had the voir dire of each juror not stressed over and over again that three yes answers would result in death and a no answer on any issue would result in life, then the use of the third special issue as presented would have been generous to the defense even though totally without statutory authority. The proper

vehicle should have been an instruction on mitigation as used in the <u>Rios</u> case cited above. So, as the second prong of <u>Strickland</u> is not necessary at punishment on the question of ineffectiveness of counsel, had the jury only been presented with two special issues as authorized by statute and had the jury received a proper instruction on mitigation, no error would have occurred and no confusion on the "three yes answer" problem would have been possible. Under the totality of the circumstances, this mistake deprived Petitioner of reasonably effective assistance of counsel.

With regard to the 8th and 14th Amendment violations, while the jury was given an instruction consistent with <u>Penry</u> and <u>Rios</u>, the confusion and the failure of trial counsel for the petitioner, counsel for the state or the court to instruct the jury that the prior statement of the law at voir dire was improper and to ensure that the jury understood the changes, resulted in the same violation <u>Penry</u> sought to correct.

**VOIR DIRE CHALLENGE ISSUES**

**CLAIM NUMBER FIFTEEN**
**TRIAL COUNSEL WERE CONSTITUTIONALLY INEFFECTIVE IN THEIR EXERCISE OF PEREMPTORY CHALLENGES.**

**CLAIM NUMBER SIXTEEN**
**TRIAL COUNSEL WERE CONSTITUTIONALLY INEFFECTIVE IN FAILING TO MAKE THE PROPER OBJECTION TO  PRESERVE FOR APPEAL THE TRIAL COURT'S IMPROPER PEREMPTORY CHALLENGE PROCEDURE.**

**CLAIM NUMBER SEVENTEEN**
**TRIAL COUNSEL WERE CONSTITUTIONALLY INEFFECTIVE IN FAILING TO PRESERVE FOR APPEAL THE TRIAL COURT'S  ERRORS DURING VOIR DIRE IN OVERRULING DEFENSE CHALLENGES FOR CAUSE.**

**CLAIM NUMBER EIGHTEEN**
**APPELLATE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE ON APPEAL FOR FAILURE TO PROPERLY RAISE THE  TRIAL COURT'S IMPROPER PEREMPTORY CHALLENGE PROCEDURES AS DENYING PETITIONER  HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND**

EQUAL PROTECTION UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION,

**CLAIM NUMBER NINETEEN**
**APPELLATE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE ON APPEAL FOR FAILURE TO ALLEGE SUCH FACTS AS WOULD SHOW THE TRIAL COURT ERRED IN OVERRULING PETITIONER'S CHALLENGES FOR CAUSE TO TWO PROSPECTIVE JURORS.**

**CLAIM NUMBER TWENTY**
**PETITIONER WAS DENIED DUE PROCESS AS THE QUALIFIED JURORS WERE NOT PASSED FIRST TO THE STATE AND THEN TO THE DEFENSE FOR CAUSE CHALLENGES AND THEN FOR PEREMPTORY CHALLENGES, ALL IN VIOLATION OF HIS DUE PROCESS AND EQUAL PROTECTION RIGHTS AS GUARANTEED BY THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**CLAIM NUMBER TWENTY-ONE**
**PETITIONER WAS DENIED DUE PROCESS AND EQUAL PROTECTION PURSUANT TO THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN THE COURT UNJUSTIFIABLY OVERRULLED DEFENSE CHALLENGES FOR CAUSE.**

From Line 14 of p. 5196 of the Statement of Facts through Line 11 of p. 5225, counsel for both the State and the defense carry on a discussion with the Trial Court on the Court's procedure for exercising peremptory strikes. This discussion continues at a later time at Line 6 of p. 5395 until the strikes begin at Line 12 of p. 5402.

The Statement of Facts herein shows the Trial Court's procedure during voir dire was the same used in non-capital cases. At the end of qualifying 44 potential jurors, the Trial Court had both the State and the Defense mark their strikes and independently submit them to the Court. In fact, it appears the Defense submitted their 15 strikes all at one time on a clean strike sheet before the State presented their 15 strikes on a separate sheet. Nevertheless, the qualified jurors were not passed for acceptance or challenge first to the state and then to the defendant for peremptory challenges. The Court after receiving

both defense and State strikes then marked and announced the strikes and gave a list of the first twelve. Defense objected to this procedure requesting additional peremptory strikes prior to making their first 15 strikes, but the Trial Court denied the request. After the first twelve were named, the Defense objected to every venire person where a defense challenge for cause was made and overruled. The defense then asked for additional peremptory strikes without naming which specific jurors in the first twelve were objectionable. The defense counsel merely indicated that ten of the twelve were objectionable. The Court refused any additional peremptory strikes to the defense all but begging the defense to specifically name the objectionable juror or jurors. Defense counsel told the Court he did not have to name the objectionable jurors. The Court then ruled that nevertheless the defense had peremptorily stuck four jurors with numbers higher on the list than the twelfth juror seated declaring these four strikes as wasted denying the defense the right to additional peremptory strikes. The defense counsel objected to the Court's procedure throughout asking for additional peremptory strikes before the defense was made to exercise their original 15 strikes, but the Court steadfastly refused to follow this procedure. (SR p. 5395 et seq).

*Texas Code of Criminal Procedure Article 35.15* provides for the number of peremptory strikes to be given each side in a capital case. Granting a defendant additional peremptory strikes is discretionary with the trial court. In the absence of wrongdoing on the court's part, no abuse of discretion will be found when the court overrules a defendant's request for additional peremptory strikes after the defendant has exhausted those accorded him by statute. Hafti v. State, 487 S.W.2d 745 (Tex.Crim.App. 1972), citing Norman v. State, 121 Tex.Cr.R. 433, 52 S.W.2d 105 1, 1052 (1932). The

"wrongdoing" may occur when the court deprives a defendant of a peremptory challenge by improperly overruling a defendant's challenge for cause and forcing him to use a strike on a juror who is subject to challenge for cause. Barefoot v. State, 596 S.W.2d 875 (Tex.Crim.App. 1980), cert. denied 453 U.S. 913, 101 S.Ct. 3146, 69L.Ed.2d996(1981); Von Byrd v. State, 569 S.W.2d 883 (Tex.Crim.App. 1978), cert. denied 441 U.S. 967,99 S.Ct. 2418, 60 L.Ed.2d 1073 (1979), rehearing denied; 444 U.S. 888, 100 S.Ct. 190, 62L.Ed.2d 123 (1979); Burns v. State, 556 S.W.2d 270 (Tex.Cr.App.1977), cert. denied 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977); Tezeno v. State, 484 S.W.2d 374 (Tex.Cr.App.1972).

If the trial court has improperly denied a challenge for cause, the defendant may establish harm by showing that an "objectionable" juror was placed on the jury. Tezeno supra. Bayless v. State, 166 Tex.Cr.R. 479, 316 S.W.2d 743 (1958); Wolfe v. State, 147 Tex.Cr.R. 62, 178 S.W.2d 274 (1944). In the case of Cumbo v. State the Defendant had exhausted his fifteen (15) peremptory challenges allotted him pursuant to *Texas Code of Criminal Procedure Article 35.15(a)*. Thereafter, when Defendant requested two additional peremptory challenges they were denied. Defendant made it clear to the court that Ronnie Davis was an objectionable juror and "totally unacceptable." Also, Defendant made it clear to the court that the two alternatives chosen were also objectionable jurors. By this method the Defendant preserved for review the claimed error. Cumbo v. State, 760 S.W.2d 251 (Tex.Crim.App. 1988), rehearing denied Nov. 9, 1988. Hernandez v. State, 563 S.W.2d 947 (Tex.Crim.App. 1978); Barefoot v. State, 596 S.W.2d 875 (Tex.Crim.App. 1980), cert. den. 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996.

In <u>Hernandez</u>, supra, at 948, the Court of Criminal Appeals quoted from <u>Wolfe v. State</u>, 178 S.W.2d 274, 281 (Tex.Crim.App. 1944) (Opinion on Rehearing):

> ... in the trial of a criminal case where an accused has been wrongfully deprived of peremptory challenge by being forced to use such upon a juror who was shown to be subject to a challenge for cause, and such accused has exhausted his peremptory challenges, and a further *254 juror be presented whom he states to be objectionable to him, then it will not be necessary for accused to show in what manner such further juror was objectionable to him, nor to show that such juror was an unfair or partial juror. In further words, we think the accused should only be required to exercise a peremptory challenge on the objectionable juror and not a challenge for cause, nor show grounds for a challenge for cause, nor to show why such juror was objectionable to him. "

Thus, if a challenge for cause to a certain prospective juror is improperly overruled by the trial court and the defense is required to unnecessarily use a peremptory challenge, and later is forced to accept on the jury an objectionable juror because he was deprived of a peremptory challenge, and he has exhausted all his statutorily assigned peremptory challenges the reversible error is normally reflected unless the court grants an additional peremptory challenge. See <u>Turner v. State</u>, 671 SM.2d 679, 680 (Tex.Crim.App. 1984).

After <u>Wolfe</u>, the Court of Criminal Appeals unfortunately used the word "objectionable" with two different meanings: an "objectionable" juror meaning one challengeable for cause, <u>Burns v. State</u>, 556 SM.2d 270; <u>Stephenson v. State</u>, 494 SM.2d 900, and "objectionable" meaning unacceptable by reason of politics, religion, environment, association, or simple appearance; in other words, an arbitrary dislike for a particular juror. <u>Wolfe v. State</u>, supra, and cases cited therein.

In <u>Hernandez</u>, venireman Carroll was "objectionable" from the standpoint that Defendant simply did not want him on the jury. Carroll was not subject to some legal

objection which would excuse him, nevertheless, Defendant desired to challenge this venireman peremptorily but was denied this opportunity by having been forced to use a peremptory challenge on venireman Abel. If it can be shown that venireman Abel was challengeable for cause and that the overruling of such challenge deprived Defendant of a peremptory challenge he would have used to strike venireman Carroll, this case must be reversed. Hernandez v. State, 563 S.W.2d 947 (Tex.Crim.App. 1978); Wolfe v. State, supra, Salazar v. State, 149 Tex.Crim.App. 260, 193 S.W.2d 211; Bayless v. State, 166 Tex.Cr.R. 479, 316 S.W.2d 743; Sifford v. State, 505 S.W.2d 866, (Tex.Crim.App., _____.)

The following is a brief recitation of the rules regarding jury selection and the harm a defendant must show in order to merit reversal. If a trial court erroneously overrules a defendant's challenge for cause, the defendant may establish harm by showing: (1) exhaustion of his peremptory challenges; (2) denial of a request for additional peremptory challenges; and (3) the seating of a juror upon whom the defendant would have exercised a peremptory challenge. East v. State, 702 S.W.2d 606 (Tex.Crim.App. 1985); White v. State, 629 S.W.2d 701 (Tex.Crim.App. 198 1), cert. denied, 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982); Hernandez v. State, 563 S.W.2d 947 (Tex.Crim.App. 1978). In non-capital murder cases, if the trial court erroneously grants a State's challenge for cause and excludes a qualified juror, the defendant may establish harm simply by showing that the State exhausted all of its peremptory challenges. In such a case the court has effectively given the State the benefit of an additional peremptory challenge. Payton v. State, (Civ.App-Houston [10 Dist.), 1992); See also Culley v. State, 505 S.W.2d 567 (Tex.Crim.App. 1974); and Weaver v.

State, 476 S.W.2d 326 (Tex.Crim.App. 1972). In capital murder cases, if the trial court improperly sustains a State's challenge for cause and excludes a qualified juror, over a defendant's objection, reversible error arises regardless of whether the State has exhausted its peremptory challenges. **This is because peremptory strikes are exercised after each Prospective Juror is questioned, under Art. 35.13, V.A.C.C.P., as opposed to after the entire panel is questioned in a non-capital case.** Grijalva v. State, 614 SM.2d 420 (Tex.Crim.App. 198 1). See also Turner v. State, 635 SM.2d 734 (Tex.Cr.App.1983). Bell v. State, 724 S.W.2d 780 (Tex.Crim.App. 1985) [Emphasis added].

A defendant must establish that he was tried by a jury to which he had a legitimate objection. Goodman supra at 856; Esquivel supra; Henriksen v. State, 500 S.W.2d 491 (Tex.Crim.App. 1973). Although the facts of the Grijalva case differ from the facts of Petitioner's case, there is within the case language which is instructive. "From these statutory provisions *[Arts. 35.13-capital cases and 35.25 - non-capital cases, Texas Code of Criminal Procedure]* it is clear that in capital cases each party must exercise any peremptory challenge at the time the particular prospective juror has been qualified. The parties may not wait until all prospective jurors have been examined before exercising peremptory challenges as is allowed in non-capital cases." Grijalva v. State, 614 S.W. 2d 420, 424 (Tex.Crim.App. 1980), rehearing denied. In Grijalva the case of Vigneault v. State, 600 S.W. 2d 318, (Tex.Crim.App. 1980) was discussed. Therein, the State was allowed to make a "retroactive" exercise of four unused peremptory strikes. In comparing Grijalva and Vigneault the Court of Criminal Appeals discusses the effect to the accused of allowing the State to exercise its peremptory strikes after a the prospective jurors are otherwise qualified. In Petitioner's trial the State was allowed to exercise all 15

peremptory strikes after a panel of 44 was qualified. The Court in Grijalva said to allow the State to strike in this manner is "a corruption" of the peremptory strike practice that violates the terms of *Art. 35.13*, supra, and gives an unfair advantage to the State in the jury selection process.

> "First to allow the State to exercise its peremptory challenges in a capital case after conclusion of the voir dire examination gives it the benefit of making its judgments with a perspective of the entire panel, a perspective that is not given the defendant.
> "Second, giving such a privilege to the State allows it to withhold its strikes until after the defendant has exercised his strikes, even though Art. 35.13, supra, explicitly states that the qualified venireman shall be passed first to the state and then to he defendant....
> "Third, to allow retrospective exercise of peremptory challenges on appeal gives the State even greater advantages.... In effect a peremptory strike against a prospective juror is transformed into a peremptory strike against a ground of error." Grijalva p. 424-425.

But Grijalva is factually different than Petitioner's case as Grijalva involves dismissal of veniremen challenged by the State. But, the language within Grijalva is clear, in interpreting *Art. 35.13* that the method used in Petitioner's trial gave the benefit of perspective of the entire panel to the State, allowed the State to strike last or at least not first, and allowed the State to correct any errors it thinks the Court may have made in challenges for cause, not at the time occurred but after study and deliberation with the entire panel before it. These various unfair advantages to the State were unchallenged at trial and on appeal. Thus, the "corruption of the peremptory strike practice" that gave the State "an unfair advantage," so condemned in Grijalva supra at 424, is present in Petitioner's case. See, Bell v. State, 724 S.W.2d 780 (Tex.Crim.App. 1986)

Therefore, can it be said that had the peremptory challenge procedure been according to statute that the result at trial would have been different? Of course, if the

defense is allowed to pass for cause and peremptorily challenge after the State on each juror as they are qualified, the strategy of the defense changes. What happened in Petitioner's situation was the defense was overly concerned about additional peremptory challenges and failed to recognize that for his error to be preserved that a specific juror had to be named that was objectionable. Trial Counsel never did this. Had Counsel merely said we object to Juror Urban or Juror Saint or Juror Hedrick and we would exercise peremptory challenges against them had the court not forced the defense to use three peremptory challenges on Venire person's King, Burleson, and Krantz, whose challenges for cause were improperly overruled, then error would have been preserved.

The additional problem occurred in that Petitioner's Appellate Counsel did not allege facts in his brief on appeal that as a result of alleged error of the Trial Court Petitioner was forced to use all of his peremptory strikes and was denied additional peremptory strikes, or that an objectionable juror was seated on the jury. The Court of Criminal Appeals declared that any error in the Trial Court on Petitioner's challenge for cause of two prospective jurors was waived because of Appellate Counsel's failure to allege such facts. This goes beyond ineffective assistance of counsel and rises to the level of 6th Amendment denial of counsel when the Appellate Counsel fails to do the basic things necessary to bring an error before the Appellate Court for review.

Insufficient time is available to review in detail all challenges for cause that were overruled, but Petitioner hereby states that the defense challenges for cause at trial on the following prospective jurors were all improperly overruled by the Trial Court, to-wit: Challenges for cause on Follis, Whitaker, Battle, Krantz, Minter, Burleson, Linstrom, King, Jones, Sims, and Deen, and Juror Hedrick who was seated on the jury was

objectionable to the defense necessitating an additional peremptory strike for Hedrick as the error in overruling challenges for cause made the defense waste peremptory challenges that had they not had to use they would have used on Hedrick.

Having Juror Hedrick, an objectionable juror, on the jury denied Petitioner his rights to due process as protected in the 14' Amendment to the United States Constitution, and unequally applied the protections of the *Texas Code of Criminal Procedure Art. 35.13* of. The forced use of an objectionable juror denied Petitioner a fair trial.

The petitioner should have had the benefit of generally applicable law and procedure in his trial and not be required to select a jury pursuant to the capricious decision of the court to utilize a process which reduces a defendant's ability to carefully select non-objectionable jurors.

It is worth our while to remind ourselves what the Supreme Court stated many years ago. " Due Process of law, within the meaning of the 14th Amendment is secured if laws operate on all alike, and do not subject individuals to arbitrary exercise of powers of government." Leeper v. Texas 139 U.S. 462, 35 L. Ed. 225, 11 S. Ct. 577 (1891)

**CLAIM NUMBER TWENTY-TWO**
**FAILURE OF TRIAL COUNSEL TO OBJECT AND PROPERLY PRESERVE THE ERROR WITH REGARD TO THE USE OF UNTRUTHFUL, INHERENTLY UNRELIABLE AND PERJUROUS TESTIMONY OF RANDY WELLS VIOLATED THE PETITIONER'S RIGHT TO EFFECTIVE TRIAL COUNSEL PURSUANT TO THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND PREVENTED A FAIR TRIAL.**

**CLAIM NUMBER TWENTY-THREE**
**FAILURE OF TRIAL COUNSEL TO OBJECT TO THE USE OF UNTRUTHFUL, INHERANTLY UNRELIABLE AND PREJUROUS TESTIMONY OF CARL SWEENEY VIOLATED THE PETITIONER'S RIGHT TO EFFECTIVE TRIAL COUNSEL PURSUANT TO THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND PREVENTED A FAIR TRIAL.**

**CLAIM NUMBER TWENTY-FOUR**
**TO OBTAIN A CONVICTION THROUGH THE USE OF UNTRUTHFUL, INHERENTLY UNRELIABLE AND PERJUROUS TESTIMONY OF RANDY WELLS VIOLATED PETITIONER'S RIGHT TO DUE PROCESS UNDER THE 14th AMENDMENT TO THE UNITED STATES CONSTITUTION AND PREVENTED A FAIR TRIAL.**

**CLAIM NUMBER TWENTY-FIVE**
**TO OBTAIN A CONVICTION THROUGH THE USE OF UNTRUTHFUL, INHERENTLY UNRELIABLE AND PERJUROUS TESTIMONY OF CARL SWEENEY VIOLATED PETITIONER'S RIGHT TO DUE PROCESS UNDER THE 14th, AMENDMENT TO THE UNITED STATES CONSTITUTION AND PREVENTED A FAIR TRIAL.**

**CLAIM NUMBER TWENTY-SIX**
**TO OBTAIN A CONVICTION THROUGH THE USE OF TESTIMONY PROCURED THROUGH THE PAYMENT OF MONEY OR BENEFITS BY THE GOVERNMENT DENIES THE PETITIONER EQUAL PROTECTION AND DUE PROCESS PURSUANT TO THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

In the interest of brevity, as Sweeney and Wells were together for many days prior to the Grand Jury for the purpose of consolidating their stories, and as Trial Counsel confronted Sweeney with his desire to collect the $25,000.00 reward, even if Sweeney's testimony was properly admitted over objections to it violating a privilege between Petitioner and Sweeney, his legal representative, Sweeney's testimony is untrue and should be given no consideration as his veracity should be automatically at issue. (SF. p. 7010 et seq).

A new trial is required if there is any reasonable likelihood that false testimony could have affected the judgment of the jury. Granger v. State, 683 S.W.2d 387, 391 (Tex.Crim.App. 1984); Trujillo v. State 757 S.W.2d 169,171 (Tex.App.-San Antonio 1988, no pet.) Lawson v. State, 896 S.W.2d 828, 832 (Tex-App. -Corpus Christi 1995).

Mr. George M. Hall sent a letter to Debra Morgan, Assistant District Attorney. Therein,

Mr. Hall discusses the State's desire for him to testify against Petitioner. The last paragraph states that "I know Sweeney committed perjury before the grand jury and that Wells and him fabricated their stories together for openers." Although Mr. Hall is trying to use this information to obtain his freedom, by apparently agreeing to withhold this information from Petitioner's Trial Counsel, Mr. Hall should be subpoenaed to testify as to these allegations. Should Mr. Sweeney's testimony be a lie, as Petitioner believes it to be, Petitioner's conviction can not stand and he is entitled to a new trial.

It was not until 1990 when Randy Wells came forward to testify against Petitioner that the State finally obtained an Indictment against Petitioner and preceded to trial. The testimony of Randy Wells was solicited out of Mr. Wells need to find a way to prevent prosecution in Eastland County, Texas, on unrelated matters. After the fact, the $25,000.00 reward offered by the citizens of El Paso only sweetened the offer to him.

STATEMENT OF FACTS (Concerning Perjury Question)

Randy Wells knew Petitioner from a time they spent together in the institutional Division of the Texas Department of Corrections. Mr. Wells was an experienced convict and knew the system well. Mr. Wells had access to the newspaper accounts involving the "Northeast Desert Deaths" through his association with Petitioner in prison. Petitioner had hundreds of news articles in his possession in prison as he was preparing a lawsuit against the El Paso authorities for what he felt was a single minded effort to place the entire blame for the missing young women on Petitioner's head without proof. From the beginning of the investigation Petitioner was the prime suspect and he knew it. It is no wonder why when faced with the prospect of being prosecuted for capital murder for the "serial" killing of at least six women, Petitioner would keep detailed publicity clippings.

The State of Texas was desperate. Therefore, after the reward became news in April, 1990, by July, 1990, not only had Wells surfaced for his own reasons in addition to the money, but another cell mate of Petitioner had come forward, Carl Sweeney. Here, the testimony of Sweeney should be found to be highly suspect because of his association with Wells and because of Wells avowed purpose in lying to convict Petitioner. Whether the testimony of Sweeney is deemed inadmissible because it violates a privilege as argued below or whether his testimony is deemed unreliable because of Wells plan, Sweeney is obviously motivated by greed and laughs at the Court in his manipulation of both Petitioner and the State in securing what is best for Sweeney. Nothing in either Wells or Sweeney's testimony should ever have been believed nor presented to the jury.

It is essential to a fair trial that counsel for the petitioner object to the introduction of this testimony as so clearly unreliable and unduly prejudicial and followed that objection with and a demand for the court to conduct a balancing test. Counsel understands that issues of credibility are generally matters for the jury to determine and such weaknesses in evidence go to the weight of the evidence not to the admissibility of such evidence. However, the defense attorney must make every effort to keep such suspect evidence from appearing before a jury and creating the very prejudice it is designed to create.

Had trial counsel objected to the testimony and to the use of this type of evidence before the jury the court would have been bound to enter findings on the record regarding its balancing analysis and further it is likely that the court would have given the jury a cautionary instruction related to the use of such witnesses upon the request of trial counsel.

The worst case scenario is that the state knowingly used false testimony. The knowing use of false testimony by the prosecution violates due process. <u>Mooney v. Holohan</u>, 294 U.S. 103, 55 S.Ct. 340 (1935). Similarly, if the prosecution's evidence presents a materially false impression, and the prosecution knowing of the falsity fails to correct it, a due process violation occurs. <u>Miller v. Pate</u>, 386 U.S. 1, 87 S.Ct. 758 (1967). The State knew or should have known that in the testimony of Wells and/or Sweeney that one or the other would perjure himself. See <u>Duggan v. State</u>, 778 S.W. 2d 465, 468 (Tex.Crim.App. 1989). Notwithstanding very real concerns regarding the reliability of the witness testimony, the State deemed the procedure acceptable. Why else would the State see to it that Wells and Sweeney spent five days together prior to their grand jury testimony to "get it right?" "It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence." <u>Harris v. State</u>, 818 S.W.2d 231, 233 (Tex.App.--San Antonio 1991); <u>Ex parte Castellano</u>, 863 S.W..2d 476, 481 (Tex.Crim.App. 1993).

The origin of a prosecutor's duty to disclose information to a defendant can be traced to the United States Supreme Court's decision in <u>Mooney v. Holohan</u> 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 54 9 791 (1935). In <u>Mooney</u>, the Court first established the general proposition that a prosecutor's knowing and intentional use of perjured testimony in obtaining a conviction violates the defendant's due process rights and denies him a fair trial. The <u>Mooney</u> principle was expanded in <u>Alcorta v. Texas</u>, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957), to forbid the prosecutor's passive use of perjurious testimony. The Court held that the prosecutor's knowing failure to correct inculpatory, perjured testimony also violated due process. In <u>Napue v. Illinois</u>, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d

1217 (1959), the Court expanded the Mooney principle even further and held that the prosecutor's knowing failure to correct perjured testimony, even if it relates solely to the credibility of the witness, constitutes a violation of due process. Ex parte Adams, 768 S.W.2d 281, 288 (Tex.Crim.App. 1989). If there is a due process violation during trial the State has the clear duty to report it to the court. This rule should be extended to the State where the State obtains information that a State's witness committed perjury during the course of a trial or during the prosecution of a companion case.

It is clear that the State is not allowed to obtain a conviction through the knowing use of perjured testimony. Mooney v. Holohan 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 54 9 791 (1935), Losada v. State, 721 S.W.2d 305, 311 (Tex.Crim.App. 1986); Luck v. State, 588 S.W.2d 371, 373 (Tex.Crim.App. 1979). If the prosecution presents a false picture of the facts by failing to correct its own testimony when it becomes apparent that the testimony was false, then the conviction must be reversed. Losada, 721 S.W.2d at 311; Luck, 588 S.W.2d at 373. However, the appellant bears the burden of showing that the testimony used by the State was in fact perjured. Losada, 721 SM.2d at 311; Luck, 588 SM.2d at 373. Perkins v. State, 902 SM.2d 88, 102 (Tex.App.-El Paso 1995).

A new trial is required if there is any reasonable likelihood that false testimony could have affected the judgment of the jury. Granger v. State, 683 S.W.2d 387, 391 (Tex.Crim.App. 1984); Trujillo v. State, 757 SM.2d 169,171 (Tex.App.-San Antonio 1988, no pet.) Lawson v. State, 896 SM.2d 828, 832 (Tex.App. -Corpus Christi 1995).

It is instructive to know that the issue sought to be resolved by this claim can serve as a basis for post-conviction habeas corpus relief. Harris 818 S.W.2d at 233. When knowledge of perjurious testimony can be imputed to the prosecution, however, perjury

may form the basis of post-conviction habeas corpus relief See, e.g., Ex parte Adams, 768

S.W. 2d 281 (Tex.Crim.App.1989).

William Sobley provided a sworn affidavit to counsel. In summary, Mr. Sobley

swears that he too has been a cell mate of Randy Wells. But, during Mr. Sobley's time

with Mr. Wells, it was Mr. Wells that admitted violation of the law. Mr. Wells admitted

he lied in his testimony against Petitioner. The purpose of his false testimony was to

secure disposition of a murder charge against him in Eastland County. Mr. Wells further

told Mr. Sobley that he spent the time those five days before grand jury securing Mr.

Sweeney's cooperation in his plan to convict Petitioner. Mr. Sobley testifies in part:

"I was arrested ... on March 13, 1997. ...At the time of my arrest, I was placed

in cell-block 5. My cellmate was Randy Wells....

> "During the time we were cellmates, Mr. Wells and I had numerous
> conversations about his testimony in the Jerry Hennington murder case, as
> well as the David Wood capital murder case. Mr. Wells bragged on a
> number of occasions that he had lied with regard to his testimony in the
> David Wood case, in order to obtain immunity for a murder charge that
> Mr. Wells was facing in Eastland County. The nature of our conversations
> is as follows; Mr. Wells stated that David Wood had never told Randy
> Wells anything about the murder/rape charge pending against Wood, that
> Mr. Wells had gotten most of his information from reading Mr. Woods'
> legal papers and from conversations with a friend of Mr. Wells' who was
> assisting Mr. Woods in filing a lawsuit against El Paso County. Mr. Wells
> made it clear to me that Mr. Woods had never told him anything about Mr.
> Woods case, and specifically not the things that Mr. Wells testified to.
> This would include anything Mr. Woods may have said while sleeping...."

The difference between the testimony of Mr. Wells which was totally self serving,

and Mr. Sobley's Affidavit is that Mr. Sobley was paid nothing and received no benefit

from coming forward. Mr. Sobley saw what Mr. Wells has done is wrong. "It was not

right for Mr. Wells to lie on the stand with the consequences of it costing another man his life."

In addition counsel has received letters from Buford Whitehead who likewise accuses Wells of lying and he too should be asked under oath the basis of his claims.

Had the State not had the perjured testimony of Wells and Sweeney, an Indictment against Petitioner would have never been obtained and a conviction for capital murder and subsequent death sentence would beyond a reasonable doubt have been denied the State.

This is the harm that the court's error created. Appellant was convicted of capital murder and faces the death penalty if his appeals are without success. Petitioner believes he was singled out as the one to be blamed for the "Northeast Desert Deaths." The State's Attorney at that time would at any cost justify the use of perjured and obviously unreliable testimony for the single purpose of obtaining and maintaining a conviction on Petitioner. Had the State truly believed they had made a case against the Petitioner for capital murder, they would not have made a "deal with the devil" for testimony motivated by blood money.

The State's use of cell mates to convict has long been accepted in Texas as proper trial technique. Whether as a violation of <u>Massiah v. United States</u>, 377 U.S. 201 (1964), extending to others in incarceration the protection of <u>Massiah</u> preventing the use of deliberate solicitations of incriminating statements by government agents after proceedings against a defendant have become adversarial or whether under a privilege argument made below, or just as a violation of due process and fundamental fairness, the use by the State of felons and those incarcerated with the accused to obtain convictions

must in a fair society be looked at as the State encouraging and utilizing a liar to get a conviction and justifying any means to obtain the desired result.

Recent case law continues to bear out the problem with paid informant testimony. While this attorney understands that the practice is accepted in the courts of this land, that does not make it right. If the desired result of the application of due process is an even handed fair trial, then how can it be said that the parties in any criminal case in which the government is able to confer some benefit upon a witness or a series of witnesses are treated equally when if such a tactic were tried by the defendant he and potentially his attorney would face criminal charges for the very offering. Regardless of the validity of the testimony, counsel (other than the government) is not to provide anything in exchange for the testimony of a witness excluding the payment of professional fees to an expert.

The government and the courts have justified this practice by stating that the fact of payment or benefits conferred on the witness is a matter of credibility for the jury to determine. In addition, the government howls, "how can we get the convictions unless we provide some benefit to the witnesses." The tenuous logic of the government and the courts is lost on this simple lawyer. It is not uncommon for attorneys in criminal cases to be met with witnesses who have information beneficial to the defendant but who because of fear or because it is just not worth it to get involved, never have the opportunity to secure such witnesses. The only benefit the attorney can convey is the admonition to "do the right thing".

Certainly even if the jury had the opportunity to hear the facts related to the benefits received by the witness, the very act of procuring a witness through payment of money or freedom taints the testimony of the witness to the extent that the introduction of

that testimony should be prohibited.   The government has an extremely powerful advantage in these cases that the defendant will never have and that is quintessentially violative of due process and equal protection set forth in the 14th Amendment.

United States v. Singleton, 144 F. 3d 1343 (10th Cir. 1998) initially dealt with a very similar issue in the federal court context and subject to § 201 ( C)(2) which provides for the exclusion of testimony from witnesses who receive anything of value.  However, within the year the en banc court corrected, on rehearing, the momentary lapse of the panel in United States v. Singleton, 1999 U.S. App. Lexis 222 (10th Cir. Jan. 8, 1999) (en banc) finding that offers of reductions in sentence and immunity were permissible.

This concept of "fairness" is untenable and should be abandoned.

Further, the State should not be allowed to make a determination of which version of the "truth" it wishes to present to the jury. The State is not the fact finder and the State should not use the "truth" convenient with the State's theory of the crime. This tactic should not and can not be condoned. This becomes even more distasteful with the full knowledge now that Wells and Sweeney were lying to protect themselves and to obtain "blood money," and the State was allowing and encouraging it.

The State should agree to a new trial in the interest of Justice and Petitioner challenges the State to allow Petitioner a fair trial not tainted with the smell of perjury. At the retrial, Petitioner is confident that without Well's and Sweeney's testimony that Petitioner will receive a fair trial and be acquitted of all charges. However, should the State choose to present Wells and Sweeney's testimony the Petitioner will this time have the opportunity to confront them with their perjury for impeachment purposes. If this Honorable Court has the courage to assist in a grant of a new trial for Petitioner, let the

State and the previous District Attorney, who is responsible, suffer what the Constitution guarantees the accused a fair trial governed by the principles of Justice, Fairness and Due Process under the 14th Amendment to the United States Constitution.

**CLAIM NUMBER TWENTY-SEVEN**
**ATTORNEY-CLIENT PRIVILEGE OR ITS EQUIVALENT SHOULD BE RECOGNIZED IN TEXAS BETWEEN JAIL HOUSE LAWYERS AND THEIR INMATE CLIENTS.**

> "We recognize the reluctance with which one in a judicial position should approach a line of decisions of long standing with the purpose of setting aside the doctrines therein laid down, some gray with antiquity, and the doctrine of stare decisis should bear heavily on retaining the integrity of such decisions. However, upon a conviction of the inequitable nature of such fine of decisions, and their unfairness to one accused of an offense, one's duty should be plain to correct the same at a presented opportunity."
> Wolfe v. State, 178 S.W.2d 274,281(Tex.Crim.App. 1944).

In this claim Petitioner contends that the Trial Court erred in permitting Carl Sweeney to testify against the Petitioner where Sweeney's knowledge of the case came to him by virtue of his status as the Petitioner's legal advisor with the penitentiary. Sweeney testified that he met the Petitioner while both were incarcerated in a Texas penitentiary. The Petitioner was using Sweeney to assist in two civil lawsuits, one against the El Paso authorities for their persistent desire to blame Petitioner for the "Northeast Desert Deaths," and a lawsuit against a former attorney of Petitioner. Sweeney was not and had never been licensed to practice law, he had never attended law school, but he considered himself a paralegal. Sweeney though performed all functions of a practicing attorney for his inmate clients including accepting fees. Alleged incriminating statements of Petitioner were admitted at trial over the petitioner's objection that the statements were subject to a common-law attorney-client privilege. The Petitioner does not argue that he believed the

witness was a licensed attorney and was misled to his detriment. Instead, Petitioner contends that Sweeney was acting as his "legal advisor" and as such is entitled to the same privileges as any licensed attorney. Authority for this argument is premised both on interpretations of the common-law attorney- client privilege and on Farretta v. California, 422 U.S. 806, 95 S. Ct. 2525, 45 L.Ed.2d 562 (1975), which held that an individual has a constitutional right to defend himself in a criminal proceeding, and the case of Arizona v. Melendez, 172 Ariz. 68, 834 P.2d 154 (Supreme Court of Arizona, 1992) and the authority stated therein. In Melendez, which involves a disciplinary proceeding in prison (a civil matter), the Court states:

"The touchstone of due process under both the Arizona and federal constitutions is fundamental fairness. See Oshrin v. Coulter, 142 Ariz. 109, 111, 688 P.2d 1001, 1003 (1984) ("[T]he denial of due process is a denial of 'fundamental fairness, shocking to the universal sense of justice. '")(quoting Crouch v. Justice of Peace Court of Sixth Precinct, 7 Ariz.App. 460, 465-66, 440 P.2d 1000, 1005-06 (1968) and Kinsella v. United States ex rel, Singleton, 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960). We agree with Defendant that to permit the state to introduce testimony garnered from communications between Defendant and his formal inmate representative would, under the circumstances, be fundamentally unfair and thus a deprivation of due process ...... Melendez at p. 157.

In citing the Texas case of Richardson v. State, 744 S.W.2d 65 (Tex.Crim.App. 1987), and the failure of Texas to recognize the common law attorney-client privilege, the Melendez Court noted that the Texas case did not address whether the admission of a

jailhouse lawyer's testimony might violate the defendant's right to due process. <u>Melendez</u>. at p. 159.

*Texas Code of Criminal Procedure Article 38.10*, specifically provided at the time of trial that "an attorney at law shall not disclose a communication made to him by his client during the existence of that relationship, nor disclose any other fact which came to the knowledge of such attorney by reason of such relationship." *Article 38.10* further provided that all persons who are not otherwise explicitly enumerated in the Code are competent to testify, "whatever may be the relationship between the  defendant and witness  The  attorney-client privilege was recodified in *the Texas Rules of Criminal Evidence Rule 503*. Although the courts in Texas have extended this privilege to "persons who are the media of communication" between the attorney and the client, there is no Texas authority or rationale in case law or statute to justify the Petitioner's request that the privilege to include communications between a defendant and anyone who may take it upon himself to give legal advice to that defendant. <u>Burnett v. State</u>, 642 SM.2d 765 (Tex.Crim.App. 1982).

But Petitioner now claims that his rights to due process and equal protection under the 14th Amendment to the United States Constitution were violated by the use of Sweeney who had previously established a relationship with Petitioner as his legal advisor and representative.

Under the findings in <u>Johnson v. Avery</u>, 393 U.S. 483, 89 S. Ct. 747, 21 L.Ed.2d 718 (1969), the Supreme Court held that an inmate's right to access to the courts, founded in the Due Process Clause, prohibits prison regulations which bar inmates from furnishing legal assistance to each other "unless and until the State provides some

reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief " Id., 393 U.S. at 490, 89 S.Ct. at 751. The Supreme Court further held that the prisons could place "reasonable restrictions and restraints" upon the inmates in, the exercise of this right. Id., 393 U. S. at 490, 89 S. Ct. at 75

In Texas, case and statutory law denies an inmate right to access to the courts by denying the inmate legal assistance, in violation of the Due Process Clause, as the State does not provide a reasonable alternative to inmate legal assistance. Without a privilege to protect communications between inmates and their legal advisors inmates are not free to use inmate representation without the fear of the inmate legal representative revealing information detrimental to the inmate traditionally held as privileged between those in a legal trust relationship.

The most compelling argument Petitioner has found for his proposition is found in the learned paper of Julie B. Nobel, Ensuring Meaningful Jailhouse Legal Assistance: The Need for a Jailhouse Lawyer-Inmate Privilege, Cardozo Law Review, Yeshiva University, (January, 1997). Petitioner has copied the article and attached a copy to this Application and incorporates this Exhibit into this argument by reference as if recited here verbatim.

**CLAIM NUMBER TWNETY-EIGHT**
**PETITIONER WAS DENIED A FAIR TRIAL IN VIOLATION OF HIS RIGHTS TO DUE PROCESS UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AS THE STATE OF TEXAS USED EVIDENCE WHICH WAS UNRELIABLE AND POTENTIALLY PLANTED TO INCRIMINATE PETITIONER.**

**CLAIM NUMBER TWENTY-NINE**
**FAILURE OF TRIAL COUNSEL TO OBJECT TO THE INTRODUCTION OF ALLEGED EXPERT TESTIMONY MAKING A COMPARISON OF THE FIBER EVIDENCE VIOLATED THE PETITIONER'S RIGHT TO DUE PROCESS**

UNDER THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION
AND PREVENTED A FAIR TRIAL

**CLAIM NUMBER THIRTY**
THE INTRODUCTION OF ALLEGED EXPERT TESTIMONY MAKING A
COMPARISON OF THE FIBER EVIDENCE VIOLATED THE PETITIONER'S
RIGHT TO DUE PROCESS UNDER THE 6TH AMENDMENT TO THE UNITED
STATES CONSTITUTION AND PREVENTED A FAIR TRIAL IN VIOLATION
OF THE PETITIONER'S 14TH AMENDMENT RIGHT TO DUE PROCESS.

**CLAIM NUMBER THIRTY-ONE**
FAILURE OF TRIAL COUNSEL TO OBJECT TO THE USE OF INHERENTLY
UNRELIABLE FIBER EVIDENCE FOUND AT THE CRIME SCENE AND IN A
VACUUM CLEANER POTENTIALLY USED BY THE PETITIONER AND
PROPERLY PRESERVE TRIAL ERROR VIOLATED THE PETITIONER'S
RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED
UNDER THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION
AND PREVENTED A FAIR TRIAL.

The El Paso Police had a mandate in the Fall of 1987 to find the "Northeast Desert

Deaths" perpetrator.. On October 23, 1987, pursuant to the he that they were looking for

evidence in the sexual assault case of Judith Kelley (or Gina Gallegos), trace evidence

was illegally obtained from Petitioner's truck which was submitted to the DPS laboratory

in Lubbock, Texas, only for the purpose of tying this evidence to the trace evidence taken

from Petitioner in an attempt to tie him to the missing women.

The State submitted trace evidence for examination trying to link the Petitioner to

other evidence of the six victims. A copy of a report of the DPS dated September 29,

1989, shows the purpose and results of the examination in regard to the victim Dawn

Smith. A copy of a report of the DPS dated September 29, 1989, shows the purpose and

results of the examination in regard to the victim Angelica Frausto A copy of a report of

the DPS dated September 29, 1989, shows the purpose and results of the examination in

regard to the victim Rosa Maria Casio. A copy of the reports of the DPS dated September

29, 1989, October 30, 1987, and November 3, 1987, show the purpose and results of the examinations in regard to the victim Karen Baker. A copy of a report of the DPS dated September 29, 1989, shows the purpose and results of the examination in regard to the victim Ivy Williams. A copy of a report of the DPS dated October 3, 1989, shows the purpose and results of the examination in regard to the victim Desiree Wheatley. The one consistent fact between all, of these reports is that no evidence submitted can be tied to Petitioner, Mr. Wood, except for the October 3, 1989 report as to Desiree Wheatley. In the October 3, 1989 report, the DPS finally makes a connection between Petitioner and one of the victims with some physical evidence. Therein, the results show that orange fibers from under the Petitioner's truck seat matched fibers found on the T-shirt of the victim Desiree Wheatley, from her grave and from a vacuum cleaner bag obtained from a vacuum cleaner believed to have belonged to Petitioner and his girlfriend The State wanted the jury to believe the fibers came from an orange blanket. The question of the missing orange blanket was never resolved at trial. The blanket was not produced because it wasn't the right color. The blanket should have been in Petitioner's pickup when the truck was impounded by the police. The blanket was never found because it was burnt orange or dark red in color not orange, or the fibers were obviously of a different origin. The orange fibers suppressed by the Trial Court in September, 1991, contained similar fibers obtained from under the seat of Petitioner's truck.

It is uncontroverted that upon first finding the remains of Ms. Wheatley and thoroughly searching the crime scene on October 20, 1987 and no fibers were discovered. The grave site was abandoned by police and the site remained unsecured for nine days. On October 23, 1987 pursuant to a search warrant, later suppressed, the state discovered

orange fibers in a truck the petitioner was using.  Following the discovery of these orange fibers the state miraculously discovered orange fibers in a non-operable vacuum once believed to have been used by the petitioner, and orange fibers were discovered at the grave of Ms. Wheatley.

Further, it is uncontroverted that the "expert" examination of the fibers could only render a "match" of the fibers. A match in scientific parlance means that the fibers shared similar characteristics and not that they were beyond a reasonable scientific certainty from the same source.

At the time of the trial under *Texas Rules of Evidence § 702* the court must determine if the test is sufficiently reliable and relevant to assist the jury in determination of a material fact. <u>Jackson v. State</u> 17 S.W.3d 664, 670 (Tex.Crim.App. 2000) <u>Jordon v. State</u> 928 S.W.2d 550, 554-55 (Tex.Crim.App. 1996) Reliability must be shown by clear and convincing evidence. <u>Jackson</u> @ 670.

<u>Kelly v. State</u> 824 S.W.2d 568 (Tex.Crim.App. 1992) required a defendant to demand a hearing to determine the reliability of novel scientific evidence. The <u>Kelly</u> decision had been passed down at the time of the petitioner's trial . <u>Hartman v. State</u> 946 S.W.2d 60 (Tex.Crim.App. 1996), required that the trial court conduct a hearing to determine if the evidence meets the standard required by <u>Kelly v. State</u> 824 S.W.2d 568 (Tex.Crim.App. 1992) for <u>all</u> scientific evidence not just the novel evidence. The court is to determine the following: 1. If the underlying scientific theory is  valid;  2. If the technique applying the theory is valid; and 3. If the technique was properly applied in the case in question. <u>Kelly</u> at 573; <u>Hartman</u> @ 62.

"Once it is determined the proffered evidence is relevant, the proponent of scientific evidence has the burden of proving its scientific reliability by clear and convincing evidence. See Kelly @ 573. To satisfy this burden, the proponent must make a technical showing , outside the presence of the jury, demonstrating: 1. A valid underlying scientific theory, 2. A valid technique applying the theory, and 3. That the technique was properly applied on the occasion in question. Jordan v. State 928 S.W.2d 550 @ 555   Factors that may influence a trial court's determination of reliability include: a. the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if ascertainable; b. the qualifications of the expert testifying; c. the existence of literature supporting or rejecting the underlying theory and technique; d. the potential rate of error of the technique; e. the availability of other experts to test and evaluate the technique; f. the clarity with which the underlying theory and technique can be explained to the court; and g. the experience and skill of the person who applied the technique on the occasion in question. See Kelly 824 S.W.2d @ 573."

Jordan v. State 950 S.W.2d 210 (Tex.App.- Fort Worth 1997) see also Daubert v.

Merrell Dow Pharm., Inc. 509 U.S. 579, 592-93, 113 S.Ct. 2786, 2796 (1993)

The analysis in this case is not reliable enough to admit to the jury as such "analysis" will most certainly mislead a jury. In addition, the act of collecting the fibers from such uncontrolled locations and circumstances make even a reliable testing procedure suspect and invalid. Without any control over the crime scene and without any common garment or other cloth to confirm a single source for the fibers, the admission of the fibers and the admission of the "expert opinion" are little more than wishful speculation on the part of the state and should have been stricken. To allow such voodoo at trial before a jury is to deny the petitioner due process.

The origin of the orange fibers is unknown. It was suggested that they came from a blanket that Petitioner kept in his truck. However, no blanket is ever produced.

The Police knew that in Northeast El Paso many people knew each other. This area of El Paso is like any other community within a community. Many people knew and had contact with the young women that were missing. There must be direct physical evidence showing Petitioner guilty.

After the fibers were obtained from the pickup the opportunity to link Petitioner with Ms. Wheatley's daughter was too tempting to resist. Rather than plant fibers in both graves found October 20, 1987, leaving the orange fibers in Ms. Wheatley's grave was perfect. Petitioner asks the reviewing Court to ask themselves one question. How could so many orange fibers consistent with fibers out of Petitioner's truck, find themselves in a grave left open for nine days, on the shirt of the body of Ms. Wheatley, and in a vacuum cleaner bag, but on nothing else? The vacuum bag found in January, 1988, was the final perfect link to Petitioner. The detective in possession of the fibers need only place a few fibers in the bag before submitting it for testing. How convenient. If these fibers came from a blanket used to help kill six young women, the fibers would have been found else where, certainly on other victim's clothing or in other graves. Where is this evidence? It does not exist.

This claim raises legal and factual issues. The admission of the fiber evidence before the jury denied Petitioner a fair trial violating his constitutional rights to due process under the 14th Amendment to the United States Constitution. The sufficiency of the evidence claim should be made without the benefit of the fiber evidence admitted at trial.

## CLAIM NUMBER THIRTY-TWO
## THE CONVICTION OF THE PETITIONER UPON PROOF LESS THAN BEYOND A REASONABLE DOUBT VIOLATED THE PETITIONER'S RIGHT TO TRIAL AND DUE PROCESS OF LAW AS GUARANTEED IN THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION.

The Due process clause of the 14th Amendment to the United States Constitution is implicated when a person is convicted upon proof less than beyond a reasonable doubt. Jackson v. Virginia 443 U.S. 307, 61 L. Ed. 2d 560, 99 S.Ct. 2781, reh den. 444 U.S. 890, 62 L. Ed. 2d 126, 100 S.Ct. 195 (1979).

". . . evidence which has tendency to make existence of an element of crime slightly more probable than it would be without evidence (that is, "relevant" evidence) cannot by itself, rationally support conviction of crime beyond a reasonable doubt, as is required by due process. . ." Jackson

The court in Jackson further stated that, ". . . constitutional necessity in criminal trial of proof of guilt beyond a reasonable doubt, as guaranteed by due process, is not confined to those defendant's who are morally blameless."

Glasser v. United States, 315 U.S. 60, 80 (1942); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979) which holds that the conviction must stand if, "after viewing the evidence in the light most favorable to the prosecution . . ." the reviewing court finds that ". . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

The jury is entitled to believe a witness unless the testimony is so incredible that it defies physical laws. United States v. Lerma, 657 F.2d 786, 789 (5th Cir. 1981), cert. denied, 455 U.S. 921, 102 S. Ct. 1279, 71 L. Ed. 2d 463 (1982).

What the jury is permitted to infer from the evidence in a particular case is governed by a rule of reason, and juries may properly use their common sense to evaluate the facts in light of their common knowledge of the natural tendencies and inclinations of people. United States v. Henry, 849 F.2d at 1534, 1537 (5th Cir.1988).

Further, as the Supreme Court long ago held that, "circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." Coggeshall v. United States (The Slavers), 69 U.S. (2 Wall.) 383, 17 L. Ed. 911, 914-15 (1865).

The evidence does not have to exclude every reasonable hypothesis of innocence. United States v. Leed, 981 F.2d 202, 205 (5th Cir. 1992), cert. denied, 508 U.S. 975, 113 S. Ct. 2971, 125 L. Ed. 2d 669 (1993) but, the government must prove that the defendant is guilty, not that the defendant could have been guilty. United States v. Luttrell, 574 F.2d 828, 832 (5th Cir.1978) see also United States v. Crain, 33 F.3d 480, 486 (5th Cir.1994)

In addition,  suspicion, even if it is a strong one, is insufficient to support a verdict of guilty. United States v. Jackson, 700 F.2d. 181, 185 (5th Cir.) cert. Denied, 464  U.S. 842, 104 S. Ct. 139, 78 L.Ed. 2d 132 (1983); United States v. Palacios, 556 F.2d 1359, 1365 (5th Cir.1977).

Petitioner's conviction for capital murder was under an indictment which arguably charged him with six murders. Even, if the Indictment is found in the alternative to properly allege capital murder in opposition to Petitioner's Claim, the sufficiency of the evidence used to convict Petitioner of capital murder is challenged, taking into consideration Petitioner's challenges herein to the testimony of Randy Wells and Carl

Sweeney, and Petitioner's challenge to the admission of fiber evidence. The reviewing court is asked to review the sufficiency of the evidence without the perjured testimony of Wells and Sweeney and with a cautious eye toward the reliability of the fiber evidence-the only physical evidence tying Petitioner to only just one, not all six, of the murder victims.

This case involves the murder of six women, and there no way of knowing if the murder of each victim may become the aggravating murder justifying a capital murder charge,

At the trial the state presented evidence as to each of the victims. Assuming the evidence in the light most favorable to the prosecution the state presented the following evidence with regard to Ivy Williams. The Petitioner knew Ms. Williams, the Petitioner gave her a ride from time to time, witnesses saw the petitioner at a balloon festival and saw the petitioner and Ms. Williams leave together. Ms. Williams was never seen again.

With regard to Ms. Desiree Wheatley the stated proved that she attended school across the street from the petitioner's father's residence, that witnesses saw the victim get into a beige pick up truck which potentially belonged to the petitioner but did not provide proof that the driver of the pick up truck was the petitioner, that the Petitioner was seen at the "Circle K" store at the same time as the victim on the date of her disappearance, and finally, that similar fibers were found at the grave site, and in a vacuum bag at the apartment where Mr. Wood and Ms. Blaich lived from time to time.

With regard to Ms. Karen Baker the state showed that she disappeared on or about June 5, 1987. Witnesses testified that they saw Ms. Baker leave on a date with a guy in a pickup truck. The witness was originally unable to identify the petitioner in a line up  but

later "corrected" his testimony by telling police that he was mistaken and identifying the petitioner later. In addition, the state proved that Mr. Wood had access to shovels and other tools and witnesses stated that they had seen them together.

Ms. Angelica Frausto disappeared on August 8, 1987. Witnesses testified that they had seen her get on a loud reddish motorcycle on August 4, 1987. Evidence showed that her clothing bore defects indicating potentially that the victim was stabbed. No other evidence was elicited.

Ms. Rosa Marie Casio disappeared on August 12, 1987. Witnesses saw her with a man who had a mole on his face. Later that same evening witnesses stated that she entered a dirty bronco and left never to be seen again. The witnesses to her departure were unable to identify the driver of the bronco.

Finally, Ms. Dawn Smith disappeared on August 28, 1987. Ms. Smith knew the petitioner and would have accepted a ride from the petitioner if he had offered one.

The date or time of the alleged murder is never shown and the state is never able to offer any proof of cause of death short of the testimony of Wells and Sweeney and the speculation related to Ms. Ivy Williams and Ms. Frausto that they had been stabbed. Even assuming that they were stabbed, were the injuries the actual cause of death?

The only other evidence in the case came in the testimony of Randy Wells and Carl Sweeney those testimony is the subject of other claims in this petition. While their testimony is compelling a closer look reveals that the facts they present are readily discoverable from the documents and newspaper articles provided to Sweeney and available to Wells. Nothing in the testimony of Wells or Sweeney is corroborated by

other evidence, and the only previously unknown alleged facts presented by these witnesses are not subject to any verification.

Regarding the fiber evidence, even if we consider that evidence, it proves nothing.

Where is the proof beyond a reasonable doubt that Petitioner first intentionally or knowingly murdered Ivy Williams and then in the same scheme or course of conduct killed more than that one person. Where is the proof that these women were killed pursuant to a common scheme or plan and not in the same criminal transaction. Where is the proof that the petitioner killed anyone.

It is apparent that Petitioner was marked by the El Paso Police Department as the scape goat for the "Northeast Desert Deaths" and it took them three years just to get an indictment and five years to obtain a conviction.

Petitioner's position here is not that Petitioner is a saint, far from it. Petitioner has four convictions for sex crimes going back to his early adulthood. However, does this make his life any more expendable to satisfy the political needs of the police and the District Attorney of El Paso? The safety of the public is not what is at risk. What is challenged by the manner and method of Mr. Wood's conviction is the very fabric of our freedoms. A wise man once said it is how we treat the worst of us that is the measure of our society. Certainly Petitioner has to qualify as one the Courts must force themselves to avail of Constitutional rights and privileges afforded all citizens. He is defenseless when the Police set their sights upon him and to the exclusion of all others find ways in which to imply his guilt. As an example, other than the use of questionable, inherently unreliable testimony from felons, and the planting of fiber evidence, just the description of witnesses as the "last person to see" the victim alive, is evidence of their compulsion to convict. No

one knows who was the last to see these women alive. These witnesses are just the last

ones we know of who saw the victims. In fact, witnesses were contacted over and over

until their stories finally implicated Mr. Wood in some way Why was the confession of

Edward Barton in Las Vegas so easily dismissed and hidden from the defense until a

month before the first real trial setting in August, 1991? Why were Wells and Sweeney

placed in the same cell together for five days prior to grand jury? Why was the (,orange"

blanket never found?

How could the jury be rational when the facts of this case were presented in such a

way as to paint Petitioner guilty without the benefit of evidence. Where is the evidence to

show Mr. Wood guilty? Petitioner submits the compulsive need of the El Paso Police

Department with the assistance of the then current District Attorney's Office overrode the

Constitutions and skipped lightly over the evidence without the burden of reasonable

doubt because Mr. Wood's conviction was the primary objective, not Justice as the

District Attorney is charged to uphold.

**CLAIM NUMBER THIRTY-THREE**
**THE INTRODUCTION OF TESTIMONY AND EVIDENCE OF OTHER CRIMES WRONGS AND ACTS VIOLATED THE PETITIONER'S RIGHT TO DUE PROCESS UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND PREVENTED A FAIR TRIAL RESULTING IN A CONVICTION FOR BEING A CRIMINAL GENERALLY.**

**CLAIM NUMBER THIRTY-FOUR**
**FAILURE OF TRIAL COUNSEL TO OBJECT TO THE TESTIMONY AND EVIDENCE OF OTHER CRIMES WRONGS AND ACTS CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL AND   VIOLATED THE PETITIONER'S RIGHT TO DUE PROCESS UNDER THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND PREVENTED A FAIR TRIAL**

Prior to the trial in this matter the Petitioner was arrested and tried for the

aggravated kidnapping of Gina Gallegos and the aggravated sexual assault of Judith

Brown aka Judith Kelling. At the trial in this matter evidence of these prior convictions were entered into evidence against the petitioner. This evidence is irrelevant to the charge at hand and it's introduction violates the petitioner's right to due process of law as guaranteed in the 14th Amendment to the United States Constitution. In addition, the introduction of this evidence into trial violates the 8th Amendment to the United States Constitution in that the petitioner is being executed for being a criminal generally and such punishment for general criminal behavior constitutes cruel and unusual punishment.

Further, the failure of trial counsel to object to this evidence is constitutionally ineffective and a violation of the petitioner's right to effective assistance of counsel pursuant to the 6th Amendment to the United States Constitution.

Pursuant to the above discussion of ineffective assistance of counsel, trial counsel had a duty to know the standard in Texas related to extraneous crimes and to object to the introduction of that evidence and to protect the record of said violation.

The extraneous evidence rule in Texas is as follows:

> **TRE 404b "Other crimes, Wrong or Acts.** Evidence of other crimes wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the Status's case in chief such evidence other than that arising in the same transaction."

The defendant may not be tried for being a criminal generally. Wheeler v. State, 988 S.W.2d 363 (Tex. App.-Beaumont 1999) PDR granted; see also Castaldo v. State, 32 S.W.3d 413 (Tex.App.-Waco 2000).

However, some extraneous acts can be admitted to provide context and essential information to the trier of fact. The evidence may be admissible if it is shown to be part of the same transaction. Westbrook v. State, 29 S.W.3d 103, cert. den. 121 S.Ct. 1407. The court in Wyatt v. State, 23 S.W.3d 18 (Tex.Crim.App. 2000) rehearing denied, held that the other evidence is not admissible unless the charged crime makes no sense without the extraneous evidence. See also England v. State, 887 S.W.2d 902 (Tex.Crim.App. 1994), Kiser v. State, 893 S.W.2d 277, PDR refused (Tex.App.-Houston [1st District] 1995) (court held that extraneous evidence was not admissible because it was not essential to the charged case) and Texas Penal Code 8.06 (a). but see Cunningham v. State, 982 S.W.2d 513 (Tex.App.-San Antonio 1998) rehearing overruled and PDR refused.

Nevertheless, even if the evidence has a proper or justifiable purpose it may not be admitted if it is unduly prejudicial. Rankin v. State, 974 S.W.2d 707 opinion withdrawn in part on reconsideration, on remand 995 S.W.2d 210, PDR refused (Tex.Crim.App. 1996); see also Fletcher v. State, 852 S.W.2d 271 PDR refused, denial of writ of habeas corpus affirmed; Texas Rules of Evidence § 403.

The Court of Criminal Appeals has set forth factors helpful in balancing the competing interest in Wyatt v. State, 23 S.W.3d 18, rehearing denied (Tex.Crim.App. 2000). The Factors are, 1. How compelling is the extraneous act or offense evidence in making a fact or consequence more or less probable, which is related to the strength of the evidence presented by the proponent to show the Appellant in fact committed the extraneous offense; 2. The potential of the extraneous act or offense evidence to impress the jury in some irrational but nevertheless indelible way; 3. The time used by the proponent to develop the extraneous offense and it's effect to distract the jury from

proper consideration of the indicted offense; and 4. How much does the proponent need the extraneous offense or act evidence to prove a fact of consequence, i.e. does the state have another means of proving the same fact.

If the trial court determines the extraneous evidence serves no purpose but to prove the appellant acted generally as a criminal the evidence must be excluded. Santellan v. State, 939 S.W.2d 155 (Tex.Crim.App. 1997)

As alluded to previously, the state must show that the Appellant was connected to or actually committed the act or crime before the trier of fact can consider such evidence. Moreno v. State, 858 S.W. 2d 453 (Tex.Crim.App. 1993) rehearing denied, cert. den. 114 S.Ct. 445, 510 U.S. 966, 126 L.Ed.2d 378; Hoitt v. State, 28 S.W.3d 162, PDR refused.

**CLAIM NUMBER THIRTY-FIVE**
**PETITIONER WAS DENIED DUE PROCESS PURSUANT TO THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION IN THAT THE VERDICT FORM USED DID NOT REQUIRE SPECIFICITY SUFFICIENT TO DETERMINE IF THE JURY PROPERLY FOUND THE PETITIONER GUILTY OF CAPITAL MURDER AND WAS MISLEADING**

**CLAIM NUMBER THIRTY-SIX**
**FAILURE OF TRIAL COUNSEL TO OBJECT TO THE VERDICT FORM USED IN THE CASE VIOLATED THE PETITIONER'S 6TH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

The verdict form presented to the jurors set forth three general alternatives. The jury have the option to find the petitioner not guilty of individual murders, guilty of individual murders or guilty of capital murders. With regard to the Capital charge the court specifically instructed the jury as follows:

> "Now, bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that during the period, May 30, 1987 through August 28, 1987, in El Paso County, Texas, the defendant, DAVID LEONARD WOOD, did intentionally or knowingly cause the death of more than one of the following individuals, to wit:

On or about the 30th day of May, 1987, IVY WILLIAMS by stabbing the said IVY WILLIAMS with a sharp instrument, and / or

On or about the 2nd day of June, 1987, DESIREE WHEATLEY in some manner and by some means, instrument or weapon, unknown to the Grand Jury, and /or

On or about the 5th day of June, 1987, KAREN BAKER in some manner and by some means, instrument or weapon, unknown to the Grand Jury, and /or

On or about the 8th day of June, 1987, ANGELICA FRAUSTO in some manner and by some means, instrument or weapon, unknown to the Grand Jury, and /or

On or about the 12th day of August, 1987, ROSA MARIA CASIO in some manner and by some means, instrument or weapon, unknown to the Grand Jury, and /or

On or about the 28th day of August, 1987, DAWN MARIE SMITH in some manner and by some means, instrument or weapon, unknown to the Grand Jury,

during different criminal transactions, pursuant to the same scheme or course of conduct, by the said DAVID LEONARD WOOD, then you will find the defendant guilty of Capital Murder and so say by your verdict. (VERDICT FORM C)"

Verdict form c states as follows:

"We the jury, in the above entitled and numbered cause find the defendant, DAVID LEONARD WOOD, guilty of the offense of Capital Murder, as alleged in the Indictment.

_____
Presiding Juror"

The verdict form is insufficient as it fails to designate the specific victim of the capital offense contrary to the language set forth in the statute. As such the petitioner was denied due process as guaranteed by the 14th Amendment to the United States Constitution.

**CLAIM NUMBER THIRTY-SEVEN**
**THE COURT OF CRIMINAL APPEALS BY FAILING TO AUTHORIZE**
**THE EMPLOYMENT OF EXPERT'S DENIES PETITIONER HIS RIGHTS TO**
**DUE PROCESS IN THE POST-CONVICTION HABEAS CORPUS**
**PROCEDURES.**

The Petitioner filed a Motion with the Court of Criminal Appeals for an order for funds to employ a forensic anthropologist to examine the methods used by the El Paso Police Department in the unearthing of the victims, in particular Ivy Williams who it was testified suffered injury to her bones. In addition Petitioner requested money for DNA testing of the finger nails of the victims, in particular Angelica. Frausto. The Court of Criminal Appeals in a one page Order denied the Motion without comment.

In reviewing the video tapes of the unearthings of the victims it was noticed that the police probed the graves with sharp instruments that could have caused injury to the skeletal remains of the victims. As the injuries to Ivy Williams were blamed on a sharp instrument, and the cause of death being homicidal attack and the manner of death with a sharp instrument, and as Petitioner was testified to carry a pocket knife, which was never recovered, the examination of the forensic techniques of the police could very easily rebut the primary testimony on this issue at trial.

On the matter of DNA, the victim Angelica, Frausto was deemed to be a "wildcat" and much was made of whether the Petitioner suffered scratches. Although an attempt was made to recover DNA evidence from the victim nails it is common knowledge that advancements in DNA techniques ca n now produce accurate results.

The Mexican Government has in their possession an individual who is charged with similar crimes to those crimes Petitioner was convicted. Had the Court of Criminal Appeals provided the funds to employ such an expert the resolution of this issue could

occur. Without the funds, and the exhumation of all the victims for testing, Petitioner is

denied due process and the advancements in DNA technologies since the time of trial.

Petitioner, it is to be remembered, stiff denies his guilt to any of these murders.

These experts are needed to assist Petitioner in finding the flaws in the methodology used

by the State's witnesses on these issues. This testimony should have been provided at

trial. Ake, 470 U.S. at 77, 105 S.Ct. at 1093, 94 L.Ed.2d at 62; Cawley v. Stricklin, 929

F.2d 640 (11th Cir. 1991); Buttrum v. Black, 721 F.Supp. 1268 (N.D.Ga. 1989), aff'd, 908

F.2d 695 (11th Cir. 1990); De Freece v. State, 848 S.W.2d 150, at 153 (Tex.Crim.App.

1993).

The Texas Court of Criminal Appeals in Rey v. State, 897 S.W.2d 333

(Tex.Crim.App. 1995) reh. denied, states the law in Texas interpreting Ake v. Oklahoma

and other cases on the issue of appointment of expert witnesses for the defense. The

United States Supreme Court in Ake has identified three factors to be examined to

determine if a defendant is entitled to have an appointed expert:

(1) The first is the private interest that will be affected by the action of the State;

(2) The second is the governmental interest that will be affected if the safeguard is to be

provided; and

(3) The third is the probable value of the additional or substitute procedural safeguards

that are sought, and the risk of an erroneous deprivation of the affected interest if those

safeguards are not provided. Ake v. Oklahoma, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84

L.Ed.2d 53, 62 (1985).

The Defendant's versus the States interests must be factored into the analysis in

each case, in addition to the Defendant's threshold showing which is the weightiest

consideration. The Court herein is asked to view the positions of the respective parties much as the interests of the parties in $\overline{Ake}$.

I. Private Interest Affected by the Action of the State

The Supreme Court states that an individual's interest in the accuracy of a proceeding where his life or liberty is at stake is "obvious and weighs heavily" in the analysis. $\overline{Ake}$, 470 U.S. at 78, 105 S.Ct. at 1093. The Defendant's interest in the accuracy of this proceeding in having a doctor whose qualifications and knowledge in the area of forensic anthropology and DNA testing to evaluate the State's hypnosis and testimony is "obvious."

The Governmental Interest Affected

The State also has a significant interest in the fairness of the proceeding and the accuracy of the result. $\overline{Ake}$, 470 U.S. at 79, 105 S.Ct. at 1094. While the State has a competing interest in not paying for this expert, the type of "medical" issues present in this case are fact-dependent and opinion intensive. The credibility of the Experts' opinions in these areas are essential to the believability of their testimony and may well have convicted the Petitioner with inadequate testimony,

Judicial Economy

Given that the State also maintains an interest in the legitimacy of the verdict, the only interest the Supreme Court in $\overline{Ake}$ could identify that weighs against an accused's interest in an accurate outcome is the State's concern for judicial economy. In $\overline{Ake}$, the Court concluded that the State's interest in judicial economy was "not substantial, in light of the compelling interest of both the State and the individual in accurate dispositions." $\overline{Ake}$, 470 U.S. at 79, 105 S.Ct. at 1094.

Wood, David Leonard
Habeas Corpus Petition (Initial Petition)

The Court of Criminal Appeals in this case has already approved the use of a psychologist. The cost of the experts for DNA and forensic testimony are shown in Petitioner's Motion attached hereto and incorporated herein for all purposes. These costs are minimum as Petitioner believes the results will show him "not guilty." Given the weight of Petitioner's interest in an accurate result, the Defendant submits that the State's anticipated interest in judicial economy is "not substantial" in this case. Accordingly, like in Ake, the Petitioner's interest weighs more heavily than the States, M. Probable Value of the Procedural Safeguards vs. the Risk of an Erroneous Deprivation of the Affected Interest if Safeguards not provided-Fairness

Finally, it seems highly probable that, without the requested experts there will not be a fair review of Petitioner's trial. Unlimited State experts at trial against Petitioner's appointed counsel with no funds for these experts does not approach being a level playing field. Nor is it fair to expect Petitioner's counsel to pay for the expert himself.

The Petitioner has a right to his own expert. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake. Ake, 470 U.S. at 76, 105 S.Ct. at 1092, 84 L.Ed.2d at 6 1. The Court in Ake concluded that the risk of an inaccurate verdict was high where the defendant was not assisted by an expert to "help determine whether the defensive theories are viable, to present testimony, and to assist in preparing the cross-examination of a State's expert witnesses." Ake, 470 U.S. at 74-83, 105 S.Ct. at 1091-98. Caldwell v. Mississippi, 472 U.S. 320, 323-24 n. 1, 105 S.Ct. 2633, 2637 n. 1.

86 L.Ed.2d 231 (1985). Petitioner believes that the chance of an inaccurate review of this Application will result and relief denied if he is not given the tools to show he is innocent. In addition to the constitutional mandate, the Code of Criminal Procedure allows for reimbursement of reasonable expenses incurred with prior court approval for expert investigation and testimony. *Texas Code of Criminal Procedure Art. 26.05(a)*. *Article 26.05* applies to all experts. A court's failure to provide approval for expenses under this article can be reversible where the defendant demonstrates a need for the expert's help. Ventura v. State, 801 S.W.2d 225, at 227, (Tex.App.-San Antonio 1990); *Also under the Texas Code of Criminal Procedure § 11.071, of,* such funds as are necessary for investigation should be made available to the Petitioner.

One of the Petitioners key theories to show his innocence is to establish reasonable doubt on the issue of when and how the remains of Ivy Williams were damaged, whether before or after death, whether before or during exhumation. Also, a key piece of evidence would be the DNA under the finger nails of the victims. Petitioner has no fear of these tests.

To show the Petitioner is entitled to the appointment of the requested experts, Petitioner has herein generally made his defensive theories clear to the reviewing court, supported it with factual allegations and/or evidence that expert testimony would support his theories, and has shown the Court how the denial of such experts could affect the outcome of this case.

Due process requires access to the raw materials integral to the building of an effective defense. Ake, 470 U.S. at 77, 105 S.Ct. at 1093.

Habeas Corpus Petition (Initial Petition)
Wood, David Leonard

Because the jury is the ultimate fact-finder, our justice system rests on the assumption that each party to a dispute, motivated by self-interest, will develop his position to the greatest extent possible within the boundaries of the rules of evidence and procedure, thus providing the fact-finder an optimal vantage from which to gauge all relevant facts and make an informed decision on the merits. De Freece, 848 S.W.2d at 158. Therefore, just as the Court in Ake reasoned that it is best for the jury to hear "the psychiatrists for each party," so too it would be best for the reviewing court herein to hear evidence it was denied at trial rebutting the "medical" experts for the State. Ake, 470 U.S. at 81, 105 S.Ct. at 1095, 84 L.Ed.2d at 65. Meaningful access to justice dictates that when there is a medical question as complex and central to the case as is presented in the instant case, we must endeavor to give the Defendant, whose life and liberty depend upon the decision, every reasonable opportunity to present his side of the story to the fact-finder. Rodriguez v. State, 906 S.W.2d 70, (Tex.App.-San Antonio 1995). Do we as a society want to execute another innocent man for the lack of conviction to pay for the tests which might show him not guilty? Most courts that have considered the application of Ake have held that where an indigent defendant established a substantial need for an expert, without which the fundamental fairness of his trial will be called into question, Ake requires the appointment of an expert regardless of his field of expertise. As explained by the Eighth Circuit: "There is no principled way to distinguish between psychiatric and non-psychiatric experts. The question in each case must be not what field of expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given." Little v. Armontrout, 835 F.2d 1240, 1243 (8th Cir. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101

L.Ed.2d 894 (1988). The type of expert requested is relevant to the determination of whether a trial is fundamentally unfair without the expert's assistance. The nature of an expert's field and the importance and complexity of the issue will bear directly upon whether the appointment of an expert will be helpful. For instance, in reaching its conclusion in Ake the Supreme Court recognized that psychiatry is not an "exact" science, that experts within the field often disagree on important issues and that the issue of a defendant's sanity was to jurors "complex and foreign." Ake, 470 U.S. at 81. 105 S.Ct. at 1095. The adversarial model rests on the assumption that each party to a dispute, motivated by self-interest, will develop his position to the greatest extent possible, thus providing the fact finder an optimal vantage from which to gauge all relevant facts and make an informed decision on the merits.

In an adversarial system due process requires at least a reasonably level playing field at trial. In the present context that means more than just an appointment of an expert in the area in question. It also means the appointment of an expert of sufficient qualifications to provide technical assistance to the Defendant, to help evaluate the strength of his defense, to assist in understanding the qualifications of the State's witnesses, to identify the weaknesses in the State's case by testifying himself and/or preparing counsel to cross-examine opposing experts if necessary, and most importantly to do these things without his expertise and qualifications being at issue. De Freece, 848

S.W.2d at 158-59.

## CLAIM NUMBER THIRTY-EIGHT
## ARTICLE 11.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE AND THE FEDERAL HABEAS CORPUS STATUTE .... IS UNCONSTITUTIONAL IN ITS APPLICATION TO PETITIONER.

The Texas Habeas Corpus Statute, Texas Code of Criminal Procedure Article 11.071, gives the Petitioner 180 days to file his post conviction Application for Writ of Habeas Corpus, allowing for a maximum of one 90 day extension upon proper showing. Petitioner's Counsel therefore, had to review a ten week trial investigate mitigation, investigate jury misconduct, secure the trial and appellate trial's files and review them, research all legal issues as they arise, research and draft the application, communicate with Petitioner and his family, and make as much as possible an independent investigation of the facts of the case in the time allotted.

The El Paso Police Department took almost three years to develop the case to the point where they could just get an indictment. After five years from the commission of the murders of these young women, Petitioner was put to trial. At trial, both sides had two attorneys, the Trial Court is of course an attorney, the Court of Criminal Appeals is just chocked full of lawyers and now ten years after the fact Petitioner's Counsel with a limited budget and order" of money for anticipated expert witnesses must have filed in 9 months an Application that covers all violations of Petitioner's rights in the trial and appeal of his case.

Petitioner's case is not a "simple' double murder but a complex "serial" murder under the then new serial murder statute. The State had hundreds of investigators and years to prepare. Petitioner's Counsel has regretfully run out of time and must just cease

Wood, David Leonard
Habeas Corpus Petition (Initial Petition)

investigation and preparation. Despite devoting in excess of 250 hours during the last 9

months to this case, there are issues undeveloped.

As applied to Petitioner the new State and Federal Habeas Corpus Statutes are

unconstitutional by denying Petitioner his rights to due process and by denying him equal

protection afforded those Petitioners whose cases can be fully investigated in 9 months.

The Federal Statute's one year limitation is complained of herein for the same reasons

given for complaint of the State Statute.

There are many issues and things left undone. All of the witnesses at trial except

Petitioner's Father and Sister have not been contacted. At the present time there is

somewhere a man named Edward Burton who has confessed to the crimes to which

Petitioner has been convicted. There is a man in Mexican custody who it is believed is

responsible for some or a of the murders of the six victims in Petitioner's case. Petitioner

suffers from organic brain damage the exact nature of which and effect on Petitioner is

unknown. DNA evidence that could prove Petitioner not guilty is kept from him by the

denial of his rights under Ake v. Oklahoma. And finally, the Court of Criminal Appeals

has set an arbitrary ceiling on the time Petitioner's Counsel should take in representing an

inmate in a proceeding of this nature. Petitioner's Counsel is still waiting to be paid for

approximately 100 hours of work performed in July and August, 1997, the payment of

which has not been received due to funding problems on the State level. Further,

Petitioner's Counsel has been warned that as he approaches the 250 hour figure that his

fees may be adjusted. Petitioner's Counsel could not make as detailed an investigation in

this matter as should have been done because of the arbitrary time limits set by the

statutes and the Court of Criminal Appeals.

For these reasons, the referenced statutes should be held unconstitutional, releasing Petitioner from the artificial restraints of the political process that brought about such statutes, and return once again to Petitioner and all like him the benefits of the Great Writ as originally conceived.

## PRAYER

WHEREFORE PREMISES CONSIDERED, petitioner, David Leonard Wood, prays that this Honorable Court:

1. Stay his execution pending final disposition of this petition;

2. Order and conduct an evidentiary hearing at which additional proof may be offered supporting the allegations of this petition;

3. Grant full discovery in this matter, including but not limited to access to all physical evidence to allow analysis by independent experts and disclosure of the full prosecution files in the case; full disclosure of any and all records, wherever and however maintained, concerning agreements made by the State promising its witnesses favorable or lenient treatment in exchange for testimony; or, in the alternative, inspect this evidence in camera to determine whether it is or should have been properly subject to disclosure;

4. Grant Mr. Wood, because of his indigence, funds to secure expert testimony that is required to prove the allegations of this application;

5. Compensate undersigned counsel for expenses incurred in the investigation of this case and the preparation of this petition;

6. Vacate Mr. Wood's conviction of Capital Murder and sentence of death;

7. Issue a writ of habeas corpus releasing Mr. Wood from custody, unless the State grants him a new trial;

8. Allow Mr. Wood a reasonable period of time in which to amend this petition.

9. Allow Mr. Wood a reasonable period of time and an opportunity to submit a memorandum of law briefing all of the issues in this petition prior to and following an evidentiary hearing, and an opportunity for oral argument;

that he may pursue all of his claims for relief in a single proceeding;

10. Grant such other relief as law and justice require.

Respectfully submitted:

Michael D. Samonek
TSBN: 00789795
2200 Ross Ave., Suite 2525
Dallas, Texas 75201-6770
(214) 979-7312 Telephone
(214) 979-7301 Facsimile

John Thomas Haughton
TSBN: 00788660
2200 Ross Ave., Suite 2525
Dallas, Texas 75201-6770
(214) 979-7313 Telephone
(214) 979-7301 Facsimile