

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

**MAR 2 5 2003**

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| DAVID LEONARD WOOD, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:01-CV-2103-L |
| | § | **CAPITAL LITIGANT** |
| JANIE COCKRELL, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Institutional Division, | § | |
| Respondent. | § | |

## RESPONDENT COCKRELL'S ORIGINAL ANSWER WITH BRIEF IN SUPPORT

Petitioner David Leonard Wood ("Wood")[1] was properly convicted and sentenced to die in Texas state court for the murders of Ivy Williams, Desiree Wheatley, Karen Baker, Angelica Frausto, Rosa Maria Casio, and Dawn Smith. He now challenges his conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. However, Wood's petition should be denied because he fails to demonstrate that he is entitled to federal habeas relief.

### PETITIONER'S ALLEGATIONS

The Director understands Wood to raise the following grounds for federal habeas relief:

1.     He was denied the right to a speedy trial and trial and appellate counsel were ineffective for failing to assert his speedy trial rights (claims 1-2, Petition at 9-26).

2.     The indictment was defective for failing to allege the offense of capital murder for which he was charged, and trial and appellate counsel were ineffective for failing to raise this issue (claims 3-4, Petition 26-35).

---

[1]     Respondent Janie Cockrell will be referred to as "the Director."

3.      Section 19.03(a)(7)(B)[2] of the Texas Penal Code is unconstitutionally
        vague because the terms "same scheme or course of conduct" and
        "different criminal transaction" are not defined; the trial court erred in
        failing to define those terms in the charge; and trial counsel were
        ineffective for failing to demand an instruction defining those terms
        (claims 5-9, Petition at 35-39).

4.      His due process rights were violated by the trial court's use of special
        issue number three during the punishment phase; the trial court erred
        in denying his request for a proper mitigation instruction and in
        allowing voir dire to proceed using a version of special issue number
        three that was different than the special issue actually submitted to the
        jury; and trial counsel were ineffective for failing to object to the
        special issue and to preserve the court's error in denying his request for
        a proper instruction (claims 10-14, Petition at 39-48).

5.      The trial court's peremptory challenge procedure during voir dire
        deprived him of due process; the trial court erred in overruling the
        defense's challenges for cause; trial counsel were ineffective for failing
        to object to the court's procedures and denials of the defense's
        challenges for cause; and appellate counsel was ineffective for failing
        to raise these issues on appeal (claims 15-21, Petition at 48-59).

6.      The State presented unreliable and perjured testimony; trial counsel
        were ineffective for failing to object to this testimony; and his
        conviction was obtained through the use of testimony procured through
        money or benefits (claims 22-26, Petition at 59-70).

7.      The attorney-client privilege should be recognized in Texas between
        jail house lawyers and their inmate clients (claims 27 and 39, Petition
        at 70-74, 100-04).

8.      He was deprived of a fair trial by the introduction of expert testimony
        pertaining to fiber comparison; he was denied a fair trial because the
        fiber evidence was unreliable and potentially planted; and trial counsel
        were ineffective for failing to object to the introduction of and
        testimony pertaining to the fiber evidence (claims 28-31, Petition at 74-
        81).

---

[2]   Formally TEX. PENAL CODE § 19.03(a)(6)(B).

9.     The evidence was insufficient to support his conviction (claims 32 and 40, Petition at 81-86, 104-25).

10.    The trial court erred in allowing the admission of extraneous offense evidence during the guilt/innocence phase, and trial counsel were ineffective for failing to object to this evidence (claims 33-34, Petition at 86-89).

11.    He was denied due process because the verdict form was misleading and nonspecific, and trial counsel were ineffective for failing to object to the verdict form (claims 35-36, Petition at 89-91).

12.    The Texas Court of Criminal Appeals erred by failing to authorize his request for expert assistance during state habeas corpus review (claim 37, Petition at 91-98).

13.    Article 11.071 of the Texas Code of Criminal Procedure and the statute of limitations provision of the AEDPA are unconstitutional (claim 38, Petition at 98-100).

Wood's requests for relief fail. Initially, the Director denies all allegations of fact made by Wood, except those supported by the record and those specifically admitted herein. Additionally, all or portions of grounds 3-6, 8, and 10-11 have not been presented to the Court of Criminal Appeals by way of either direct appeal or a state habeas application, and are unexhausted and procedurally defaulted.[3] The remainder of Wood's claims are without merit and should be denied.

_____

[3]    Although grounds 12 and 13 challenge the state habeas corpus proceeding, as well as federal habeas corpus review, Wood did present these grounds in his state habeas application.

## STATEMENT OF THE CASE

Wood was convicted[4] and sentenced to death for the murders of Ivy Williams, Desiree Wheatley, Karen Baker, Angelica Frausto, Rosa Maria Casio, and Dawn Smith during different criminal transactions but pursuant to the same scheme or course of conduct. Tr 3, 297-300.[5] Wood directly appealed his conviction and sentence to the Texas Court of Criminal Appeals, which affirmed the conviction and sentence in an unpublished opinion delivered on December 13, 1995. *Wood v. State*, No. 71,594 (Tex. Crim. App. 1995).

Wood filed a state application for writ of habeas corpus in the trial court on December 19, 1997. I SHTr 17. The trial court then entered findings of fact and conclusions of law recommending that Wood be denied relief. II SHTr 1-6. The Court of Criminal Appeals adopted the trial court's findings and conclusions and denied relief on September 19, 2001. *Ex parte Wood,* No. 45,746-01 at cover and Order. Thereafter, Wood filed a federal petition in this court on May 6, 2002, and subsequently filed an amended petition.

## STATEMENT OF FACTS

### I.   Facts Of The Crime

Between September 1987 and March 1988, the bodies of six young females were discovered in the northeast desert area of El Paso, Texas.  57 RR 5517-18. Although the

---

[4]   As will be explained in section I, *infra*, Wood was indicted and originally set to be tried in El Paso. However, Wood moved for a change of venue and, on April 8, 1992, the motion was granted and venue was transferred to Dallas.

[5]   "Tr" refers to the transcript of pleadings and documents filed with the court during trial, followed by page numbers. "RR" refers to the reporter's record of transcribed trial proceedings, preceded by volume number and followed by page numbers. "I SHTr" refers to the state habeas transcript — the transcript of pleadings and documents filed with the court during state habeas proceedings — preceded by volume number and followed by page numbers. "II SHTr" refers to the trial court's findings of facts and conclusions of law, which are not attached to the main state habeas transcript.

cause of death could be determined in only one case, it was evident that each woman had been murdered.

**A.    The disappearance of the victims**

The first woman abducted and killed was twenty-three-year-old Ivy Williams. Jennifer Lynn Prefountain knew Ivy because they worked together at a topless bar. 60 RR 6167. According to Prefountain, Ivy engaged in prostitution and used drugs. 60 RR 6168. The last time she saw Ivy was at the King's X bar in May 1987.[6]  60 RR 6170. The two talked for a couple of hours. 60 RR 6171. At some point, Ivy used the telephone and then two of her friends, including Wood, showed up. 60 RR 6171-72. Ivy left the bar at 4:00 p.m. with Wood and his friend. 60 RR 6172. Prefountain, who first met Wood when she was working at another club called the New Yorker, stated that she never saw Ivy again after that day. 60 RR 6172-74. Darla Jean Castle testified that she last saw Ivy on May 13, 1987, when Ivy came into her store to buy back some jewelry that she had previously sold Castle. 60 RR 6160. Castle was contacted by the police because the police found the original sales receipt from the sale of the jewelry in Ivy's pocket when they found her body. 60 RR 6161.

The second person to disappear was fifteen-year-old Desiree Wheatley. In June 1987, Desiree lived with her mother Marcia, her sister Sundee, and her grandparents. 60 RR 5939. June 2, 1987, was the last day of middle school for Desiree. 60 RR 5940-41. The last time Marcia saw Desiree was when she dropped Desiree off at school that morning. 60 RR 5942. Desiree was wearing a white T-shirt, blue jeans, and tennis shoes. 60 RR 5942. After school was out, Desiree and Sundee both came home, ate dinner, did some chores, and then left to go out. 60 RR 5987-88.   Yvette Garcia, a school friend of Desiree's, stated that she saw

---

[6]    Prefountain could not recall the exact day that she saw Ivy, but stated that this was before Memorial Day.

Desiree that night at the house of a girl named Wendy. 60 RR 5996-6000. Later that evening, Yvette and Desiree started walking home; but then they split up, and Desiree walked back toward Wendy's. 60 RR 6002. Yvette got home and then decided to go back to Wendy's; however Desiree was not there. 60 RR 6003. Yvette then walked to a nearby 7-11 convenience store thinking that Desiree might be there, but she did not see Desiree. 60 RR 6004. Yvette continued to walk to the Circle K store about eight blocks away and saw Desiree on the outside payphone. 60 RR 6004. Desiree said that she was arguing with her mother on the phone. 60 RR 6005. However, Desiree was actually talking to a boy named Ronald Graves, who testified that he received a phone call from Desiree that evening and argued with her over the phone. 60 RR 6126. Graves stated that, during the conversation, Desiree indicated that she was being watched by an older man. 60 RR 6129. Ernestine Galloway, testified that she was at the Circle K store that evening, and noticed a girl on the telephone arguing with someone on the other end. 60 RR 6104. Galloway also noticed a small beige pickup truck on the side of the store and saw Wood, who had a tattoo on his left arm, inside the store. 60 RR 6105-06, 6108. Yvette testified that she saw the back of a man who was tall and slender inside the store. 60 RR 6005. Desiree came inside the store, went up to the cash register, and left. 60 RR 6107. Wood then went up to the cash register and left right behind Desiree. 60 RR 6107-08. Galloway saw Wood get in his truck and drive off, but she did not see anybody else in the truck. 60 RR 6120-21. After Yvette and Desiree walked out of the store, they talked for a few minutes and then walked away from each other in opposite directions. 60 RR 6006-07. While they walked away from each other, they continued to talk by shouting. 60 RR 6007. Desiree stopped yelling, so Yvette turned around and saw Desiree getting into a truck across from the Circle K. 60 RR 6007. The truck belonged to Wood, who was nicknamed "Skeeter." 60 RR 6008. That was the last

6

time Yvette saw Desiree. 60 RR 6009.

Desiree's grandmother Helen Blaine testified that Desiree, who was wearing a white T-shirt, blue jeans, white tennis shoes, and white socks, had a curfew at 9:00 p.m. but called home about a quarter to nine and asked if she could stay out until 10:00 p.m. 60 RR 5979-80. Sundee came home at 10:00 p.m., and she thought Desiree was spending the night with friends. 60 RR 5980, 5990. Helen asked Sundee to call Wendy, but Wendy said that Desiree had left a long time ago in order to be home at 10:00 p.m. 60 RR 5981. Sundee called some of other Desiree's friends but could not locate Desiree. 60 RR 5981, 5990. When Marcia Wheatley came home from work at 1:00 a.m., Helen told her that there was a problem and that Desiree had not come home. 60 RR 5982, 5943-44. Marcia called the police and told them her daughter was missing. 60 RR 5946. On October 22, 1987, Marcia learned that the police found Desiree in the desert. 60 RR 5948. Finally, both Yvette and a close friend of hers, Robert Franqui, testified that they were acquainted with Wood, and that, on a previous occasion, Wood had asked Yvette and Desiree to go into the desert and smoke marijuana. 60 RR 6011-14, 6138-45. Yvette stated that she was afraid of Wood, and Franqui testified that Wood had several tattoos, including a dagger on one arm, a skull on his upper left chest, and a motorcycle on his back. 60 RR 6013, 6142.

Karen Baker, who was twenty-one years old, was the third person abducted and killed. Charles Lloyd, who used to work at the Hawaiian Royale Motel, stated that Karen was living with her foster grandparents in the apartment complex of the motel in the summer of 1987. 61 RR 6223, 6225. On Friday, June 5, 1987, Lloyd saw Karen at the motel between 5:30 and 6:00 p.m. when she was coming home from beauty school. 61 RR 6226. Karen walked back and forth between the pool area and her apartment most of the night. 61 RR 6228. Later that evening, a person on a motorcycle rode by and Karen yelled at the person. 61 RR 6230. The

person on the motorcycle turned around and came back to where Karen was standing. 61 RR

6230. Karen got on the back of the motorcycle for about thirty seconds to a minute, and then

the person dropped her off at the motel and left. 61 RR 6230. Roger Dickson testified that

he also witnessed Karen get on the motorcycle, which was red and had a windshield on it.

61 RR 6300-01. Dickson stated that Karen was wearing his blue jean jacket. 61 RR 6301.

Dickson also testified that the man on the bike had some tattoos. 61 RR 6301. Lloyd further

confirmed that the motorcycle was a shiny red Harley that was extremely loud. 61 RR 6230.

Lloyd did not get a good look at the man, but he saw the man's clothing and noticed that he

was wearing dark clothing, black chaps, a black jacket, and a bandanna. 61 RR 6231. Karen

then informed Lloyd that she had a date with the gentleman on the motorcycle at midnight.

61 RR 6232. Karen returned to the office later that evening after changing clothes, and was

wearing white boots with fringes, red stirrup pants, and a blue jean jacket. 61 RR 6233.

When Lloyd got off work around twelve midnight, he saw Karen outside talking to a lady

and noticed a truck pull up. 61 RR 6234. The truck was small and white or beige. 61 RR

6235. Lloyd got a good look at the man in the truck and described him as a white anglo male

about five foot seven inches tall, thinly built, with long curly brown hair and a bandanna on

his head, a light beard, and wearing dark clothing. 61 RR 6235. Lloyd stated that this is the

same person that was on the motorcycle earlier. 61 RR 6236. Lloyd never saw Karen again

after that. 61 RR 6237. A missing persons report was filed on Karen about a week later. 61

RR 6237. The Monday following Karen's disappearance, the same man on the motorcycle

came looking for Karen. 61 RR 6237-38. Eventually, Lloyd was shown a photo line-up and

identified Wood as the man in the truck and on the motorcycle. 61 RR 6241-43.[7] Patricia

---

[7]     Lloyd testified that when he was shown a physical line-up, he made a mistake and did
not identify Wood. 61 RR 6240. He told a police officer that he believed he made a mistake and

Von Maluski also testified that she had seen Karen with Wood at a Chinese restaurant located in the motel on a prior occasion. 61 RR 6196-97.

The fourth woman who disappeared was seventeen-year-old Angelica Frausto ("Angie"). Denise Frausto Kramer and Amy Thompson, Angie's sisters, testified that they last saw Angie at Rudy's Bar on August 8, 1987. 61 RR 6340-41, 6368. Amy and Angie did not get along, but Amy had helped Angie get a job at a topless bar in order to get her off the streets. 61 RR 6365. However, on August 8, 1987, Angie and Amy got into an argument about the clothes Angie was wearing. 61 RR 6341. Amy did not like the way Angie was dressed. 61 RR 6369. Angie was wearing white shorts with purple hearts and an imitation brown leather jacket. 61 RR 6342. That was the last time Angie's sisters saw her, and they thought it was unusual that Angie did not show up for Amy's birthday party on August 15, 1987. 61 RR 6343, 6371. However Veronica Minjarez testified that she had seen Angie with a person that may have been Wood on August 4, 1987. Specifically, Angie and Veronica were at Rudy's Bar and, at some point, stepped outside. 61 RR 6389. Veronica was waiting for her husband to show up when a man on a loud red motorcycle passed by. 61 RR 6390. The man on the bike stopped, and Angie went up to the man. 61 RR 6391. The man had wavy brown hair, was tall and was a Caucasian. 61 RR 6391. Veronica did not get a good look at the man's face. 61 RR 6391. Angie talked to the man for about ten minutes, and then got on the bike and went for a ride around the block. 61 RR 6392. After they came back, Veronica's husband arrived, and Veronica and her husband got into an

---

asked the officer if he could change his choice. The police officers showed him a photo lineup and he chose Wood. 61 RR 6241-43. Lloyd explained that the reason that he did not choose Wood in the physical lineup is that Wood had apparently shaven and cut his hair, and although Lloyd recognized Wood in the physical lineup, he was looking for a person who fit his original description of long curly hair and a mustache or goatee. 61 RR 6240, 6242. Detective Alfred Giron also testified as to these facts. 61 RR 6279-85.

argument that resulted in the police coming out to the bar. 61 RR 6392-93. Veronica, however, did not see what happened to Angie; she simply noticed that Angie and the man were not there. 61 RR 6393. Veronica did not see Angie anymore after that time. 61 RR 6394. Jerry Ybarra, an officer with the El Paso Police Department, testified that he was the case agent responsible for the investigation of the death of Angie Frausto. 61 RR 6322. He stated that when Angie's body was found, the body had a blue-colored jacket with fur on it, a T-shirt, some light-colored shorts with purple heart's, some bobbysocks, and tennis shoes. 61 RR 6324.

The fifth female murdered was twenty-three-year-old Rosa Maria Casio. Rosa's sister, Esperanza, testified that she last saw Rosa on August 12, 1987. 62 RR 6453. In 1987, Rosa lived in Addison, Texas. 62 RR 6454. Esperanza lived in Juarez, Mexico. 62 RR 6453. Rosa arrived in El Paso on August 4th and was going back to Addison on August 17th. 62 RR 6455. During that time, Rosa apparently visited her sister in Juarez. On August 12, 1987, Rosa left Juarez around 6:00 p.m. 42 RR 6456. She was wearing long shorts, a blue blouse, some moccasin type shoes, and was driving a green Ford Grand Torino. 42 RR 6456. Esperanza testified that Rosa was supposed to come back to Juarez, but she never did. 42 RR 6456. Fritz Simon Zimmerle testified that he met Rosa when she was working as a dancer at a club called the Playhouse. 62 RR 6464. Zimmerle, who also worked there, knew Rosa as "Janet." 62 RR 6463-64. He last saw Rosa on August 12, 1987. 62 RR 6464. At about 8:00 p.m. Rosa walked in the club with a friend that Zimmerle knew as Junior. 62 RR 6464. Zimmerle then went to go smoke marijuana with Rosa and Junior. 62 RR 6465. They took Zimmerle back to the bar and then they went to the bar next door called the Flower Garden. 62 RR 6465. However, about fifteen or twenty minutes later, Rosa and a white male walked past the club where Zimmerle was working. 62 RR 6466. Zimmerle described the man as

10

a tall white male with a mole on the left side of his face and with short blonde or brown hair. 62 RR 6466. According to Zimmerle, the man was dressed like a businessman, and Rosa was wearing blue shorts and a blouse. 62 RR 6466-67. Zimmerle saw them walk down the sidewalk and, about 20 minutes later, she came back to the club by herself. 62 RR 6467. Zimmerle saw Rosa again at about 1:30 a.m. when Rosa came up to him and told him goodbye because she was going back to Addison. 62 RR 6469. Rosa got into her car, and then Zimmerle saw a person sitting in a four-wheel-drive Ford Bronco that was muddy. 62 RR 6469. The man in the Bronco looked like the white male Zimmerle saw with Rosa earlier. 62 RR 6469. As Rosa left, the person in the Bronco followed her. 62 RR 6469. However, she stopped to talk to Junior, and the Bronco went around her to the stop sign and took a right. 62 RR 6470. Rosa went to the traffic light, took a right going up Montana Street, and took a left at Chico's Tacos. 62 RR 6470. That is the last time Zimmerle saw Rosa. 62 RR 6470. On August 13, 1987, El Paso Police Officer James Abrogast located an abandoned vehicle at 1300 Selden. 61 RR 6417-18. The car was a green 1974 Ford Grand Torino. 61 RR 6418. Abrogast discovered that the car was registered to Rosa. 61 RR 6420. An inventory of the contents in the vehicle confirmed that Rosa was the vehicle's occupant. 62 RR 6439-42.

The last woman murdered was fourteen-year-old Dawn Smith. Mary Fernandez, who was in the U.S. Army, testified that, in 1987, she met Dawn Smith at the movies when she walked up to Dawn to ask her what had happened in the first part of the movie. 62 RR 6486. Dawn asked Mary if she could sit with her and her son, and Dawn proceeded to tell Mary her life story, including that she had no place to live. 62 RR 6487. This occurred in January 1987. 62 RR 6487-88. Mary offered to let Dawn stay at her house, and Dawn stayed with her for about a month. 62 RR 6488-89. At the time, Mary believed Dawn was seventeen-

11

years-old, but she later found out that she was fourteen. 62 RR 6490. After a month, Dawn moved in with her sister, but she moved back in with Mary in the middle of August. 62 RR 6491-92. The last evening Mary saw Dawn was August 27, 1987, during a small party at Mary's house. 62 RR 6494-95. Dawn was wearing a yellow terry-clothed romper and a pair of white thongs/flip-flops. 62 RR 6496, 6520. Mary last saw Dawn at about 11:00 p.m. at night, and she had denied Dawn permission to have a friend over or to leave the house because Dawn had not completed her chores. 62 RR 6497-98. The next morning, Dawn was not in the house and she never heard from Dawn again. 62 RR 6498-99. Angela Chumley, Dawn's best friend, testified that she last talked to Dawn around midnight that night. 62 RR 6528. Dawn was going to leave Mary's house, and Angela was going to meet Dawn in between McCombs and Salem near a 7-11 convenience store. 62 RR 6528. The plan that night was to go back over to Mary's and drink a bottle of alcohol and watch TV until Angela's boyfriend got off work. 62 RR 6532. She knew Dawn was supposed to be wearing a yellow romper, a jacket, and a pair of flip-flops. 62 RR 6530. However, Angela never found Dawn, and she went back home. 62 RR 6530. After the police found Dawn's body, Mary identified the clothing found by the police because Dawn was wearing her son's jacket, her son's purple thongs/flip-flops, the yellow romper, and a blue pair of panties that were Mary's. 62 RR 6501. The police told Mary that Dawn was known as a runaway. 62 RR 6503.

Although no one testified that Dawn and Wood were together the night she disappeared, several witnesses testified that Dawn had been with Wood in the past. Desiree Bowden testified that, at one point, Dawn lived across the street from her in an apartment with a person named Ruby, and they would babysit Ruby's kids. 62 RR 6546-48. One night during the summer, Desiree and Dawn were watching Ruby's children, and a man named Sal

12

and his friend came by the apartment. 62 RR 6549. Desiree could not identify the second man, but on a few occasions the man came over to Ruby's on a red motorcycle. 62 RR 6550. Ernesto De Los Santos testified that he also lived across from Ruby and was Dawn's boyfriend. 62 RR 6559. He had seen David Wood around the area and saw Wood at Ruby's apartment on one occasion. 62 RR 6560-61. On that occasion, Wood embraced Dawn, which upset Ernesto. 62 RR 6561. That was the only time he saw Wood and Dawn together, but he knew that Wood rode a red Harley. 62 RR 6562. Ernesto also saw Sal Martinez at Ruby's apartment. 62 RR 6563. Additionally, Michael Jimenez testified that he first met Wood in February or March 1987 when Wood approached him in his car asking to speak to Jimenez's neighbor. 62 RR 6582. Jimenez was in his yard with his motorcycle, and they got to talking about motorcycles. 62 RR 6583-84. After that time, Wood would drop in from time to time especially if Jimenez had a group of people in his yard. 62 RR 6585. Wood usually drove by on his Harley, which was reddish in color, and he often had women with him who were fifteen years old or younger. 62 RR 6585-86. Jimenez stated that he saw Dawn with the Wood on one of these occasions at his house. 62 RR 6587. He also saw Wood at his house when Wood was accompanied by his girlfriend Joanne Blaich. 62 RR 6586-87.

**B.    The discovery of the bodies**

As stated above, the bodies were discovered between September 1987 and March 1988 in the Northeast desert. 57 RR 5517-18. All of the bodies were found within a one and a half mile square radius, except for the sixth body. 57 RR 5522. The desert area was described as hilly with shrubs and desert plants, and there was a lot of trash dumping and shooting in the area. 57 RR 5523. Each body was found between thirty and forty yards from one of the dirt roadways. 57 RR 5524. However, back in 1987, none of the grave sites were within yelling or screaming distance of any home or business. 57 RR 5526.

13

On September 4, 1987, Ralph Castro, who was employed by El Paso water utilities, was directed to the northeast desert area of El Paso by one of his subordinates Frank Brooks. 57 RR 5535. He went to an area where there was a trash pile and saw hands and feet sticking out from the dirt. 57 RR 5536-37. After notifying the police, he met with Officer Steven Bilbo and directed him to the site of the body. 57 RR 5538, 5546-47. When the body was removed from the dirt, the police found that the body was not clothed. 57 RR 5555. The body, which was face down and five feet two inches in length, was in a grave that was only about six to twelve inches deep. 57 RR 5556. The police did locate some clothing buried five feet seven inches from the grave. 57 RR 5558-61. Some items were removed from the clothes, but the police were unable to get any fingerprints from those items. 57 RR 5565.

Once the area where the body was located was sectioned off, Officer Jorge Ortiz began to walk outside the perimeter and noticed an indentation in the ground between two bushes. 57 RR 5579. That area was found to contain the remains of the second body. 57 RR 5580. The first body was approximately seventy-one feet from a dirt road, and the second body was approximately fifty-five feet from the first body. 57 RR 5582. Detective Alfred Giron arrived, saw the first body which was covered with trash, and then was notified about the second grave. 57 RR 5592. The second body, which was eventually removed from a fourteen-inch deep grave, was laying face down in a southerly direction. 57 RR 5593, 5597. There was some clothing on the body, and the body had brown hair. 57 RR 5594. The body, however, was decomposed, and there was nothing but skeletal remains. 57 RR 5594.

On October 20, 1987, Officer Julio Perez, who was assigned to the police canine unit, went out to the scene where the first two bodies were located. 57 RR 5620, 5623-24. Twenty minutes into his search for other possible cadavers, his dog indicated that something

14

was in the ground. 57 RR 5631. Another officer probed the ground, and the police uncovered a third body. 57 RR 5633. This third grave was 119 feet south from the roadway, and some clothing was located approximately 47 feet from the dirt road and in between the grave site and the road. 57 RR 5656-57, 5661. The police seized a jacket from the third body, 57 RR 5684-85, and a yellow sun suit, a green pair of panties, and a thong were found near the grave. 57 RR 5686, 5688. The third body was not clothed except for the jean jacket. 57 RR 5689. About twenty to twenty-five minutes later, the fourth body was uncovered by another canine handler. 57 RR 5633-35. Ramiro Gonzalez, Jr., took his dog to the two previous graves to pre-scent the animal, 58 RR 5693, and his dog found the fourth body. 58 RR 5696-97. This grave site was about half a mile from where the first two bodies were found. 58 RR 5703. The victim was wearing a T-shirt and bobbysocks. 58 RR 5699. A bra and brown hair barrette were also seized. 58 RR 5712. This body was laying face down in a one foot deep grave, and the body was buried thirty feet two inches from the nearest road 58 RR 5713.

On November 3, 1997, Officer Ernie Melendez was dispatched out to the desert area because he was told that another body had been found out in the desert. 58 RR 5738-39. The fifth body was also found by a cadaver dog, and was laying in a grave six inches deep. 58 RR 5741, 5743. Melendez attended the autopsy and took possession of the clothing from the body. 58 RR 5743-44. Unlike the other bodies, this body was fully clothed with a jacket, a pair of shorts, socks and tennis shoes, some blue panties, and a T-shirt with a heart on it. 58 RR 5744-46. Some fingernails were also taken from the body. 58 RR 5753-54.

On March 14, 1988, John Fielder was out in the desert area collecting aluminum cans at about 8:00 a.m. when he discovered human remains. 58 RR 5770. He saw a bone sticking up out of the sand and noticed a sparkle which turned out to be braces on the teeth of a skull.

58 RR 5771-72. He walked back to his home and then called the police. 58 RR 5772. Detective Alfred Giron went out to the crime scene and when he got to the grave site he noticed metal braces on the teeth. 58 RR 5773-74. The head was separated from the body, 58 RR 5788, the body was clothed and laying on its back, 58 RR 5790, and the skull was hairless. 58 RR 5789-90. On the left hand of skeleton was a silver ring. 58 RR 5776, and moccasin shoes were also found in the area. 58 RR 5777. One of the moccasin shoes was found north of the grave site and had some foot bones in it; the other shoe was found south of the grave site. 58 RR 5786. In one of the pockets of the clothing the police found a cigarette lighter, a hypodermic syringe, a razor blade, and a motel key; in the other pocket was a wallet, some keys and another ring. 58 RR 5791. The wallet contained some identification and an appointment card for an orthodontist. 58 RR 5791-92.

Juan Contin, the medical examiner for El Paso County, examined the remains of all six bodies. 58 RR 5817-18. Dr. Contin, however, could not establish the cause of death because the bodies were decomposed with little or no flesh on them, although the manner of death was determined to be homicide. 58 RR 5820-34. He noticed that the T-shirt on the fifth body had some longitudinal defects indicating possible stab wounds, but he could not find any corresponding injuries to the chest area based on the defects in T-shirt. 58 RR 5833-34. With regard to the sixth body, Dr. Contin also noticed linear defects in the clothing, 58 RR 5835, braces on the teeth of the skull, 58 RR 5836, and a defect in the right shoulder blade consistent with being caused by a sharp instrument. 58 RR 5836. One of the ribs on the skeleton was cut in two, 58 RR 5837, and although the cause of death was undetermined, the evidence indicated that this person was stabbed to death. 58 RR 5804-06, 5838-39. Harold Gill-King, Ph.D, a physical anthropologist, was contacted to determine the cause of death of the sixth body, Ivy Williams, and he determined that the wounds to the scapula and

16

rib indicated that Ivy was stabbed to death while she was lying prone and either restrained or unconscious. 60 RR 6084-90, 6093-94.

George M. Isaac, D.D.S., a forensic dentist, was contacted by the El Paso police department to identify the bodies. 59 RR 5903. He had sufficient dental records on the last four women found in the desert. 59 RR 5903.[8] He examined the skull of one of the persons found on October 20, 1987, and identified the person as Dawn Smith. 59 RR 5909. He identified the other body found on October 20, 1987, as that of Desiree Wheatley. 59 RR 5915-16. He identified the fifth body that was found on November 3, 1987, as that of Angelica Gans (Frausto). 59 RR 5921. He identified the sixth body as that of Ivy Williams. 59 RR 5927. Ivy Williams was easily identified due to the braces on her teeth. 59 RR 5892. Karen Baker, who was one of the victims discovered on September 4, 1987, was identified by a white boot with tassels that was found near the first two grave sites, 57 RR 5612-13; 61 RR 6244, 6314-15, and via a pre-mortem pelvic x-ray that Dr. Gill-King determined was consistent with the pelvis on one of bodies found on September 4, 1987. 59 RR 5869; 63 RR 6766-67. The other victim found on September 4, 1987, Rosa Casio, was identified only by her clothing. 62 RR 6457-58, 6461.

## C.    The evidence linking Wood to the murders

As discussed above, the evidence presented by the State showed that Wood, or at least a person fitting his description, knew or was seen with each of the victims at the times they disappeared. Moreover, Joanne Blaich, who was a topless dancer and Wood's girlfriend at one point, provided various circumstantial information linking Wood to the murders. 63 RR 6611. She stated that Wood had numerous tattoos, including a motorcycle on his back and

---

[8]    Dr. Isaac testified that, to his knowledge, there were no available dental records on the first two victims. 59 RR 5904.

a snake on his chest. 63 RR 6614. Wood had a beige truck and a red Harley Davidson motorcycle with saddlebags and a trunk. 63 RR 6615. Wood also had some blankets, one burnt orange and one yellow, that he kept in his truck or his motorcycle. 63 RR 6616. Further, he had some shovels that he kept in the truck, 63 RR 6617, he carried a knife in his belt, 63 RR 6618, and he sometimes wore a bandanna and a leather vest with lots of pins on it when he was on his bike. 63 RR 6618-19. Blaich recalled that Wood had two friends named Sal Martinez and Jerry Hagger. 63 RR 6618. She also stated that, at one point, Wood grew his hair longer and he had thick curly hair with a thin mustache. 63 RR 6620. She further recalled once when Wood had some scratches on his face and back, and he told her that he got those in a fight at a bar. 63 RR 6620. Blaich acknowledged that both she and Wood knew Ivy Williams and that the night Wood was introduced to Ivy was the last night Blaich saw Ivy Williams. 63 RR 6621. Blaich also testified that eventually she moved in with Wood in October 1987 and, during that time, Wood seemed real nervous and worried about everything. 63 RR 6623. On some occasions Wood would come home late, for instance after 3:00 a.m., sometimes he would be dressed up, and sometimes he would be muddy because, according to Wood, he went snake hunting in the desert with his brother-in-law. 63 RR 6623-24.

On October 5, 1987, Joyce Armstrong rented an apartment to Blaich. 63 RR 6613, 6626, 6666. Blaich and Wood lived there for approximately one month. 63 RR 6626, 6666. When Blaich left the apartment, a vacuum cleaner that was not in the apartment before Blaich rented it was left behind. 63 RR 6667-68. On January 14, 1988, Officer John Guerrero came into contact with Joyce Armstrong. 63 RR 6652. Joyce directed him to a vacuum cleaner, and Guerrero took the vacuum bag into custody. 63 RR 6654-55. Ultimately, orange fibers were found in the vacuum bag. Prior to that time, Officer Ernesto

18

Melendez went to the Desiree Wheatley grave site on October 29, 1987, to sift through the dirt.  63 RR 6681.  His search uncovered some orange fibers.  63 RR 6682-83.  Steve Robertson, a chemist with the Texas Department of Public Safety crime lab in Austin, examined all these fibers.  Specifically, he compared orange fibers that were on Desiree Wheatley's T-shirt, fibers that were removed from the vacuum cleaner bag, and the fibers recovered from the grave sifting.  63 RR 6725-27.  Robertson found that the fibers from the vacuum bag, the T-shirt, and the grave siftings were the same size, shape, color, polymer composition and dye composition.  63 RR 6728-29.  Robertson testified that these fibers are acrylic and could have been used to make an orange colored blanket, and Blaich confirmed that Wood had a burnt-orange blanket that he carried in his truck or motorcycle.  63 RR 6616, 6731.  Robertson also testified that the majority of the orange fibers were located on the T-shirt, that he generally does not see as much fiber as was recovered in the grave siftings and the T-shirt, and that finding a lot of fibers on a murder victim tends to indicate that those fibers are from some item that the victim came into contact with in the few hours before death.  63 RR 6732, 6760.

The State also linked Wood to the crimes via the testimony of a prostitute, Judith Kelly, who was abducted and sexually assaulted by Wood under circumstances and conditions extremely similar to that of the murdered women.  Kelly testified that one evening in July 1987, she accepted a ride from Wood who took her into the desert area of Northeast El Paso.  64 RR 6804.  She first came into contact with Wood in front of the Circle K store.  64 RR 6804.  She went there to get cigarettes and then walked out because she needed a ride.  64 RR 6805.  Wood stopped in his tan truck and asked her if she needed a ride.  Kelly said yes and jumped in the truck.  64 RR 6805.  Wood was wearing jeans, a Harley-Davidson black T-shirt, and a baseball cap.  64 RR 6805.  Kelly also noted that Wood had a lot of tattoos on

19

his arms. 64 RR 6806. Kelly needed to go to a friend's house who lived on Titanic Street, but when Wood approached Titanic street he kept going. 64 RR 6806. Wood told her that he had to go to a friend's house and that he would take her back. 64 RR 6806-07. He also said he was going out into the desert to get some cocaine that he buried, but he never did come back with any type of drugs. 64 RR 6818. Wood then drove straight down McCombs into the northeast desert area, went to some apartments on the right side and made a right turn into an apartment building. 64 RR 6807. Wood went into an apartment while Kelly waited in the truck, and then he came back out. 64 RR 6807. When he came out, he had a thin rope hanging out of his pocket. 64 RR 6808. Wood got back on McCombs and then made a right going out of town. 64 RR 6808. He drove into the desert area, took a dirt road, and continued to where there was a fence. 64 RR 6808-09. Wood made Kelly get out, but he could not get the gate open, so he pulled her back in the truck and they went back across the road to the other side of the desert. 64 RR 6808-09. Wood kept driving around and then eventually stopped. 64 RR 6810. He got out and told Kelly to also get out. 64 RR 6810. Wood took a blanket out of the back of his truck, he took the blanket behind some bushes along with a shovel, and he began to dig. 64 RR 6810-11. Kelly stated that something was in the blanket, and Wood picked it up and took it behind the bush apparently to bury it. 64 RR 6851-52. Wood had tied Kelly to the front of his truck and although she turned to see what he was doing, he yelled at her saying "turn around, bitch." 64 RR 6811. Wood continued to dig for about ten or fifteen minutes. 64 RR 6811. When he finished digging, he went back to where Kelly was, laid the blanket down, and started ripping off her clothes. 64 RR 6811. Wood told her to lay down, and he forcibly put her down. 64 RR 6811-12. Wood then said that he heard voices out in the desert, and he told Kelly to shut up. 64 RR 6812. Kelly told him that she also heard the noises, so he grabbed her and put her back in

20

the truck. 64 RR 6812.  Wood put the blanket back in the truck, and they drove around to another spot. 64 RR 6812.  He then stopped in the desert area on the west side of McCombs. 64 RR 6813.  Wood made Kelly get out again, put the blanket down, ripped off her clothes, tied her up, put a handkerchief in her mouth, and raped her from behind.  64 RR 6813-14. Wood told Kelly to say that she was 13 years old.  64 RR 6814.  After he raped her, Wood took her clothes and threw them in the back of his truck, including his blanket.  64 RR 6814. Wood told Kelly "always remember, I'm free," and then he got in the truck and left her out in the desert.  64 RR 6815.  Wood said that he heard voices a second time right after he raped her and that is when he left.  64 RR 6815-16.  Kelly eventually got a ride with a truck driver who took her to her apartment.  64 RR 6816.  Kelly did not report this incident to the police because Wood threatened her life, and she did not think that the police would believe her because she was a prostitute.  64 RR 6816.  When she got home, she did tell her sister what happened to her.  64 RR 6817.

About a month and a half after this happened, Kelly called the police. 64 RR 6817. On September 22, 1987, Detectives Giron and Tabullo retraced the route with Kelly.  65 RR 6916-17.  They went from Kelly's apartment first to the apartments on McCombs, and Kelly then directed them to the scene of the rape in the desert.  65 RR 6918-20.  She also directed them to the area where Wood had done some digging.  65 RR 6921, 6923.  This area was where the other bodies had been found,  65 RR 6922, 6924-25, although at this point in time only two of the bodies had been found.  65 RR 6925.  They went back to the office and Giron took a statement from Kelly.  65 RR 6925.  Wood was ultimately convicted for sexually assaulting Kelly.

Finally, the State presented two prison inmates who testified that Wood made incriminating statements to them while he was in prison for his sexual assault conviction.

21

Randy Wells testified that he met Wood in prison at the Eastham Unit in February or March of 1989. 65 RR 6964. They were cellmates for two and one-half months. 65 RR 6964. At some point, Wood began talking to Wells about the murders,[9] telling him bits and pieces of the murders, not one long story. 65 RR 6966-67. The two names of victims he remembered Wood giving him were Desiree Wheatley and Karen Baker. 65 RR 6967. Wood never told him how many girls he killed but based on the discussion, Wells testified it was about four or five. 65 RR 6967. Wood described the girls as whores, prostitutes, or girls that worked in topless bars. 65 RR 6967. Wood also said there was a grave with feet sticking out, that this was his grave, and that he buried two bodies close together. 65 RR 6967. Wood told Wells that the police gave him information about a grave that could not be right, which was an indication that he knew the grave. 65 RR 6968. Wood also told Wells that he had a brown pickup and a motorcycle. 65 RR 6968. According to Wells, Wood said that he convinced his victims to go with him by telling them he was going to give them drugs. 65 RR 6968. Wood stated that once he got the girls out into the desert area, he tied them up to his pickup and then he would dig a grave. 65 RR 6969. Afterwards, he would tie them to his pickup and to a tree, and rape them. 65 RR 6969-70. Wood indicated that he would rape the girls by penetrating them anally. 65 RR 6970. Wood also said that one girl scratched him and worried that this mark could be used to identify him. 65 RR 6970. Wood further stated that he wanted to cover up the tattoos because one of the girls who got away from him noticed the tattoos. 65 RR 6972. Wells himself covered up Wood's tattoos, specifically the

---

[9]    Wells gave this information to a TDCJ-ID officer. 65 RR 6994. He also gave this information to his attorney, Gary Luellen. 67 RR 7330-31. Luellen then relayed this information to a Texas Ranger in Eastland County, 67 RR 7331, who then contacted former El Paso District Attorney Steve Simmons. 66 RR 7124-25, 7140, 7165. This is how the investigation focused on Wood as the primary suspect.

22

knife tattoo, by giving him new tattoos that blended in with the old ones. 65 RR 6972-73. Eventually, Wells asked to be moved to another cell away from Wood because all Wood talked about was killing these girls. 65 RR 6971.

James Carl Sweeney, Jr., also testified against Wood. He met Wood in the summer of 1988 at the Eastham Unit. 65 RR 7034. Initially, Wood inquired about Sweeney doing some legal work for him because Sweeney was known as a jailhouse writ writer. 65 RR 7035. Later Wood moved into his cell, and began to talk to him about his case. 65 RR 7035-36. The first time they talked, Wood admitted to Sweeney that he was responsible for the murders of the young girls. 65 RR 7037. Wood also provided Sweeney with over 100 newspaper clippings about this case that Wood knew by memory. 65 RR 7038-39. Wood referred to this case as the northeast desert slayings or his case. 65 RR 7039. Wood specifically mentioned that he was responsible for the deaths of Karen Baker, Desiree Wheatley, Rosa Casio, and Dawn Smith, and he referred to one of the girls as "biker girl." 65 RR 7039. Wood showed Sweeney photos of the girls from the newspapers, and told him these girls were between fifteen and twenty years old. 65 RR 7039-40. Wood also mentioned that he was worried about Desiree Wheatley. 65 RR 7040. Additionally, Wood stated on one occasion that he was concerned about whether or not the death penalty would be issued automatically if the victim was found tied, and he was concerned that he may have left a rope at one of the graves. 65 RR 7041. Wood, however, did not say how he killed the women or what he did to the girls. 65 RR 7041. At trial, Sweeney described Wood's tattoos and mentioned that Wood covered the tattoos on his arms specifically to hide the tattoo of the dagger so that it could not be used to identify him. 65 RR 7042.

23

## II.    Facts Pertaining To Punishment

### A.    State's evidence

The State first presented evidence of Wood's prior criminal history. Specifically, the State showed that Wood had a five-year conviction and sentence for indecency with a child, a twenty-year conviction and sentence for rape, a twenty-year conviction for rape of a child, and a fifty-year conviction and sentence for sexually assaulting Judith Kelly. 71 RR 7597-98; 83 RR at SX 284, 285, 286.

Several witnesses testified about Wood's criminal history. Virginia Staples testified that she worked as a prostitute. 71 RR 7601. On September 19, 1987, Wood offered her money for sex while she was standing on a street corner. 71 RR 7602. Staples got into Wood's truck and told him to go to the Mesa Inn Motel. 71 RR 7603. However, Wood did not drive to the Motel; instead, he pulled a knife on Staples and, while laughing, said, "I'm going to fuck you, stab you, and throw you in the river." 71 RR 7604. At one point, Wood hit Staples in the eye with the back of his hand. 71 RR 7606. Staples said that Wood wanted to drive to the northeast part of town, but Staples said it was too far away. 71 RR 7605. Wood continued to drive toward the river and Staples eventually jumped out of the truck while it was moving, resulting in some injuries. 71 RR 7605-66. She then ran to the freeway, and a man picked her up and took her back to her motel room. 71 RR 7607.

Christi LeClaire testified that Wood sexually assaulted her when she was thirteen years old. On March 10, 1980, she and her friend Andrea walked to Andrea's house after a gymnastics class. 71 RR 7612-13. She then planned to run home, and her boyfriend Henry was supposed to catch up to her. 71 RR 7614. At one point while she was running, she turned around and thought she saw Henry behind her about 100 yards. 71 RR 7615. She stopped running and heard footsteps, believing that it was Henry. 71 RR 7616. The person

24

grabbed her and, although she tried to get away, the man said to stop fighting or he would beat her up.  71 RR 7616-17.  The man told LeClaire that someone had broken the windshield of his car, that it cost $110 to fix, and that he was going to walk with her to her house so that her family could give him the money.  71 RR 7617.  Eventually they walked underneath a bridge area, and then the man raped her.  71 RR 7619-20.  LeClaire described the rape in detail at trial.  71 RR 7620-23.  The assault was extremely violent and included choking, oral sex, and vaginal penetration.  71 RR 7621-23.  Later, she was examined by a doctor, and the doctor could tell the she had been raped because her vagina was torn an inch and a half from the opening.  71 RR 7628.  LeClaire identified Wood as her attacker.  71 RR 7629.

Joan Szymblowski Capps also testified that Wood raped her when she was twelve years old.  On August 30, 1976, she was playing with a friend of hers when Wood approached her and asked her to help him find his dog.  71 RR 7633-34.  Capps walked around the corner, and Wood put his hand over her mouth.  71 RR 7635.  Wood then took off her clothes and raped her.  71 RR 7635-36.  She bled badly from the vaginal penetration.  71 RR 7637.  At trial, she identified Wood as the culprit.  71 RR 7638.

Finally, Dora Morales Padilla testified that Wood raped her.  On August 8, 1988, she reported an aggravated sexual assault to the El Paso Police Department that happened in March or April of 1987 when she was twenty-three years old.  71 RR 7640.  Padilla was working in the New Yorker bar, where she worked with Joanne Blaich.  71 RR 7640-41.  On the night in question, she got a ride home with Blaich and Wood at 2:30 a.m.  71 RR 7641.  They drove to some apartments on Montana Street, and Blaich and Wood, who were arguing, went inside.  71 RR 7642.  Wood came back to the truck alone and started driving.  71 RR 7643.  Wood offered Padilla drugs and called her a whore from Juarez.  71 RR 7643-44.  At

25

one point, Wood pulled off to the side of the road and began attacking Padilla. 71 RR 7646. She tried to get away, but Wood caught her and tied her up in the truck. 71 RR 7647-48. He also had a pocketknife and put it to Padilla's neck. 71 RR 7648. Then, he pulled her clothes off and raped her. 71 RR 7649. Wood continuously hit Padilla while he raped her. 71 RR 7649. Eventually, she made it home by stopping a taxicab. 71 RR 7651. At trial, she identified Wood as the person who raped her. 71 RR 7651.

### B.    Defense's evidence

Wood's father, Leo, testified about general information pertaining to Wood's family. He stated that he had a rocky marriage with Wood's mother, that Wood's mother was always sick, that she was always under psychiatric care, and that she had to be institutionalized. 72 RR 7666-67, 7672. The children lived from place to place and, Wood was twice placed in foster homes. 72 RR 7668-69. Further, due to the trouble with Wood's mother, his sister Debbie was his mother figure on many occasions. 72 RR 7673. Wood's father further stated that Wood was hyperactive in grade school and could not sit still, but outside of school he was normal. 72 RR 7674. Wood was placed on medication but, according to Leo Wood, Wood was over-medicated. 72 RR 7675. Eventually, it was discovered that Wood had a learning disorder, but his father maintained that he was not dumb or stupid. 72 RR 7676.

Wood's sister Debbie Galvan testified that she cared most of the time for her siblings because of her mother's illnesses and because their father was a workaholic. 72 RR 7679. The family was forced to take care of their mother rather than  vice versa. 72 RR 7680. Debbie recalled that her brother was on Ritalin to control his hyperactivity. 72 RR 7682. She also said that he never made good grades, but that he was  talented with his hands. 72 RR 7683. She also recalled that Wood was placed in a foster home twice, and ran away from home on one occasion. 72 RR 7683, 7686. Finally, Debbie testified that, as a child, Wood

26

was no different than any other boy. 72 RR 7686.

Next, Michael Maxwell, Wood's former employer, testified on Wood's behalf. He stated that he allowed Wood into his house and that Wood was around his family. 72 RR 7689. Wood was polite towards Maxwell's family, he ran errands for Maxwell, and Maxwell trusted Wood even to be around his daughters. 72 RR 7695. Maxwell also stated that Wood is a slow learner, and he is not very smart. 72 RR 7696. However, he testified that during the time he knew Wood, he was mild, calm, and never violent. 72 RR 7697.

Last, Donald T. Lunde, M.D., a clinical professor of psychiatry at Stanford University Medical School testified that he examined Wood. 72 RR 7698, 7706. Dr. Lunde found that Wood has long history of organic brain deficiency, attention deficit disorder which is associated with minimal brain damage, and a below average intelligence. 72 RR 7707-09. Dr. Lunde stated that because Wood had caseworkers or doctors when he was a child, this indicates serious problems, including a lack of maternal support and a dysfunctional family. 72 RR 7710-11. At one point, it was recommended that Wood be hospitalized. 72 RR 7711-12. Dr. Lunde indicated that although Wood has some form of organic defect in his opinion, the defect is something that would not be detectable on a brain scan. 72 RR 7715. He also stated that he believes with a high decree of certainty that Wood would not present a threat of any kind to other person, such as other prison inmates or employees, and that as people become older, they get less aggressive. 72 RR 7718. Dr. Lunde based his opinion in part on his conclusion that Wood has not been violent or aggressive during prior incarcerations and that, in his opinion, Wood does not have the capacity for deliberation or the type of thought processes necessary to do harm. 72 RR 7718-19, 7722. He also stated that predictions of future dangerousness are inaccurate and unreliable. 72 RR 7720.

On cross-examination, the prosecution pointed out that Wood has been involved in a fight each time he was incarcerated in TDCJ-ID. 72 RR 7724. The prosecution also noted that Wood was involved in a pre-trial confinement fight where he hit an inmate in the face and threatened him with a pen. 72 RR 7725-27. Dr. Lunde responded that this action was mild, that no disciplinary action was taken, that he considers Wood's actions to be routine of prison life in that this is behavior necessary for surviving in prison, and that he believes Wood would not re-offend. 72 RR 7724, 7727, 7730-31, 7743.

### C.    State's rebuttal

On rebuttal, the State presented testimony from Richard E. Coons, M.D., a general psychiatrist. 72 RR 7745. Dr. Coons was provided with materials to review regarding Wood's behavior. 72 RR 7749. The prosecution posed a hypothetical to Dr. Coons by asking him, assuming that all the facts in evidence are true, if would Wood constitute a future danger to society. Dr. Coons concluded that Wood would pose a continuing threat to society. 72 RR 7758-63. He also considered the other evidence, including Wood's attack on another inmate during pre-trial confinement, and concluded that this only strengthened his opinion. 72 RR 7763-64. Further, he believed that Wood is very capable of a deliberate act. 72 RR 7764-65. On cross-examination, Dr. Coons acknowledged that he never examined Wood or his family, nor did he independently verify this information. 72 RR 7766-71.

### ORIGINAL ANSWER

Pursuant to the AEDPA, an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

28

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *(Terry) Williams v. Taylor,* 529 U.S. 362, 405-06 (2000) ("*Williams I*"); *Hernandez v. Johnson,* 248 F.3d 344, 346 (5th Cir.), *cert. denied,* 122 S. Ct. 621 (2001). Alternatively, a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Williams I,* 529 U.S. at 407-09; *Hernandez,* 248 F.3d at 346. However, a federal habeas court's inquiry into reasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams I,* 529 U.S. at 409-11; *Tucker v. Johnson,* 242 F.3d 617, 620 (5th Cir.), *cert. denied,* 533 U.S. 972 (2001). Rather, federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable. *Williams I,* 529 U.S. at 411; *Martin v. Cain,* 246 F.3d 471, 476 (5th Cir.), *cert. denied,* 122 S. Ct. 194 (2001).

Importantly, "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams I,* 529 U.S. at 410. In other words, habeas relief is inappropriate when a state court, at a minimum, reaches a "satisfactory conclusion." *Williams I,* 529 U.S. at 410-11 (citing *Wright v. West,* 505 U.S. 277, 287 (1992)). The Fifth Circuit has also held that it is the state court's "ultimate decision" that is to be tested for

29

reasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001), *cert. denied*, 122 S. Ct. 1463 (2002); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding that a federal court's "focus on the 'unreasonable application' test under section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"), *cert. denied*, 123 S. Ct. 963 (2003).

Section 2254(e)(1) also requires federal courts to presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[10] Further, except for the narrow exceptions contained in section 2254(e)(2), the evidence upon which an applicant would challenge a state court fact finding must have been presented to the state court. Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence *presented in the state court proceeding*," 28 U.S.C. § 2254(d)(2) (emphasis added), it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.

In addition, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have

---

[10]   *See also Marshall v. Lonberger*, 459 U.S. 422, 432 (1983) (explaining that, under the pre-AEDPA standard, a federal habeas court was required to "conclude that the state court's findings lacked even 'fair [] support' in the record" before rejecting those findings.").

him guilty. 28 U.S.C. § 2254(e)(2). Any failure to present controverted, previously unresolved factual issues to .the state court is sufficient to constitute "failure" under the plain meaning of section 2254(e)(2). *(Michael) Williams v. Taylor,* 529 U.S. 420, 433 (2000) ("*Williams II*"); *Beazley v. Johnson,* 242 F.3d 248, 273 (5th Cir.), *cert. denied,* 122 S. Ct. 329 (2001). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence.[11] *Williams II,* 529 U.S. at 436; *Beazley,* 242 F.3d at 272-73.

Because Wood is unable to meet the above standards, habeas corpus relief is not warranted in this case.

## I. Wood Was Not Denied The Right To A Speedy Trial, And Trial And Appellate Counsel Were Not Ineffective For Failing To Raise This Issue.

In his first two claims, Wood contends that he was denied the right to a speedy trial and that trial and appellate counsel were ineffective for failing to assert Wood's speedy trial rights. Petition at 9-25. Wood's claim is primarily directed at the State's tactics during discovery, which he contends delayed the trial for two years and prejudiced his defense. However, as will be addressed below, these claims have no merit. As a preliminary matter, Wood raised these claims on state habeas review, and the trial court found as follows:

> [Wood's] trial counsel's failure to file a motion claiming that [Wood's] constitutional right to a speedy trial were violated fails to reveal any deficient performance on the part of trial counsel. The delay [from] July 13, 1990, the time of indictment, until the beginning of trial on September 8, 1992, is not unreasonable under the existing circumstances reflected by the record in this cause. Furthermore, much of the delay was occasioned by a motion to suppress filed by applicant which was granted and appealed and the trial

---

[11] Even if the habeas petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits of his claims. *Clark v. Johnson,* 227 F.3d 273, 284-85 (5th Cir. 2000), *cert. denied,* 531 U.S. 1167 (2001); *Barrientes v. Johnson,* 221 F.3d 741, 770 (5th Cir. 2000), *cert. dis'd,* 531 U.S. 1134 (2001).

judge's order reversed, and delay of the trial upon [Wood's] motion for continuance [from] November 30, 1990 to August 21, 1991. Additionally, [Wood] requested continuances on August 1, 1991 and August 16, 1991. Since [Wood] never invoked his constitutional right to a speedy trial and has not shown the possibility that the defense was impaired in any way, [Wood] has simply failed to show that his trial counsel's performance was deficient in any manner.

II SHTr 1-2.[12] The state court's denial of relief was not contrary to, nor an unreasonable application of, clearly established federal law.

### A. Facts pertaining to these issues

Wood was indicted for the murders of the six victims on July 13, 1990. Tr 2. On July 25, 1990, Wood was arraigned, and the trial court initially set the trial date for January 14, 1991. 3 RR 5. At a pre-trial hearing on August 31, 1990, the defense requested that the court postpone the trial until January 1992 because the State decided to close its file. 5 RR 73. The defense also filed a motion to compel discovery arguing that Article 39.14 of the Texas Code of Criminal Procedure, which pertains to discovery, was unduly restrictive and requesting that the State be required to provide photocopies of everything in its file, including material beyond the scope of 39.14. Tr 18-19. The defense's position was that unless the files were copied, it would take several months to make handwritten notes of everything in the State's file because it was voluminous. 5 RR 40-69. The State asserted that for the sake of saving time, it would close its files at that point and adhere to Article 39.14. 5 RR 70.

---

[12] Because trial counsel failed to assert Wood's speedy trial rights or raise an objection, the Director asserts that Wood has defaulted his speedy trial claim based on the Texas contemporaneous objection rule. *See Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991) ("[t]o preserve error for appellate review, the complaining party must make a timely, specific objection."); *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999) ("The 'Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims.'") (internal citations omitted)); *Nichols v. Scott*, 69 F.3d 1255, 1280 (5th Cir. 1995).

Then, at a hearing on September 21, 1990, the State reasserted that it would not agree to allow the defense to discovery beyond the scope of the Code of Criminal Procedure or to any evidence that was not *Brady*[13] material. 6 RR 78-79. The court then ordered the State to copy and provide to the defense all material previously shown to the defense because the court believed that it would take the defense approximately two years to conduct an independent investigation, thereby denying Wood the right to a speedy trial. 6 RR 80-81. The trial court also entered findings of fact and conclusions of law to that effect. Tr 20-22. The defense then filed a motion for a continuance arguing that the State's closed file policy would not allow it to be ready for trial by January 14, 1991. Tr 49-50. However, the State sought mandamus relief from the court's order to the Texas Court of Appeals, Eighth District, El Paso. On October 23, 1990, that court vacated the trial court's order, ruling that trial court unnecessarily and improperly intruded into the discretionary area of the prosecution and disregarded statutory enactments regulating discovery. *State ex. rel Simmons v. Peca*, 799 S.W.2d 426, 428-32 (Tex. App.–El Paso, 1990). The court of appeals also held that the trial court's order was void for vagueness. *Id.* at 432. The trial court subsequently entered an order vacating its previous order, Tr 93, and denied the defense's motion for a continuance on October 26, 1990. 8 RR 170.

On November 19, 1990, the defense filed a second motion for continuance arguing that its experts would not be ready for trial by January 14, 1991, and requesting the court to reset the trial for September 1991. Tr 105-06. Following a hearing on November 30, 1990, the trial court granted the defense's motion. 11 RR 290-91. On July 25, 1991, the defense filed another motion for continuance based on a lack of funds and arguing that it would be

---

[13]   *Brady v. Maryland*, 373 U.S. 83 (1963).

prejudicial for the jury, in all probability, to be sequestered over the Thanksgiving and Christmas holidays. Tr 122-24. On August 1, 1991, the defense filed a supplemental motion for continuance asserting that, because the State just released exculpatory information, more time was needed to investigate this evidence. Tr 126-27. At a hearing on August 1, 1991, the prosecutor testified that, on July 18th or 19th, she became aware of an FBI report concerning a man named Edward Barton who had allegedly stated that he was responsible for the murders in this case, but who could not be tracked down because he had escaped from federal custody. 15 RR 364-86. The defense asked the court for additional time to track down Barton and investigate this, as well as other, matters. 15 RR 377-79. The court overruled the motion stating that the defense had 90-120 days to investigate the issue until the State actually started presenting its case. 16 RR 398-99. The defense asked for additional continuances in subsequent pre-trial hearings, but the court denied them. 17 RR 462; 20 RR 596. Then, on August 21, 1991, the defense filed a motion to suppress fiber evidence found in Wood's truck, Tr 148-49, and the court sustained the motion on September 5, 1991. 21 RR 606; Tr 153. At that time, the defense also stated that it was not prepared to go to trial, arguing that the court erroneously overruled its continuance motions. 21 RR 606. Yet, the court overruled any request for a continuance. 21 RR 606. However, the State sought to appeal the court's ruling on the defense's motion to suppress the fiber evidence, and the court postponed the trial until January 21, 1992, to allow time for the matter to be resolved by the court of appeals. 23 RR 646. The defense also acknowledged that this took care of any problems resulting from the court's denials of its continuance motions. 23 RR 646-47.

Next, during a status conference on December 11, 1991, the trial court pushed back the date of trial to May 12, 1992, in order to allow the court of appeals to rule on the

34

suppression issue. 24 RR 652. On March 13, 1992, the Eighth Court of Appeals affirmed the trial court's ruling with regard to the suppression issue in a published decision. *State v. Wood*, 828 S.W.2d 471 (Tex. App.–El Paso, 1992); Tr 218-27. At a pre-trial hearing on April 2, 1992, the State asserted that it would not appeal the Eighth Court of Appeals decision to the Court of Criminal Appeals. 25 RR 657. However, in the interim, the defense filed a motion for change of venue arguing that extensive pre-trial publicity prevented Wood from obtaining a fair trial in El Paso. Tr 231-32. A hearing was conducted on the motion on April 8, 1992, and the court subsequently granted the motion, transferring the case to Dallas and setting the case for trial on September 9, 1992. 26 RR 672-780; Tr 238.

### B.    Wood's speedy trial rights were not violated.

Whether the constitutional right to a speedy trial is violated is determined by a balancing process of four factors: (1) length of delay, (2) reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). The length of the delay, the first *Barker* factor, is a triggering mechanism, and if the length is sufficient, an examination of the other factors is necessary. *Id*. at 530. The Fifth Circuit generally requires a delay of one year to trigger speedy trial analysis and, consequently, an examination of the other three *Barker* factors. *See U.S. v. Lucien*, 61 F.3d 366, 371 (5th Cir. 1995); *Robinson v. Whitley*, 2 F.3d 562, 568 (5th Cir. 1993). The starting point for measuring length of delay is arrest or indictment, whichever comes first. *Robinson*, 2 F.2d at 568. "If the length of delay reaches a threshold level regarded as 'presumptively prejudicial,' the court must make findings regarding the remaining three factors and balance all accordingly." *Id*. If the delay is not presumptively prejudicial, there is no need to consider the other factors. *Doggett v. United States*, 505 U.S. 647, 651 (1992); *Nelson v. Hargett*, 989 F.2d 847, 851 (5th Cir. 1993).

35

### 1.     Length of delay

In the present case, Wood was indicted on July 13, 1990.  Although Wood attempts to argue that there was a five-year delay, Petition at 25, the fact is that Wood was incarcerated several years prior to the date of indictment because he had been arrested and convicted for the sexual assault on Judith Kelly, for which he received a fifty year sentence. 83 RR at SX 286.  Wood was not arrested in 1987 for the murders of the six victims. Therefore, the triggering date for the purpose of the speedy trial analysis must be considered the date of indictment.  Nonetheless, because Wood's trial began in September 1992, the two year delay is sufficient to require an examination of the other three *Barker* factors.  *Lucien*, 61 F.3d at 371; *Robinson*, 2 F.3d at 568.

### 2.     Reasons for the delay

The second *Barker* factor, reasons for the delay, certainly do not weigh in Wood's favor.  The gist of Wood's claim is that he was denied a speedy trial due to the State's tactics with regard to discovery.  Further, he relies heavily on the trial court's stern language to the prosecution during the September 21, 1990, pre-trial hearing that the State closed its file in retaliation for the aggressive defense by Wood's attorneys and that if the State did not copy its file for the defense, Wood would ultimately be deprived of a speedy trial.  6 RR 80-81; Petition at 13-15.  Yet, as the Eighth Court of Appeals made clear, the State's actions were proper and part of the blame for any discovery problems lied with the defense.  Specifically, the court held:

> It has been conceded by all concerned that the scope and form of discovery sought by the defense and ordered by the Respondent are beyond the discretionary range of Tex.CodeCrim.Pro.Ann. art. 39.14 (Vernon 1979). *State ex rel. Simmons v. Moore,* 774 S.W.2d 711, 714 (Tex.App.--El Paso 1989) (original proceeding in mandamus), *Brem v. State,* 571 S.W.2d 314, 321- 322 (Tex.Crim.App.1978).  Nor is this order supportable under constitutional

36

discovery principles as expressed in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny. The motions for discovery filed by the defense were too broad to support a constitutional claim, particularly in the absence of allegation and proof of any exculpatory or otherwise favorable material in the file. *Thomas v. State,* 511 S.W.2d 302 (Tex.Crim.App.1974); *Jackson v. State,* 501 S.W.2d 660 (Tex.Crim.App.1973). *See also Boles v. State,* 598 S.W.2d 274 (Tex.Crim.App.1980). This is not a case in which the defense was unable to provide greater specificity in pursuing the contested range of discovery. *See Sellers v. Estelle,* 651 F.2d 1074 (5th Cir.1981), *cert. denied,* 455 U.S. 927, 102 S.Ct. 1292, 71 L.Ed.2d 472 (1982). Here, the defense had several weeks of access to the entire file. The first hearing was in fact continued for the express purpose of providing the lower court with a detailed description of the contents of the file. The defense made no such [effort] and did not further *refine* its discovery motion. The defense similarly did not take advantage of the State's policy of providing individual document copies upon specific requests. In any event, the record before the lower court and this Court does not reflect a *Brady* basis for the discovery order. *See generally Quinones v. State,* 592 S.W.2d 933 (Tex.Crim.App.1980), *cert. denied,* 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1981).

\* \* \*

In the present case, it would seem that the trial judge's actions in the interest of constitutional rights to due process, effective assistance of counsel and speedy trial are premature. On the basis of speculative anticipation of injury to these rights, the trial judge has exceeded the remedial power granted the judiciary by constitution, statute and case law. In doing so, upon these bases, the lower court has unnecessarily and improperly intruded into the discretionary area of the executive authority of the State's prosecutor and has disregarded the authority of the legislature in its statutory enactments regulating discovery. That same analysis in *Meshell v. State,* 739 S.W.2d 246 (Tex.Crim.App.1987) which led to the demise of the legislature's Speedy Trial Act, should in this case preclude reliance upon speedy trial, due process and effective assistance of counsel as bases for the challenged discovery order.

In particular, the Respondent's own preference for the speed of disposition of his docket does not equate per se with the dictates of the speedy trial guarantees of the United States and Texas Constitutions. His focus upon estimated length of delay in anticipating a violation unduly focuses upon but one of the four critical factors identified in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), as disposition of speedy trial complaints.

> Indeed, with regard to all of these theoretical constitutional injuries, at the time Respondent entered the challenged order, not one had been embodied in a defense motion or complaint. In light of the fact that none of these could be preserved for appellate relief in the absence of trial complaint by the defense, it was inappropriate for the Respondent to have ordered such extraordinary discovery as compensatory relief for speculative future injuries raised by the court sua sponte.

*State ex rel. Simmons*, 799 S.W.2d at 429-31. The court of appeals also concluded that the trial court's order was void for vagueness because it simply directed the State to copy all material in its file previously shown to the defense. *Id.* at 432. The court of appeals stated, "Understandably, the Respondent could not be more precise, since he was never provided by the defense with any specific description of the contents of the district attorney's file. Respondent did direct the defense to prepare such an inventory when the first hearing was continued. That was not done and, in fact, testimony at the second hearing reflected, without specification, that the contents of the file changed." *Id.* Thus, it is clear that the State's actions with regard to discovery were not improper, and its appeal of the trial court's order, to the extent it could be considered to have resulted in any delay, was clearly taken in good faith. Therefore, the State's discovery tactics do not weigh in Wood's favor.

Next, the fact that Wood sought and received an eight month continuance to prepare its experts does not weigh in Wood's favor and refutes any notion that the State's discovery tactics are to blame for the delay in the trial. For instance, at a pre-trial hearing on August 31, 1990, Wood's counsel stated that it would take several months to take handwritten notes of everything in the State's file if it was required to do so. 5 RR 45. Yet, at the pre-trial hearing on November 30, 1990, Wood's attorney, Norbert Garney, testified that the experts the defense intended to use could not be ready for trial until the summer of 1991. 11 RR 282-87. This had nothing to do with the State not providing information; rather the defense

38

testified it would take its experts that long to complete their examinations and prepare reports. Indeed, Wood's attorney, Adolfo Quijano stated:

> Judge, this is not a frivolous motion for continuance. This is an incredibly complicated case. It's a case that's going to rest whether it is won or lost based on the testimony of expert witnesses in the various fields of expertise. Primarily what we are really concerned about is having the best expert possible . . . We have spoken to two of the top experts in this country, which we believe we need, and they have indicated pursuant to what Mr. Garney has testified to. We will not be able to try this case any time sooner than the summer of 1991. And we are requesting a continuance until September in order to have the minimum amount of time to adequately prepare a defense for our client.
>
> * * *
>
> I will not be able to render, nor will Mr. Garney, effective assistance of counsel for our client without the availability of those experts coming to us and telling us what they know and how we can defend our client. *We need the time*. We are not asking for it to drag our feet. We want the time to September 1st or at least until September, 1991. That's the minimum time we need. I'm a little concerned, Your Honor, about trying to push experts who will just say, Look, I'm not taking the case. You go get somebody who is less qualified or less competent. This case doesn't deserve that type of treatment.

11 RR 288-89 (emphasis added). The court granted the continuance, but noted its displeasure with the defense in asking for the time, mainly because the defense waited several months to contact any experts. 11 RR 290-91. The defense then told the court that it could not promise that it would not file other motions for continuances, and the court informed the defense that it could file additional motions but that "you better be ready to go to trial in August." 11 RR 292. Therefore, the delay in the trial until September 1991 had nothing to do with the State's discovery tactics because it is clear that the defense was given the time to copy the State's file; rather, the defense needed time to prepare its experts.

Then, the defense filed two motions for continuances in July and August 1991, and the second supplemental motion was in response to the fact that the State just discovered and

handed over possible *Brady* evidence to the defense. This did not result in any further delay in the trial because the court did not grant the continuances. The trial was further postponed when the court granted the defense's motion to suppress, and the State appealed the court's decision. Although Wood argues that this weighs in his favor, Petition at 16, the Director disagrees for two reasons. First, the appeal was not taken in bad faith because the evidence pertained to critical evidence: fibers found in Wood's truck that could have further linked him to the killings. Second, and more importantly, as the trial date approached, the defense repeatedly asked for continuances and, on September 5, 1991, stated that it was not prepared to go to trial because the court overruled its prior motions for continuances.  21 RR 606. As stated above, the defense argued that it needed the time to investigate the evidence turned over by the State. Therefore, although the delay at that point was due to the State's appeal, it is clear that the defense welcomed the postponement to further prepare for trial. Consequently, this factor does not weigh heavily in Wood's favor.

The last factor that resulted in the delay of the trial until September 1992 was the defense's motion to transfer venue filed in March 1992, which was granted. This clearly does not weigh in Wood's favor because the court told the defense as early as July 25, 1990, the date Wood was arraigned, that it wanted to know if the defense intended on filing a motion to transfer venue. 3 RR 7. At a hearing on November 11, 1990, the defense specifically told the court that it would not file a motion to transfer because Wood himself wanted to be tried in El Paso. 7 RR 160-61. Thus, the defense waited over a year and a half after the court first inquired into the matter to attempt to have the case moved.

In short, the reasons that this case was delayed do not weigh in Wood's favor. Indeed, Wood's claim ignores the complexities of this case, complexities defense counsel recognized, and the fact that the information pertaining to the case was incredibly voluminous. Simply

40

put, two years is not a significantly long delay between indictment and trial when considering all of the circumstances of this case, including the number of victims, the facts of the offenses, and the number of witnesses, including potential witnesses, involved in this case. The Fifth Circuit has stated that "[i]n assessing the reasons for the delay, we observe at the outset that 'pretrial delay is often both inevitable and wholly justifiable.'" *United States v. Bieganowski*, 313 F.3d 264, 284 (5th Cir. 2002) (quoting *Doggett*, 505 U.S. at 656). "We also recognize that the extent to which this observation rings true will necessarily vary with the complexity of the case. Thus, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge such as the one in which [the defendant] found himself enmeshed." *Id.* (citation omitted). In fact, the Fifth Circuit has held that, under certain circumstances, delays much longer than two years have not deprived the defendant of a fair trial. *Jameson v. Estelle*, 666 F.2d 241, 243-45 (5th Cir. 1982) (holding 44 month delay not unconstitutional); *Hill v. Wainwright*, 617 F.2d 375, 379 (5th Cir. 1980) (defendant not deprived of speedy trial when three year delay attributed mainly to defendant's actions); *Turner v. Estelle*, 515 F.2d 853, 856-60 (5th Cir. 1975) (delay of four years eight months not unconstitutional). Moreover, the Fifth Circuit has held that the "speedy trial clock is properly tolled in cases where responsibility for the delay lies with the defendant rather than the state." *Nelson*, 989 F.2d at 852. Further, "[d]elays resulting from pre-trial motions 'will toll the trial clock indefinitely; there is no independent requirement that the delay attributable to the motions be reasonable.'" *United States v. Walker*, 960 F.2d 409, 414 (5th Cir. 1992) (quoting *United States v. Santoyo*, 890 F.2d 726, 728 (5th Cir.1989)). Here, Wood filed five motions for continuances, a motion to transfer venue, and countless other motions that the State needed time to oppose. *See Doggett*, 505 U.S. at 656. At least one year in the delay must be solely attributed to Wood based on his motion for

41

continuance to prepare expert witnesses and his motion to transfer venue. Consequently, the evidence in this case demonstrates that the reasons for the two year delay do not weigh in Wood's favor.

### 3. Assertion of the right

In *Barker*, the Supreme Court stated:

> Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

407 U.S. at 531-32. Here, Wood did not assert his right to a speedy trial. He never filed a motion complaining that his rights were impaired. Of course, this is the basis of Wood's ineffectiveness claims. Regardless, the evidence is clear that the defense did not raise this issue for one simple reason: counsel believed it needed as much time as possible to prepare for trial given the circumstances and complexities of this case. As stated above, as the September 1991 trial date approached, the defense maintained it was not prepared to go to trial and was obviously happy when the trial was postponed based on the State's appeal of the suppression of the fiber evidence. Thus, not only did the defense not assert this right, it is evident that counsel had no reason to do so because they did not want to go to trial any sooner. This factor weighs heavily against Wood and demonstrates that his speedy trial claim has no merit.

42

### 4. Prejudice to the defendant

With regard to the fourth *Barker* factor, prejudice to the defendant, the Supreme Court has identified three interests: "(1) preventing 'oppressive pretrial incarceration,' (2) reducing the 'anxiety and concern of the accused,' and (3) protecting against impairment of the defense." *Cowart v. Hargett*, 16 F.3d 642, 647 (5th Cir. 1994) (citing *Barker*, 407 U.S. at 532). When the first three factors do not weigh heavily against the State, as in this case, a petitioner must make an "affirmative showing of actual prejudice." *Cowart*, 16 F.3d at 637. Wood, however, fails to make this showing.

Wood claims that he was prejudiced for four reasons. First, he claims that he was prejudiced because the delay prevented him from interviewing and investigating Edward Barton. Petition at 23-24. As discussed above, in July 1991, the State disclosed to the defense an FBI report pertaining to Barton that revealed that he had made statements implicating himself in the instant crime. 82 RR at DX A & C (pre-trial exhibits). The FBI report was dated March 1989. 82 RR at DX A. At the time the prosecutor informed the defense of this report, Barton was already an escapee from federal custody. 17 RR 417; 82 RR at DX C. He escaped from a halfway house on July 9, 1991. 82 RR at DX 1. During the pre-trial hearings, there was some evidence presented that the report may have been sent to the El Paso Police Department shortly after it was prepared, but the prosecution did not become aware of it until they retrieved it from a box of miscellaneous materials that had been in a locker at the Crimes Against Persons Division of the police department. 15 RR 366; 17 RR 413-14. In a memorandum from the prosecutors to defense counsel dated August 9, 1991, the prosecutors listed the names, addresses and numbers of various persons, including Barton's ex-wife, whom the defense could contact to further investigate this matter. 82 RR at DX 1. The memorandum also listed additional information pertaining to other *Brady*

43

evidence. At the August 16, 1991, pre-trial hearing, the defense asked for a continuance to investigate this matter and essentially accused the State of hiding and not disclosing the information until right before trial. 17 RR 456-59.

Wood contends that the State failed to present this information in a timely fashion and that, had the State disclosed the information earlier, the defense could have located and interviewed Barton before he escaped. Petition at 23. Thus, Wood alleges that by delaying the trial and violating the court's *Brady* order, the State caused the unavailability of a potentially important witness. *Id.* The problem with Wood's claim as a speedy trial issue is that, at the time this information was disclosed, the trial had been delayed not because of any action by the State, but because the defense had been granted a continuance to prepare its experts. In other words, this is not a case in which the State intentionally delays a trial until a witness is no longer available. What Wood is complaining about is the timing of the disclosure, in that the evidence was not turned over until shortly before the trial was to begin in September of 1991. In other words, this appears to actually be a prosecutorial misconduct claim. Regardless, Wood did not suffer any prejudice because (1) the prosecutors disclosed the evidence as soon as they became aware of its existence; (2) the prosecutors gave the defense sufficient leads to track down Barton, which the court acknowledged, 15 RR 381-82; and (3) Wood actually received over a year to investigate the matter because the trial was ultimately postponed until September 1992. Wood, however, did not present any evidence or witnesses pertaining to this matter at trial, nor does he even claim in his petition that Barton could have actually provided exculpatory evidence. In fact, he does not even state whether or not he ever located or tried to locate Barton during the year he had to investigate the matter. Thus, it is purely speculative whether any of this information was actually beneficial. In this regard, Wood's claim is conclusory and fails to state a constitutional issue.

*Ross v. Estelle*, 694 F.2d 1008, 1011-12 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his petition . . . to be of probative evidentiary value.").

Second, Wood contends he was prejudiced because, contained in that same box of miscellaneous materials, was *Brady* evidence regarding a sex for drugs scandal occurring out of a tattoo parlor and involving some of the women who disappeared. Petition at 24. However, the owner of the tattoo parlor had recently died and, thus, the State deprived Wood of another witness. *Id.* The evidence in question was a letter from a jail inmate named Billy Smith, dated September 18, 1988, in which Smith stated "Jackson [Piersall] told me the guy name[d] Frank [Connally] is responsible for most of the actual deaths but it's all from a biker group in [connection] with a [tattoo] shop there in El Paso." SHTr 194. The State handed over this letter to the defense at the same time the evidence pertaining to Barton was disclosed. 15 RR 374-76. Nonetheless, once again, Wood's contention does not actually pertain to a speedy trial matter because his trial was delayed at this point due to the continuance he filed. He is complaining about the timing of the State's disclosure. Yet, he did not suffer any harm for three reasons. First, the prosecution provided to the defense Billy Smith's current address and phone number so that he could be tracked down, as well as the addresses and numbers for Jackson Piersall, who had died, and Frank Connally. 82 RR at DX 1. Second, the defense had over a year to track down Smith and Piersall and investigate this matter. Yet, they were not called to testify at trial. Third, this matter was actually addressed at trial. Detective Giron testified that he received the letter from Smith, that he was aware of the allegations in the letter, that he discussed the matter with the investigators in his office, that he learned Frank Connally had been questioned by another investigator, that Connally had died in a motorcycle accident, that the matter had been investigated, that none

45

of the murdered girls were connected with the tattoo parlor, that the allegations in Smith's letter proved to be unfounded, and that Jackson Piersall even denied the allegations. 65 RR 6940-46, 6959-60. Thus, Wood could not have suffered any prejudice because he had the time to investigate the matter, the issue was raised before the jury, but it simply did not have any merit. For these reasons, Wood's claim fails.

Third, Wood complains that the State delayed the submission of DNA evidence, a fingernail from Angie Frausto, to the laboratory for a year and a half. Petition at 24. Specifically, Wood claims:

> The results were inconclusive due to the way in which the evidence was stored (in ambient conditions, instead of frozen), and because the evidence sat in a Department of Public Safety laboratory in Lubbock, Texas, without being tested for an inordinate amount of time. Had the State not been obstinate in refusing to assist with discovery and prosecuting unnecessary interlocutory appeals, trial of this case would have forced the quick examination of the evidence left unattended in Lubbock for over a year.

*Id.* Wood's claim, as evidenced above, completely ignores the fact that the trial was delayed over a year based solely on defense motions and not by any improper delay tactics by the State, and that the defense was not ready to go to trial any earlier. Nonetheless, his claim has no merit. Judith Floyd, a DNA forensic analyst with Genescreen in Dallas, testified that she received the fingernail on July 9, 1991, and that it was in a sealed Petri dish at room temperature that was contained in a Federal Express envelope. 67 RR 7307-08. She was unable to obtain any results from the nail. 67 RR 7311-14. Floyd stated that the factors contributing to her lack of results could be the nail's exposure to ultraviolet light, the age of the specimen, and exposure to dirt and other chemicals. 67 RR 7315. She further stated that it would have been preferable had she received the specimen earlier, 67 RR 7315-16,

however she acknowledged on cross-examination that she was not optimistic about obtaining results regardless of when she received it because the nail was buried in dirt and subjected to rain and humidity for two and a half months.  67 RR 7325-27.  In fact, Floyd stated that "I have found dirt to be one of the most detrimental substances to DNA that is present as far as agents that can come in contact with the tissue or body fluids present from another person."  67 RR 7325-26.  Floyd further acknowledged that while her company had conducted PCR DNA testing since 1986, she did not perform DQ Alpha testing until April 1991.  67 RR 7319-22.  Thus, her testimony revealed (1) that in all likelihood, her results were inconclusive due to the nail's exposure to the elements and not by any delay in receiving the specimen and (2) that she could not have conducted a DQ Alpha test on the nail any earlier.

Wood's claim is further refuted by the testimony from the State's rebuttal witnesses. Steve Robertson, a chemist with the DPS Crime Lab in Austin, testified that the nail was first sent to CBR Laboratories in Boston, Massachusetts, in February 1991and that he also received inconclusive results from that lab. 68 RR 7353. He then sent the nail to Genescreen upon a defense request for testing. 68 RR 7353. Robertson further stated that he did not send the nail for testing in late 1989 or 1990 because, at that time, PCR analysis was brand new and Genescreen was having problems with its technique. 68 RR 7354.  In mid or late 1990, CBR Laboratory was recommended to him and, after sending some other cases to that lab and obtaining good results, he sent the nail to the lab in early 1991.  68 RR 7355. Therefore, it is clear that no testing facilities in the country were even prepared to adequately test the nail specimen prior to 1991.  Additionally, David Bing, the Director of CBR Laboratories, testified that his lab was not prepared to perform DQ Alpha PCR testing back in 1987, that it did not get its first DQ Alpha testing kit until April 1990, and that it did not

47

get its first results until August 1990. 68 RR 7358-59. His lab did test the nail but was unable to get any results. 68 RR 7362-63. He also stated that DNA is quickly degraded by environmental elements and that his lab has not been successful in obtaining a DQ Alpha type from materials taken from exhumed bodies. 68 RR 7360-64. On cross-examination, Bing stated that although its preferable to store DNA samples in temperatures just above freezing, it is acceptable to keep these samples in dry conditions at room temperature and shielded from light. 68 RR 7368-69.

In sum, although Wood complains about the delay in sending the nail for testing and the conditions under which the nail was stored, it is evident that the nail could not have been sufficiently tested at any earlier time and that, in all probability, no lab would have obtained results even if it was immediately submitted for testing because any DNA material was degraded by the elements. Wood has not provided any evidence to demonstrate otherwise, and he has not shown with any facts that the State actually mishandled the nail specimen. Moreover, even if a lab had obtained DNA results and the results excluded Wood, this would have only meant that Wood's DNA was not present on the nail. This does not mean that Wood could not have killed Angie Frausto. In other words, whether or not this would have proven to be exculpatory evidence is questionable. Therefore, Wood did not suffer any prejudice by the delay in testing the nail, and his claim fails as a result.

Finally, Wood claims that he suffered pre-trial anxiety having to wait five years from arrest to trial. Petition at 24-25. This is a completely meritless claim because, as stated previously, Wood was incarcerated for his sexual assault on Judith Kelly before he was indicted in the instant case. The Fifth Circuit has held that, with regard to pre-trial anxiety, "[i]ncarceration on other charges or convictions pending trial also does not constitute prejudice for *Barker* purposes." *Cowart,* 16 F.3d at 647. Thus, the time preceding

48

indictment cannot be factored into any pre-trial anxiety. Additionally, Wood's claim is, at best, conclusory because he simply asserts that having to wait that time with the possibility of receiving the death penalty caused him great anxiety and worry. He has offered no evidence to show that he actually did suffer undue anxiety. Thus, his claim fails to state a constitutional claim. *Ross*, 694 F.2d at 1011-12. In sum, with regard to his prejudice allegations, Wood has failed to demonstrate that he was subjected to oppressive pretrial incarceration or anxiety or that his defense was impaired. Further, the totality of the evidence and an analysis of the *Barker* factors shows that Wood's right to a speedy trial was obviously not violated because these factors do not weigh in his favor. Thus, his claim must be denied.

### C.   Counsel were not ineffective for failing to raise this issue.

It is clearly established that claims of ineffective assistance of counsel are to be reviewed under the two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *See Burger v. Kemp*, 483 U.S. 776, 781 (1987). Under that standard, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Concerning the deficiency prong of *Strickland,* the Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight." *Strickland,* 466 U.S. at 689-90. Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Id.* at 689; *Lockett v. Anderson,* 230 F.3d 695, 711 (5th Cir. 2000). In order to prove prejudice, Wood must show a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694. Furthermore, "a failure to establish either requirement necessarily defeats the claim." *Lincecum v. Collins*, 958 F.2d 1271, 1278 (5th Cir. 1992). Wood cannot satisfy this standard.

Wood's speedy trial claim was addressed above and, for the reasons discussed, he was not deprived of a speedy trial. It is clear counsel had no reason to file a motion asserting Wood's speedy trial rights because counsel needed and wanted as much time as possible to prepare for trial. As the September 1991 trial date emerged, counsel informed the court that it was not ready to proceed to trial and repeatedly asked for continuances. And, the case was delayed over a year based on motions filed by the defense. Given that defense counsel was requesting more time to prepare and asked for these continuances, as well as a change of venue, it would have be completely foolish and nonsensical for counsel to complain that Wood was being denied the right to a speedy trial. Thus, it was wise for counsel not to object to any delay. *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); *Koch v. Puckett*, 907 F.2d 524, 526 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections."). Moreover, as addressed above, there is no evidence showing that Wood was prejudiced by trial counsel's failure to raise this issue because, even assuming that his claim had some merit, there is not a reasonable probability that the delay altered the outcome of the trial. Indeed, if anything, the time between indictment and trial worked to counsel's advantage by giving them more time to prepare for an extremely complex trial. For these reasons trial counsel were not ineffective.

Wood also claims that appellate counsel was ineffective for failing to raise this issue on appeal. Yet, it is not required that an attorney argue every conceivable issue on appeal, especially when some may be without merit. *Jones v. Barnes,* 463 U.S. 745, 754 (1983). Indeed, it is his professional duty to choose among potential issues, according to his judgment as to their merit and his tactical approach. *Id.* Further, to prevail on an ineffective assistance claim such as the instant one, a habeas petitioner must demonstrate a reasonable

probability that, but for appellate counsel's unprofessional errors, the result of his appeal would have been different.   *Smith v. Robbins,* 528 U.S. 259, 285 (2000); *Lockhart v. McCotter,* 782 F.2d 1275, 1283 (5th Cir. 1986).   Appellate counsel's failure to raise certain legal issues on direct appeal does not amount to the ineffective assistance of appellate counsel unless petitioner can demonstrate that these issues reflected trial errors of arguable or colorable merit.   *Robbins,* 528 U.S. at 285; *Hooks v. Roberts,* 480 F.2d 1196, 1198 (5th Cir. 1973).

Here, appellate counsel could not have been ineffective for two reasons.   First, trial counsel never objected or asserted the right and, consequently, the claim was not preserved for appellate review.   *Turner,* 805 S.W.2d at 431; TEX. R. APP. PROC. ANN. 33.1(a).[14]   Thus, the Court of Criminal Appeals would not have reviewed the claim even if appellate counsel had raised it.   Yet even had trial counsel objected, appellate counsel was not ineffective for failing to raise this issue.   As explained at length above, Wood's underlying speedy trial contention has no merit.   Thus, appellate counsel could not have been ineffective for failing to raise this claim.   *Evitts v. Lucey,* 469 U.S. 387, 394 (1985) (appellate counsel is not deficient for failing to raise a meritless issue); *Jones v. Barnes,* 463 U.S. 745, 754 (1991); *Moawad v. Anderson,* 143 F.3d 942, 948 (5th Cir. 1998) (if there is no prejudice from the trial error, there is no prejudice from the appellate error); *Sharp v. Puckett,* 930 F.2d 450452 (5th Cir. 1991).   Even if the claim might have merit, appellate counsel has no constitutional obligation to raise every possibly meritorious challenge to Wood's death sentence -- even if Wood had desired for the claim to be raised.   *See Jones*, 463 U.S. at 751-54 (explaining that a criminal defendant does not have a constitutional right to have appellate counsel raise every

---

[14]   Formerly TEX. R. APP. PROC. 52(a).

"colorable" claim that the defendant requests); *Engle v. Isaac*, 456 U.S. 107, 134 (1982) ("[T]he constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."). Assuming *arguendo* counsel rendered deficient performance for failing to raise this issue, Wood was certainly not prejudiced by the omission because, for the reasons explained above, he never would have received relief on the claim. Therefore, Wood cannot show that trial and appellate counsel were ineffective under *Strickland* for failing to raise this issue, and his claim must be denied.

## II.   Wood's Claim Challenging The Indictment Is Procedurally Barred, Not Cognizable On Federal Habeas Review, And Is Meritless. Consequently, Trial And Appellate Counsel Were Not Ineffective For Failing To Raise This Issue.

In his next two claims, Wood challenges his indictment.  His basic complaint is that the indictment fails to allege the offense of capital murder because "the indictment as alleged at best indicts Petitioner for six separate murders.  At worst the indictment is fundamentally defective for failing to allege a crime in Texas and certainly for failing to allege the offense of capital murder." Petition at 28.  Wood also complains that trial and appellate counsel were ineffective for failing to address this issue.   Wood's indictment claim, however, is procedurally barred and not cognizable, and all of his allegations are meritless.

### A.   Wood's indictment claim is procedurally barred and not cognizable.

The Texas courts have already considered and rejected Wood's challenge to the indictment based on an independent and adequate state procedural bar.  Wood raised this claim for the first time in his state habeas application. I SHTr 98-99.  The state habeas court rejected this claim based on an independent state procedural bar.  Specifically, the court found that the "failure to raise the issue before trial constitutes waiver and prohibits an

applicant [from] raising the defect for the first time in a post-conviction proceeding." *See Ex parte Morris*, 800 S.W.2d 225 (Tex. Crim. App. 1990); *Cook v. State*, 902 S.W.2d 471 (Tex. Crim. App. 1995). Although trial counsel raised many pre-trial challenges to the indictment, as will be discussed *infra*, counsel did not raise the *exact* claim Wood is now presenting. Thus, his challenge to the indictment is procedurally barred. It is well settled that federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default.[15] *Harris v. Reed*, 489 U.S. 255, 265 (1989); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995). Further, where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice that is attributable to the default. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977). Wood fails to prove cause and prejudice, nor has he shown that the failure to consider this claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. To the extent that Wood alleges ineffective assistance of counsel as cause, such a contention has no merit because ineffectiveness of counsel does not "constitute cause for the default sufficient to allow federal habeas review," *Carrier*, 477 U.S. at 486, 106 S. Ct. at 2644, absent an independent showing of constitutional ineffectiveness pursuant to *Strickland v. Washington. See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000); *Coleman*, 501 U.S. at 755. However, as will be discussed below, Wood cannot show that counsel was ineffective. Thus, Wood cannot establish cause and his claim is barred from federal habeas

---

[15]  A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim. *Fisher v. Texas,* 169 F.3d 295, 300 (5th Cir. 1999).

review.

Further, Wood's claim is not cognizable. In *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985), the Fifth Circuit held that where the state courts find the indictment is not fundamentally defective, then the issue is not entitled to federal habeas review. *Millard v. Lynaugh*, 810 F.2d 1403, 1407 (5th Cir. 1987). Furthermore, "the sufficiency of a state indictment is not a matter for federal habeas relief unless it can be shown that the indictment is so defective that it deprives the state court of jurisdiction." *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *Johnson v. Puckett*, 930 F.2d 445, 447 (5th Cir. 1991); *Morlett v. Lynaugh*, 851 F.2d 1521, 1523 (5th Cir. 1988); *Uresti v. Lynaugh*, 821 F.2d 1099, 1102 (5th Cir. 1987); *Branch v. Estelle*, 631 F.2d 1229, 1232 (5th Cir. 1980) (*citing Meyer v. Estelle*, 621 F.2d 769, 771 (5th Cir. 1980)). If the question of sufficiency of the indictment is presented to the highest state court, consideration of the question is foreclosed in federal habeas proceedings. *McKay v. Collins*, 12 F.3d 66, 69 (5th Cir. 1994); *Yohey*, 985 F.2d at 229. Further, where the state courts have implicitly held as a matter of state law that an indictment or information is sufficient to confer jurisdiction on the trial court, a federal habeas court should inquire no further. *McKay*, 12 F.3d at 69; *Lavernia v. Lynaugh* , 845 F.2d 496, 496 (5th Cir. 1988). Federal habeas corpus is available only for the vindication of rights existing under federal law; not rights existing solely under rules of state procedure. *Manning v. Blackburn*, 786 F.2d 710, 711 (5th Cir. 1986).

The sub-issue of the state court jurisdiction has been legislatively and judicially settled. A 1985 amendment to the Texas Constitution, Art. V. § 12(b) states:

> The presentment of an indictment or information to a court invests the court with jurisdiction of the cause.

Tex. Const. Art. V. § 12(b); *see McKay,* 12 F.3d at 69. This amendment applies to all indictments returned after September 1, 1985. Upon review of the sufficiency of the indictment issue after the 1985 amendment to the Texas Constitution, the Fifth Circuit held that "due deference must be given to the state court's interpretation of the 1985 amendment, and that alleged defects in an indictment do not deprive the state trial courts of jurisdiction. *McKay* 12 F.3d at 68. Further, Texas courts have held that the failure to include an essential element of the crime charged, which constitutes a defect of substance, does not deprive the trial court of jurisdiction. *Studer v. State*, 799 S.W.2d 263, 271-72 (Tex. Crim. App. 1990) (cited in *McKay*, 12 F.3d at 69).

In the case at bar, the Grand Jury of El Paso County, Texas returned the indictment against Wood on July 13, 1990. Tr 2. Thus, the 1985 amendment clearly applies to Wood's indictment. Furthermore, Wood raised this issue on state habeas review,[16] and the trial court specifically found that the indictment was not defective, in addition to finding that Wood's claim was waived. II SHTr 5. Therefore, the Texas Court of Criminal Appeals found the indictment was sufficient as a matter of state law when it denied Wood's state habeas application on the findings of the trial court. *Ex parte Wood*, Application No. 45,746-01 at cover and Order. In similar cases, this court has noted that "the Texas Court of Criminal Appeals in declining to grant relief has necessarily, though not expressly, held that the Texas courts have jurisdiction and that the indictment is sufficient for that purpose." *McKay*, 12 F.3d at 68 (citing *Alexander*, 775 F.2d at 599). Therefore, Wood has presented his defective indictment claim to the highest state court, and that court has "necessarily" found that the

---

[16] As will be discussed below, Wood's attorneys also raised numerous challenges to the indictment during the pre-trial hearings. The trial court rejected these challenges and, in doing so, implicitly found the indictment to be sufficient as a matter of law.

trial court had jurisdiction over the case. Thus, the federal courts are barred from addressing this issue on federal habeas review. *McKay*, 12 F.3d at 69; *Millard*, 810 F.2d at 1407; *Morlett*, 851 F.2d at 1523; *Alexander*, 775 F.2d at 599.

**B.     Wood's challenge to the indictment is meritless.**

Wood's contention is that the indictment did not follow the language of the statute pertaining to a serial offense, failed to give him fair notice of the offense charged, and failed to allege that he was being charged with capital murder. His claim is completely meritless. As preliminary matter, the trial court addressed this claim on state habeas review and found that the indictment "was not fundamentally defective because it alleged all of the elements of the offense of capital murder. Even if the indictment failed to allege a constituent element of the offense, it is still an indictment as contemplated by Article 5, Sec. 12(b) of the [Texas] Constitution and under Article 1.14(b)." II SHTr 5. The state court's conclusion was clearly reasonable.

The Fifth Circuit has described the standard for determining whether an indictment is sufficient:

> The standard for determining the sufficiency of an indictment is based upon practical, not technical considerations. *United States v. Chaney*, 964 F.2d 437, 446 (5th Cir.1992). The test involves minimal constitutional standards, not whether a better indictment could have been written. *Id.* The essential elements of the offense, including knowledge or intent, must be included in the indictment but need not be expressed in any specific terms. *United States v. Arteaga-Limones*, 529 F.2d 1183 (5th Cir.), *cert. denied* 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 286 (1976). The "plain and sensible meaning of the language used" may give the defendant notice sufficient to meet the requirements of the sixth amendment. *United States v. Haas*, 583 F.2d 216 (5th Cir.1978), *cert. denied* 440 U.S. 981, 99 S.Ct. 1788, 60 L.Ed.2d 240 (1979).

*McKay*, 12 F.3d at 69. The court then stated that "[a]n indictment should be found sufficient *unless no reasonable construction* of the indictment would charge the offense for which the defendant has been convicted." *Id.* (emphasis added). The Court of Criminal Appeals has also set out its standard for determining whether, under the Texas Constitution, a written instrument is an indictment. That court has held that "a written instrument is an indictment or information under the Constitution if it accuses someone of a crime with enough clarity and specificity to identify the penal statute under which the State intends to prosecute, even if the instrument is otherwise defective." *Duron v. State*, 956 S.W.2d 547, 550-51 (Tex. Crim. App. 1997); *see also Ex parte Patterson*, 696 S.W.2d 16, 19 (Tex. Crim. App. 1998) ("an indictment or information flawed by a defect of substance but which purports to charge an offense is not fundamentally defective").

In this case, the relevant portion of the Texas Penal Code pertaining to capital murder states that "[a] person commits an offense if he commits murder as defined under Section 19.02(b)(1) of this code and . . . the person murders more than one person . . . during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct." TEX. PENAL CODE § 19.03 (a)(7)(B). A person commits murder under Section 19.02 if the person "intentionally and knowingly causes the death of an individual." TEX. PENAL CODE § 19.02(b)(1). The indictment returned by the grand jury stated as follows:

> The Grand Jurors for the County of El Paso, State aforesaid, duly organized as such, at the April Term, A. D. 1990, extended by Court Order of the 34th Judicial District Court for said County, upon their oaths in said Court, present that DAVID LEONARD WOOD, hereinafter styled Defendant and anterior to the presentment of this indictment, in the County of El Paso and State of Texas, did then and there unlawfully, intentionally and knowingly cause the death of more than one person, during different criminal transactions, pursuant

57

to the same scheme and course of conduct, by the said DAVID LEONARD WOOD, to-wit:

On or about the 30th day of May, 1987, the said defendant, DAVID LEONARD WOOD, intentionally and knowingly cause the death of IVY WILLIAMS by stabbing the said IVY WILLIAMS with a sharp instrument, and

On or about the 2nd day of June, 1987, the said defendant, DAVID LEONARD WOOD, intentionally and knowingly cause the death of DESIREE WHEATLEY, in some manner and by some means, instrument or weapon, unknown to the Grand Jury . . .

Tr 3. The remainder of the indictment, which was four paragraphs pertaining to the other victims, tracked the language of the paragraph pertaining to Desiree Wheatley. Therefore, the indictment charged that Wood intentionally and knowingly killed more than one person during different criminal transactions but pursuant to the same scheme or course of conduct and then listed the victims and the manner, if known, in which they were killed. Thus, the indictment accused Wood of committing murder and obviously pointed to the correct criminal statutes, sections 19.02(b)(1) and 19.03(a)(7)(B). Under any reasonable construction or interpretation, the indictment clearly defined the crime for which Wood was charged. Although Wood attempts to demonstrate that the indictment is fatally defective, his complaint actually pertains to the sequence of the language in the indictment, which he contends was not proper. Petition at 32-33. As the case law demonstrates, improper sequence, even if it occurred in this case, is not enough to render an indictment fatally defective so as to deprive the court of jurisdiction. *McKay*, 12 F.3d at 69. Moreover, Wood's claim is fairly confusing because it is clear that all of the essential elements were included in the indictment. Regardless, this indictment was sufficient under *Duron* and *McKay* and, as a result, his claim fails.

58

### C. Counsel were not ineffective.

Wood contends that trial counsel were ineffective for "failing to bring to the Court's attention the fundamental incorrectness of the indictment's language." Petition at 30. This is a meritless claim. On state habeas review, the trial court found:

> [Wood's] trial counsel's performance was not deficient for an alleged failure to raise the issue of fundamentally defective indictment against [Wood]. Trial counsel made a number of attacks upon the indictment prior to trial. Any failure on the part of trial counsel to pinpoint the defect which is now alleged is not ineffective assistance of counsel because [Wood's] trial counsel performed [sic] reasonably effective assistance. Considering trial counsel's representation in its totality, ineffective assistance of counsel is not established. Furthermore, this alleged omission or mistake on the part of trial counsel does not amount to a professional error of a magnitude sufficient to raise a reasonable probability that the outcome of the trial would have been different but for the claimed error.

II SHTr 2. As the evidence in this case demonstrates, the state court's denial of relief was not contrary to, nor an unreasonable application of, clearly established federal law.

A major problem with Wood's claim is that, as he recognizes, trial counsel attempted several times to challenge the indictment prior to trial. Specifically, trial counsel filed two motions to quash the indictment. In the first motion, counsel alleged, in general, that the indictment was so vague and ambiguous that it failed to apprize him of the charges against him with sufficient specificity to prepare his defense. Tr 39-40. These are the *general* challenges that Wood actually appears to be raising in his petition. Counsel's motion also complained that, in particular, the indictment failed to allege what "different criminal transactions occurred" and what acts constituted the "same scheme in course of conduct." Tr 40. In the second motion, counsel alleged that the indictment failed to give Wood proper notice because it did not give the cause of death of five of the victims, it failed to allege that the deaths of five of the six victims were cause by criminal acts committed by Wood, and

because the offense of capital murder as defined in the Penal Code is unconstitutionally vague. Tr 155-56. Counsel also filed a motion to dismiss the indictment on the grounds that the capital murder statute failed to define "criminal transactions" and "the same scheme or course of conduct." Tr 41-42. During the pre-trial hearings, the trial court overruled all these motions. 7 RR 89, 91; 20 RR 570. Thus, counsel attempted in many ways to challenge the indictment but was unsuccessful. In this regard, counsel's performance was clearly not deficient. Moreover, the possibility that another challenge to the indictment based on the sequence of the allegations in the indictment would have been successful is practically inconceivable, particularly considering the trial court's rulings to counsel's other motions. As stated previously, counsel is not required to make futile motions. *Clark*, 19 F.3d at 966; *Koch*, 907 F.2d at 526. Additionally, given the discussion in the previous section, it is evident that, as a matter of both state and federal law, the indictment was more than sufficient. Consequently, counsel was not deficient for challenging the indictment in the manner that Wood now desires, and because any challenge would have been futile, counsel's actions did not result in any prejudice.

For these same reasons, appellate counsel was not ineffective for failing to raise this issue on appeal. Assuming that a challenge to the indictment as briefed in Wood's Petition would not have been waived for the purposes of appeal, appellate counsel clearly had no reason to raise such a claim. As addressed above, any claim pertaining to the sufficiency of the indictment would have failed under *Studer v. State*, *Duron v. State*, and *Ex parte Patterson* because, under that precedent, the indictment was sufficient to at least confer jurisdiction on the trial court. Further, appellate counsel cannot be ineffective for failing to raise meritless issues on appeal. *Lucey*, 469 U.S. at 394; *Barnes*, 463 U.S. at 754. Thus, appellate counsel was not deficient, and Wood was not prejudiced by any omission because

60

he never would have received relief on the claim. In sum, Wood cannot show that trial and appellate counsel were ineffective under *Strickland*, and his claims must be denied.

**III.** **Wood's Claims That Section 19.03(a)(7)(B) Of The Texas Penal Code Is Unconstitutionally Vague, That The Trial Court Erred In Failing To Define The Terms In The Statute "Same Scheme Or Course Of Conduct" And "Different Criminal Transactions," And That Trial Counsel Were Ineffective For Failing To Request Definitions Of These Terms Are Procedurally Defaulted And, Alternatively Meritless.**

In claims 5-9, Wood challenges Section 19.03(a)(7)(B) of the Texas Penal Code. Specifically he alleges that the statute is unconstitutionally vague, that the trial court erred by failing to define in the jury charge the terms "same scheme or course of conduct" and "different criminal transactions,"which are the primary terms of that section of the Penal Code, and that trial counsel were ineffective for failing to request definitions of these terms. Petition at 35-39. All of these claims, however, are unexhausted and procedurally barred because Wood has not presented them to the Court of Criminal Appeals. Alternatively, these claims have no merit.

**A.** **Wood has defaulted these claims.**

Wood failed to present the instant claims to the Court of Criminal Appeals via direct appeal or state habeas review. Therefore, his claims are unexhausted and, consequently, procedurally barred from federal habeas review. It is well settled that habeas relief "shall not be granted" under any circumstances unless it appears that "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1) (2001). The exhaustion of state remedies doctrine codified in section 2254(b)(1) reflects a policy that has been consistently adhered to by the Supreme Court of the United States and the Fifth Circuit. *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 8-10 (1992); *Picard v. Conner,* 404 U.S. 270, 275, 277-78 (1971); *Dowthitt v. Johnson,* 230 F.3d 733, 745-46 (5th Cir. 2000), *cert. denied,* 532

U.S. 915 (2001). A petitioner must have first provided to the highest court of the state a fair opportunity to apply (1) the controlling federal constitutional principles to (2) the same factual allegations, before a federal court will entertain the alleged errors. *Duncan v. Henry,* 513 U.S. 364, 365-66 (1995); *Rose v. Lundy,* 455 U.S. 509, 522 (1982); *Thomas v. Collins,* 919 F.2d 333, 334 (5th Cir. 1990). This doctrine reflects the policy of comity between federal and state governments. The requirement is designed to give state courts the initial opportunity to pass upon or correct errors of federal law in a state prisoner's conviction. *Picard,* 404 U.S. at 275-76.

In order to satisfy exhaustion, all of the grounds raised in a federal application for writ of habeas corpus must have been "fairly presented" to the state courts prior to being presented to the federal courts. *Id; Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir. 1997). The Supreme Court has reasoned that the purpose of exhaustion "is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court." *Keeney,* 504 U.S. at 10. "Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court." *Id.* Finally, it is clear that unexhausted claims are procedurally defaulted for the purposes of federal habeas review because, as in this case, if Wood returned to state court in order to exhaust his claims by filing a successive state writ, the application would be dismissed for abuse of the writ. *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1 (1991); *Nobles,* 127 F.3d at 422.

Because Wood has not presented the instant claims to the state court, his allegations are procedurally barred, unless he can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that the failure to consider

62

the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.
Failure to raise a claim in a prior state habeas corpus application may not be excused for
cause unless the claim was not "reasonably available" at the time of the prior petition.
*Fearance v. Scott*, 56 F.3d 633, 636 (5th Cir. 1995).   As demonstrated below, trial counsel
were not ineffective for failing to request definitions of these terms and, thus, Wood's Sixth
Amendment claim in this regard cannot constitute cause.[17]  Further, a miscarriage of justice
in this context means that the petitioner is actually innocent of the crime of which he was
convicted. *Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992); *Smith v. Dixon,* 14 F.3d 956,
974 (5th Cir. 1994).   Wood does not even allege cause and prejudice for his failure to raise
this claim before the state courts, nor has he shown or alleged that he is actually innocent of
capital murder.  Therefore, his claims are procedurally barred.

**B.      Nevertheless, Wood's claims have no merit.**

**1.      The applicable statute is not unconstitutionally vague.**

Wood contends that Section 19.03(a)(7)(B) of the Penal Code is unconstitutionally
vague because it does not define "same scheme or course of conduct" and "different criminal
transactions" nor distinguish between "same criminal transaction" as stated in section
19.03(a)(7)(A). Petition at 35-37.  Wood argues, "In this case no proof of time of death or
the manner and means of death has been forthcoming from the State and the jury is left to
discern these undefined competing terms without guidance from the court." *Id.* at 37. Wood
claims that this lack of information and lack of further definitions forced him to defend
against two statutory offenses at the same time. *Id.* at 36.  This is a meritless claim.

First, the Court of Criminal Appeals has held that "a statute is not unconstitutionally

---

[17]     Wood's ineffective assistance claim is also unexhausted and procedurally defaulted and,
thus, cannot constitute cause. *Edwards*, 529 U.S. at 451-53.

vague merely because the words or terms used are not specifically defined." *Engelking v. State*, 750 S.W.2d 213, 215 (Tex. Crim. App. 1988). Moreover, under clearly-established Supreme Court precedent, a statutory aggravating factor for the death penalty is unconstitutionally vague only "if it fails to furnish principled guidance for the choice between death and a lesser penalty." *Richmond v. Lewis*, 506 U.S. 40, 46 (1992) (citing *Maynard v. Cartwright*, 486 U.S. 356, 361-364 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 427-433 (1980)); *see also Arave v. Creech*, 507 U.S. 463, 474 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm."). So long as the aggravating factor "genuinely narrow[s] the class of persons eligible for the death penalty and . . . reasonably justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder," it is constitutionally sound. *Zant v. Stephens*, 462 U.S. 862, 877 (1983). Almost of necessity, all aggravating factors that pass constitutional muster require the jury to answer a question that has "a factual nexus to the crime or [to] the defendant so as to 'make rationally reviewable the process for imposing a sentence of death.'" *Tuilaepa v. California,* 512 U.S. 967, 973 (1994) (quoting *Arave*, 507 U.S. at 471). And, when the aggravating circumstance adequately performs its constitutional narrowing function, the state court's application of this circumstance raises only a question of the proper application of state law, errors of which are not cognizable on federal habeas review. *Lewis v. Jeffers*, 497 U.S. 764, 783 (1990).

In the instant case, the statute formed the correct narrowing function. The jury was required to find that Wood intentionally killed more than one person during different criminal transactions but pursuant to the same scheme or course of conduct. And, while it is true that the cause and time of death were unable to be ascertained due to the decomposition of the

64

bodies, the evidence presented obviously conformed to the language of the statute. Specifically, the women were not killed at the same time, but disappeared within a span of several months. The women were all very young, and most were prostitutes or nude dancers. They disappeared from the same general part of town, and their bodies were found within a one and a half square mile radius in the northeast desert. Moreover, nearly all of the bodies were disrobed. Finally, although the cause of death was determined in only one case, the manner of death was determined to be homicide. Therefore, given the evidence linking Wood to the instant offenses, it is clear that he intentionally killed more than one person during different criminal transactions but pursuant to the same scheme or course of conduct. These are unique circumstances and, obviously, the aggravating circumstances in this case could not apply to every capital defendant. Further, it is evident that no further definitions of the statutory terms were needed in order to clarify which portion of 19.03 applied to Wood. It must also be noted that Wood's complaint, *i.e.* that the term "same criminal transaction" in 19.03(a)(6)(A) is difficult to distinguish between the term "same scheme or course of conduct" in 19.03(a)(6)(B), has no practical significance because the offenses defined under the statutes are both capital crimes; thus, any confusion between the two does not require the jury to discern between a capital and non-capital offense. *Richmond*, 506 U.S. at 46.

Second, and more importantly, the Fifth Circuit has resolved the question at hand. In *Corwin v. Johnson*, the petitioner also complained that Section 19.03(a)(7)(B) was unconstitutionally vague. 150 F.3d at 475-76. In rejecting this claim, the Fifth Circuit held as follows:

> [T]he sentencing provision itself--killing more than one person during different criminal transactions where the murders are committed pursuant to the same scheme or course of conduct--is much more specific than language

> previously rejected by the Supreme Court--"outrageously or wantonly vile,
> horrible or inhuman." *See Godfrey v. Georgia,* 446 U.S. 420, 432, 100 S.Ct.
> 1759, 64 L.Ed.2d 398 (1980). The language of § 19.03(a)(7)(B) operates like
> an element of the substantive offense. In addition, the Texas Court of Criminal
> Appeals' interpretation and construction of the provision is sufficiently narrow
> to eliminate the possibility of unconstitutional applications. *See Corwin,* 870
> S.W.2d at 27-29.   The Supreme Court has held that "[f]or purposes of
> vagueness analysis, ... in examining the propositional content of a factor, our
> concern is that the factor have some 'common-sense core of meaning ... that
> criminal juries should be capable of understanding.' " *Tuilaepa v. California,*
> 512 U.S. 967, 975, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (citing *Jurek v.
> Texas,* 428 U.S. 262, 279, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (White, J.
> concurring)). We are satisfied that § 19.03(a)(7)(B) has such a common-sense
> core of meaning that juries are able to comprehend.

*Corwin,* 150 F.3d at 475-76.   Therefore, the Fifth Circuit has specifically held that Section

19.03(a)(7)(B) satisfies constitutional principles and that juries can understand the language

of the statute.   Therefore, the instant claim has been resolved in the Director's favor and

Wood's claim must be denied.

Finally, given the clarity of the statutory language at issue in this case, any declaration

that Texas' serial murder provision is unconstitutional would effectively announce a new rule

of constitutional law. *See Teague v. Lane,* 489 U.S. 288, 303, 310, 316 (1989) ("[With very

narrow exceptions,] new constitutional rules of criminal procedure will not be applicable to

those cases which have become final before the new rules are announced."). Under Supreme

Court and Fifth Circuit precedent, however, this court may not retroactively apply such a new

rule to Wood's case unless the proposed rule forbids punishment of certain primary conduct,

is a watershed rule of criminal procedure, or addresses a right that is "susceptible of

vindication only on habeas review." *See Graham v. Collins,* 506 U.S. 461, 477 (1993);

*Teague,* 489 U.S. at 313; *Jackson v. Johnson,* 217 F.3d 360, 364 (5th Cir. 2000).  None of

those narrow exceptions apply in this case.  Hence, this claim is barred by *Teague,* regardless

of the merits. *Teague*, 489 U.S. at 303, 310, 316.

> ### 2. The trial court did not err in failing to define the terms of the statute.

Next, Wood complains that he was deprived of due process by the trial court's failure to define "different criminal transaction" and "same scheme or course of conduct" in the jury charge. Petition at 38. These are meritless claims. In reviewing a claim that jury instructions were erroneous, a federal habeas court must ask the question, "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *Kinnamon v. Scott*, 33 F.3d 462, 465 (5th Cir. 1994) (citations omitted). It is not enough that "the instruction is undesirable, erroneous, or even 'universally condemned'" it must violate some constitutional right. *Kinnamon*, 33 F.3d at 465 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (citation omitted)). The charge must be looked at as a whole and must be examined in light of the entire trial record. *Estelle*, 502 U.S. at 72; *Kinnamon*, 33 F.3d at 465. Essentially, in the context of a jury instruction case, "a federal court reviewing a petition for a writ of habeas corpus must consider whether, under the totality of the circumstances, the errors complained of were so gross or the trial was so fundamentally unfair that the petitioner's constitutional rights were violated." *Boyd v. Scott*, 45 F.3d 876, 881 (5th Cir. 1994).

Wood can hardly make such a showing. As addressed above, the Fifth Circuit has specifically held that the Texas serial murder statute is not unconstitutionally vague and has a common sense core of meaning that juries are able to comprehend. *Corwin*, 150 F.3d at 475-76. The Fifth Circuit has also repeatedly rejected arguments that words used, for instance, in punishment phase special issues have such imprecise meanings in the context of

a capital murder trial that the jury cannot discern what is being asked without a definition of the terms in the jury instructions. *Milton v. Procunier,* 744 F.2d 1091, 1096 (5th Cir. 1984); *see also Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.1993) (rejecting claim that court should have defined "deliberately"); *Netherly v. Collins,* 993 F.2d 1154, 1162 (5th Cir. 1993); *Thompson v. Lynaugh,* 821 F.2d 1054, 1060 (5th Cir. 1987) ("deliberately" and "reasonable doubt" need not be defined as their "common meaning is sufficiently clear to allow the jury to decide the special issues on punishment"). And with regard to defining terms in the jury charge, the Fifth Circuit has also stated that "[t]o the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system.... The answer is that such words, often of great consequence, do have a common understanding in the sense that they ultimately mean what the jury says by their verdict they mean." *Hughes v. Johnson*, 191 F.3d 607, 615 (5th Cir. 1999) (citation omitted). It is clear that the jury understood the terms at issue here because the jury was charged in accordance with the statute and language in the indictment, and although it was given eight verdict forms, the jury found Wood "guilty of the offense of capital murder as alleged in the indictment," which also included the terms "different criminal transaction" and "same scheme or course of conduct." Tr 3, 262-73. Moreover, jurors are presumed to follow their instructions. *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993). In short, this is not a case in which the trial court needed to define these terms in order to assure that the jury understood what it was required to determine in order to find Wood guilty of capital murder. Wood, moreover, has presented no evidence to the contrary. In fact, although Wood alleges that these terms should have been defined and some guidance provided, he does not even state how the trial court should have defined these terms. Thus, it is sheer speculation

68

whether or not the court could have provided definitions that would have actually clarified the meanings of these terms, particularly considering that the terms are already clear. *Corwin v. State*, 870 S.W.2d 23, 29 (Tex. Crim. App. 1993) ("we think that the 'core' conduct proscribed by § [19.03(a)(7)(B)] is clear enough"). In sum, the trial court's failure to define these terms in no way violated Wood's constitutional rights or deprived him of a fair trial. For these reasons, his claim must fail.

Finally, because there is no constitutional rule requiring that these terms be defined, the requested relief is barred by the principles of *Teague v. Lane*, which were addressed above.

### 3. Counsel was not ineffective for failing to request definitions of the terms in question.

For the reasons addressed above, trial counsel could not have been ineffective for not requesting definitions of the terms in question. In the *Corwin* cases, both the Fifth Circuit and Court of Criminal Appeals held that the language of the statute has a common sense core of meaning that juries are able to comprehend. Further, the facts of the instant case easily fell within the proscribed conduct of the statute. In short, it would have been frivolous and futile for counsel to have objected to the charge on the grounds that these terms needed to be defined in order for the jury to understand them. Defense counsel even referred to the plain meaning of the statute during the State's objection to the jury charge, and defense counsel had little if any problem with these terms when it offered its objections to the trial court's proposed charge. 68 RR 7388-7407. This itself is evidence that the meaning of the terms in the statute is clear. Further, Wood has not shown that the court would have sustained such an objection or granted a request to define these terms in the charge.

Additionally, assuming that counsel should have requested these definitions and that the court would have included them in the charge, Wood does not allege, let alone demonstrate, how he was prejudiced by counsel's failure to do so. It is well-established that a petitioner must affirmatively plead, as well as prove, prejudice in his petition. *Hill v. Lockhart*, 474 U.S. 52, 60 (1986); *Strickland,* 466 U.S. at 693. Thus, absent even a contention that there is a reasonable probability that the outcome of the guilt/innocence phase of the trial would have been different but for the alleged error, Wood's claim must be dismissed as conclusory. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (conclusory allegations of ineffective assistance of counsel fail to raise a constitutional issue). Therefore, Wood's ineffectiveness claim has no merit and must be denied.

**IV.    Wood's Challenges Pertaining To The Mitigation Instructions And Special Issue Have No Merit.**

In claims 10-14, Petition at 39-48, Wood levies what appears to be three challenges pertaining to the mitigation instructions and special issue. He contends (1) that the trial court's submission of the mitigation special issue was erroneous because the instruction was inadequate to give effect to the mitigating evidence; (2) that he was deprived of due process because the court allowed the voir dire of the jury to proceed with an older version of special issue number three that was not the same as the third special issue actually submitted to the jury; and (3) counsel were ineffective for failing to assist in the preparation of the third special issue and for failing to preserve error. *Id.* Wood's first two contentions are procedurally barred, and all of his claims are meritless.

**A.    Wood's claims of trial court error are procedurally barred.**

In his state habeas application, Wood presented the exact same text that he uses to

70

support the above claims in his petition. I SHTr 50-58; Petition at 40-48. However, on state habeas review, Wood presented this issue solely as a claim of ineffective assistance of counsel. I SHTr 50-58. He did not challenge the mitigation instructions and third special issue as a matter of trial court error, as he does in the instant petition. Therefore, Wood's claims of trial court error are unexhausted and, consequently, procedurally barred.

As discussed previously, an unexhausted claim presented in a federal petition must be dismissed as procedurally barred. Further, the Fifth Circuit has refused to find exhaustion on numerous occasions under nearly identical circumstances, *i.e.,* where a petitioner raised the factual basis of a claim under a disparate legal theory. *Cf. Nobles,* 127 F.3d at 420-21 (holding that mitigating evidence-ineffective assistance claim was procedurally defaulted where "gist" of the claim was presented to state courts as related Sixth Amendment *Ake*[18] claim); *Thomas,* 919 F.3d at 334-35 (holding that ineffective assistance of appellate counsel claim was procedurally defaulted even though ineffective assistance of trial counsel claim based on same error was raised in state court); *Lamberti v. Wainwright,* 513 F.2d 277, 281-83 (5th Cir. 1975) (holding that ineffective assistance claim was procedurally defaulted because it was not "substantial equivalent" of due process claim presented in state court, even though the basic facts underlying both claims were similar).

The Fifth Circuit has also refused to find exhaustion where a habeas petitioner raised a *Chambers*[19] claim through a related state law hearsay claim, an ineffective assistance of counsel claim, and a conclusory due process claim. *Wilder v. Cockrell,* 274 F.3d 255, 259-60 (5th Cir. 2001). The circuit court held that a "fleeting" or "vague" reference to federal law

---

[18]    *Ake v. Oklahoma,* 470 U.S. 68 (1985).

[19]    *Chambers v. Mississippi,* 410 U.S. 284 (1973).

"does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights." *Id.* at 260. More importantly, the Court held that a claim of *trial court error,* such as Wood's claims, is legally and logically distinct from a claim of *attorney error,* and one cannot be said to "fairly present" the other. *Id.* at 261. Given this precedent, it is clear that Wood's claims of trial court error are not exhausted because, in state court, he challenged the mitigation instructions under the guise of ineffective assistance of counsel, not as trial court error. Therefore, these claims are procedurally defaulted. Further, because trial counsel's failure to raise these issues was not professionally unreasonable, Wood fails to establish cause for his default, as discussed below.

### B.     Nonetheless, the mitigation instructions and special issue were sufficient.

Wood claims not that the trial court erred in submitting the third special issue and instructions pertaining to mitigating evidence, but that the instructions were insufficient to give effect to evidence of his mental retardation.[20] Petition at 40-48. In support of his claim, Wood relies primarily on *Rios v. State,* 846 S.W.2d 310 (Tex. Crim. App. 1992), which is a case involving a nullification instruction. There, the trial court submitted a mitigation

---

[20] Wood's overall claim is somewhat confusing because, while he states that he was "entitled to an instruction empowering the jury to assess a penalty less than death . . . as a 'reasoned moral response' to the fact of his mental retardation," (*i.e.* a mitigation instruction), Petition at 38, he also claims that counsel were ineffective for not lodging a proper objection because "as this is a case that uses § 37.071 in effect in 1987, a third special issue should not have been used *except on the question of provocation if raised by the evidence.*" *Id.* at 44 (emphasis added). Thus, on the one hand, Wood is complaining that an insufficient mitigation instruction was given and, on the other, he seems to be alleging that no mitigation instruction should have been submitted given the law in effect at the time of the offenses. Nonetheless, to the extent Wood is complaining about the trial court's decision to add the third mitigation special issue because the court had no statutory authority to do so, his argument pertains to an error in state law, which is not a proper basis for federal habeas relief. *Manning,* 786 F.2d at 711 (habeas corpus is available only to correct violations of federal constitutional law, not violations of state procedure) (citing *Nelson v. Estelle,* 642 F.2d 903, 905-06 (5th Cir. 1981)).

instruction that informed the jury:

> You are instructed that any evidence which, in your opinion, mitigates against the imposition of the Death Penalty, including any aspect of the defendant's reputation, character, or record, any of the circumstances of the commission of the offense which have been admitted in evidence before you, may be sufficient to cause you to have a reasonable doubt as to whether or not the true answer to any of the Special Issues is "Yes"; and in the event such evidence does so cause you to have such a reasonable doubt, you should answer the Issue "No."

*Id.* at 315-16. The Court of Criminal Appeals disapproved of this instruction stating:

> [i]t does *not* do enough to explain to jurors that they may, should they find it appropriate in their reasoned moral judgment: 1) use the fact of appellant's mental retardation as a reason to answer the first special issue "no" even if they do not find it prevented him from acting "deliberately"; or, 2) use that fact not only to answer the future dangerousness question "yes," but also, paradoxically, to answer it "no" instead. In short, it simply does not adequately inform the jury that it may assess a punishment less than death on account of appellant's mental retardation, irrespective of what the evidence shows as to deliberateness and future dangerousness.

> * * *

> Without more explanation, an instruction that baldly tells the jury it may consider evidence to be mitigating that seems either altogether irrelevant to the special issues, or relevant only in an aggravating sense, is likely in the context of our scheme to confound rather than inform. That counsel for appellant framed his entire final argument at punishment, albeit brief, in terms of the mitigating impact of appellant's retardation can only have served to compound the confusion. Without clearer guidance it seems likely the jury would limit its consideration of appellant's mental retardation to whatever tendency it had to disprove deliberateness or to prove future dangerousness. Under *Penry* [*v. Lynaugh*, 492 U.S. 302 (1989) ("*Penry I*")] appellant was entitled to more. We hold the instruction given in this cause did not adequately protect appellant's Eighth Amendment rights.

73

*Id.* at 316-17. The Court of Criminal Appeals approved of the defendant's proposed instruction because "it was sufficient to alert the trial court to appellant's wish to have the jury make explicit its reasoned moral response to the fact of his mental retardation." *Id.* at 316. The defendant's proposed instruction was a detailed charge, somewhat similar to a special issue, specifically focusing on the defendant's mental retardation. *Id* at n.6. With regard to the instant case, Wood contends that the first two special issues should have been submitted along with the type of instruction proposed in *Rios.* Petition at 43, 47-48. This is a meritless claim.

First, *Rios* does not support Wood's claim because the Court of Criminal Appeals specifically disapproved of a nullification instruction, the type which the Supreme Court recently held to be insufficient in *Penry v. Johnson,* 532 U.S. 782, 797-802 (2001) ("*Penry II*"). In fact, the Court of Criminal Appeals' reasoning as to why the nullification instruction was inadequate was very similar to the Supreme Court's reasoning in *Penry II.* For instance, in *Penry II,* the Court held that a nullification instruction rendered the entire charge contradictory because the jury was required to honestly answer the special issues and then was forced to give a false answer to one of the issues in order to give effect to the mitigating evidence. *Penry II,* 532 U.S. at 799-802. Thus, the Court concluded that the instruction was inadequate because, at best, it sent mixed signals to the jury. *Id.* at 802. As shown above, the *Rios* court essentially reached the same conclusion. In the instant case, however, the trial court did not submit to the jury a nullification instruction. The court submitted the same mitigation special issue now codified in Article 37.071 § 2(e)(1) of the Code of Criminal Procedure in response to *Penry I.* In fact, the *Penry II* Court seemed to, at least implicitly, approve of Texas' current capital sentencing scheme and mitigation special issue as revised by the legislature when the Court noted that:

74

[a] clearly drafted catchall instruction on mitigating evidence also might have complied with *Penry I*. Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference. Texas now requires the jury to decide "[w]ether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment rather than a death sentence be imposed." [] Penry's counsel, while not conceding the issue, admitted that he "would have a tough time saying that [*Penry I*] was not complied with under the new Texas procedure." At the very least, the brevity and clarity of this instruction highlight the confusing nature of the supplemental instruction actually given, and indicate that the trial court had adequate alternatives available to it as it drafted the instructions for Penry's trial.

*Penry II*, 532 U.S. at 803. The *Penry* case is one that also involves the issue of retardation, and the Supreme Court indicated that the current Texas mitigation special issue, the same one submitted in the instant case, was sufficient to give effect to evidence of retardation. Therefore, given the similarity of the reasoning in both *Penry II* and *Rios*, it is evident that those cases support the Director's position that the instructions in this case were adequate.

Second, in *Rios*, the Court of Criminal Appeals did not say that the instruction proposed by the defendant was required to be submitted when evidence of mental deficiencies or retardation is presented to the jury. In fact, the court noted that the defendant's proposed instruction was not a model. *Rios*, 846 S.W.2d at 316. Rather, the Court of Criminal Appeals was concerned mainly with the fact that the nullification instruction submitted by the court served only to confuse the jury and did not give effect to mitigating evidence of retardation as mandated by *Penry I*. Therefore, *Rios*, like *Penry II*, simply struck down a nullification instruction. The *Rios* case does not stand for the proposition that a jury must receive an instruction or special issue more detailed than that given in the instant case when retardation is involved.

75

Third, the instructions and special issues in the instant case comported with constitutional requirements, and Wood was not entitled to an instruction that specifically referred to evidence of his intelligence or brain dysfunction. The Supreme Court has upheld the constitutionality of the first two Texas special issues. *Johnson v. Texas,* 509 U.S. 350 (1993); *Jurek v. Texas,* 428 U.S. 262 (1976). The *Jurek* plurality held that the Texas special issues were constitutional because "the enumerated questions allow consideration of particularized mitigating factors," *e.g.,* a defendant's criminal record (or lack thereof), the range of severity of such a record, his youth, the circumstances of the crime, duress and mental or emotional disturbance, and remorse. 428 U.S. at 272-73. This conclusion was reaffirmed in *Lowenfeld v. Phelps*, 484 U.S. 231, 245 (1988), and in *Franklin v. Lynaugh,* 487 U.S. 164, 182 (1988). The Fifth Circuit has also held that with regard to the future dangerousness special issue, which has not changed since *Jurek* and remains in the amended Texas statute, a jury is allowed to give effect to good character evidence under that issue as well. *Beazley,* 242 F.3d at 260; *Crank v. Collins,* 19 F.3d 172, 175 (5th Cir. 1994).

Then, in *Penry I*, the Court held that although the Texas capital sentencing framework was facially valid, it could fail in certain circumstances to satisfy the constitutional requirement that a jury give effect to mitigating evidence. 492 U.S. at 328. Specifically, the *Penry I* Court held that the Texas special issues, as applied to Penry, did *not* allow consideration of his specific evidence of mental retardation, brain damage, and severe child abuse.[21] *Id.* at 322. However, *Penry* is a unique case. The Court specifically noted that its *Penry I* opinion did *not* negate the facial validity of the Texas special issues, nor did it

---

[21] Penry's evidence indicated that he was mildly or moderately retarded, may have suffered traumatic damage to his brain at birth or as a result of later injuries, and was frequently beaten about the head and locked in his room as a child. *Penry I, 492 U.S. at 307-09.

change the fact that other types mitigating evidence *could* be considered under the plain language of the special issues. *Id.* at 315-19. Indeed, the Fifth Circuit has just recently stated that "*Penry I* does not speculate on the effect of the statutory issues beyond the type of facts adduced in Penry's case." *Robertson v. Cockrell*, 2003 WL 1204119, *12 (5th Cir. March 14, 2003) (*en banc*). Further, the Supreme Court has held that a mere possibility that the jury was precluded from considering relevant mitigating evidence did not establish Eighth Amendment error. *Boyde v. California,* 494 U.S. 370, 380 (1990). Rather, such error occurred only if there was a "reasonable likelihood" that the jury applied its instructions in a way that prevented the consideration of such evidence. *Id.*

In order to distinguish between *Penry I* and non-*Penry I* mitigating evidence, *i.e.* evidence that either can or cannot be given mitigating effect under the first two Texas special issues, the Fifth Circuit has subscribed to a test first articulated in *Graham v. Collins*, 950 F.2d 1009 (5th Cir. 1992), *aff'd*, 506 U.S. 461 (1993). The test is whether the criminal act was "due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own." *Robertson*, 2003 WL 1204119 at *6 (quoting *Graham*, 950 F.2d at 1029). The *Robertson* court further explained this test as follows:

> This formulation encompasses four principles found in *Penry I*: voluntariness, permanence, severity, and attribution. [1] Did the defendant acquire his disability voluntarily or involuntarily? [2] Is the disability transient or permanent? [3] Is the disability trivial or severe? [4] Were the criminal acts a consequence of this disability?

*Id.* Under this test, it is clear that the mitigating evidence presented by Wood during the punishment phase does not amount to *Penry I* evidence. The defense presented evidence that Wood suffered from a troubled childhood, learning disability, attention deficit disorder/hyperactivity, a low IQ, and possible brain damage. As a preliminary matter, the

77

Fifth Circuit has rejected *Penry I* claims pertaining to each of these types of evidence. *Smith v. Cockrell*, 311 F.3d 661, 682 (5th Cir. 2002) ("neither evidence of low IQ nor evidence of borderline retardation is sufficient to warrant a *Penry* instruction"); *Hernandez v. Johnson*, 248 F.3d 344, 349 (5th Cir.) ("evidence of child abuse alone, unlinked to the offense, is not mitigating"), *cert. denied*, 534 U.S. 1043 (2001); *Harris v. Johnson,* 81 F.3d 535, 539 n. 11 (5th Cir. 1996) (rejecting that a nexus is inherent between any evidence of mental retardation and a crime); *Davis v. Scott*, 51 F.3d 457, 460 (5th Cir. 1995) (evidence of emotional or mental problems does not "*ipso facto*" raise a *Penry* claim); *Madden v. Collins*, 18 F.3d 304, 308 (5th Cir. 1994) (evidence of learning disability does not fall within ambit of *Penry*); *Id.* (organic brain damage must be uniquely severe to establish a *Penry* claim). The circuit court has specifically found such claims to be meritless when a defense expert testifies that the defendant's actions cannot be attributed to these handicaps, *Smith*, 311 F.3d at 682; *Lackey v. Scott*, 28 F.3d 486, 489-90 (5th Cir. 1994); *Madden*, 18 F.3d at 307, or that these problems are treatable. *Hernandez*, 248 F.3d at 349; *Motley v. Collins*, 18 F.3d 1223, 1235 (5th Cir. 1994).

First, it is evident that Wood's "handicaps" or difficulties are involuntary because he did not acquire them through his own actions. Second, as to whether they are permanent, the answer is not as clear. The only evidence of permanence was Dr. Lunde's testimony that Wood had a long history of brain deficiency and below average intelligence. 72 RR 7707-15. However, Lunde simply believed that Wood had an organic defect and admitted that any brain damage would not appear on a brain scan. 72 RR 7715. Further, there is no evidence in the record showing that Wood's mental difficulties and problems stemming from his childhood would not be treatable. Third, Wood's problems are not severe. While his mother was an alcoholic and he was occasionally placed in foster homes, there is no evidence to

suggest that he was mentally or physically abused as a child. Moreover, although Wood had to be treated for attention deficit disorder, has a low IQ, and might suffer from some form of brain deficiency, the record disputes any notion that these are significant problems. Wood's father and sister testified that, away from school, Wood was an ordinary boy and no different than anyone else. 72 RR 7674, 7686. Wood's father also stated that, although Wood had a learning disorder, it did not render him "stupid or dumb." 72 RR 7676. Further, Wood's behavior does not demonstrate a severe brain deficiency. He had a girlfriend, a job, and he exhibited fairly normal social interaction. Additionally, it is doubtful that any man with a severe mental impairment would be able to consistently and repeatedly lure women away in order to rape and kill them. In other words, his actions reveal a level of control and calculation that would not be present in a man significantly impaired by a brain disorder. Fourth, Wood failed to establish any nexus between his alleged difficulties and his criminal acts. In fact, Dr. Lunde testified that Wood would not be a danger in prison and that he does not have the mental capacity to do harm to others. 72 RR 7718-22. The opposite would be true, however, if the alleged brain deficiencies actually caused Wood to commit murder. Accordingly, the evidence demonstrates no link between Wood's mental deficiencies and his acts of violence.

Therefore, under the test articulated in *Robertson*, Wood was not even entitled to a *Penry* instruction because the mitigating evidence does not rise to the level of permanence, severity, and causation necessary to require an additional instruction to be given effect. Consequently, although Wood actually received a mitigation instruction that was implicitly approved by *Penry II*, he cannot demonstrate any error by the court's denial of the defense's proposed instruction.

79

Finally, as the above precedent demonstrates, there are no rules of constitutional law supporting Wood's claim that a more specific or detailed instruction was required, and Wood is not entitled to the retroactive application of a new rule of law. *Teague*, 489 U.S. at 310 ("new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced"). In fact, the Supreme Court has specifically held that a petitioner's claim of entitlement to a *Penry* instruction is *Teague* barred when, as in this case, the mitigating evidence was not placed beyond the effective reach of the jury. *Graham*, 506 U.S. at 475-77. Therefore, because Wood is essentially seeking relief based on a new rule of law not clearly established at the time his conviction became final, his claim is *Teague* barred.

### C.    Wood's voir dire claim is meritless.

Next, Wood claims that the trial court erred in allowing the voir dire of the jury to proceed using a version of special issue number three which was contrary to the actually special issue presented to the jury during the punishment phase. Petition at 45-47. In support of his claim, Wood cites to a portion of the record where the prosecution was explaining the special issues to a prospective juror during voir dire. 46 RR 3628. The prosecution explained to the juror that the third special issue was "if raised by the evidence whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." 46 RR 3628. The prosecution then explained that if the jury answered all three special issues "Yes," then the court would have to sentence the defendant to death. 46 RR 3628. The prosecution also explained to this juror that if any one of the questions was answered "No," then the court would have no choice but to sentence Wood to life imprisonment. 46 RR 3628. At this point during the trial, the State properly explained the law and special issues to this veniremember. Although the Texas Legislature

80

amended article 37.071 of the Code of Criminal Procedure in 1991 by deleting the provocation special issue and adding the mitigation special issue as issue number three, the legislature did not make this change retroactive. Section 5(a) of SB 880.[22] However, on October 28, 1992, while Wood's trial was taking place, the Court of Criminal Appeals decided the *Rios* case. In response to that case, the trial court added the mitigation special issue, as worded in article 37.071 § 2(e)(1), and deleted the provocation special issue. 72 RR 7776.

Wood's claim, which is confusing as stated above, appears to be that the prosecution's explanation of the special issues during voir dire combined with the actual special issues presented to the jury served to only confuse the jury and, thus, deprive him of due process. Specifically, Wood seems to be alleging that because a death sentence actually required two "yes" answers and a "no" answer to the mitigation special issue, rather than three "yes" answers, the jury may have believed that it was imposing a life sentence by answering the mitigation special issue "no." This is a frivolous claim. First, it assumes that jurors cannot properly interpret a court's instructions. However, it is foreclosed by Supreme Court precedent holding that jurors are presumed to follow their instructions. *Zafiro*, 506 U.S. at 540-41; *Richardson v. Marsh,* 481 U.S. 200, 211 (1987). Wood, moreover, has presented no evidence to show that the jury did not follow their instructions or that the jury was confused. His claim is based completely on an unsubstantiated assumption and, thus, is conclusory. Second, and more importantly, during the State's punishment phase argument, the prosecutor explained the special issues to the jury once again, however the explanation this time

---

[22]    In 1993, the legislature changed the law once again and mandated that article 37.071 as amended in 1991 *would* apply to offenses committed prior to September 1, 1991. TEX. CODE CRIM. PROC. art. 37.0711 (Vernon 1993); Section 6 of HB 798.

incorporated the mitigation special issue. 72 RR 7783-85, 7788-89. Further, defense counsel informed the jury as follows: "Very, very simply we have special issues numbers one, two and three. Yes, yes, no is death. Yes, yes, no is death. Any other combination results in a life imprisonment sentence for David Leonard Wood." 72 RR 7797. Therefore, any problem caused by the State's explanation of the special issues during voir dire was rendered moot by both the State's and defense's explanations during final arguments. Third, Wood's claim is refuted by *Penry II*. There, the State urged the Court to hold that a nullification instruction satisfied constitutional requirements in part based on the comments explaining the instruction to the venire during voir dire. *Penry II*, 532 U.S. at 800. The Court disagreed stating:

> we are skeptical that, by the time their penalty phase deliberations began, the jurors would have remembered the explanations given during *voir dire*, much less taken them as a binding statement of the law. *Voir dire* began almost two full months before the penalty phase deliberations. In the interim, the jurors had observed the rest of *voir dire*, listened to a 5- day guilt-phase trial and extensive instructions, participated in 2 ½ hours of deliberations with respect to Penry's guilt, and listened to another 5-day trial on punishment. The comments of the court and counsel during *voir dire* were surely a distant and convoluted memory by the time the jurors began their deliberations on Penry's sentence.

*Id.* at 801-02. Likewise, in this case, voir dire began on September 14, 1992, continued until October 16, 1992, the guilt phase of the trial lasted for almost three weeks, and the jury did not begin to deliberate during the punishment phase until nearly a month after the conclusion of voir dire. Thus, the possibility that comments during voir dire actually affected the jury's deliberations is remote at best, particularly considering that the State explained the special issues again during its punishment phase argument. Fourth, assuming for argument's sake that the jurors could not follow their instructions and were confused, it is arguable that this confusion could have worked in Wood's favor. For instance, the jury could have answered

82

all three special issues "yes" believing Wood would receive the death penalty, and then he would have actually received a life sentence. Finally, Wood has absolutely no reason to complain because the mitigation special issue is designed to work to the defendant's benefit. The court submitted the instruction and special issue based on the *Rios* case, in which the Court of Criminal Appeals held that a defendant must be given an instruction that gives effect to mitigating evidence of retardation. It would make no sense for Wood to contend that he wishes the jury had not been given this special issue, particularly considering that such an instruction comports with *Penry II*. Therefore, the Director hardly understands how Wood was deprived of due process in this case. For these reasons his claim must be denied.

### D.  Counsel were not ineffective.

Wood contends that counsel were ineffective for allowing special issue number three to be used before the jury without objection and in failing to preserve the trial court's error in denying his request for a *Penry* instruction. These are meritless claims. On state habeas review, the trial court addressed these issues and found that "[Wood's] trial counsel was not ineffective for failure to object to the charge at the penalty phase of the trial which submitted the *Penry* issue to the jury. Allowing the jury to consider a reasonable moral response to any mitigating evidence was beneficial to [Wood] and counsel's performance was not deficient in failure to object to such a beneficial jury instruction." II SHTr 2. The court's conclusion was clearly reasonable.

Wood's claim, however, is unreasonable and contradictory. He is actually contending that counsel should not have allowed the beneficial mitigation instruction to be submitted to the jury because, at the time of trial, it was not authorized by statute. However, he also states that the jury should have been presented with the first two special issues and then an instruction like that proposed in *Rios*. Petition at 48. Yet, the proposed instructions in *Rios*

83

were somewhat similar to the instructions and special issue submitted in this case. Thus, while he complains that counsel should have not allowed the mitigation instruction to be submitted, he states that he was, however, entitled to an instruction to give effect to evidence of his retardation. This claim makes no sense to the Director and, simply put, counsel could not have been ineffective for failing to oppose the trial court's submission of the mitigation instruction.

With regard to Wood's contention that counsel failed to preserve the trial court's error in denying his requests for further mitigation instructions pertaining to his mental retardation (to the extent Wood is actually making this claim), his allegation also fails. At trial, defense counsel requested that, within the definition of mitigating evidence, the court include language allowing the jury to consider Wood's intelligence. 72 RR 7775. Counsel also requested that the court define a mitigating circumstance as "any evidence which in fairness or mercy calls for a sentence less than death," 72 RR 7777, and requested that the court inform the jury that evidence of organic brain damage was presented and that the jury may consider such evidence to be mitigating. 72 RR 7777-78. The court denied these requests. 72 RR 7775-79. Under Texas law, in order to preserve error pertaining to the jury charge, there must be an objection *or* a requested charge. *Vasquez v. State*, 919 S.W.2d 433, 435 (Tex. Crim. App. 1996). Further, if the defendant requests a special charge, as in this case, no objection is required to preserve error. *Id.* Therefore, counsel did preserve error with respect to whether the court erred in denying the defense's proposed instructions. And, even if error was not preserved, Wood has completely failed to explain how he was prejudiced as a result. For these reasons, his ineffectiveness claims must be denied.

**V.    Counsel Were Not Ineffective With Regard To The Procedure Used During Voir Dire, and Wood Has Failed To Support His Claims Of Trial Court Error With Any Facts.**

In claims 15-21, Petition at 48-59, Wood contends that trial counsel were ineffective with regard to voir dire. Specifically, he contends that counsel were ineffective (1) in their exercise of peremptory challenges; (2) in failing to make proper objections to the trial court's peremptory challenge procedure; and (3) in failing to preserve for appeal the trial court's errors in overruling the defense's challenges for cause. Further, he alleges that appellate counsel was ineffective for failing to properly challenge these trial court errors on appeal. Finally he complains that the trial court's voir dire procedure deprived him of due process and that the court improperly overruled the state's challenges for cause. These claims have no merit. Further, Wood's claims of trial court error are procedurally barred.

**A.    Facts pertaining to this claim.**

During pre-trial hearing, the court asked the State its preference as to how the jury would be selected. 18 RR 480. The prosecutor responded, "I would also prefer making all of our strikes at the time after which we have arrived at the appropriate number of jurors." 18 RR 480. Defense counsel then stated that the defense's preference was the same, rather than striking jurors as the person is passed. 18 RR 479-80. Counsel then pointed out that this method allowed the court to better accommodate prospective jurors. 18 RR 482. The court agreed that this is the way both parties would exercise their strikes. 18 RR 482. A few days before voir dire began, defense counsel reaffirmed that the State and defense agreed "that all the strikes be taken at the same time once the final panel is seated." 31 RR 915. After the first 42 jurors were qualified, the court asked the parties for their peremptory strikes. 55 RR 5196. The defense then complained that, despite any earlier agreements, they did not want to give their strikes without first receiving extra peremptory strikes. 55 RR

5197-98. The judge then stated that the defense was not entitled to any extra strikes until the defense pointed out that an objectionable juror was on the panel. 55 RR 5199-5200, 5210. The court also stated the defense could not get any extra peremptory strikes until it used its other ones. 55 RR 5201. After much discussion, the court stated that it would bring in 46 or 48 jurors, allow the defense to exercise its first 15 strikes, and if the defense used one of its strikes on a juror outside of the first 42, then the court and defense would discuss extra peremptory strikes. 55 RR 5217-18. The court continued to insist, however, that, under the law, the defense was not entitled to additional strikes until it used its first 15. 55 RR 5219.

The following day, the State raised similar complaints about the court's peremptory strike procedure. 56 RR 5395-5402. The court also stated that the procedure it was employing was just what the State and defense requested. 56 RR 5399. Both sides, however, made their strikes. 56 RR 5402-03. The defense then asked for additional peremptory strikes maintaining that the court had erroneously overruled the defense's challenges for cause against 11 jurors, but the court denied the defense's requests. 56 RR 5403-13. The court reasoned that there was no basis to give extra peremptory strikes because the defense never alleged that any objectionable jurors were seated on the panel. 56 RR 5413-14. The defense stated that objectionable jurors were on the panel but that it did not have to identify who they were. 56 RR 5415. The court then pointed out that the defense failed to preserve error because it had not used all of its strikes prior to the twelfth acceptable juror. 56 RR 5415. On October 21, 1992, the jury was sworn and impaneled. 57 RR 5434.

**B.     Trial counsel were not ineffective.**

On state habeas review, the trial court addressed Wood's claims of ineffective assistance of trial counsel and found: (1) "[Wood's] trial counsel's agreement that peremptory challenges to jurors be made at the time the final panel was seated was [a] matter

86

of trial strategy which trial counsel felt was beneficial to [Wood]. [Wood's] trial counsel's agreement to this procedure was not a deficient performance and did not constitute ineffective assistance of counsel;" and (2) "[Wood's] allegation that trial counsel was ineffective in his failure to make [a] proper objection to the trial court's improper peremptory challenge procedure and to preserve for appeal the trial court's errors during voir dire in overruling defense challenges for cause are simply conclusory in nature and do not allege any facts which indicate that [trial] counsel's performance was deficient." II SHTr 3. The trial court's conclusions were reasonable.

Under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner is required to plead facts in support of his claims. Conclusory allegations do not state a claim for federal habeas corpus relief and are subject to summary dismissal. *Ross*, 694 F.2d at 1011-12; *Koch*, 907 F.2d at 530. This is true for claims alleging ineffective assistance of counsel. *See West v. Johnson,* 92 F.3d 1385, 1399-1400 (5th Cir. 1996) (rejecting habeas petitioner's conclusory assertions that counsel failed to reasonably investigate and present exculpatory evidence); *see also Anderson v. Collins,* 18 F.3d 1208, 1221 (5th Cir. 1994) (without a specific, affirmative showing of what missing evidence or testimony would have been entered if counsel had properly investigated, "'a habeas court cannot even begin to apply *Strickland's* standards' because 'it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance'") (citation omitted);

All of Wood's allegations in this entire section fail based on this precedent. Wood first contends that trial counsel were ineffective in the manner in which they exercised peremptory strikes. However, he does not attempt to explain what defense counsel did wrong with regard to how they exercised their strikes. He fails to identify the juror or jurors that

should have been removed by counsel, and he refers to only one juror who actually sat on the jury who was objectionable, Juror Hedrick, but does not explain why this juror was objectionable. *See Mattheson v. King*, 751 F.2d 1432, 1438 (5th Cir. 1985). To the extent Wood is contending that counsel used some of its strikes on jurors higher on the venire list than the twelfth juror seated, he does not explain how defense counsel could have better used their strikes or otherwise allege how this resulted in prejudice.

Next, Wood contends that counsel were ineffective for failing to make proper objections to the court's peremptory challenge procedure. Wood contends that the procedure used by the court was incorrect because in a capital case, peremptory strikes are to be exercised after each prospective juror is questioned as opposed to after the entire panel is questioned, as occurred in this case. Petition at 54. Yet, as discussed above, both the State and defense agreed to the procedure to be used during voir dire. And although the defense argued with the court regarding whether it was entitled to additional peremptory challenges, the defense believed it would be best to exercise its strikes after all jurors had been qualified. In fact, defense counsel decided to use this procedure to accommodate jurors so that "they don't get mad at us and take it out on David Wood." 18 RR 481. Therefore, Wood is complaining about a strategic decision by trial counsel. Yet, the Fifth Circuit has held that legitimate strategic decisions should not be second-guessed. *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993). Indeed, "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Crane v. Johnson*, 178 F.3d 309, 314 (5th Cir. 1999) (citation omitted). Wood has not made such a showing. In fact, Wood does not even claim that counsel's decision rendered the trial unfair.

Wood's entire claim is based on *Grijalva v. State*, 614 S.W.2d 420 (Tex. Crim. App.

88

1980) in which the Court of Criminal Appeals stated:

> it is clear that in capital cases each party must exercise any peremptory challenge at the time the particular prospective juror has been qualified. The parties may not wait until all prospective jurors have been examined before exercising peremptory challenges as is allowed in non-capital cases.

*Id.* at 424. However, *Grijalva* and its progeny were concerned with giving the State an advantage by allowing it to retroactively exercise peremptory challenges after the defense has exercised its strikes, thereby utilizing hindsight. *Id.*; *see also Bell v. State*, 724 S.W.2d 780, 795-96 (Tex. Crim. App. 1986). In fact *Grijalva* involved a situation in which the State sough to exercise a peremptory challenge on appeal. *Id.* at 424-25. Further, the issue in *Grijalva* involved the State causing the improper excusal of a juror by issuing a challenge for cause. The Court of Criminal Appeals held that the harm resulting from an erroneous grant of the State's challenge for cause could not be removed by the State being allowed to subsequently exercise a peremptory challenge at a later time. *See Ransom v. State*, 920 S.W.2d 288, 292-93 (Tex. Crim. App. 1994). In this case, however, *both* parties exercised their peremptory challenges at the same time. In other words, the State was not permitted to exercise peremptory challenges after the defense had used its strikes, and this is not a case in which the procedure allowed the State any form of advantage, which was the court's concern in *Grijalva*. Moreover, Wood does not contend that the State caused the improper removal of a juror based on a challenge for cause and was allowed to hold back a peremptory strike. Wood simply contends that in a capital case, it is improper procedure for the parties to exercise their strikes after all jurors have been questioned. He does not identify any harm that occurred in this case, nor has he pointed to any case law holding that this procedure constituted reversible error. The very fact that both parties agreed to this process clearly shows that no harm occurred. In short, this is a conclusory allegation lacking any factual

support.

Last, Wood contends that counsel were ineffective for failing to preserve for appeal the trial court's errors in overruling the defense's challenges for cause. Wood, however, does not explain why error was not preserved. In fact, when Wood contended on appeal that the trial court erred in overruling his challenges for cause to two prospective jurors, the Court of Criminal Appeals found that Wood waived error for failing to allege the necessary facts to support his claim, not that trial counsel failed to preserve error. *Wood v. State*, slip op. at 2. Regardless, whether or not counsel preserved this error for appeal is irrelevant. Wood does not explain how the result of the appeal would have been different had counsel done so. For instance, to be entitled to reversal on appeal, Wood was required to show wrongdoing on the part of the trial court in overruling the defense's challenges for cause. *Cooks v. State*, 844 S.W.2d 697, 717 (Tex. Crim. App. 1992). Although Wood contends in his petition that the court erred in overruling the defense's challenges for cause to eleven prospective jurors, he does not attempt to explain why the court's rulings were erroneous. He does not even allege why these prospective jurors were objectionable. In fact, Wood mentions only one person who actually sat on the jury, Juror Hedrick, as being objectionable, but he does not state why Hedrick should have been struck from the jury. Thus, as with his other ineffectiveness claims, Wood is raising a conclusory allegation unsupported by any facts. Moreover, he has completely failed to allege, let alone prove, prejudice. For these reasons his claim fails.

C.    **Wood cannot demonstrate ineffective assistance of appellate counsel.**

Wood alleges that appellate counsel was ineffective for failing to raise on appeal the trial court's erroneous peremptory challenge procedures, and for failing to allege facts that would have shown the court erred in overruling the defense's challenges for cause to two

90

prospective jurors.  To prevail on these claims, Wood must demonstrate a reasonable probability that, but for appellate counsel's unprofessional errors, the result of his appeal would have been different.  *Robbins,* 528 U.S. at 285.  This he cannot do.  First, appellate counsel could not have challenged the trial court's peremptory challenge procedures on appeal because counsel agreed to the procedure.  Therefore, any error would have been waived because it was invited.  *United States v. Baytank Inc.*, 934 F.2d 599, 606 (5th Cir. 1991) ("[a] party generally may not invite error and then complain thereof."); *Ricalday v. Procunier*, 736 F.2d 203, 207 n.3 (5th Cir. 1984) (defendant would not be heard to complain with regard to a jury instruction that he requested); *United States v. Montemayor*, 684 F.2d 1118, 1123-24 (5th Cir. 1982) (error complained of was invited by defense counsel) (citing *United States v. Cook*, 586 F.2d 572, 578 (5th Cir. 1978); *United States v. Gray*, 626 F.2d 494, 501 (5th Cir. 1980) (citing *United States v. Easterly*, 444 F.2d 1236 (5th Cir. 1971)); *Tucker v. State*, 771 S.W.2d 523, 534 (Tex. Crim. App. 1988) ("the accused can not first invite error and then complain about it on appeal"); *Capistran v. State*, 759 S.W.2d 121, 124 (Tex. Crim. App. 1982) ("It is well-established in our jurisprudence that 'an accused cannot invite error and then complain thereof.") (citations omitted).  Consequently, appellate counsel would have been raising an entirely meritless allegation, which he was not required to do. *Evitts*, 469 U.S. at 394; *Jones*, 463 U.S. at 754.  Second, even if error was not invited, Wood certainly has not shown, nor does he even argue, that the error was reversible.  As stated above, the *Grijalva* case does not hold that if the proper peremptory strike procedure is not followed, this constitutes automatic reversible error.  And, Wood has not offered any precedent to support such a contention.  Last, Wood does not explain how the court's procedure resulted in any errors or actually deprived him of a fair trial.  Thus, there is no evidence indicating that the result of the appeal would have been different had appellate

counsel raised this claim. For these reasons, the trial court's finding that Wood's claim is conclusory and is unsupported by any facts was obviously correct. II SHTr 3.

Next, while it is true that the Court of Criminal Appeals found that Wood waived error on appeal with regard to his challenge for cause allegations because appellate counsel failed to allege sufficient facts to support his claim, this does not entitled Wood to relief. In fact, Wood's current allegation is defective for the same reason appellate counsel's claim failed: he does not claim, let alone prove, that as a result of the court's decision to overrule his two challenges for cause, trial counsel were forced to use all of their peremptory strikes, were denied additional strikes, or that an objectionable juror was seated on the jury. *Wood v. State*, slip op. at 2. In other words, Wood does not contend or demonstrate that the facts omitted by appellate counsel actually exist. As stated above, Wood simply mentions in passing that an objectionable juror was on the jury, but he does not state why the juror was objectionable. Further, Wood offers no evidence to show that the trial court actually erred in overruling the defense's challenges for cause. In short, there is nothing in the record to show that the Court of Criminal Appeals would have reversed had appellate counsel asserted the requisite facts on appeal. Therefore, absent any evidence to substantiate his claim, Wood has failed to show a reasonable probability that, but for appellate counsel's error, the result of the appeal would have been different.

### D.    Wood's allegations of trial court error during voir dire are procedurally barred and meritless.

Wood contends that the trial court erred in utilizing its peremptory challenge procedure. In his state habeas application, Wood presented the same text included in his federal petition in challenging this procedure; once again, however, he raised his claims in

92

state court solely as a matter of ineffective assistance of trial and appellate counsel. I SHTr 58-68. He did not frame any of his allegations in terms of trial court error. Consequently, for the reasons discussed in section IV, A, *supra*, Wood's claim that the trial court's peremptory challenge procedure was erroneous is unexhausted and procedurally barred.

Moreover, this claim fails for several reasons. First, Wood's claim pertains to an error of state law and, as such, is not cognizable on federal habeas review. *Manning*, 786 F.2d at 711; *see also Mayo v. Lynaugh*, 882 F.2d 134, 137 (5th Cir. 1989) (claim that trial court violated defendant's rights to due process and jury trial by swearing jurors individually, rather than collectively, was frivolous, in federal habeas corpus proceeding; court of appeals does not sit to review state law, and there was no federal constitutional violation in the alleged error). Second, Wood cannot complain about the procedure because he agreed to it and desired to implement strikes in that manner. Thus, any error was invited. *Baytank Inc.*, 934 F.2d at 606. Third, Wood has not presented any facts to show that this procedure actually resulted in any harm or resulted in an unfair trial. Therefore, it fails as a conclusory allegation. *Ross*, 694 F.2d at 1011-12; *Koch*, 907 F.2d at 530.

Next, Wood contends that the trial court unjustifiably overruled the defense's challenges for cause. To the extent Wood's claim pertains to veniremembers Follis and King, the two jurors Wood complained about on appeal, his allegation is procedurally barred because the Court of Criminal Appeals found that Wood waived error on appeal. *Wood v. State*, slip op. at 2. As stated previously, federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default. *Harris*, 489 U.S. at 265; *Coleman*, 501 U.S. at 722; *Amos*, 61 F.3d at 338. Where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and

actual prejudice that is attributable to the default. *Carrier,* 477 U.S. at 485; *Sykes,* 433 U.S. at 87-88.  To establish cause, a habeas petitioner must ordinarily identify circumstances external to the defense that prevented the proper assertion of the claim in state court. *McClesky v. Zant,* 499 U.S. 467, 497 (1991). Counsel's failure to raise a claim in state court does not "constitute cause for the default sufficient to allow federal habeas review," *Carrier,* 477 U.S. at 486, absent an independent showing of constitutional ineffectiveness pursuant to *Strickland v. Washington.*  Here, to the extent Wood alleges ineffective assistance of appellate counsel as cause, his claim fails because, as demonstrated above, appellate counsel was not constitutionally ineffective.  Therefore, his claim is procedurally barred.

Regardless, Wood's claim that the trial court improperly overruled the defense's challenges for cause pertaining to the persons listed in his petition has no merit. Wood simply states "Insufficient time is available to review in detail all challenges for cause that were overruled, but Petitioner hereby states that the defense challenges for cause at trial on the following prospective jurors were overruled by the trial court . . ." Petition at 56.  Wood then lists these prospective jurors, but he does not allege the requisite facts needed to prove his claim, as discussed by the Court of Criminal Appeals. *Wood v. State,* slip op. at 2.  In fact, he does not provide any facts pertaining to these veniremembers.  Further, as stated previously, only one of the listed persons, Hedrick, served on the jury, and although Wood says this juror was objectionable, he does not offer any evidence to support his allegation. Additionally, he fails to explain why the court improperly overruled his challenges for cause, or how this resulted in an impartial jury. *Id.; see Ross v. Oklahoma,* 487 U.S. 81, 88-91 (1988) (finding no due process or Sixth Amendment violation where capital murder defendant exhausted his peremptory challenges removing a juror who should have been excused for cause in the absence of a showing that any juror who ultimately was seated was

subject to removal for cause). In sum, Wood's claims are unsubstantiated, conclusory, and fail to state a constitutional issue. *Ross*, 694 F.2d at 1011-12; *Koch*, 907 F.2d at 530. For these reasons, his claim fails.

VI.   **Wood's Claims That The State Used Perjured Testimony Are Meritless. Further, His Claims That Counsel Were Ineffective For Failing To Object To The Alleged Perjured Testimony And That His Conviction Was Unlawfully Obtained Through The Use Of Testimony Procured Through The Payment Of Money Or Benefits By The State Are Procedurally Barred And Meritless.**

A.   **There is no evidence that the State knowingly presented false testimony.**

In claims 24-25, Wood complains about the testimony from Randy Wells and Carl Sweeney, the inmates who testified that Wood admitted to his involvement in the murders. *See* STATEMENT OF FACTS, *supra*. Petition at 59-70. It is Wood's contention that these persons committed perjury, and to support his claim, he refers to an affidavit and letters from other inmates who state that Wells and Sweeney lied. *Id.* at 60, 65-66. He further alleges that Wells and Sweeney lied in order to obtain money. *Id.* at 68. These are meritless claims.

As a preliminary matter, Wood raised these claims on state habeas review, and the trial court found that (1) Wood's claims did not rise to the level of a constitutional violation because he did not allege that the State knowingly used perjured testimony, and (2) Wood's allegation that Sweeney's testimony may be false is mere supposition and does not amount to a factual allegation that constitutes a denial of Wood's constitutional rights. II SHTr 3-4. The record shows that the state court's denial of relief was not contrary to, nor an unreasonable application of, clearly established federal law.

To obtain relief on the claim that the State improperly relied on "false evidence," Wood bears the burden of demonstrating (1) that the evidence was false; (2) that the false testimony was material; and (3) that the prosecution offered the testimony knowing it to be

false. *Kutzner v. Johnson,* 242 F.3d 605, 609 (5th Cir. 2001) (citing *Giglio,* 405 U.S. at 153-54); *Chambers v. Johnson,* 218 F.3d 360, 363-64 (5th Cir.), *cert. denied,* 531 U.S. 1002 (2000). However, due process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured. *Kutzner,* 242 F.3d at 609 (citing *Koch,* 907 F.2d at 531); *Black v. Collins,* 962 F.2d 394, 407 (5th Cir. 1992); *United States v. Sutherland,* 656 F.2d 1181, 1203 (5th Cir. 1981).

Here, Wood generally complains about the reliability of Well's and Sweeney's testimony and contends that their testimony should be found highly suspect. Petition at 62. However, the jury already resolved the credibility of their testimony, a fact that Wood acknowledges. Petition at 62. Indeed, the jury was clearly aware of all the relevant impeachment evidence, including that (1) these were prison inmates; (2) they had numerous prior convictions, 65 RR 6961, 6977-81, 7010-11, 7048-53; (3) Wells cut a deal with Eastland County in exchange for his testimony in that a charge for murder pending against him would be dropped and he would receive a lighter sentence for a lesser crime, 65 RR 6962, 6982-83; 66 RR 7176-78; (4) Wells might benefit from a movie/book deal involving this case in the future, 65 RR 6989; (5) Sweeney was a writ writer, helped Wood in a civil matter involving this case, and was paid $500 by Wood in exchange for his help, 65 RR 7036-37, 7059; (6) Sweeney acquired from Wood over 100 news articles about this case, 65 RR 7038, 7068; (7) Sweeney inquired into a $25,000 reward for information regarding this crime, 65 RR 7033, 7061-63, 7066, 7083-85; (8) Sweeney asked for and received approximately $100 from the El Paso police before being transported back to TDCJ-ID after testifying before the grand jury, 65 RR 7060; (9) Sweeney and Wells were together for several days in the same cell prior to testifying before the grand jury, 65 RR 6986, 7078.

Therefore, at the least, the jury had ample reason to conclude that these witnesses were less than models of integrity. *Goodwin v. Johnson*, 132 F.3d 162, 187 (5th Cir. 1997).

Ironically, while Wood argues that these witnesses should not be believed based on their backgrounds and motivations, his perjury claim is based solely on affidavits from other inmates who claim that Wells and Sweeney lied at trial. First, Wood refers to an affidavit from an inmate named William Sobley who stated that he shared a cell with Wells in 1997 and that Wells told him the following: he lied in order obtain immunity in his own murder case, Wood never told him anything about the murders, he got his information about this case from newspaper articles and Sweeney, and he would receive $20,000 as a reward for information in this case. I SHTr 125-26.[23] Wood contends that while Wells' testimony was unreliable and self-serving, Sobley's affidavit is credible because he has nothing to gain. Petition at 66. To the contrary, Sobley stated in the affidavit that he would be testifying in another case involving a member of the Aryan Brotherhood, that in connection with that case his life had been threatened, and that he wanted to make this information about Wells available in the event he is killed or incapacitated. I SHTr 126. While Sobley attempted to portray himself as a man with nothing but good intentions, his involvement in another trial is completely irrelevant to the issues pertaining to Wood. It is doubtful that Sobley would even mention this other case and refer to his possible impending death if he was not looking for some form of benefit. Moreover, this is not reliable evidence because it is hearsay offered to prove the truth of the matter asserted and does not fall within any hearsay exception. *See United States v. Ismoila*, 100 F.3d 380, 391-92 (5th Cir. 1996) ("Evidence is considered reliable if it falls within a firmly rooted hearsay exception or is otherwise supported by a

---

[23] Wood did not attach this affidavit, or any other documents to his petition. Rather, this affidavit is a part of Wood's state habeas application.

97

showing of particularized guarantees of trustworthiness."). As such, it is incompetent evidence. *Goodwin*, 132 F.3d at 186.

Next, Wood refers to a letter from another inmate named Buford Whitehead. Whitehead stated in this letter that he was a cellmate of Wells for two or three days in 1990, that Wells admitted his guilt in his own murder case, and that Wells asserted he lied about Wood's involvement in this case and concocted the story in order to get "off the hook" in his case. I SHTr 129. Wood also mentions a letter from George Hall, who was in the same cell as Wells and Sweeney prior to the grand jury proceeding in El Paso, 65 RR 6976, 7032, to Assistant District Attorney Debra Morgan. I SHTr 127-28, 196. In this letter, Hall stated that he refused to be a witness for the State, that "I damn sure wouldn't testify and then have to be returned to prison," and that Sweeney and Wells committed perjury before the grand jury and fabricated their stories. *Id.* Yet, these two letters are wholly unreliable and have no evidentiary value because they are unsworn assertions based on hearsay and lacking any factual support. *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 192 (5th Cir. 1990) (unsworn hearsay may not be admitted to prove truth of assertions necessary to defeat summary judgment); *Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) ("It is a settled rule in this circuit that an unsworn affidavit is incompetent to raise a fact issue precluding summary judgment."); *see also United States v. Tolliver*, 61 F.3d 1189, 1219 (5th Cir. 1995) ("objections in the form of unsworn assertions do not bear a sufficient indicia of reliability to be considered"). Simply put, not only is this evidence completely unreliable to show that Wells and Sweeney committed perjury, but it is also contradictory for Wood to question the credibility of these witnesses based on their backgrounds and motivations by submitting documents from persons who are equally suspect. Furthermore, other than these documents, Wood's contention that Wells and Sweeney committed perjury

98

is based on his own suppositions and conclusory assertions stemming from the impeachment evidence, not from any credible evidence of actual perjury.

More importantly, although Wells' and Sweeney's testimony was in all likelihood material, Wood is not entitled to relief simply because he has made absolutely no showing that the prosecutors presented evidence that they actually knew to be false. The best that Wood can state is that the prosecution knew or should have known that one or both of these witnesses would commit perjury. Petition at 63. As the state habeas court found, however, Wood provides nothing to show that the State had knowledge that false testimony was or would be presented, and there is no evidence in the record to even remotely supports such an assertion. Absent any evidentiary basis, his claim cannot succeed. *East v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995) (conclusory and speculative allegations that prosecutor knew of perjury insufficient); *Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988) (denying habeas petition because allegations demonstrate neither falsity of law enforcement officer's testimony nor State's knowing use of false testimony); *United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980). For these reasons, Wood's claim must fail.

### B.   Wood's ineffectiveness claims are procedurally barred and meritless.

In claims 22-23, Wood contends that counsel were ineffective for failing to object to Wells' and Sweeney's testimony. Petition at 59. First, these claims are procedurally barred because Wood never presented any allegation of ineffective assistance with regard to his perjury claim in his state habeas application. I SHTr 69-76. Therefore, Wood has not exhausted these claims and, for the reasons discussed above, he has defaulted these allegations.

Second, Wood's claims have no merit because, as Wood himself recognizes, the practice of using prison inmates as witnesses against defendants is accepted in Texas.

99

Petition at 66-67.   As long as Wells and Sweeney were not acting as agents of law enforcement at the time Wood admitted his guilt to them, then their testimony was admissible.  *Macias v. State*, 733 S.W.2d 192, 195 (Tex. Crim. App. 1987); TEX. CODE CRIM. PROC. art. 38.22 § 5.  Of course, there is no evidence in the record that Wells and Sweeney were acting in concert with law enforcement.  Thus, counsel had absolutely no basis for an objection and could not have been ineffective for failing to lodge one.  Further, counsel did the only thing possible, which was to thoroughly impeach Wells and Sweeney and expose any lack of credibility.  Moreover, counsel did object to Sweeney's testimony on the grounds that it violated the attorney-client privilege.  65 RR 7025-30, 7046-47.  In short, Wood cannot show that counsel's performance was in any way deficient.

Wood, however, claims that had counsel objected to this testimony, the court would have entered findings on the record regarding its balancing analysis and would have likely given the jury a cautionary instruction related to the use of these witnesses upon counsel's request.  Petition at 62.  This is incorrect.  Wood is essentially stating that the court should have informed the jury how it should consider the testimony from Wells and Sweeney.  Yet, it has long been the case in Texas that a judge cannot comment on the weight of the evidence.  *Russell v. State*, 749 S.W.2d 77, 78-80 (Tex. Crim. App. 1988).  In fact, it is reversible error for a court to give instructions to the jury that refer to the credibility of witnesses.  *Id.* at 78.  Therefore, the court was not allowed to give anything to the jury that would have constituted "a standard by which the jury should weigh the testimony" or "authorize[d] the jury to act arbitrarily in passing on the credibility of a witness."  *Id.* at 79. Consequently, any objection and request by counsel for a cautionary instruction would have been overruled and frivolous.  Also, such an instruction was not needed because all of the impeachment evidence described above was before the jury.

100

Finally, even if counsel had objected and obtained the instruction, Wood submits nothing to show that this would have made a difference in the outcome of the case. He does not allege, let alone prove, prejudice for counsel's omission. Therefore, Wood cannot satisfy either prong of the *Strickland* standard, and his claim must be denied.

C.  **Wood's claim that his conviction was unlawfully obtained through the use of testimony procured through the payment of money or benefits by the State is procedurally barred and meritless.**

In claim 26, Wood alleges that he was deprived of due process and equal protection because his conviction was obtained through Wells' and Sweeney's testimony, who received money and benefits in exchange for their testimony. Petition at 60, 67-70. Wood did not raise this claim on state habeas review. In fact, he has added a new legal argument to his petition in support of his claim. *Id.* at 67-70. Thus, he has not satisfied the exhaustion requirement. *Nobles*, 127 F.3d at 420 (no fair presentation to state court "if the prisoner presents new legal theories or factual claims in his federal habeas petition"). Consequently, this claim is procedurally barred from federal habeas review.

Further, Wood's claim is meritless. Wood attempts to portray these witnesses as paid informants. The record does not support his assertion. Wells came forward on his own initiative. He told a TDCJ-ID officer and his attorney about the information Wood gave him. 65 RR 6994; 67 RR 7331. Wells' attorney subsequently relayed this information to a Texas Ranger who then informed the El Paso District Attorney of the matter. 66 RR 7124-25, 7140, 7165; 67 RR 7331. Steve Simmons, the former district attorney, testified that he had never heard of Wells before he was contacted by the Texas Ranger. 66 RR 7165. Wells then told the district attorney's office that George Hall and Sweeney might also know about this case, 65 RR 6975-76, and then Sweeney was contacted. 66 RR 7125. However, Simmons stated that he never ordered anyone to actively seek out inmates to testify against Wood. 66 RR

101

7165. Further, when Sweeney was brought to El Paso, he did not know why, and when he became aware of the reason, he was reluctant to testify for fear of reprisals because "snitches . . . usually get killed." 65 RR 7031. Thus, if anything, Sweeney had little incentive to testify.

Additionally, the money in question pertained to a general award for anyone who would come forward with information pertaining to the case. There is nothing in the record to suggest that the State procured Wells' and Sweeney's testimony through monetary inducements. While Sweeney asked for and was given $100 from the police prior to being transferred back to TDCJ-ID, he did not testify that he received the money in exchange for his grand jury testimony. The small amount he was given suggests that the money was for travel expenses or the trouble of being transferred back and forth from his prison unit, which was over 700 miles from El Paso.[24] Indeed, it would make little sense for a prison inmate to make a deal for only $100 in exchange for testifying against another inmate in a capital murder trial, particularly considering that he might face reprisals. Further, although Wells eventually received a deal with regard to his murder case, he testified that he was not aware of any award when he came forward with his information nor when he was brought to El Paso to testify before the grand jury. 65 RR 6975, 6989. Even Wells' attorney testified that Wells never told him about a reward. 67 RR 7332. And, while it is clear that Sweeney had some interest in the reward for the purpose of restitution, he testified that he became aware that an award actually existed only after he testified before the grand jury, and that he did not receive any deal to testify. 65 RR 7032-33, 7043. Thus, any evidence that Wells and Sweeney testified in order to obtain the reward or other benefits is lacking. More

---

[24]    At the time Sweeney was transported to El Paso, he apparently resided on the Eastham Unit, TDCJ-ID, which is in Houston County. He was then transferred back to the Byrd Unit, which is in Huntsville, TX. Huntsville is also 700 miles from El Paso.

importantly, these witnesses had not been given any reward at the time of trial, 65 RR 7033, and Sweeney stated that he did not know if he would ever get any reward money.  65 RR 7082.  Therefore, Wood's portrayal of Wells and Sweeney as paid informants or witnesses whose testimony was procured through promises of money or awards is not accurate. Further, all of the impeachment evidence described above was presented before the jury. Thus, the jury was not deprived of any evidence in determining whether or not Wells and Sweeney were credible.

Additionally, even assuming that Wells and Sweeney specifically received money in exchange for their testimony, Wood's claim is refuted by Fifth Circuit precedent.  The Fifth Circuit has held on several occasions that it is the jury's role to evaluate the credibility of a compensated witness.  *United States v. Garcia Abrego*, 141 F.3d 142, 152 (5th Cir. 1998); *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994) ("Although the credibility of witnesses who receive consideration in exchange for their cooperation or testimony may suffer from that fact, we have concluded that 'it is up to the jury to evaluate the credibility of a compensated witness.'") (quoting *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987)).  Thus a defendant is not deprived of due process simply because the government obtains favorable witnesses through the use of inducements.  *Garcia Abrego*, 141 F.3d at 152.  As stated above, all of this evidence was before the jury, which was able to determine the credibility of Wells and Sweeney.  Therefore, Wood was not deprived of due process, let alone equal protection, in this case, and his claim must be denied.

**VII.  Wood's Claim That The Attorney-Client Privilege Should Be Recognized Between Jailhouse Lawyers and Their Inmate Clients Is Procedurally Barred And Meritless.**

In claims 27 and 39, Wood contends that the attorney-client privilege should be recognized in Texas between jailhouse lawyers and their clients. Petition at 70-74, 100-04.[25] Wood claims that he was deprived of due process and equal protection because Sweeney used the information Wood gave him about Wood's involvement in the murders while Sweeney was working on Wood's behalf in a legal matter. *Id.* Thus, Wood contends that because Sweeney was his jailhouse lawyer, any information he gave Sweeney should be protected under the attorney-client privilege. *Id.* This claim is procedurally barred and meritless.

**A.  Wood's attorney-client privilege claim is procedurally barred.**

To the extent Wood is solely claiming a deprivation of his due process rights, his allegation is procedurally barred. As addressed in section II, A, *supra*, federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default. *Harris*, 489 U.S. at 265; *Coleman*, 501 U.S. at 729. Wood raised this claim on direct appeal and the Court of Criminal Appeals found as follows:

> In point of error eight, [Wood] contends the trial court erred in overruling his due process objection to Sweeney's testimony. [Wood] claims the use of this testimony violated his right of access to the courts because he had no reasonable alternative to inmate representation.

> Rule 52(a) of the Texas Rules of Appellate Procedure provides that to preserve a complaint for appellate review a party must make a timely objection

---

[25]  Claim 39 is simply a restatement of claim 27.

104

stating the specific grounds for the ruling he desires the court to make, if the specific grounds were not apparent from the context. The failure to make a specific objection which puts the trial judge on notice as to the basis of the objection waives any objection to the testimony. *McGowan v. State*, 664 S.W.2d 355,358 (Tex. Crim. App. 1984); *Long v. State*, 800 S.W.2d 545,548 (Tex. Crim. App. 1990).

[Wood]'s original objection to Sweeney's testimony was that it violated the attorney client privilege. [Wood] next made a broad constitutional objection in which he did not argue any due process violation. The judge overruled both objections.   After the witness had testified on direct examination, [Wood] moved to strike the testimony, mentioning for the first time his belief that a due process violation had occurred, but citing no specific grounds.   Under these circumstances, we find that [Wood] has failed to preserve this complaint for appeal.  Point of error eight is overruled.

*Wood v. State*, slip op. at 11.  Thus, the Court of Criminal Appeals held that Wood failed to properly object in order to preserve his due process claim.  The Fifth Circuit has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims.  *Sharp v. Johnson*, 107 F.3d 282, 285-86 (5th Cir. 1997) (citing *Amos*, 61 F.3d at 333); *Nichols v. Scott*, 69 F.3d 1255, 1280 n.48 (5th Cir. 1995).   Further, where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice that is attributable to the default. *Carrier*, 477 U.S. at 485; *Sykes*, 433 U.S. at 87-88.  To establish cause, a habeas petitioner must ordinarily identify circumstances external to the defense that prevented the proper assertion of the claim in state court. *McClesky*, 499 U.S. at 497.  Wood has failed to assert, let alone prove, cause for his failure to object at trial or raise the claim on direct appeal, nor has he shown that the failure to consider this claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.  Therefore, Wood has defaulted this claim.

105

### B.    Wood's claim has no merit.

Should this court determine that Wood's claim is not procedurally barred, his claim must still be denied.  First, the Director contends that Wood is actually complaining about an error of state law, because he states that this attorney client privilege *should be recognized in Texas*.  Petition at 70.  To the extent his claim pertains to a matter of state law, it is not cognizable.  *Manning*, 786 F.2d at 711.  Moreover, the Court of Criminal Appeals resolved this matter as follows:

> In point of error seven, [Wood] contends that the trial court erred in overruling his objection to the testimony of James Carl Sweeney.  Specifically, he argues that statements he made to Sweeney were protected by the attorney-client privilege.

> Rule 503 of the Texas Rules of Criminal Evidence provides that a client has a privilege to refuse to disclose, and prevent his lawyer from disclosing, confidential communications made for the purpose of facilitating the rendition of processional legal services to the client.  Rule 503(a) defines lawyer as "a person authorized, or reasonably believed by the client to be authorized, to engage in the practice of law in any state or nation."

> [Wood] claims he confided in Sweeney, who was a prison "writ writer", because he believed Sweeney was acting as his attorney at the time.  However, Sweeney testified that he told [Wood] he was not a licensed attorney and that he had [Wood] sign a document acknowledging that he was not an attorney.  [Wood] concedes that Sweeney did not claim he was an attorney but asserts that an attorney-client relationship existed nonetheless.  In *Strong v. State*, 773 S.W.2d 543, 549 (Tex. Crim. App. 1989), this Court held that "the subjective standard in Rule 503 (a)(3) relates to whether the client reasonably believes that the individual he or she is consulting is a licensed attorney."  We have held that a fellow prisoner may testify to incriminating statements over the objection that the statements were subject to a common-law attorney client privilege.  *Richardson v. State*, 744 S.W.2d 65, 76 (Tex. Crim. App. 1987).  Accordingly, point of error seven is overruled.

*Wood v. State*, slip op. at 10-11.  Thus, the court determined that, under state law, no attorney-client privilege existed.  Fatal to Johnson's claim is the venerable rule that a federal habeas corpus court must defer to a state's interpretation of its own law.  *Weeks v. Scott*, 55 F.2d 1059, 1063 (5th Cir. 1995); *Moreno v. Estelle*, 717 F.2d 171, 179 (5th Cir. 1983). Given the Court of Criminal Appeals' resolution of this claim, Johnson is not entitled to relief, and he has failed to state a cognizable claim.

To the extent Wood has asserted a claim that implicates a federal constitutional right, his claim has no merit.  Although the Supreme Court has not spoken to this issue, Wood's allegation is refuted by Fifth Circuit precedent.  Specifically, the Fifth Circuit has a four part test for determining whether or not a defendant can invoke the attorney-client privilege.  The second prong of this test is that "the person to whom the communication was made (a) is (the) member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer."  *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir. 1978); *see also In re Grand Jury Proceedings*, 663 F.2d 1057, 1059 (5th Cir. 1981).  Here, it is evident, and Wood admits, that Sweeney was not the member of a bar of a court or the subordinate of a member, although he attempts to argue that Sweeney was acting as a lawyer. Nonetheless, Sweeney's lack of qualifications rendered it impossible for Wood to have invoked any attorney-client privilege.

Wood's general argument as to why this privilege should be extended to communications between inmates and jailhouse lawyers is that an inmate has a constitutional right of access to the courts and that, because inmates often do not have many options with regard to legal assistance, the lack of a privilege might prevent inmates from speaking with jailhouse "legal advisors," thereby impeding that right.  Petition at 73-74.  Yet, this argument is also refuted by Fifth Circuit precedent.  This circuit has held that there is "no right to be

or to receive legal assistance from a jailhouse lawyer independent of the right of access to the court." *Tighe v. Wall*, 100 F.3d 41, 43 (5th Cir. 1996). Indeed, "[p]risoners have no right to a particular prisoner's help in legal matters as long as the putative recipient's constitutional right of access to the courts is not infringed." *Id.*[26] Thus, although Wood attempts to link the two "rights," the Fifth Circuit has made clear that the right of access to courts is the only right that matters. Further, Wood has made no showing, nor does he even allege, that his right of access to courts was or has been infringed. Therefore, he was not entitled to receive help from Sweeney. Logically, it also follows that because an inmate has no right to legal assistance from a jailhouse lawyer, that inmate would also have no right to protected or privileged communications with a "writ writer." Consequently, this precedent forecloses any notion that the attorney-client privilege applies to this circumstance. For these reasons, Wood's claim has no merit.

Finally, because the Supreme Court has never held that the attorney-client privilege extends to communications between inmates and jailhouse lawyers, Wood's claim would effectively announce a new rule of constitutional law. Consequently, any relief is barred under the non-retroactivity principle of *Teague v. Lane, supra. See also Williams*, 529 U.S. at 379-80 (holding that the AEDPA codified the non-retroactive rule of *Teague v. Lane* "to

---

[26] The Fifth Circuit has held that "[t]here is a narrow exception to this conclusion: a jailhouse lawyer may help fellow prisoners file initial papers in habeas corpus actions when the state has failed to provide alternative aid to such prisoners in seeking post-conviction relief." *Thomas v. Estelle*, 603 F.2d 488, 489 (5th Cir. 1979) (citing *Johnson v. Avery*, 393 U.S. 483 (1969)). To the extent this case was not overruled by *Tighe*, the exception would still not apply in this case because Wood asked Sweeney to help him out in filing a law suit pertaining to his complaints of police harassment and violation of civil rights while this case was being investigated. 65 RR 7018, 7036. That matter did not involve the filing of a habeas corpus petition.

the extent that *Teague* requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final."). Further, Wood has not shown that any exception to the *Teague* rule applies. Therefore, this claim is *Teague*-barred.

**VIII. Wood's Claims That The Police "Potentially" Planted Fiber Evidence, That Counsel Were Ineffective For Failing To Object To Expert Testimony Regarding Fiber Comparison And To the Fiber Evidence Itself, And That This Expert Testimony Deprived Him Of A Fair Trial Are Meritless. Additionally, All Of These Claims, Except For Wood's Contention That The Police Planted Evidence Are Procedurally Barred.**

In claims 28-31, Wood alleges that he was deprived of a fair trial because he was convicted with fiber evidence that was unreliable and potentially planted, that counsel were ineffective for failing to object to this evidence and expert testimony pertaining to this evidence, and that the introduction of the fiber evidence deprived him of a fair trial. Petition at 74-81. Wood's claims of ineffectiveness, that the fiber evidence was unreliable, and that the introduction of this evidence deprived him of a fair trial are procedurally barred. Further, all of these claims are wholly conclusory and must be dismissed.

**A.   Claims 29-31 are procedurally barred.**

On state habeas review, the only claim Wood raised with regard to the fiber evidence was that it was planted to incriminate him. I SHTr 76-80. He never claimed that this evidence was unreliable or deprived him of a fair trial, that expert testimony pertaining to this evidence violated his constitutional rights, nor that counsel was ineffective for failing to raise objections to this evidence. He also never raised these claims on direct appeal.[27] Therefore,

---

[27]   On direct appeal Wood did contend that the court erred in overruling his objection to testimony from the State's fiber comparison expert, but the objection pertained to testimony

these are new, unexhausted claims. Consequently, based on the precedent discussed above, Wood's claims are procedurally barred. Further, Wood does not allege any cause or prejudice, which is necessary to overcome his default. Thus, these claims are precluded from federal habeas review.

**B.     All of these claims must be dismissed as wholly conclusory.**

Wood's argument in support of these claims is actually nothing more than a veiled challenge to the sufficiency of the evidence based on the circumstances of the police investigation pertaining to the fiber evidence. Petition at 74-81. Basically, Wood hints that the fiber evidence may have been planted on Desiree Wheatley's shirt and in the vacuum cleaner, but his claim is based on nothing more than supposition and conclusory allegations pertaining to the circumstances. For instance, he reasons that this court should question whether the fiber evidence was planted because the police had to have physical evidence to convict Wood, Wheatley's grave was left unattended for several days, it was suggested that the fibers came from a blanket but the blanket was not found, no fibers were found on any other grave sites, and the fibers appeared in Wheatley's grave only after they were found in Wood's truck. In other words, Wood's claim is based on the circumstantial evidence in this case. He has provided absolutely nothing, no affidavits or anything else, to demonstrate that the police intentionally planted evidence. In fact, his actual claim is that evidence was "potentially" planted. Thus, based on the precedent discussed previously, *i.e. Ross v. Estelle, Koch v. Puckett*, this court cannot begin to consider this claim absent any factual support. Further, on state habeas review, the trial court found Wood's claim to be "nothing more than

---

regarding how quickly fibers are lost from clothing. *Wood v. State*, slip op. at 9. Wood's point of error did not challenge the reliability of fiber comparison itself, nor expert testimony pertaining thereto.

a conclusory allegation based purely upon speculation and supposition. No facts have been alleged or brought forward which support an allegation that any evidence was planted to incriminate [Wood]." II SHTr 4. Clearly, the trial court's conclusion was reasonable.

Next, Wood challenges the reliability of fiber comparison, the expert testimony pertaining to that evidence, and the admission of this evidence. This is also a completely conclusory claim. Wood sets out the test for determining whether scientific evidence is reliable and valid. *See, i.e., Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); Petition at 77-78. However, he provides no evidence or legal authority actually addressing the scientific reliability of fiber comparison and demonstrating that this technique is invalid. Indeed, his claim is undermined by the actual testimony presented in this case. Steve Robertson testified at length regarding the scientific process involved in fiber comparison, and he acknowledged that it is "possible to compare fibers . . . from two different locations and using the testing process determine whether or not they are alike." 63 RR 6713-23. The defense's own expert witness, Richard Bisbing, testified that the fibers found from the vacuum cleaner and from Wheatley's grave were similar in microscopic features. 66 RR 7202. There was nothing submitted at trial to show that this type of comparison is unreliable, and obviously the defense did not believe so.

Additionally, any notion that Robertson's testimony should not have been admitted is further refuted by the Court of Criminal Appeals opinion, which discussed Robertson's qualifications as follows:

> The record reflects that the witness possessed a bachelors degree in chemistry and had been employed as a chemist with the Texas Department of Public Safety Crime Lab for 15 years. After supervising the McAllen Crime Lab for 11 and a half years, he transferred to Austin. His primary function as a chemist with the department was to analyze trace-evidence, including paint,

111

fibers, glass and hair. He testified that he was a member of the Southwestern Association of Forensic Scientists hand had been a member of the American Society of Crime Lab Directors. He estimated that he had performed 5,000 to 10,000 fiber examinations during his career and that he had testified as an expert in trace-evidence analysis one hundred times. He had also prepared a training manual on fiber analysis which was used within the department. The testimony of the witness indicated a familiarity with scientific research regarding exchange of trace evidence.

*Wood v. State*, slip op. at 9-10. Thus, if anything, the record indicates that the fiber comparison performed by the State was based on a reliable scientific technique. For his part, Wood presents nothing to prove otherwise, and the best he can state is that the admission of this evidence deprived him of a fair trial. Petition at 81. Yet, Wood offers no factual support to prove his claim or to show how he was deprived of a fair trial. Thus, his allegation is not only conclusory, but it is also not cognizable. *See Cupit v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994) (a state court's ruling on an evidentiary question presents a cognizable habeas corpus claim only if it violates a specific constitutional right or if it renders the trial fundamentally unfair); *Pemberton v. Collins*, 991 F.2d 1218, 1226 (5th Cir. 1993); *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992).

Finally, Wood contends that counsel were ineffective for failing to object to the fiber evidence and Robinson's testimony. Yet, the only place Wood even mentions ineffective assistance is in the heading to this section. Petition at 74-75. He offers no argument to actually support these claims. He fails to explain why counsel should have objected or describe the basis of any objections. Indeed, the very fact that counsel presented their own fiber comparison expert indicates that counsel did not believe this evidence was inadmissible. As stated previously, counsel cannot be ineffective for failing to raise a futile objection. *Koch*, 907 F.2d at 526. Further, Wood offers no evidence, no legal precedent or facts, to

112

show that the court would have sustained any objections and not admitted this evidence. In short, Wood cannot begin to satisfy either prong of the *Strickland* standard because he is raising wholly conclusory claims. *See Anderson*, 18 F.3d at 1221. Therefore, these claims are not worthy of the court's attention and must be dismissed.

## IX.   Wood's Challenge To The Sufficiency Of The Evidence Is Procedurally Barred And, Alternatively, Meritless.

In claims 32 and 40, Wood challenges the sufficiency of the evidence to convict him of capital murder. Petition at 81-86, 104-25. Wood's complaint in general is that the evidence presented at trial was inadequate to tie him to the murders of the six victims. Yet, he also improperly requests this court to analyze his claim "without the perjured testimony of Wells and Sweeney and with a cautious eye toward the reliability of the fiber evidence." Petition at 83. Nonetheless, Wood's claim is procedurally barred and, alternatively, meritless.

### A.   Wood's sufficiency of the evidence claim is procedurally barred.

It has long been the case in Texas that sufficiency of the evidence is not cognizable in a post-conviction writ of habeas corpus. *Ex parte McLain*, 869 S.W.2d 349, 350 (Tex. Crim. App. 1994); *Ex parte Williams*, 703 S.W.2d 674, 677 (Tex. Crim. App. 1986); *Ex parte Easter*, 615 S.W.2d 719, 721 (Tex. Crim. App. 1981); *Ex parte Ash*, 514 S.W.2d 762, 763 (Tex. Crim. App. 1974). The Fifth Circuit has also recognized this state procedural bar. *See West*, 92 F.3d at 1398, n.18 ("Although the Court of Criminal Appeals' denial of habeas relief stated no reasons, that court, as we have held, has long held that the sufficiency of the evidence may only be raised on direct appeal, and may not be raised on state habeas."); *Renz v. Scott*, 28 F.3d 431, 432 (5th Cir. 1994) (recognizing that under Texas law a claim

113

regarding sufficiency of the evidence may be raised on direct appeal but not in a habeas corpus proceeding).

On direct appeal, Wood did not challenge the sufficiency of the evidence to support his conviction for capital murder.[28] Further, on state habeas review, the trial court, citing to *Ex parte McLain*, stated that "sufficiency of the evidence is not a matter that can be reviewed by habeas corpus. II SHTr 4.[29] Therefore, the state court denied relief based on a regularly applied state procedural bar; consequently, this claim is precluded from federal review. *Harris*, 489 U.S. at 265; *Coleman*, 501 U.S. at 722. Wood, moreover, does not allege, let alone prove, cause and prejudice for his default. To the extent Wood might contend that ineffective assistance of appellate counsel is adequate cause, Wood cannot demonstrate prejudice because his underlying sufficiency claim lacks merit. Additionally, Wood fails to allege or show that he is actually innocent of capital murder. Therefore, this claim is procedurally barred.

**B.** **Regardless, the evidence was sufficient to show that Wood committed capital murder as alleged in the indictment.**

In *Jackson v. Virginia,* 443 U.S. 307 (1979), the Supreme Court held that a habeas petitioner is entitled to relief if he can demonstrate that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt from the evidence

---

[28] On direct appeal, Wood did contend that the evidence was insufficient to prove that one of the bodies discovered that that of Rosa Casio as alleged in the indictment. *Wood v. State*, slip op. at 1. This is not the same claim that Wood is now raising.

[29] The trial court also stated, without going into any detail, that Wood's sufficiency of the evidence claim was meritless. II SHTr 4. Yet, even when a procedural default is the second ground stated for the state court's decision, review on the merits is still barred in federal court. *Harris*, 489 U.S. at 264 n.10; *Sawyers v. Collins*, 986 F.2d 1493, 1499 (5th Cir. 1993); *Ellis v. Lynaugh*, 873 F.2d 830, 838 (5th Cir. 1989).

114

adduced at trial, when the evidence is viewed in the light most favorable to the prosecution. 443 U.S. at 319.  Importantly, "this inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," and "does not permit a court to make its own subjective determination of guilt or innocence." *Id.* at 318-19 & n. 13 (internal quotations omitted, emphasis in original).  The Court reasoned that it was the responsibility of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Further, a rational finder of fact may "infer beyond a reasonable doubt" that a defendant is guilty from uncontradicted circumstantial evidence in the record. *Id.* at 325.

In applying this standard, all reasonable inferences and credibility choices should be made in support of the verdict. *Jackson,* 443 U.S. at 320; *United States v. Jones,* 133 F.3d 358, 362 (5th Cir. 1998); *United States v. Tencer,* 107 F.3d 1120, 1124 (5th Cir. 1997). This is the rule regardless of whether the conviction is based on direct or circumstantial evidence. *United States v. Peterson,* 101 F.3d 375, 379 (5th Cir. 1996) (citing *United States v. Ruggiero,* 56 F.3d 647, 654 (5th Cir. 1995)).  A reviewing court cannot disturb a jury's verdict unless the record demonstrates that a rational jury could not have found each of the substantive elements of the offense beyond a reasonable doubt. *Id.*; *Jackson,* 443 U.S. at 324 n. 16. Additionally, sufficiency of the evidence must be gauged in light of applicable state law, and federal courts should defer to state evidentiary rules. *Jackson,* 443 U.S. at 324; *McGee v. Estelle,* 732 F.2d 447, 451 (5th Cir. 1984); *Turner v. McKaskle,* 721 F.2d 999, 1003 (5th Cir. 1983).

Moreover, in deciding whether the evidence is constitutionally sufficient to sustain a state court criminal conviction, a federal habeas court must apply the *Jackson* standard "with explicit reference to the substantive elements of the criminal offense as defined by state

115

law." *Foy v. Donnelly,* 959 F.2d 1307, 1313-14 (5th Cir. 1992) (quoting *Jackson,* 443 U.S. at 323 n.16, 99 S. Ct. at 2792 n.16). In Wood's case, the state was required to prove, beyond a reasonable doubt, that he committed murder as defined under Section 19.02 and murdered more than one person during different criminal transactions but the murders were committed pursuant to the same scheme or course of conduct. TEX. PENAL CODE § 19.03(a)(7)(B). A person commits murder if he intentionally or knowingly causes the death of another individual. TEX. PENAL CODE § 19.02(b)(1).

Here, the evidence showed that all of the women who disappeared were young, between the ages of fourteen and twenty-three, four of them were either topless dancers or had engaged in prostitution, and they were all last seen in the same general area of town during the nighttime. They disappeared between May and the end of August 1987. The bodies were found within a one and a half mile square radius of each other in the northeast desert area, except for the sixth body, and they were all thirty to forty yards from one of the dirt roadways. Further, all of the bodies were laying in shallow graves and were completely or partially disrobed, except for Angie Frausto's body, indicating that they may have been sexually assaulted. Although the cause of death could be determined only with regard to Ivy Williams, the manner of death in each case was homicide.

Additionally, Wood, a person fitting his description, or someone driving a red Harley Davidson motorcycle or beige truck very similar to those Wood owned was seen with each of the victims, except for Dawn Smith, at or near the time of their disappearance. However, testimony revealed that Wood personally knew Dawn Smith, as well as Ivy Williams, Desiree Wheatley, and Karen Baker. The evidence also showed that Wood frequented the adult establishments where some of the victims worked and that, on most occasions, the women were lured away by a man fitting Wood's description. Wood's girlfriend, Joanne Blaich,

116

recalled that, at one point, Wood had some scratches on his back and face. And, when they moved in together in October of 1987, Wood would sometimes come home very late often with mud on his clothes. Blaich also testified that Wood kept some orange and yellow blankets in his truck or motorcycle compartments and also had a shovel. After Blaich and Wood moved out of the apartment they rented, some fibers were located in a vacuum cleaner they left behind that were microscopically similar to fibers found on Desiree Wheatley's shirt and in her grave. The significant amount of fibers on Wheatley's shirt indicated that those fibers were from an item, possibly an orange blanket, that Wheatley came into contact with in the hours proceeding her death. Further, the evidence clearly showed that Wheatley was last seen getting into Wood's truck before she was killed.

Perhaps the most damaging evidence came from Judith Kelly. Kelly, who was a prostitute, accepted a ride from Wood during July 1987, which is the same time period during which the other women disappeared. She came into contact with Wood in front of the Circle K store where Wheatley was last seen. She accepted a ride with Wood and, against her wishes, he drove her out to the northeast desert area. When Wood eventually stopped, he made Kelly get out, he tied her up, and then he proceeded to carry a blanket behind a bush and started digging. When he finished digging, he went back to where Kelly was, laid the blanket down, and started ripping off her clothes. He heard noises so he put her back in his truck and drove to another spot. Wood made Kelly get out again, put the blanket down, ripped off her clothes, tied her up, and proceeded to rape her from behind. At one point, Wood told Kelly to say that she was thirteen years old. After he raped her, Wood took her clothes and threw them in the back of his truck, and, before driving away, told Kelly to "always remember, I'm free." The evidence further showed that the area where Wood had been digging was the same area where the other bodies were found.

117

Finally, the State presented the testimony from Wells and Sweeney, both of whom stated that Wood admitted to committing these murders. Karen Baker, Desiree Wheatley, Rosa Casio, and Dawn Smith were specifically mentioned by name, and Wood described to Wells how he raped and killed the women, which was consistent with the evidence presented above. Wood described the girls as whores, prostitutes, or girls that worked in topless bars, asserted that one girl scratched him, told Wells he owned a brown pickup and a motorcycle, and stated to both Wells and Sweeney that he wanted to cover up the tattoos on his arms to prevent any identification. Wood was also in possession of over one hundred newspaper clippings pertaining to these murders.

In sum, this is the evidence the State presented to the jury. It definitely shows that multiple women were murdered at different times, but pursuant to the same scheme or course of conduct. Further, although the evidence tying Wood to these murders was mainly circumstantial, it was sufficient to prove beyond a reasonable doubt that Wood killed the six victims. Importantly, Wood presented no evidence at trial to actually rebut or contradict the State's circumstantial or direct evidence, and he offers nothing new in his petition to refute the jury's verdict. *Jackson*, 443 U.S. at 325. Indeed, Wood simply describes the State's evidence and concludes that any evidence showing his guilt is lacking. Of course, he also complains that the State never proved the date, time, or cause of death of the victims. Yet, as the trial court explained, the State was not required to prove the exact date or time of death. Tr 263. Further, the exact cause of death of the victims was not a crucial factor in this case because that would not change the determination that the manner of death was obviously homicide. For instance, the cause of death could have been stabbing, choking, beating, etc. But, although proof of the cause might contribute to the evidence of a common scheme, it would not necessarily shed anymore light on who killed the six women given the

118

circumstances of this case.  The circumstantial evidence, however, combined with Wood's admissions to Wells and Sweeney and the fiber evidence, was sufficient to prove the State's case, and nothing more was needed.  At best, Wood's claim is nothing more than a disagreement with the jury's resolution of the conflicts in the evidence and, consequently, is not adequate to entitle him to relief.  *See United States v. Basey*, 816 F.2d 980, 1001 (5th Cir. 1987) ("a jury is free to choose among reasonable constructions of evidence, and evidence of guilt need not exclude every reasonable possibility of innocence or be wholly inconsistent with every conclusion except that of guilt.") (citation omitted).

Last, Wood contends that this court should review the sufficiency of the evidence "without the perjured testimony of Wells and Sweeney and with a cautious eye toward the reliability of the fiber evidence." Petition at 83.  This is completely improper under *Jackson* because the test is whether no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt *from the evidence adduced at trial, when the evidence is viewed in the light most favorable to the prosecution.*  443 U.S. at 319.  The testimony from Wells and Sweeney and the fiber evidence were very favorable to the prosecution and cannot be discounted simply because Wood believes this was not credible evidence.  Indeed, this court "must accept credibility choices that support the jury's verdict, and [] may not reweigh the evidence." *United States v. Guerrero*, 169 F.3d 933, 939 (5th Cir. 1999).   Essentially, Wood is asking this court to take on the role of the trial court, suppress this evidence, and then reweigh the other evidence presented by the State.  This he cannot do, and his claim must be denied.

X.     **Wood's Claim That Extraneous Offense Evidence Was Unlawfully Introduced And Admitted Is Not Cognizable And Meritless.  Wood's Contention That Counsel Were Ineffective For Failing To Object To This Evidence Is Procedurally Barred And Refuted By The Record.**

In claims 33-34, Wood alleges that the introduction and admission of the extraneous offense evidence pertaining to Judith Kelly violated his right to due process because it was irrelevant and simply convicted Wood of being a criminal in general.  He also contends that counsel were ineffective for failing to object to this evidence.  Petition at 86-89.  His challenge to the admissibility of this evidence is not cognizable and meritless.  Further his ineffectiveness claim is procedurally barred and refuted by the record.

A.     **Wood was not deprived of a fair trial by the introduction of this evidence; therefore, his claim is not cognizable.**

The admission of Judith Kelly's testimony did not deprive Wood of a fair trial, and he is raising a claim that is not cognizable.  As stated previously, habeas corpus is available only to correct violations of federal constitutional law, not violations of state procedure. *Manning*, 786 F.2d at 711; *Nelson*, 642 F.2d at 905-06.  "[E]rrors of state law, including evidentiary errors, are not cognizable in habeas corpus." *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992).  Accordingly, because Wood's claim specifically alleges a violation of state law, Petition at 87-89, he has not stated a basis for habeas corpus relief.  Further, a state court's ruling on an evidentiary question presents a cognizable habeas corpus claim only if it violates a specific constitutional right or if it renders the trial fundamentally unfair. *Cupit*, 28 F.3d at 536; *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998) ("We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a 'denial of fundamental fairness' under the Due Process Clause.").

120

It is clear that Wood was not deprived of a fair trial. The Court of Criminal Appeals thoroughly addressed the admission of this evidence as follows:

In points of error one through five, [Wood] challenges the trial court's admission of extraneous offense evidence. The evidence of which [Wood] complains is the testimony of Judith Kelly, the victim of a sexual assault committed by [Wood] in July of 1987. [Wood] had been tried and convicted for the prior assault, and assessed a fifty year sentence. Testimony revealed that the location, time, and circumstances of the assault upon Kelly were strikingly similar to that of the six murders at issue here. The State asserts that the evidence is relevant to prove both identity and the existence of a common scheme or plan. The victim, a prostitute and heroin addict, testified that the following occurred in July of 1987:

Kelly was walking outside of a Circle K located on Kemp and Dyer in the northeast part of El Paso. A tattooed man driving a tan pickup stopped and asked her if she needed a ride. Kelly identified [Wood] in court as the driver of the pickup. She accepted his offer, climbed into his vehicle, and told [Wood] where she was going. When [Wood] passed up the turn she had directed him to take, he explained that he would take her back after first stopping by the house of a friend. He stopped at an apartment complex and went inside. When he returned about three minutes later, a piece of narrow rope was hanging from one of his pockets.

[Wood] drove northeast of town toward the desert, in the direction opposite Kelly's friend's apartment. He explained that he was going there to recover some cocaine he had buried in the desert. He stopped first at a gate in the desert area east of Dyer. Finding the gate locked, he crossed back west into the desert area located between Dyer and McCombs. After driving around the area for a good while, [Wood] finally stopped his truck, got out, and ordered Kelly out as well. She saw him get a "brownish red" blanket and a shovel from the back of his truck and take them behind some bushes. After tying her to the front of his truck with the rope, [Wood] proceeded to dig a hole behind the bushes. Ten or fifteen minutes later, he returned with the blanket and began ripping her clothes and forcing her to the ground. Suddenly hearing voices, [Wood] ordered Kelly to get back in the truck.

[Wood] drove across to the desert on the west side of McCombs, where he stopped his vehicle again. He ordered her out, spread the blanket on the ground and forced her to remove her clothes. He gagged her and tied her to a bush. While he had her on the ground attempting to rape her, he ordered her to say that she was 13; she refused to do so, saying she was 27 or 28 years old. Ultimately, [Wood] did rape Kelly. Immediately afterwards, [Wood] stated that

121

he heard voices. He hastily threw the blanket and Kelly's clothing into the back of his truck and drove away, leaving her naked in the desert. His final words to her were, "[A]lways remember, I'm free".

When this testimony is compared to the evidence surrounding these six murders, a unique pattern emerges:

Six women disappeared from the El Paso area between May 13, 1987 and August 27, 1987. Between September 4, 1987 and March 14, 1988, the bodies of these women were found buried in shallow graves in the same desert area northeast of El Paso where Judith Kelly was raped. The first body discovered was that of Rosa Casio, age 23, who worked in a topless club. On the evening of her disappearance, she was seen holding hands with a man who could have been [Wood]. The second body found was that of Karen Baker, age 21, who lived at a hotel on Dyer. The day of her disappearance, she was seen by Charles Lloyd riding on a red Harley Davidson with [Wood]. She told Lloyd that [Wood] would be back to pick her up for a date at midnight. At midnight, Lloyd saw a man pull up in a white or beige pickup. The man got out and walked toward Karen, who was standing nearby. This was the last time Karen was seen. The third body recovered was that of Dawn Smith, age 14. This victim was well-acquainted with [Wood] and there was testimony that she would have accepted a ride from him. The fourth body was that of Desiree Wheatley, age 15. Desiree was last seen near a Circle K store, getting into the passenger side of a small beige truck driven by [Wood]. The fifth body was that of Angelica Frausto, age 17, who was a dancer at a topless bar. She was last seen going for a ride with a man on a red Harley-Davidson. The sixth body recovered was that of Ivy Williams, age 23, a prostitute and exotic dancer. She was seen with [Wood] shortly before her disappearance.

Five of the bodies were located in the same one by one-half mile area; the sixth was three-quarters of a mile away. All of the bodies were approximately 30 to 40 yards from one of the dirt roadways in the desert. Four of the bodies were in various states of undress, indicating that the killer had sexually abused them. [Wood]'s former girlfriend and others testified that he owned a beige pickup. He also drove a red Harley-Davidson. [Wood]'s girlfriend testified that he had several tattoos on his body and that he owned both a burnt orange blanket and some shovels, all of which he often kept in the back of his pickup. A forensic chemist testified that orange fibers found on the clothing of one of the victims matched orange fibers taken from a vacuum cleaner bag which [Wood] and his girlfriend had left in their old apartment.

Randy Wells testified that he shared a cell with [Wood] for two and a half months in 1989. [Wood] told him about the murders, describing his victims as topless dancers or prostitutes. [Wood] told him that he would lure

each girl into his pickup with an offer of drugs. Then he would drive out to the desert, tie her to his truck and dig a grave. Next he would tie the victim to a tree and rape her. Wells also testified that he covered over some of [Wood]'s tattoos with new ones. He said [Wood] told him he wanted the tattoos covered up because one girl who had seen the tattoos had gotten away from him.

Both Karen Baker and Desiree Wheatley were with [Wood] when they were last seen alive. Ivy Williams was seen with [Wood] shortly before her disappearance. In the case of the victim Desiree Wheatley, a witness who knew [Wood] before the incident identified him as the man driving the pickup that Wheatley climbed into. All of the murders took place between May 30, 1987 and August 28, 1987.

[Wood] complains in his first point of error that the evidence was not relevant to prove identity and that the trial court erred in admitting it to show a common scheme, since the State offered it for the purpose of proving identity only. [Wood] claims in his second point of error that the evidence is not relevant to prove the existence of a common scheme or plan.

If extraneous offense evidence is not relevant apart from supporting an inference of character conformity, it is absolutely inadmissible under Rule 404(b) of the Texas Rules of Criminal Evidence. Extraneous offense evidence which has relevance apart from character conformity may be admissible, subject to the trial court's discretion to exclude it if its probative value is substantially outweighed by the danger of unfair prejudice. TEX.R.CRIM.EVID. 403, 404 (b). Examples of permissible purposes for which such evidence may be admitted are proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake. *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990). If the proponent can show that such evidence tends to establish some elemental fact or some evidentiary fact leading inferentially to an elemental fact, the evidence will be admissible. *Id.* at 387-388.

Extraneous offense evidence demonstrating a unique system may be admitted when the material fact at issue is the defendant's identity. *Owens v. State*, 827 S.W. 2d 911, 916 (Tex. Crim. App. 1992). The term "system" may refer to a defendant's distinctive and idiosyncratic manner of committing criminal acts - - in other words, his "modus operandi". *Owens* at 914. In order to admit evidence under a theory of "system" or "modus operandi," it must be shown that the extraneous offense was so nearly identical in method to the charged offense as to earmark them as the handiwork of the accused. *Id.*; *Collazo v. State*, 623 S.W. 2d 647, 648 (Tex. Crim. App. 1981). Mere repeated commission of crimes of the same class or type will not satisfy the test. The method must be so unusual and distinctive as to be like a signature. *Id.*

123

Judith Kelly's testimony demonstrates that the offense against her was committed by a method matching that used in the commission of the crimes charged. The method was so distinctive that it may be considered as the defendant's "signature." Given the obvious similarities between the details of the sexual assault upon Judith Kelly and the evidence surrounding the murders, and given that they occurred within the same geographical area and the same four month period, we find that the trial court did not err in finding the evidence relevant to establish [Wood]'s identity. Because the evidence was admissible to prove identity, points of error one and two are overruled.

In his third and fifth points of error, [Wood] asserts that the trial court erred in overruling his objection to the extraneous offense evidence because its prejudicial effect substantially outweighed its probative value.

The approach under rule 403 is to admit relevant evidence unless its probative value is substantially outweighed by the danger of unfair prejudice to the accused. *Crank v. State*, 761 S.W.2d 328, 342 n. 5 (Tex. Crim. App. 1980), *cert. denied*, 493 U.S. 874, 110 S.Ct. 209, 107 L.Ed.2d 162 (1989). Thus, the presumption is that the relevant evidence will be more probative than prejudicial. *Long v. State*, 823 S.W.2d 259, 271 (Tex. Crim. App. 1991); *Montgomery*, 810 S.W.2d at 389. Factors that the trial court should consider in the balancing include: (1) the inherent probativeness of the evidence; (2) the strength of the proponent's evidence to show opponent in fact committed the offense; (3) the potential that the extraneous offense will impress the jury in some irrational but indelible way; (4) the amount of trial time that the opponent uses to develop evidence of the extraneous offense; and (5) the proponent's need for the extraneous offense evidence. *Montgomery*, 810 S.W.2d at 389-90. The appellate standard of review of a Rule 403 ruling is abuse of discretion. *Id.* at 390; *Cantrell v. State*, 731 S.W.2d 84, 90 (Tex. Crim. App. 1987).

First, identity was a hotly contested issue in this case. The testimony of Judith Kelly was very compelling evidence in establishing the identity of [Wood] as the murderer.

Second, the evidence to establish that [Wood] did in fact commit the extraneous offense is unassailable.

Third, the circumstances of the rape were far less severe than the charged offense of serial murder of six women. There did not, therefore, exist a danger that the jury would be impressed by this evidence in an irrational way.

Fourth, as to the amount of time spent in introducing the evidence, the record reflects that it was minimal in relation to the entire trial time. In a trial record consisting of 2,124 pages on the issue of guilt, 20 pages consist of direct examination of Kelly and 45 consist of her cross-examination.

Considering the fifth factor, the evidence was extremely important to the State's case. In determining probative versus prejudicial value, the court must consider the following:

(a) does the proponent have other available evidence to establish the fact of consequence that the extraneous misconduct is relevant to show?

(b) If so, how strong is that other evidence?

(c) Is the fact of consequence related to an issue that is in dispute?

*Montgomery*, 810 S.W.2d at 390. This court has held that extraneous offense evidence will carry less weight in a Rule 403 balancing when the proponent has other compelling or undisputed evidence to establish the proposition or fact that the extraneous offense goes to prove. *Id.*; *Morgan v. State*, 692 S.W.2d 877, 880.

The identity of the murderer was a disputed issue at trial, obviously critical to both sides. Other evidence linking [Wood] to the murders consisted of the testimony of his former cellmates, circumstantial evidence and witness testimony placing [Wood] with one of the victims on the night of her disappearance. But [Wood] impeached his former cellmates with their lengthy criminal history and vigorously attacked their testimony as the product of deal-making with the State. The remaining evidence was not so compelling or undisputed as to render unnecessary the extraneous offense evidence. Under these circumstances the State's need for the evidence was great. Therefore, the trial court did not abuse its discretion in overruling [Wood]'s objections to the testimony regarding the extraneous offense. Points of error three and five are overruled.

In his fourth point of error, [Wood] contends the trial court erred by failing to perform the required balancing test under Rule 403 of the Texas Rules of Criminal Evidence.

When a rule 403 objection is made, the trial court must engage in a balancing process. *Long*, 823 S.W.2d at 271; *Montgomery*, 810 S.W.2d at 389. In *Montgomery*, this court suggested that the trial judge should ask the proponent to articulate his need for the evidence and ask the opponent to state what prejudice will occur. *Id.*

In response to defendant's motion in limine, the State explained why under a Rule 403 balancing, the evidence should be admitted. The defendant in turn offered a lengthy explanation of why he believed it should not be admitted under the same test. The record reflects that the judge considered each argument and decided in favor of the State. We find that the judge conducted the required balancing test under Rule 403.

*Wood v. State*, slip op. at 2-8. The Court of Criminal Appeals' opinion makes clear that

125

Kelly's testimony was highly relevant and admissible. And, it is not a federal habeas corpus court's function to review a state's interpretation of its own law. *Weeks*, 55 F.2d at 1063; *Moreno*, 717 F.2d at 179.

Additionally, the state court's resolution of this matter was not contrary to established federal precedent. "An extraneous offense may be admitted into evidence without violating the due process clause if the government makes a 'strong showing that the defendant committed the offense' and if the extraneous offense is 'rationally connected with the offense charged.'" *Story v. Collins*, 920 F.2d 1247, 1254 (5th Cir. 1991) (quoting *Enriquez v. Procunier*, 752 F.2d 111, 115 (5th Cir.1984)). Here, Wood had been convicted for sexually assaulting Kelly; thus it is evident he committed this crime. Further, the assault upon Kelly was indeed incredibly similar to evidence indicating the manner in which the six women were abducted and murdered. The Fifth Circuit has held that evidence of a *modus operandi* is relevant and admissible to prove identity. *United States v. Sanchez*, 988 F.2d 1384, 1393-94 (5th Cir. 1993) ("It is well-settled that extraneous- acts evidence offered to prove identity is admissible in the Fifth Circuit only if the circumstances of the extraneous act were so similar to the offense in question that they evince a signature quality--marking the extraneous act as the handiwork of the accused.") (citations omitted). Thus, given the facts of Kelly's sexual assault, her testimony was admissible as a matter of both Texas and federal law. Moreover, Wood offers nothing to show that the evidence was not admissible. He simply makes a bald accusation that Kelly's testimony was not relevant to the instant case without explaining why. Therefore, the facts and precedent demonstrate that Wood was not deprived of due process and that the admission of this evidence did not render Wood's trial unfair. Consequently, his claim is not cognizable.

126

**B.**     **Wood's ineffective assistance of counsel claim is procedurally barred and refuted by the record.**

Wood contends that counsel were ineffective for failing to object to the admission of this evidence. However, Wood did not raise this claim on direct appeal or on state habeas review. Therefore, the claim is unexhausted. Further, Wood does not allege cause and prejudice for his failure to exhaust this claim. Consequently, based on the precedent discussed previously, Wood's claim is procedurally barred.

Nonetheless, Wood's claim is refuted by the record. Prior to trial, counsel filed a motion for the State to disclose extraneous offense evidence and requesting the court to exclude that evidence. Tr 146. Further, prior to Kelly testifying, counsel objected "entirely as to anything that lady may say." 64 RR 6786. Both parties presented their cases and the court overruled the defense's objection. 64 RR 6786-99. Thus, counsel could not have been deficient because counsel did in fact object. In fact, the Court of Criminal Appeals would not have even reviewed this claim on direct appeal if counsel had not properly objected. *Turner*, 805 S.W.2d at 431. Therefore, Wood's claim is refuted by the record. Moreover, even if counsel had not objected, Wood could still not demonstrate ineffective assistance because, as shown above, Kelly's testimony was admissible. Therefore, this is a meritless claim and it must be denied.

**XI.**     **Wood's Challenge To The Verdict Form Is Procedurally Barred, Not Cognizable, And Meritless. Additionally, Wood's Claim That Counsel Were Ineffective For Failing To Object To The Verdict Form Is Procedurally Barred And Meritless.**

In claim 35, Wood alleges that he was deprived of due process because the verdict form that the jury signed in finding him guilty of capital murder was misleading and

insufficiently specific, in that it did not designate the specific victim of the capital offense, contrary to the language of the statute. Petition at 90-91. In claim 36, Wood alleges that counsel were ineffective for failing to object to the verdict form. *Id.* Both of these claims are procedurally barred and, alternatively, meritless.

### A.   Wood's claims are procedurally barred.

Wood failed to raise these claims on either direct appeal or state habeas review. Therefore, they are unexhausted and procedurally barred. Wood fails to demonstrate cause and prejudice for his failure to exhaust these claims, which is necessary to overcome his default. Consequently, based on the precedent addressed previously, these claims are barred from federal habeas review.

### B.   Wood's challenge to the verdict form is not cognizable and meritless.

Wood's complaint about the verdict form is actually an extension of his challenge to the indictment because both were worded in the same manner.[30] Tr 3, 264, 273. In fact, the verdict form signed by the jury simply states that the jury "find the defendant, DAVID LEONARD WOOD, guilty of the offense of capital murder, as alleged in the indictment. Tr 273. To the extent Wood is raising the same claim simply worded in a different manner, this allegation was addressed in Section II, *supra*. Nonetheless, although Wood states that this verdict form deprived him of due process, he is basically raising a claim challenging state procedure. Yet, it is settled that "an error in the application of a state law does *not* assert a claim cognizable in federal habeas proceedings." *Beazley v. Johnson*, 242 F.3d 248, 261 (5th Cir. 2001), *cert. denied*, 534 U.S. 945 (2001) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). Further, Wood's claim falls squarely within the body of precedent holding that state

---

[30]   Wood is actually referring to the verdict form and language in the court's charge.

law questions are not cognizable on federal habeas review. *Martinez v. Johnson*, 255 F.3d 229, 246 (5th Cir. 2001) (federal right to state court consistency is not cognizable in federal habeas under the due process clause of the Fourteenth Amendment); *Fuller v. Johnson*, 158 F.3d 903, 908 (5th Cir. 1998) (claim that state law was violated when disqualified juror served on jury was not cognizable in federal habeas corpus proceeding, where petitioner failed to show that failure to follow state law regarding the composition of the jury rendered the entire trial fundamentally unfair.); *Sharp v. Johnson*, 107 F.2d 282, 290 (5th Cir. 1997) (violation of plea/indictment rule involved procedural defect that is purely a matter of state law); *Lavernia v. Lynaugh*, 845 F.2d 493, 496 (5th Cir. 1988) (where the lack of transfer order violated state law, "[f]ederal habeas courts are without authority to correct simple misapplications of state criminal law or procedure"); *Cook v. Morrill*, 783 F.2d 593, 596-97 (5th Cir. 1986) (claim that state court of criminal appeals misconstrued state statute regarding procedure for changing venue raised only state law issues not reviewable in federal habeas corpus proceeding); *Stewart v. Estelle*, 634 F.2d 998, 999 (5th Cir. 1981) (failure to comply with requirements of Texas statute governing guilty plea admonishments does not state a claim upon which relief can be granted).

Thus, to be entitled to relief where there has been a violation of state procedure, Wood must demonstrate that this was a constitutional infraction of his due process rights which would render the trial as a whole fundamentally unfair. *Sawyer v. Butler*, 848 F.2d 582, 594-95 (5th Cir. 1988); *see also McGuire*, 502 U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Wood simply alleges that the verdict form violated his due process rights, but he does not explain how. He contends that the form was misleading and was contrary to the language of the statute. Wood, does not mention the statute he is referring to.

129

To the extent Wood is referring to section 19.03(a)(7)(B) of the Penal Code, again that section states that a person commits capital murder if he murders more than one person during different criminal transactions but pursuant to the same scheme or course of conduct. The verdict form in question and accompanying instruction, however, listed each of the victims and asked the jury to find if Wood killed each of the women during different criminal transactions but pursuant to the same scheme or course of conduct. Tr 264, 273. Therefore, the jury was required to find more than one victim to convict Wood of capital murder, not simply one specific victim. Moreover, the specific victim of the capital offense must have been identified because all of the victims were identified in the charge. Tr 264. Regardless, Wood does not explain how this alleged error deprived him of a fair trial. Absent any evidence or facts to support his claim, his allegation of a due process violation is wholly conclusory at best. In sum, it is evident that Wood is raising nothing more than a state law claim, and this allegation must be dismissed.

### C.    Wood's ineffectiveness claim has no merit.

Wood alleges that counsel were ineffective for failing to object to the verdict form. This is a meritless and conclusory claim. Wood cannot show, nor does he even allege, that there was any legitimate reason for counsel to object, for the reasons discussed above. Indeed, any objection surely would have been frivolous and futile. Moreover, Wood does not explain or allege how counsel's failure to object affected the outcome of the trial, nor does he offer any facts whatsoever to support his ineffectiveness claim. Therefore, Wood's claim fails to state a constitutional issue, *Ross*, 694 F.2d at 1011-12, and he cannot satisfy either prong of the *Strickland* standard.

**XII. Wood's Claim That The Court Of Criminal Appeals Erred By Failing To Authorize The Employment Of Experts On State Habeas Review Is Procedurally Barred, Not Cognizable And Meritless.**

In claim 37, Wood alleges that he was deprived of due process because, during state habeas review, the Court of Criminal Appeals failed to authorize the employment of experts, specifically a forensic anthropologist to examine the remains of Ivy Williams and a DNA expert to test the fingernail from Angie Frausto. Petition at 91-98. First, this claim is procedurally barred. Wood raised the allegation on state habeas review and the trial court found that it did not have jurisdiction or authority to consider Wood's claim. II SHTr 5. Thus, the court denied Wood's claim based on a state procedural default. Consequently, given the precedent addressed above, this claim is barred from federal habeas review.

Second, Wood's claim is not cognizable. Alleged infirmities in state habeas proceedings do not constitute grounds for federal habeas relief. *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992). As Justice O'Connor described the role of state habeas corpus proceedings in her concurring opinion in *Murray v. Giarratano*, 492 U.S. 1, 13 (1989),

> A postconviction proceeding is not part of the criminal process itself, but is instead a civil action designed to overturn a presumptively valid criminal judgment. Nothing in the Constitution requires the States to provide such proceedings . . . nor does it seem to me that the Constitution requires the States to follow any particular federal model in those proceedings.

On that basis, the Fifth Circuit has held that "[a]n attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it 'is an attack on a proceeding collateral to the detention and not the detention itself.'" *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995) (quoting *Millard v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir.)); *Duff-Smith*, 973 F.2d at 1182 ("infirmities in state habeas proceedings do not

constitute grounds for federal habeas relief"); *Vail v. Procunier*, 747 F.2d 277 (5th Cir. 1984) (same).

Furthermore, "[f]ederal courts hold no supervisory power over state judicial proceedings and may intervene only to correct errors of constitutional dimension." *Smith v. Phillips*, 455 U.S. 209, 221 (1982); *see also Springer v. Coleman*, 998 F.2d 320, 324 (5th Cir. 1993). Because the federal "writ has but one remedy – to direct the liberation of a state prisoner whose confinement violates federal law," *Smith v. Lucas*, 9 F.3d 359, 366 (5th Cir. 1993), and because Wood may not be released based upon alleged infirmities in the Texas habeas corpus statute, this is simply not the proper forum for raising the instant claim. For these reasons, Wood's claim is not reviewable in the instant federal habeas corpus proceeding.

Moreover, because Wood has no constitutional right to collateral review, he cannot complain that he was deprived of any right, including the appointment of expert assistance, during the state habeas process. Thus, Wood's allegation fails to raise a constitutional issue. Nonetheless, assuming for argument's sake that Wood has some right to expert assistance on collateral review, his claim has no merit. The Fifth Circuit has held that, pursuant to *Ake v. Oklahoma*, "non-psychiatric experts ... should be provided only if the evidence is both critical to the conviction and subject to varying expert opinion." *Moore v. Johnson*, 225 F.3d 495, 502 (5th Cir. 2000) (quoting *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir.1993) (pertaining to request for ballistics experts)). Further, "[a]n indigent defendant requesting non-psychiatric experts must demonstrate something more than a mere possibility of assistance from a requested expert." *Id.* at 503 (quoting *Yohey*, 985 F.2d at 227).

Wood cannot show that he is or was entitled to any experts. He claims that a forensic anthropologist is necessary to show that the injuries to Ivy Williams' remains could have

132

been caused by the recovery techniques of the police. Petition at 91-92. Specifically, he states that in reviewing the videotapes of the victim recovery process, "it was noticed that the police probed the graves with sharp instruments that could have caused injury to the skeletal remains of the victims." *Id.* at 91. Thus, he contends that the testimony showing that Ivy Williams was stabbed with a sharp instrument could be rebutted with expert testimony showing the stab wounds were caused by the police. *Id.* at 91-92. This is a completely meritless claim because it is nothing more than supposition. There is no evidence whatsoever showing that the injuries to Williams' remains were caused by the police. In fact, it assumes that the police were so careless that they severed Williams' seventh rib, cut her scapula, and punctured her right maxillary sinus, which were the wounds found by Dr. Harold Gill-King. 60 RR 6084-88. Further, when Ivy Williams was found, her head was separated from her body and her body was clothed. 58 RR 5788-90. There were several linear tears on the front and back of the jacket covering her body that corresponded to tears on her blouse. 58 RR 5805-06. Thus, under Wood's hypothesis, the police, while scouring the ground for bodies, stabbed into Williams' body several times and continued to do so with enough force that they penetrated Williams' clothes and cut through her skeleton all the way to the ground. Not only is this an absurd conclusion, but it is also refuted by the record because Williams' body was not located in this manner. Williams' body was found when a person looking for aluminum cans saw a metal reflection that turned out to be braces on her teeth. 58 RR 5770-72, 5774. Further, the testimony in the record clearly shows that the police were very careful in removing the remains. Therefore, Wood is referring to an extremely remote possibility of help from an expert, if any at all.

Moreover, even if an expert could show that the injuries to Williams' skeleton were caused by the police, this would have no effect on the case whatsoever. As stated above, the

133

actual cause of death was not a significant factor linking Wood to the murders because the lack of bodily tissue prevented the State from extracting any evidence that could shed light on who killed the women. In five of the cases, the cause of death was unknown, and the jury still found Wood guilty of killing all six women. Essentially, whether Williams died of stab wounds, choking, beating, etc., this would not impact the evidence establishing Wood's guilt, nor would it change the determination that the manner of death was homicide. At best, Wood would only be able to show that the cause of Williams' death could not be determined or that she died in some other manner. This would have no bearing on the jury's determination that Wood killed these women. Consequently, this evidence was not critical to the conviction, and expert assistance was and is not needed.

Wood also contends that expert assistance was needed to retest the fingernail from Angie Frausto because, although the results on this nail were inconclusive, "it is common knowledge that advancements in DNA techniques can now produce accurate results." Petition at 92. Wood, however, offers no evidence to show that any kind of conclusive results could be obtained after all these years, particularly given that the sample was in poor condition when recovered and was tested by two different laboratories. Therefore, whether or not expert assistance would be of any help at this point is nothing more than speculation. Nonetheless, Wood suggests that if DNA tests excluded him, then the scratches that were allegedly on his arms could not have been made by Frausto and, thus, he would be excluded as her killer. However, even if the nail was tested, significant DNA found, and the results excluded Wood, this would only mean that Wood's DNA was not on the nail. This would not prove that Wood could not have killed Frausto, nor would it refute the other evidence presented by the State. For example, assuming *arguendo* that retesting showed that someone else's DNA was present and that Frausto could not have scratched Wood, this would mean,

134

at most, that Wood did not receive scratches on his arms when he killed Frausto. That would not lead to the conclusion that someone else killed Frausto. Further, this would not rule out the possibility that the scratches on Wood's arms were not caused by one of the other victims. Indeed, Wells testified that Wood told him one of the girls scratched him, but he did not indicate which girl Wood was talking about. 65 RR 6970.[31] Additionally, the evidence simply showed that the police found Frausto's nail. No one testified that Frausto lost the nail as a result of scratching someone in self-defense. In short, a retest of the fingernail would not absolve Wood of his guilt even if it excluded him, and his claim pertains to evidence that is not critical. Moreover, DNA evidence is not subject to varying expert opinion because either it is present or it is not. The results of DNA tests do not depend on interpretation, conviction, or persuasion. Accordingly, Wood was not entitled to, nor would he have benefitted from, this expert assistance.[32][33] Therefore, any error in not appointing these experts was clearly harmless. *White v. Johnson*, 153 F.3d 197, 207 (5th Cir. 1998).

Finally, to the extent Wood is requesting this court to provide him funds for expert assistance, he is not entitled to it. Wood has failed to demonstrate a reasonable and substantial need for such assistance under 28 U.S.C. § 848(q)(9). *Hill v. Johnson,* 210 F.3d 481, 487 (5th Cir. 2000), *cert. denied,* 532 U.S. 1039 (2001); *see also Clark v. Johnson,* 202 F.3d 760, 768 (5th Cir. 2000) (holding that petitioner must show a substantial need for the

---

[31] If anything, the testimony showed that Wood was most concerned about evidence that might pertain to Desiree Wheatley. 65 RR 7040.

[32] In fact, such a test could only work to Wood's disadvantage because if his DNA was found on the nail, then that would just further show that the jury's verdict was correct.

[33] Without offering any facts, evidence, or explanation, Wood asserts in his petition that the "real" killer could be a person in custody in Mexico, and that this issue could be resolved with expert assistance. Petition at 92. Once again, this is a conclusory allegation, and it does not change the fact that Wood's request for expert assistance was and is based on rank speculation.

135

assistance of an investigator); *Fuller v. Johnson,* 114 F.3d 491, 502 (5th Cir. 1997) (the authorization of investigative funds is within discretion of the district court). Indeed, the Fifth Circuit has upheld the denial of funding for expert assistance when a petitioner has failed to couple his request with a viable constitutional claim that is not procedurally barred from review, *Fuller,* 114 F.3d at 502, or when the sought-after assistance would only support a meritless allegation. *Hill,* 210 F.3d at 487. For the reasons addressed above, Wood fails to satisfy these prerequisites. Therefore, expert assistance is not warranted.

**XIII. Wood's Claim That Article 11.071 § 4 Of The Code Of Criminal Procedure Is Unconstitutional Is Not Cognizable, *Teague*-barred, And Meritless. Further, Wood Lacks Standing To Challenge The Federal Habeas Corpus Statute, His Claim Is Not Cognizable, And It Has No Merit.**

Wood alleges that article 11.071 § 4 of the Code of Criminal Procedure is unconstitutional because it imposes time constraints for filing a state habeas application. Petition at 98-100. Specifically, § 4(a) provides that an applicant has 180 days after counsel is appointed or not later than the 45th day after the date the state's original brief is filed on direct appeal, which ever date is later, to file his application. TEX. CODE CRIM. PROC. art. 11.071 § 4(a). Section 4(b) allows the applicant one 90-day extension to file the applicant upon a showing of good cause. TEX. CODE CRIM. PROC. art. 11.071 § 4(b). Wood complains that these time constraints render the statute unconstitutional because, given the length and complexity of the instant case, he was deprived of the ability to fully develop and investigate certain issues within the allotted nine months.

First, this claim is not cognizable. As discussed in the section above, "infirmities in state habeas proceedings do not constitute grounds for federal habeas relief." *Duff-Smith,* 973 F.2d at 1182; *Vail,* 747 F.2d at 277.

Second, because the Supreme Court has never held that 11.071 § 4 is unconstitutional or deprives a petitioner of due process or equal protection, Wood's claim seeks a new rule of constitutional law and is *Teague*-barred. *Teague*, 489 U.S. at 303, 310, 316.

Third, even if this court could address the merits of Wood's claim, he would not be entitled to relief. The state court found that article 11.071 "does not deny [Wood] his right to due process of law or equal protection of the law by imposing a time limit of nine months to raise issues in this habeas corpus proceeding." II SHTr 5-6. This decision was certainly not contrary to clearly established federal law because, as stated above, the Supreme Court has never held that this statute violates due process or equal protection. And although the Court of Criminal Appeals has apparently not addressed the constitutionality of section 4, it has upheld the dismissal of an untimely filed application under 11.071. *Ex parte Smith*, 977 S.W.2d 610 (Tex. Crim. App. 1998). In doing so, the court stated:

> Our oaths are to uphold the constitutions and laws of this country and state; they are not a commission to do what a majority of us think is fair. This law was passed by the legislature and approved by the governor, in accordance with our constitutional form of government. The law is clear: this court shall dismiss this application because it was filed late. If the law is barbarous, the legislature should repeal it or the governor should commute or pardon those who are subjected to it. In the meantime, we must follow it.

*Id.* at 611. Therefore, if anything, the precedent indicates that this provision of 11.071 does not deprive a petitioner of due process.

Further, Wood's complaints about his inability to investigate certain issues are wholly meritless. He contends that all of the trial witnesses, except for his father and sister, have not been contacted, that Edward Barton has not been investigated, that there is a man in Mexican custody who is believed to be responsible for some if not all of the instant murders, that he suffers from brain damage, the severity of which is unknown, and that DNA evidence exists

137

that could prove his innocence. Petition at 99-100. Yet, Wood made the same argument on state habeas review, I SHTr 107-08, and he has not explained why he has been unable to investigate these issues within the five years since he filed his state application. Obviously, he has had plenty of time to do so, but has simply exhibited a lack of diligence. Additionally, the merits of the non-investigated issues are speculative and conclusory at best. Wood does not explain what other witnesses would state if interviewed, let alone show that any information from these witnesses would be beneficial. He had five years to investigate Edward Barton prior to filing his state application and ten years to address the issue in his federal petition, but has failed to provide anything showing that Barton actually had any involvement in this case. He has offered nothing to show that a man in Mexican custody five years ago actually committed these murders. He had the opportunity to at least raise the issue of his brain functioning on state habeas review based on the evidence the defense presented during the punishment phase of the trial, but he failed to do so, and he does not offer anything new showing he suffers from organic brain damage. In fact, he does not explain why he has not been able to investigate this issue since the time of trial. Finally, the issue with regard to the DNA evidence involving Frausto's fingernail was addressed above and is not a viable claim. Therefore, Wood has presented nothing to show that the time constraints now or on state habeas review prevented him from raising meritorious claims. Thus, the statute did not deprive him of due process.

Fourth, Wood's equal protection claim is frivolous. Wood's contention is not that the statute denies him equal protection afforded to those in a different group (*i.e.* non-death row inmates), but that it affords greater protection to those within his group who just do not have complex cases. Petition at 99. This claim is nonsensical because it does not pertain to different treatment of different groups. And given the complexities of all capital trials, it is

138

impossible to objectively distinguish between death row inmates who have "difficult" or "easy" cases. Regardless, equal protection simply requires that persons similarly situated be treated alike. *Romer v. Evans,* 517 U.S. 620, 631 (1996); *City of Cleburne, Texas v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440 (1989); *Stefanoff v. Hays County, Texas,* 154 F.3d 523, 525-26 (5th Cir. 1998). Here, the statute does not differentiate between those capital defendants with lengthy or complex cases. The deadlines it imposes apply to all capital applicants without distinction. Thus, Wood's claim in no way implicates equal protection and must be denied.[34]

Last, Wood raises similar complaints regarding the statute of limitations provision of 28 U.S.C. § 2244 (d). This claim fails for numerous reasons. Wood timely filed his federal petition, and he does not allege that the time constraints prevented him from raising meritorious claims in his federal petition. Indeed, he could not legitimately raise such a claim because he has had five years since he filed his state application to investigate and file his federal petition. Further, "[t]he requirement of standing . . . has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested

---

[34] Wood also raises a complaint that post-conviction counsel was not timely and correctly paid for his work. Petition at 100. Wood raised the same contention in his state habeas application. In fact, Wood's entire claim in this section is copied from the text of Wood's state habeas application. Thus, any contention about fees, or the lack thereof, paid to state habeas counsel does not belong in the instant federal petition and, in all likelihood, has been rendered moot. Regardless, habeas review is an improper forum to raise this type of claim. *Preiser v. Rodriguez,* 411 U.S. 475, 484 (1973) (the essence of habeas corpus is an attack by a person, in custody, upon the legality of that custody and the traditional function is to secure release from illegal confinement); *Cook v. Texas Department of Criminal Justice Transitional Planning Department,* 37 F.3d 166, 168 (5th Cir. 1994) (federal habeas corpus review is available only to challenge the "fact or duration" of confinement); *Pierre v. United States,* 525 F.2d 933, 935-36 (5th Cir. 1976) (the "sole function [of a writ of habeas corpus] is to grant relief from unlawful imprisonment or custody and it cannot be used properly for any other purpose.").

relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). The injury must be "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Henderson v. Stadler*, 287 F.3d 374, 378 (5th Cir. 2002) (citations omitted). Wood is basically complaining of potential problems with the federal habeas statute, not of any difficulties he actually faced in filing his federal petition. Therefore, he lacks standing to challenge the statute. Further, Wood's challenge to 28 U.S.C. § 2244(d) is an attack on a collateral proceeding, not a challenge to the fact or duration of confinement; as such, this is not a cognizable claim. *Cook*, 37 F.3d at 168; *Millard*, 810 F.2d at 1410. Finally, the Supreme Court has, for all practical purposes, found the statute of limitations provision of the AEDPA to satisfy constitutional requirements. *See Duncan v. Walker*, 533 U.S. 167, 179 (2001) ("The 1-year limitation period of § 2244(d) quite plainly serves the well-recognized interest in the finality of state court judgments."). Accordingly, there is no merit to Wood's claim, and it must be denied.

**CONCLUSION**

For the foregoing reasons, the Director respectfully requests that her motion for summary judgment be granted, that Wood's federal petition for writ of habeas corpus be denied with prejudice on the merits, that his request for an evidentiary hearing be denied, and that no certificate of appealability issue with regard to any of the claims raised therein.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

140

JAY KIMBROUGH
Deputy Attorney General
for Criminal Justice

GENA BUNN
Assistant Attorney General
Chief, Capital Litigation Division


_W. Erich Dryden_
W. ERICH DRYDEN*
Assistant Attorney General
State Bar No. 24008786

*Attorney-in-Charge

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
(512) 936-1280 (Fax)

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I, W. Erich Dryden, Assistant Attorney General of Texas, do hereby certify that a true

and correct copy of the above and foregoing **Respondent Cockrell's Original Answer with**

**Brief in Support** has been served by placing same in the United States mail, postage prepaid,

on this the 24th day of March, 2003, addressed to counsel for the Petitioner:

Michael D. Samonek
2200 Ross Ave., Suite 2525
Dallas, Texas 75201-6770

John Thomas Haughton
2200 Ross Ave., Suite 2525
Dallas, Texas 75201-6770

_W. Erich Dryden_
W. ERICH DRYDEN
Assistant Attorney General

141