

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN – 4 2004

CLERK, U.S. DISTRICT COURT
By_____
Deputy

DAVID LEONARD WOOD,                     §
      PETITIONER,                         §
                        §
V.                                      §
                        §     No. 3:01-CV-2103-L
DOUGLAS DRETKE, DIRECTOR,                §
TEXAS DEPARTMENT OF                     §
CRIMINAL JUSTICE,                        §
CORRECTIONAL INSTITUTIONS                §
DIVISION,                                §
      RESPONDENT.                         §

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

This cause of action was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636 (b), implemented by an order of the United States District Court for the Northern District of Texas. The Findings, Conclusions, and Recommendation of the United States Magistrate Judge follow:

## FINDINGS AND CONCLUSIONS

### I.   NATURE OF THE CASE

A state prison inmate has filed a petition for writ of habeas corpus pursuant to Title 28, United States Code, Section 2254.

### II.   PARTIES

Petitioner, David Leonard Wood, is an inmate in the custody of the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID). Respondent is the Director of TDCJ-CID.

## III.    PROCEDURAL HISTORY

A jury convicted Petitioner of capital murder, and his punishment was assessed at death by lethal injection. *State v. Wood*, No. 58486-171 (Criminal District Court No. 5 of Dallas County, Tex. Nov. 30, 1992).[1] The case was appealed to the Texas Court of Criminal Appeals, and the Court of Criminal Appeals affirmed the conviction and death sentence in an unpublished opinion. *Wood v. State*, No. 71,594 (Tex. Crim. App. Dec. 13, 1995). Petitioner filed a state application for writ of habeas corpus on December 19, 1997. The Court of Criminal Appeals denied relief in an unpublished order. *Ex parte Wood*, No. 45,746-01 (Tex. Crim. App. Sept. 19, 2001).

Petitioner filed an initial federal petition for writ of habeas corpus on May 6, 2002, and an amended petition on October 2, 2002. Respondent filed an answer on March 25, 2003, and furnished the state court records.

## IV.    RULE 5 STATEMENT

Respondent states that Petitioner has failed to exhaust state court remedies with respect to his fifth through twenty-sixth, his twenty-eighth through thirty-first, and thirty-third through thirty-sixth grounds for relief. Respondent asserts that Petitioner did not address these claims either on direct appeal or in his state writ of habeas corpus and that they are therefore procedurally barred. Nonetheless, Respondent asserts that these claims should also be denied on their merits pursuant to 28 U.S.C. § 2254(b)(2).[2].

---

[1]

Petitioner was indicted and convicted of committing capital murder in El Paso County, Texas, but his case was tried in Dallas County, Texas, pursuant to a motion for change of venue filed by the defense and granted by the trial court. (Transcript at 3, 231-39, 297).

[2]

An application for a writ of habeas corpus may be denied on its merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State. 28 U.S.C. § 2254(b)(2).

## V.   ISSUES

Petitioner raises the following thirteen issues in forty claims for relief:

A.   Petitioner's rights under the Sixth Amendment were violated because he was denied his right to a speedy trial and because both his trial and appellate counsel were ineffective in their representation on this issue (grounds one and two);

B.   Petitioner was denied his due process rights under the Fourteenth Amendment because the indictment against him was fundamentally defective, and his trial and appellate counsel were ineffective in their representation of Petitioner on this issue (grounds three and four);

C.   The Texas statute under which Petitioner was convicted violated his due process rights under the Fourteenth Amendment because it does not provide for the definition of certain terms in the jury instructions, and trial counsel were ineffective for not requesting that certain terms be defined for the jury (grounds five through nine);

D.   Petitioner's rights to due process, equal protection, and a fair trial under the Fourteenth Amendment and his right under the Eighth Amendment to be free from cruel and unusual punishment were violated because of the non-statutory mitigation special issue given to the jury at the punishment phase of the trial, and trial counsel were ineffective in failing to object to the issue and preserve error on appeal (grounds ten through fourteen);

E.   Petitioner's rights under the Sixth and Fourteenth Amendments were violated because of the method used to submit challenges to jurors, because the trial court erred in overruling certain defense challenges for cause, and because trial and appellate counsel were ineffective in their representation of Petitioner on these issues (grounds fifteen through twenty-one);

F.   Petitioner's rights under the Sixth and Fourteenth Amendments were violated because the State presented the false testimony of Carl Sweeney and Randy Wells at trial, because the State obtained this testimony through the payment of money or benefits, and because trial counsel was ineffective in failing to object to the false testimony given by these witnesses (grounds twenty-two through twenty-six);

G.   The attorney-client privilege or its equivalent should be extended to conversations between jailhouse lawyers and their inmate clients (grounds twenty-seven and thirty-nine);

H.   Petitioner's rights under the Sixth and Fourteenth Amendments were violated because of the admission of testimony regarding fiber evidence found at one of the

crime scenes and because his trial counsel were ineffective in failing to object to this evidence (grounds twenty-eight through thirty-one);

I.  The evidence is insufficient to support Petitioner's conviction for capital murder (grounds thirty-two and forty);

J.  Petitioner's rights under the Sixth and Fourteenth Amendments were violated because of the admission of an extraneous offense into evidence at trial and because Petitioner's trial counsel was ineffective in failing to object to the admission of this evidence (grounds thirty-three and thirty-four);

K.  Petitioner's rights under the Sixth and Fourteenth Amendments were violated because the verdict form used at the guilt phase was not sufficiently specific and because trial counsel were ineffective for failing to object to the verdict form (grounds thirty-five and thirty-six);

L.  Petitioner's right to due process was denied because the Texas Court of Criminal Appeals did not authorize the appointment of experts to assist Petitioner in his state post-conviction procedures (ground thirty-seven); and

M.  Both article 11.071 of the Texas Code of Criminal Procedure and 28 U.S.C. § 2254 are unconstitutional as applied to Petitioner because of the time limits they place on the filing of habeas petitions (ground thirty-eight).

## VI.  STANDARD OF REVIEW

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254, provide:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d) (2000).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001). Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-3 (2000). With respect to the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. Under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal precedent from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir.) (as modified on denial of rehearing), *cert. denied*, 531 U.S. 1002 (2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

This statute applies to all federal habeas corpus petitions which, as with the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court.

*Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Resolution on the merits in the habeas corpus context

is a term of art that refers to the state court's disposition of the case on substantive rather than

procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

## VII. FACTUAL BACKGROUND

The Texas Court of Criminal Appeals recited the following factual background in its opinion

on direct appeal:

> Six women disappeared from the El Paso area between May 13, 1987 and
> August 27, 1987. Between September 4, 1987 and March 14, 1988, the bodies of
> these women were found buried in shallow graves in the same desert area northeast
> of El Paso....The first body discovered was that of Rosa Casio, age 23, who worked
> in a topless club. On the evening of her disappearance she was seen holding hands
> with a man who could have been appellant. The second body found was that of
> Karen Baker, age 21, who lived at a hotel on Dyer. The day of her disappearance,
> she was seen by Charles Lloyd riding a red Harley Davidson with appellant. She
> told Lloyd that appellant would be back to pick her up for a date at midnight. At
> midnight, Lloyd saw a man pull up in a white or beige pickup. The man got out and
> walked toward Karen, who was standing nearby. This was the last time Karen was
> seen. The third body recovered was that of Dawn Smith, age 14. This victim was
> well-acquainted with appellant and there was testimony that she would have
> accepted a ride with him. The fourth body was that of Desiree Wheatley, age 15.
> Desiree was last seen near a Circle K store, getting into the passenger side of a small
> beige truck driven by appellant. The fifth body was that of Angelica Frausto, age 17,
> who was a dancer at a topless bar. She was last seen going for a ride with a man on
> a red Harley-Davidson. The sixth body recovered was that of Ivy Williams, age 23,
> a prostitute and exotic dancer. She was seen with appellant shortly before her
> disappearance.
>
> Five of the bodies were located in the same one by one-half mile area; the
> sixth was three-quarters of a mile away. All of the bodies were approximately 30 to
> 40 yards from one of the dirt roadways in the desert. Four of the bodies were in
> various states of undress, indicating that the killer had sexually abused them.
> Appellant's former girlfriend and others testified that he owned a beige pickup. He
> also drove a red Harley-Davidson. Appellant's girlfriend testified that he had several
> tattoos on his body and that he owned both a burnt orange blanket and some shovels,
> all of which he kept in the back of his pickup. A forensic chemist testified that
> orange fibers found on the clothing of one of the victims matched orange fibers taken
> from a vacuum cleaner bag which appellant and his girlfriend had left in their old
> apartment.

6

Randy Wells testified that he shared a cell with appellant for two and a half months in 1989. Appellant told him about the murders, describing his victims as topless dancers or prostitutes. Appellant told him that he would lure each girl into his pickup with an offer of drugs. Then he would drive out to the desert, tie her to his truck and dig a grave. Next he would tie the victim to a tree and rape her. Wells also testified that he covered over some of appellant's tattoos with new ones. He said appellant told him he wanted the tattoos covered up because one girl who had seen the tattoos had gotten away from him.

Both Karen Baker and Desiree Wheatley were with appellant when they were last seen alive. Ivy Williams was seen with appellant shortly before her disappearance. In the case of the victim Desiree Wheatley, a witness who knew appellant before the incident identified him as the man driving the pickup that Wheatley climbed into. All of the murders took place between May 30, 1987 and August 28, 1987.

*Wood v. State*, No. 71,594, slip op. at 3-5. The Court of Criminal Appeals also detailed in its opinion testimony given at the guilt phase of the trial regarding an extraneous offense committed by Petitioner:

The victim [Judith Kelly], a prostitute and a heroin addict testified that the following occurred in July of 1987:

Kelly was walking outside of a Circle K located on Kemp and Dyer in the northeast part of El Paso. A tattooed man driving a tan pickup stopped and asked her if she needed a ride. Kelly identified appellant in court as the driver of the pickup. She accepted his offer, climbed into his vehicle, and told appellant where she was going. When appellant passed up the turn she had directed him to take, he explained that he would take her back after first stopping by the house of a friend. He stopped at an apartment complex and went inside. When he returned about three minutes later, a piece of narrow rope was hanging from one of his pockets.

Appellant drove northeast of town toward the desert, in the direction opposite Kelly's friend's apartment. He explained that he was going there to recover some cocaine he had buried in the desert. He stopped first at a gate in the desert area east of Dyer. Finding the gate locked, he crossed back west into the desert area located between Dyer and McCombs. After driving around the area for a good while, appellant finally stopped his truck, got out, and ordered Kelly out as well. She saw him get a "brownish red" blanket and a shovel from the back of his truck and take them behind some bushes. After tying her to the front of his truck with the rope, appellant proceeded to dig a hole behind the bushes. Ten or fifteen minutes later, he

7

returned with the blanket and began ripping her clothes and forcing her to the ground. Suddenly hearing voices, appellant ordered Kelly to get back in the truck.

Appellant drove across to the desert on the west side of McCombs, where he stopped his vehicle again. He ordered her out, spread the blanket on the ground and forced her to remover her clothes. He gagged her and tied her to a bush. While he had her on the ground attempting to rape her, he ordered her to say that she was 13; she refused to do so, saying she was 27 or 28 years old. Ultimately, appellant did rape Kelly. Immediately afterwards, Appellant stated that he heard voices. He hastily threw the blanket and Kelly's clothing into the back of his truck and drove away, leaving her naked in the desert. His final words to her were, "[A]lways remember, I'm free."

*Wood*, slip op. at 2-3.

There was also testimony presented at Petitioner's trial from his former cellmate Carl Sweeney. Sweeney testified that Petitioner hired him to write and file a federal suit against the El Paso Police Department on Petitioner's behalf asserting that that department had violated Petitioner's civil rights. Sweeney further testified that Petitioner showed him numerous newspaper clippings about the El Paso desert murders and confessed to Sweeney that he was the one who had committed the murders. (R. 65:7034-45).

## VIII.  PROCEDURAL ISSUES

Respondent asserts that Petitioner is procedurally barred from raising most of his claims because they were not exhausted at the state level. Respondent further contends that Petitioner is procedurally barred from raising his twenty-seventh and thirty-ninth grounds because they were denied at the state level on an independent and adequate state law ground. Petitioner does not address Respondent's contention that most of his claims were not raised on the state level or that two of his claims were denied on direct appeal on an independent and adequate state law ground.

A review of the records in this case reveals that Petitioner did not raise his fifth through ninth, eleventh, twelfth, fourteenth, twenty-second, twenty-third, twenty-sixth, twenty-ninth through

thirty-first, and thirty-fourth through thirty-sixth grounds for relief at the state level. Procedural

default occurs when a petitioner fails to exhaust all available state remedies *and* the state court to

which he would be required to petition would now find that the claim is procedurally defaulted.

*Bledsoe v. Johnson*, 188 F.3d 250, 254 (5th Cir. 1999). And indeed, were Petitioner's unexhausted

claims now brought in a subsequent state writ of habeas corpus, the Court of Criminal Appeals

would consider these claims to be procedurally defaulted under Article 11.071 § 5 of the Texas Code

of Criminal Procedure, which prohibits a claim from being raised in a subsequent habeas application

unless: 1) it could not have been raised in the previous application because the factual or legal basis

was unavailable at the time; or 2) the claim contains sufficient facts establishing that, but for a

violation of the United States Constitution, no rational juror would have found petitioner guilty or

would have answered the punishment issues in the State's favor. *See* TEX. CODE CRIM. PROC. ANN.

art 11.071 § 5(a) (Vernon Supp. 1999). The legal and factual claims presented in the grounds for

relief that Petitioner failed to exhaust on the state level appear to have been available to him at the

time he filed his state habeas application, and Petitioner does not argue otherwise. And, Petitioner

has made no attempt to allege, much less prove, that his unexhausted claims contain sufficient facts

establishing that, but for a federal constitutional violation, *no* rational juror would have found him

guilty or sentenced him to death.

     With regard to his twenty-seventh and thirty-ninth grounds for relief, which both allege that

Petitioner's due process and equal protection rights under the Fourteenth Amendment were violated

because the trial court permitted Carl Sweeney to testify against Petitioner when an attorney-client

privilege between a jailhouse attorney and an inmate should be recognized, the Court of Criminal

Appeals denied this claim when it was raised on direct appeal on the basis that the defense had failed

9

to raise an objection at trial on the basis that his due process rights were violated and had thus waived the argument on appeal. *Wood*, slip op. at 11.[3] The Supreme Court has held that, when a state prisoner has defaulted his federal claim when he raised it in state court pursuant to an independent and adequate state procedural rule, federal habeas review is barred unless the prisoner can establish either cause for the default as well as actual prejudice as a result of the alleged violation of federal law *or* that failure to consider the claims would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To satisfy the independent and adequate requirements, the dismissal of a claim must "clearly and expressly" indicate that it rests on state grounds which bar relief, *and* the bar must be strictly and regularly followed by state courts and applied to the majority of similar claims. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001), *citing Amos v. Scott*, 61 F.3d 333, 338-39 (5th Cir. 1995). The Fifth Circuit has held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a claim. *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999). The Court of Criminal Appeals has also ruled that an objection at trial is need to preserve even constitutional errors for appellate review. *See Allridge v. State*, 850 S.W.2d 471 (1991). Petitioner's twenty-seventh and thirty-ninth grounds for relief were therefore denied at the state level on the basis of an independent and adequate state ground.

Accordingly, Petitioner is procedurally barred from raising all of these grounds for relief in a federal petition for writ of habeas corpus unless he can establish either cause and prejudice or that the failure to consider the claims on the merits would result in a fundamental miscarriage of justice.

---

[3]

The Court of Criminal Appeals denied on its merits a claim that the trial court erred under the Texas state evidentiary rule concerning attorney/client privilege in admitting Carl Sweeney's testimony into evidence. *Wood*, slip op. at 10-11.

*See Coleman v. Thompson*, 501 U.S. at 750; *Jones v. Johnson*, 171 F.3d 270, 277 (5ᵗʰ Cir. 1999). Petitioner does not assert either that he can establish cause and prejudice or that, should this Court fail to consider these claims on their merits, it would result in a fundamental miscarriage of justice.

Nevertheless, under 28 U.S.C. § 2254(b)(2), a federal petition for a writ of habeas corpus may be denied on its merits, notwithstanding the petitioner's failure to exhaust state court remedies. *See* 28 U.S.C. § 2254(b)(2). Accordingly, as this Court has determined that Petitioner is not entitled to relief on any of his unexhausted claims, this Court will address all of the unexhausted claims on their merits.[4]

## IX.   EXAMINATION OF THE GROUNDS FOR RELIEF

### A.   Speedy Trial Claims

In his first and second grounds for relief, Petitioner argues that his rights under the Sixth Amendment were violated because he was denied has right to a speedy trial and because both trial and appellate counsel were ineffective for failing to raise this as an issue at either the trial or appellate level. Specifically, Petitioner asserts that his speedy trial rights were violated by the delays in bringing his case to trial and that these delays were caused by the prosecutor's office rescinding a previous agreement to allow Petitioner's case to be an "open file" case, by the writ of mandamus action filed by the El Paso District Attorney's office in response to an order of the trial court regarding the case file, and the State's appeal from the trial court's decision to suppress evidence seized by the police from Petitioner's truck. Petitioner further asserts that he suffered harm as a

---

[4] This Court will not, however, address Petitioner's twenty-seventh and thirty-ninth grounds for relief on their merits, as they were exhausted on the state level, but were denied on an independent and adequate state law basis.

result of the delay because he was unable to contact certain witnesses and because certain physical evidence was not preserved.

*Applicable Facts*

Petitioner was indicted for capital murder on July 13, 1990. (Tr.:2-3). On July 27, 1990, Petitioner requested the appointment of counsel, and counsel Adolfo Quijano was appointed to represent Petitioner on July 27, 1990. (Tr.:8-12). The trial date was initially set by the trial court at January 14, 1991. (R. 3:5). At a pre-trial hearing held on August 31, 1990, defense counsel requested that the court date be postponed until January of 1992 because the State had made the decision to close Petitioner's file, after allowing defense counsel to view the documents in the file, in lieu of being required to photocopy numerous documents for the defense. (R. 5:40-70). At a subsequent hearing held on September 21, 1990, the State reiterated that it was not willing to allow the defense any further discovery than that required by state statute or *Brady v. Maryland*, 373 U.S. 83 (1963). The trial court then ordered the State to copy and provide to the defense all material previously shown to the defense on the basis that, if defense counsel were not provided these documents, an independent investigation would take two years, thereby denying Petitioner his right to a speedy trial. (R. 6:78-81). The defense then filed a motion for continuance, arguing that it would not be ready for trial on January 14, 1991, because the State's file was closed. (Tr.:49-50). The State sought mandamus relief from the trial court's order, and on October 23, 1990, the Eighth District Court of Appeals in El Paso vacated the trial court's order, ruling that the trial court had improperly intruded into the prosecution of the case and had disregarded state statutes regarding discovery. *State ex. rel. Simmons v. Peca*, 799 S.W.2d 426, 428-32 (Tex. App.–El Paso, 1990). The trial court denied the defense motion for continuance on October 26, 1990. (R. 8:170).

12

On November 19, 1990, the defense filed a second motion for continuance on the basis that its experts would not be ready for trial in January of 1991, and requested that the trial date be reset to September of 1991. (Tr.:105-06).  Following a hearing on the issue, the trial court granted the motion. (R. 11:290-91).  On July 25, 1991, the defense filed another motion for continuance based on a lack of funds and because the current jury date would in all probability conflict with the Thanksgiving and Christmas holidays. (Tr.:122-24).  The defense then filed another motion for continuance on August 1, 1991, because the State had just provided new potentially exculpatory evidence to the defense and time was needed to investigate the evidence. (Tr.:126-27).  At a hearing held on the new motion on August 1, 1991, one of the prosecutors testified that she had recently become aware of an FBI report, which had been placed in a box delivered to the prosecutor's office by the police department, about a man in Las Vegas named Edward Barton who had evidently confessed to the desert murders in El Paso, and that he had escaped from federal custody.  The State had provided this report to the defense. (R. 15:364-86; Tr. 129-36).  The prosecution further informed defense counsel that, in this same box, the prosecutors discovered a letter written by a jail inmate in September of 1988, stating that someone named Jackson Piersall had told the inmate that the victims were killed by a man named Frank Connally due to their connection with a biker group and a tattoo parlor in El Paso.  The State provided a copy of the letter to the defense. (R. 15:374-76; State Habeas Transcript at 194).  The trial court denied the defense motion for continuance on this basis, stating that the State would not begin its case-in-chief in the case for some time, which gave the defense sufficient time to investigate these issues. (R. 16:398-99).  The trial court denied subsequent requests for continuances made by defense counsel. (R. 17:462; R. 20:596).

13

Then, on September 5, 1991, after a hearing on a defense motion to suppress filed on August 21, 1991, the trial court granted the motion and suppressed fiber evidence found in Petitioner's truck. (R. 21:606; Tr.: 148-49). At that same hearing, the defense reiterated that it was not prepared to go to trial at that time, but the trial court denied the defense request for a continuance. (R. 21:606). Subsequently, however, the State filed an appeal to the order suppressing the fiber evidence, the trial court postponed the trial until January 21, 1992, and defense counsel acknowledged on the record that this remedied the denial of prior requests for continuances. (R. 23:646-47). On December 21, 1991, the trial court again pushed back the trial date to May 12, 1992, in order to allow time for the court of appeals to rule on the State's appeal. (R. 24:652). On March 13, 1992, the Eighth District Court of Appeals affirmed the trial court's ruling with respect to the suppression of the fiber evidence, ruling that fiber evidence was seized without a warrant because the search warrant did not state that it sought fiber evidence from the vehicle and the State had failed to present evidence that the evidence was seized pursuant to an exception to the warrant requirement or that the search was reasonable. *State v. Wood*, 828 S.W.2d 471 (Tex. App.–El Paso, 1992). The State decided not to appeal this decision to the Court of Criminal Appeals. (R. 25:657).

Defense counsel also, however, filed a motion for change of venue on March 31, 1992, arguing that pre-trial publicity in El Paso prevent Petitioner from receiving a fair trial there. (Tr.:231-32). After a hearing was conducted on this motion, the trial court granted the motion, transferred the case to Dallas County, and set the case for trial on September 9, 1992. (R. 26:672-80; Tr.:238).

*Applicable Law*

In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court set forth the test for determining whether the constitutional right to a speedy trial under the Sixth Amendment has been violated.  Under this test, a court must balance the following four factors: 1) the length of the delay; 2) the reason for the delay; 3) the defendant's assertion of his right; and 4) prejudice to the defendant. *Id.* at 530.  The Supreme Court also held that, to some extent, the length of delay acts as a triggering mechanism, whereby a presumptively prejudicial delay would require a court to examine the other factors. *Id.*  The Supreme Court also recognized that the delay that can be tolerated for a serious, complex charge is greater than that for an "ordinary street crime" and that a deliberate attempt by the prosecution to delay a trial in order to hamper the defense should be weighted heavily against the government. *Id.* at 531.  The Supreme Court further stated that the failure of a defendant to assert his speedy trial right will make it difficult for him to prove that he was denied his right to a speedy trial and that, with regard to prejudice, the speedy trial right is designed to prevent oppressive pre-trial incarceration, minimize anxiety and concern, and limit the possibility that the defense will be impaired. *Id.* at 532.

The Fifth Circuit has held that, generally speaking, a delay of one year triggers a speedy trial analysis under *Barker v. Wingo. United States v. Lucien*, 61 F.3d 366, 372 (5th Cir. 1995); *Robinson v. Whitley*, 2 F.3d 562, 568 (5th Cir. 1993).  Pre-indictment delay does not raise a Sixth Amendment right to speedy trial issue. *Id.* at 370.

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980).  In order to obtain federal habeas relief due to ineffective assistance of counsel, a

petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668

(1984). Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant

must prove by a preponderance of the evidence both that counsel's performance was deficient and

that this deficient performance prejudiced his defense. *Id.* at 687. Courts, however, should "indulge

a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a

defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689. And

prejudice results when "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceedings would have been different." *Id.* at 2068. *See also Lockhart*

*v. Fretwell*, 506 U.S. 364, 372 (1993) (habeas petitioner must show that trial result was unreliable

or proceeding fundamentally unfair due to deficient performance of counsel).

In *Strickland*, the Supreme Court stated that:

> [t]he reasonableness of counsel's actions may be determined or
> substantially influenced by the defendant's own statements or
> actions. Counsel's actions are usually based, quite properly, on
> informed strategic choices made by the defendant and on information
> supplied by the defendant.

466 U.S. at 691. The Court also noted in *Strickland* that a fair assessment of an attorney's

performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and

to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The Fifth Circuit has also

recognized that "[g]reat deference must be given to choices which are made under the explicit

direction of the client." *United States v. Masat*, 896 F.3d 88, 92 (5th Cir. 1990), *citing Mulligan v.*

*Kemp*, 771 F.2d 1436, 1441 (11th Cir. 1985), *cert. denied*, 480 U.S. 911 (1987).

*Analysis*

Speedy Trial Claim

Because Petitioner was indicted for capital murder in July of 1990, but his trial did not begin until September of 1992, under Fifth Circuit precedent, the delay in the instant case requires an analysis under *Barker v. Wingo*. With regards to the reason for the delay, Petitioner contends that the delay in his trial were caused primarily by the State's refusal to open its files to defense counsel, the State's late disclosure of *Brady* material to the defense, and the State's two appeals to the court of appeals. A review of the record, however, reveals that the original date for trial, January 1991, was not changed either by the State's refusal to use an open-file policy or by the State's writ of mandamus filed against the trial court. Instead, the trial court granted a defense motion for continuance in November of 1990 and continued the case from January until September of 1991 because the defense experts were unable to be available and prepared for trial in January. And, while the case was continued again to May of 1992 due to the State's appeal from the trial court's decision to suppress evidence, defense counsel filed a motion to change venue in March of 1992, the granting of which resulted in the case being continued until September of 1992. Thus, a full year of the delay in Petitioner's trial was due to the efforts of defense counsel in representing their client.

Moreover, while Petitioner complains about the State's refusal to maintain an open file policy in his case and maintains that this is one of the reasons the defense needed to delay the trial, the Texas court of appeals made clear in its decision that the State was within its rights to have a closed file and that the trial court overstepped its bounds in ordering the file to be opened. And, while the State's appeal from the suppression order did result in the case being delayed for approximately eight months, the State had a right to file such an interlocutory appeal and it was not

17

taken for the purpose of prejudicing the defense. And, most importantly, defense counsel had already requested continuances on numerous occasions prior to the State filing its appeal and acknowledged on the record that the continuance that was required in order for the State to appeal the order actually benefitted the defense, as well.[5] Accordingly, beyond the initial six-month period that the parties were given to prepare for trial, the defense was actually responsible for more than half of the additional delay in the trial. The Fifth Circuit has stated that the "speedy trial clock" should be tolled where the responsibility for the delay lies with the defense, and a defendant cannot complain of a lapse in time attributable to continuances he requested and received. *Nelson v. Hargett*, 989 F.2d 847,852 (5th Cir. 1993). Petitioner has not established that the reasons for the delay were unreasonable.

Furthermore, Petitioner did not assert his right to a speedy trial at any point during the over two-year period between his indictment and his trial. To the contrary, defense counsel either requested or stated their desire for all of two-year time period in which to prepare for trial. As the Supreme Court has stated, it is difficult for Petitioner to establish now that he was denied his right to a speedy trial when he never asserted the right earlier.

Finally, Petitioner has failed to establish that he was prejudiced by the delay in his trial such that it violated his Sixth Amendment rights. With regard to any pre-trial incarceration, Petitioner was already in prison at the time he was indicted for capital murder because of his conviction for sexually assaulting Judith Kelly. (R. 83:State's Ex. 286). Any delay in his capital murder trial did not have any effect on his fifty-year sentence in the prior case. Moreover, to the extent that

---

[5]

Indeed, after the State made its decision to have a closed-file policy in Petitioner's case, defense counsel had requested a *two year* continuance, the approximate time period about which Petitioner now complains.

Petitioner complains about any anxiety he felt during the two-year period after he was indicted on

the additional charge of capital murder and his trial, as noted by the government, the Fifth Circuit

has specifically stated that incarceration on other charges or convictions pending trial does not

constitute prejudice under *Barker*. *See Cowart v. Hargett*, 16 F.3d 642, 647 (5th Cir. 1994).

And, Petitioner has failed to show that he was prejudiced in the presentation of his defense

by the pre-trial delay. Petitioner contends that, because of the delay, he was not informed about the

existence of Edward Barton until he escaped from federal custody and was not informed about the

letter from jail inmate Billy Smith in time to investigate his allegations about Frank Connally, who

subsequently died in a motorcycle accident. He further claims that, because of the delay in his trial,

DNA testing was not performed earlier on a fingernail obtained from victim Angie Frausto, and

when the testing was performed, the results were inconclusive. (*See* R. 67:7311-15; R. 68:7362-63).

Contrary to Petitioner's contentions, the delay in his trial did not contribute to any of the

alleged harm to his defense. Defense counsel was not informed about Edward Barton and Billy

Smith until August of 1991, not because of the delay in his trial, but because the prosecutors did not

find the information until July of 1991. And, the DNA testing that was performed on Frausto's

fingernail was performed in February of 1991 and July of 1991, not because of a delay in

Petitioner's trial, but because DNA testing was only recently being used in the forensic setting and

the type of testing that was attempted on the fingernail was not done by any laboratory until late

1990 or early 1991. (R. 67:7319-22; R. 68:7353-59).[6] Moreover, Petitioner has not shown how he

---

[6]

Petitioner also complains of the fact that the fingernail was not refrigerated by the Department of
Public Safety crime lab, which would have been the appropriate method of preserving material for DNA
testing. Putting aside the question of whether the crime lab should have known in 1987 when Frausto's body
was discovered how to best preserve the fingernail for testing that was not performed for another four years,
Judith Floyd, the technician at GeneScreen laboratory who performed the testing on the fingernail,

was harmed by the delay in receiving this evidence, whatever the reason for the delay.  At the time

that the State informed defense counsel of the *Brady* material, the prosecutors also provided names,

addresses, and telephone numbers for all relevant parties. (Tr.:309-11).  Petitioner has not shown

how he was prevented from fully investigating the claims of both Edward Barton and Billy Smith.[7]

And, Petitioner has not shown how, even if DNA testing on Frausto's fingernail had been able to

be performed, it would have had helped his defense.  Even had, in the most favorable of

circumstances, someone else's DNA been found underneath Frausto's nail, this would not have

established that Petitioner did not murder her, as DNA evidence on a fingernail could have been

acquired by any number of circumstances, it would not be evidence that Frausto did *not* scratch

Petitioner, and it is mere speculation that Frausto actually scratched her murderer.[8]  *See Kutzner v.*

*State*, 75 S.W.3d 427, 438-39 (Tex. Crim. App. 2002), (holding that there was no reasonable

probability that exculpatory DNA tests from a fingernail would prove Kutzner's innocence, but

would "merely muddy the waters.")

---

acknowledged at trial that, even had the fingernail been refrigerated, due to the fact that victim's body was buried for a number of months, she would not have been optimistic about the possibility of testing because dirt is a very "detrimental substance[s] to DNA." (R. 67:7325-26).

[7]

Indeed, Detective Al Giron testified at trial that he received the letter from Smith, learned that Frank Connally had been questioned by another police officer in his office, learned that Connally had subsequently died in a motorcycle accident, determined that the allegation had been investigated and it had been determined that the victims had no connection with the tattoo parlor, and determined that Jackson Piersall, the alleged source of the information, had denied the allegations. (R. 65:6940-60).

[8]

In fact, the only evidence that Frausto might have scratched her murderer was testimony given by a former cellmate of Petitioner, who testified that Petitioner told him that one of his victims scratched him and from Petitioner's girlfriend, who testified that Petitioner had scratches on his face and back at one point. (R. 63:6620; R. 65:6970).

20

In summation, Petitioner has failed to establish that the delay in his trial was for an impermissible or unreasonable reason, that it was done in an effort to harm the defense, that it was unwanted by the defense, or that it harmed the defense. Petitioner's claim that he was denied his Sixth Amendment right to a speedy trial is without merit.

<u>Ineffective Assistance of Counsel Claim</u>

Petitioner also contends that his trial and appellate counsel were ineffective for failing to raise his right to a speedy trial as an issue at either trial or on appeal. Petitioner has not established either that his attorneys were deficient or that he was prejudiced. As noted earlier, trial counsel requested continuances that resulted in half of the two year delay in his trial. And, defense counsel made clear shortly after being appointed that they wished to have two years in which to investigate the case. Furthermore, trial counsel acknowledged that the delay caused by the State's appeal of the court's suppression order actually inured to the defendant's benefit. Counsel cannot invite error and then complain about it. *See United States v. Baytank Inc.*, 934 F.2d 599, 606 (5th Cir. 1991). Counsel were not deficient in failing to object or raise as an issue on appeal an alleged error which, in fact, benefitted their trial strategy.

Furthermore, Petitioner has not established any prejudice because he has not shown that he would have prevailed on this issue either at trial or on appeal. As this Court outlined earlier, Petitioner's Sixth Amendment right to a speedy trial was not violated. Thus, there is no reasonable probability that the case against him would have been dismissed on that basis. At the state level, the state habeas court concluded that the pre-trial delay was not unreasonable and that trial counsel were not ineffective for failing to raise the issue. (State Habeas Findings at 1-2). This is not an

21

unreasonable application of federal law. Petitioner's first and second grounds for relief are without merit, and it is recommended that they be denied.

## B.    Indictment Claims

In his third and fourth grounds for relief, the Court asserts that his indictment was fundamentally defective and that his trial and appellate counsel were ineffective for failing to raise this issue at either trial or on appeal. This Court understands Petitioner's complaint to be that the indictment is defective because it fails to allege all of the elements of capital murder, in that it does not first allege a first-degree murder under Texas law and then proceed to allege the elements of the capital murder statute under which Petitioner was tried.

Sufficiency of a state charging instrument is not a matter for federal habeas corpus relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction over the case. *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993); *Millard v. Lynaugh*, 810 F.2d 1403, 1407 (5th Cir. 1987). And the question of whether a defective charging instrument deprived a state court of jurisdiction is foreclosed to a federal court if the sufficiency of the charging instrument was presented to the highest court of the state on appeal and that court ruled that the trial court had jurisdiction over the case. *Millard*, 810 F.2d at 1407; *Liner v. Phelps*, 731 F.2d 1201, 1203 (5th Cir. 1984). Moreover, if the Texas Court of Criminal Appeals adopts a finding by the state habeas court that an indictment was not fundamentally defective, then the highest court in Texas has ruled on the issue. *Millard*, 810 F.2d at 1407; *Alexander v. McCotter*, 775 F.2d 595, 599 (5th Cir. 1985).

In the instant case, the state habeas court concluded that the indictment against Petitioner was not fundamentally defective because it alleged all of the elements of capital murder and that, even

22

if it failed to allege an element, it was still an indictment under state law. (State Habeas Findings at

5). All of the state habeas courts findings and conclusions were adopted by the Court of Criminal

Appeals. *See Ex parte Wood*, No. 45,746-01 (Tex. Crim. App. Sept. 19, 2001).  Accordingly,

Petitioner's claim that the indictment against him was fundamentally defective has been decided

adversely to him by the highest court in Texas, and this federal court is therefore foreclosed from

addressing this issue.

Moreover, even were the issue properly before this Court, the indictment against Petitioner

was not fundamentally defective because it did not deprive the trial court of jurisdiction.  And,

contrary to Petitioner's contention, the indictment against him did allege all of the elements of

capital murder.  The indictment against Petitioner alleged that he:

> ...did then and there unlawfully, intentionally and knowingly cause the death of more than one person, during different criminal transactions, pursuant to the same scheme and course of conduct...to-wit:
>
> On or about the 30th day of May, 1987, the said defendant, DAVID LEONARD WOOD, intentionally and knowingly cause the death of IVY WILLIAMS by stabbing the said IVY WILLIAMS with a sharp instrument, and
>
> On or about the 2nd day of June, 1987, the said defendant, DAVID LEONARD WOOD, intentionally and knowingly cause the death of DESIREE WHEATLEY, in some manner and by some means, instrument or weapon, unknown to the Grand Jury, and
>
> On or about the 5th day of June 1987, the said defendant, DAVID LEONARD WOOD, intentionally and knowingly cause the death of KAREN BAKER, in some manner and by some mens, instrument or weapon, unknown to the Grand Jury, and
>
> On or about the 8th day of August, 1987, the said defendant, DAVID LEONARD WOOD, intentionally and knowingly cause the death of ANGELICA FRAUSTO, in some manner and by some means, instrument or weapon, unknown to the Grand Jury, and
>
> On or about the 12th day of August, 1987, the said defendant, DAVID LEONARD WOOD, intentionally and knowingly cause the death of ROSA MARIA

CASIO, in some manner and by some means, instrument or weapon, unknown to the Grand Jury, and

On or about the 28th of August, 1987, the said defendant, DAVID LEONARD WOOD, intentionally and knowingly cause the death of DAWN MARIE SMITH, in some manner and by some means, instrument or weapon, unknown to the Grand Jury[.]

(Tr.:3). The statute under which Petitioner was indicted states that a person commits the offense of capital murder if he commits murder under section 19.02(b)(1) of the Texas Penal Code *and* he murders more than one person during different criminal transactions, but the murders were committed pursuant to the same scheme or course of conduct. TEX. PENAL CODE § 19.03(a)(7)(B) (West 1994) (formerly § 19.03(a)(6)(B)). And, under section 19.02(b)(1), a person commits murder if he "intentionally and knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 1993) (formerly TEX. PENAL CODE ANN. § 19.02(a)(1) (Vernon 1973)).

The Fifth Circuit has held that whether a state indictment confers jurisdiction on a state trial court is a matter of state law. *McKay v. Collins*, 12 F.3d 66, 69 (5th Cir. 1994). And, under a 1985 amendment to the Texas Constitution, the "presentment of an indictment or information to a court invests the court with jurisdiction of the cause." *Id.*, *citing* TEX. CONST. art. V, § 12(b). Moreover, under Texas law, the failure to include an essential element of a crime does not deprive the trial court of jurisdiction. *Id.*, *citing Studer v. State*, 799 S.W.2d 263 (Tex. Crim. App. 1990). Accordingly, the indictment against Petitioner was not a fundamentally defective one. And, contrary to Petitioner's argument, the indictment did allege all of the elements of capital murder. It alleged that Petitioner knowing and intentionally murdered more than one person in different criminal transactions pursuant to the same scheme and course of conduct and it alleged the specific victims

Petitioner was alleged to have murdered using this same scheme and course of conduct. This language tracks the language of the statute. This claim is without merit.

With regards to Petitioner's claim that his trial and appellate counsel were ineffective for failing to raise the issue that the indictment was fundamentally defective because it did not charge all of the elements of capital murder, this Court first notes that trial counsel filed two motions to quash the indictment against Petitioner on the basis that the indictment did not allege the cause of death of five of the victims and that the indictment failed to allege what "different criminal transactions occurred" and what acts constituted the same scheme or course of conduct. (Tr.:39-40, 155-56). And trial counsel filed a motion to dismiss the indictment on the basis that it failed to define the terms "criminal transactions" and "same scheme or course of conduct." (Tr.:41-42). Thus, trial counsel provided reasonable effective assistance of counsel by attacking the validity of the indictment in numerous ways. As this Court has previously determined, under Texas state law, the indictment against Petitioner was not a fundamentally one. Accordingly, Petitioner's trial and appellate counsel were not ineffective for failing to raise a meritless issue. *See Koch*, 907 F.2d at 526. At the state level, the state habeas court concluded that the indictment was not fundamentally defective and that trial counsel were not ineffective for failing to raise the fundamentally defective indictment issue, especially where trial counsel made a number of attacks on the indictment prior to trial. (State Habeas Findings at 2, 5). This is not an unreasonable application of federal law. Petitioner's third and fourth grounds for relief are therefore without merit, and it is recommended that they be denied.

C.     **Jury Instructions Claims**

In his fifth through ninth grounds for relief, Petitioner asserts that the Texas statute under which he was convicted is unconstitutionally vague and therefore violates his due process rights because it does not provide for the definition of the terms "same scheme or course of conduct" and "different criminal transaction" terms that are required under the statute to be submitted to the jury in the jury charge. Petitioner further asserts that his due process rights were violated when the trial court did not define these terms for the jury in the jury charge. And finally, Petitioner contends that his trial counsel were ineffective for failing to demand that these terms be defined for the jury.

As noted earlier, Petitioner was charged and convicted pursuant to the Texas Penal Code § 19.03(a)(7)(B), which states that a person commits a capital murder if he "murders more than one person during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct." *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(B) (West 1994). Petitioner contends that his constitutional rights were violated because the statute does not define the terms "different criminal transactions" and "same scheme or course of conduct" and because these terms were not defined in the instructions given to the jury at the guilt phase of the trial. In *Corwin v. Johnson*, 150 F.3d 467 (5th Cir. 1998), the Fifth Circuit addressed a claim that the language of this particular statute was unconstitutionally vague. Recognizing that the Supreme Court in *Tuilaepa v. California*, 512 U.S. 967, 975 (1994), set forth the standard for the analysis of a statutory vagueness claim, the Fifth Circuit held that this statute is not vague because the factors contained within the statute have a "common-sense core of meaning...that criminal juries should be capable of understanding." *Corwin*, 150 F.3d at 475-76, *citing Tuilaepa*, 512 U.S. at 975. The Fifth Circuit further held that the language used in this statute is more specific than the language "outrageously

26

or wantonly vile, horrible or inhuman," that the Supreme Court held to be unconstitutionally vague language in a capital murder statute in *Godfrey v. Georgia*, 446 U.S. 420, 432 (1980). *Corwin*, 150 F.3d at 475.  Given Fifth Circuit precedent that specifically holds that the statute under which Petitioner was convicted is not unconstitutionally vague, this Court is not at liberty to rule otherwise.

With respect to Petitioner's contention that his due process rights were violated because the trial court did not define these terms in the jury charge, Petitioner contends that these terms needed to be defined for the jury because the State was unable to present evidence as to each woman's exact time of death and was unable, except for in the case of Ivy Williams, to present evidence as to the manner of death.  Thus, Petitioner contends, it is possible that the jury convicted Petitioner for killing more than one person, without requiring that there be evidence that he killed them in "different criminal transactions" using the "same scheme or course of conduct."

However, as noted by the government, jurors are presumed to follow their instructions. *See Zafiro v. United States*, 506 U.S. 534, 540-41 (1993).  In Petitioner's case, there was evidence presented that the six victims disappeared within the same three month period, that they were all last scene in the same area of El Paso, that most of the victims were either prostitutes or topless dancers who worked in that area of town, that they were all found buried in the same general area in northeast El Paso, that all were buried in shallow graves, that most of the victims were found either partially or fully undressed indicating a sexual assault, and that there was testimony given that Petitioner confessed that he abducted all of the women in a similar manner and sexually assaulted them before killing them.  All of this evidence supports Petitioner's conviction for capital murder by murdering more than one person in different criminal transactions using the same scheme or course of conduct, and Petitioner has not shown that the jury instructions provided to the jury were

27

insufficient for them to reach their verdict in this case such that his due process rights were violated. As noted by the Fifth Circuit:

> [t]o the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system...The answer is that such words, often of great consequence, do have a common understanding in the sense that they ultimately mean what the jury says by their verdict they mean.

*Hughes v. Johnson*, 191 F.3d 607, 615 (5th Cir. 1999), *quoting Milton v. Procunier*, 744 F.2d 1091, 1096 (5th Cir. 1984).

Finally, with respect to Petitioner's contention that his trial counsel was ineffective for "demanding" that these two phrases be defined for the jury, Petitioner has failed to establish any deficiency in representation. Petitioner's trial counsel cannot be deemed ineffective for failing to request an instruction that was not provided for within a statute that has been ruled to be a constitutionally constructed statute. *Koch v. Puckett*, 907 F.2d 524, 526 (5th Cir. 1990) (holding that counsel is not required to make futile motions or objections). Petitioner's fifth through ninth grounds for relief are without merit, and it is recommended that they be denied.

## D.     Mitigation Special Issue Claims

In his tenth through fourteenth grounds for relief, Petitioner asserts that: his due process and equal protection rights were violated because the trial court submitted a third special issue to the jury at punishment regarding mitigation evidence; his due process and equal protection rights and his right to be free from cruel and unusual punishment were violated because the trial court declined to submit instructions concerning mitigating evidence that were requested by defense counsel; his due process rights and right to a fair trial were violated because potential jurors were questioned during voir dire using a different version of the punishment special issues than the one used at trial; and trial

counsel were ineffective for failing to object to the mitigation special issue submitted to the jury and for failing to preserve error regarding the trial court's refusal to use the instructions requested by defense counsel.  Petitioner contends that, rather than the special issue submitted to the jury regarding mitigating evidence, the special issue requested by trial counsel which was identical to an instruction proposed by the Court of Criminal Appeals in *Rios v. State*, 846 S.W.2d 310 (Tex. Crim. App. 1992), should have been submitted to the jury, along with further instructions regarding mitigating evidence requested by defense counsel.

*Applicable Facts*

At the time of Petitioner's trial in October and November of 1992, the Texas Legislature had recently revised the sentencing statute used in capital murder cases, the changes being effective September 1, 1991.  The changes relevant to Petitioner's claims were the removal of the special issue asking the jury to determine whether or not the defendant committed the murder "deliberately" and the addition of a special issue concerning mitigation evidence. *See* Act of Sept. 1, 1991, 72nd Leg., R.S., ch. 838, § 1.  The legislature also specifically stated, however, that these changes to the statute were applicable only to capital murders that were committed after September 1, 1991. *See* Act of Sept. 1, 1991, 72nd Leg., R.S., ch. 838, § 5.  As Petitioner had been convicted of committing capital murder in 1987, the prior statute, with the deliberateness special issue, was the correct applicable statute.  However, on October 28, 1992, during Petitioner's trial, the Court of Criminal Appeals handed down *Rios v. State*, 846 S.W.2d 310 (Tex. Crim. App. 1992).  In that case, the Court

held that the trial court had not provided the jury with an adequate vehicle to take into consideration

the evidence presented at trial regarding Rios' mental retardation. *Id.* at 317-18.[9]

During the charge conference at the punishment phase of Petitioner's trial, referencing the

opinion handed down in *Rios*, Petitioner's trial counsel requested that the following mitigating

special issue be included in the jury charge:

> Whether taking into consideration all of the evidence, whether or not relevant
> to the special issues including, but not limited to, the circumstances of the offense,
> the defendant's character and background, his intelligence and personal moral
> culpability of the defendant there is any mitigating circumstance or circumstances
> sufficient to warrant that a sentence of life imprisonment rather than a death sentence
> be imposed.

(R. 72:7775-76; Tr.:286).  The trial court denied this request and instead submitted the following

special issue to the jury:

> Do you find, taking into consideration all of the evidence, including the
> circumstances of the offense, the defendant's character and background, and the
> personal moral culpability of the defendant, that there is a mitigating circumstance
> or circumstances sufficient to warrant that a sentence of life imprisonment rather
> than a death sentence be imposed?

(Tr.:296). Except for a couple of words that do not change the meaning, this special issue submitted

to the jury at Petitioner's trial is identical to the mitigation special issue that was added to the Texas

capital sentencing statute in 1991. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071 (Vernon 1991).

Moreover, in 1993, the Texas legislature added a capital sentencing statute for cases in which the

defendant was convicted of a capital murder that occurred before September 1, 1991. In this statute,

the deliberateness special issue and the future dangerousness issue remained, and a third special

---

[9]

In *Rios*, the trial court submitted to the jury a third special issue that addressed mitigating evidence.
It was a "nullification" instruction, asking the jury to answer one of the other special issues "no" if the jury
found sufficient mitigating evidence existed. *Rios*, 846 S.W.2d at 315-16.

issue regarding mitigating evidence was added. The third special issue submitted to the jury in Petitioner's case is identical to the one required by this statute. *See* TEX. CODE CRIM. PROC. ANN. 37.0711 § 2(b)(1), 3(e) (Vernon 1993). In essence, therefore, the jury was required to answer the same special issues at Petitioner's trial as are required in a statute adopted the following year after Petitioner's trial.

Defense counsel also requested that the jury in Petitioner's case receive two further instructions regarding mitigating evidence:

> A mitigating circumstance is any evidence which in fairness or mercy calls for a sentence less than death.

> When you deliberate about the questions posed in special issue number three, you must consider any mitigating circumstance supported by the evidence presented in both phases of the trial. In this case, there was presented to you evidence that the defendant suffers from organic brain dysfunction...and/or minimal brain damage. You may consider such evidence as a mitigating circumstance in deciding the answer to special issue number three.

(R. 72:7777-78). The trial court denied these requests. (R. 72:7777, 7779). The jury was instead instructed that:

> Mitigating evidence is evidence that reduces the Defendant's personal or moral culpability, or blameworthiness, and may include, but is not limited to, any aspect of the Defendant's character, record, background, or circumstances of the offense for which you have found him guilty. Our law does not specify what may or may not be considered as mitigating evidence. Neither does our law provide a formula for determining how much weight, if any, a mitigating circumstance deserves. In answering special issue #3 each juror may consider any evidence which, in his or her opinion, is mitigating.

(Tr.:291-92).

*Analysis*

Petitioner appears to argue that his constitutional rights were violated by both the trial court's submission of a different special issue than the one requested by defense counsel and by the court's

31

refusal to submit the additional instructions regarding mitigating evidence requested by defense counsel. Petitioner further contends, however, that his constitutional rights were violated because potential jurors were not informed during voir dire about *any* mitigating special issue, but were instead only informed about the deliberateness and future dangerousness special issues. Finally, Petitioner contends that this trial counsel were ineffective in failing to preserve error regarding the mitigating instructions that were requested by defense counsel and denied by the trial court.

Contrary to Petitioner's argument, however, the mitigation special issue that the jury in his trial was required to answer is a constitutionally adequate vehicle for considering the mitigating evidence presented by Petitioner. Specifically, with regard to this mitigation special issue that was added to Article 37.071 in 1991, and to Article 37.0711 in 1993, in *Penry v. Texas*, 532 U.S. 782 (2001) (*Penry II)*, a case in which the defendant presented evidence of both mental retardation and severe childhood abuse, the Supreme Court made the following comments:

> Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference. Texas now requires the jury to decide '[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.' Penry's counsel, while not conceding the issue, admitted that he 'would find a tough time saying that [Penry I] was not complied with under the new procedure.' At the very least, the brevity and clarity of this instruction highlight the confusing nature of the supplemental instruction actually given, and indicate that the trial court had adequate alternatives available to it as it drafted the instructions for Penry's trial.

*Penry*, 532 U.S. at 803. (internal citations omitted). Through the testimony of his father and his sister, Petitioner presented evidence that he came from a somewhat troubled childhood, in which his

parents were estranged during some periods, he spent some time in foster care, and his mother had physical illnesses, became addicted to prescription drugs, and was institutionalized for her addictions on more than one occasion. Petitioner also presented evidence that he was prescribed the drug Ritalin for his hyperactivity as a child, that he did not make good grades in school, and that he dropped out of high school in the ninth grade. (R. 72:7666-73, 7679-4). Through the testimony of a psychiatrist, Petitioner presented evidence that he is of below-average intelligence, had been given IQ tests in school, had results on these testing ranging from a 64 to a 71, and suffers from an organic brain deficit or minimal brain damage. (R. 72:7707-13). As the Supreme Court has at least implicitly approved of the mitigation issue submitted in Petitioner's case as an adequate vehicle to address severe childhood abuse and mental retardation, Petitioner has failed to establish that this special issue was constitutionally inadequate to address the mitigating evidence presented in his case.

With regard to Petitioner's contention that the trial court violated his constitutional rights by declining to submit the additional instructions requested by defense counsel, Petitioner has failed to show how the failure to submit these requested instructions violated his constitutional rights. A trial court's refusal to give an additional mitigating instruction does not constitute a constitutional error unless there is a reasonable probability that the jury applied the challenged instructions in a way that prevented the consideration of constitutionally relevant mitigating evidence. *Boyde v. California*, 494 U.S. 370, 382 (1990); *Johnson v. Texas*, 509 U.S. 350, 367-8 (1993). In that regard, the trial court instructed the jury that: mitigating evidence is evidence that reduces culpability or blameworthiness; mitigating evidence may include, but is not limited to evidence of a person's character, record, background, or the circumstances of the offense; the law does not specify what

33

may or may not be considered as mitigating evidence; the law does not provide a formula for determining how much weight, if any, a mitigating circumstance deserves; and, in answering the mitigation special issue, each juror may consider any evidence which, in his or her opinion, is mitigating. (Tr.:291-92). This instruction correctly stated the law, encompassed  much of the information contained in the instructions requested by defense counsel, and did not prevent the consideration of relevant mitigating evidence. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (noting that evidence "mitigates against the imposition of the death penalty" if a reasonable juror could conclude that the evidence was a basis for a sentence less than death); *Eddings v. Oklahoma*, 455 U.S. 104 (1982) (stating that it is the sentencer's duty to determine the weight to be given mitigating evidence); *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994) (stating that a sentencer may be given unbridled discretion in determining whether to impose the death penalty once it is determined that the defendant is a member of the class that is eligible to receive the death penalty); *Buchanan v. Angelone*, 522 U.S. 269, 270 (1998) (stating that a state may shape and structure the jury's consideration of evidence at the punishment phase of a capital murder trial, so long as it does not preclude the jury from giving effect to any relevant evidence). Petitioner has failed to establish a constitutional violation.

Petitioner also contends that his constitutional rights were violated because potential jurors were not questioned about or informed about the mitigation special issue during the voir dire process. Petitioner's argument appears to be that this confused the jurors. The record of the trial suggests that potential jurors were not informed about any mitigation special issue because, during September and October of 1992, when the voir dire process took place in Petitioner's case, the capital murder sentencing statute did not provide for any mitigating special issue for cases where

the murder or murders took place prior to September 1, 1991. Then, as noted earlier, the trial court submitted the mitigation special issue to the jury in order to address the issues raised in *Rios v. State*, 846 S.W.2d 310, 317-18 (Tex. Crim. App. 1992), handed down on October 28, 1992, which was a case where the Court of Criminal Appeals reversed a death sentence because the jury instructions did not permit the jury to consider certain mitigating evidence. Although the mitigation special issue given to the jury in Petitioner's case certainly was to Petitioner's benefit, Petitioner alleges that his constitutional rights were violated because potential jurors were not informed about this instruction earlier and that this somehow led to confusion at trial.

Contrary to this argument, however, the Supreme Court has stated that jurors are presumed to understand and follow the instructions given to them. *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993). Moreover, the prosecution informed the jurors during closing statements at Petitioner's trial how their answers to the special issues would determine what sentence Petitioner received and which answers would result in which sentence. (R. 72:7783-85, 7797). Petitioner has presented no evidence that the jurors were unable to understand the jury instructions and apply them to the case before them.

Finally, with regard to Petitioner's contention that his trial counsel were ineffective for failing to preserve error on these issues, this contention is without merit. As noted by the government, under Texas law, error is preserved with respect to the jury charge when counsel either makes an objection *or* requests a specific charge that the trial court does not submit to the jury. *Vasquez v. State*, 919 S.W.2d 433, 435 (Tex. Crim. App. 1996). Therefore, counsel did preserve error with respect to all of the mitigation instructions that he requested, as the trial court declined to include them in the jury charge. Moreover, even had error not been preserved with respect to the

35

mitigation special issue and additional mitigation instructions that were submitted to the jury, Petitioner has failed to establish any prejudice. Petitioner has failed to show that, had this issue been raised on direct appeal, the Court of Criminal Appeals would have held that the jury was unable to consider the mitigation evidence presented at trial. To the contrary, the direct appeal opinion in Petitioner's case was handed down by the Court of Criminal Appeals on December 13, 1995. During that same time period, that court specifically held in other cases that the same mitigating special issue submitted to the jury in Petitioner's case was not unconstitutional. *Cockrell v. State*, 933 S.W.2d 73, 93 (Tex. Crim. App. 1996); *Lawton v. State*, 913 S.W.2d 542, 560 (Tex. Crim. App. 1995). Accordingly, there is no basis for an argument that that court would have ruled differently in the instant case. At the state level, the state habeas court concluded that trial counsel were not ineffective for failing to object to a beneficial jury instruction. This conclusion is not contrary to federal law. Petitioner's tenth through fourteenth grounds for relief are without merit, and it is recommended that they be denied.

**E.    Voir Dire Claims**

In his fifteenth through twenty-first grounds for relief, Petitioner alleges various constitutional defects regarding the voir dire process. In his fifteenth through seventeenth grounds, Petitioner asserts that his trial counsel were ineffective in their exercise of peremptory challenges, in failing to object properly to the trial court's allegedly improper peremptory challenge procedure, and for failing to object properly and preserve for appeal the trial court's alleged errors in overruling defense challenges for cause. In his eighteenth and nineteenth grounds for relief, Petitioner contends that his appellate counsel was ineffective for failing to properly raise as an issue the allegedly improper peremptory challenge procedure used by the trial court and for failing to properly allege

that the trial court erred in overruling defense challenges for cause to two particular jurors. And, finally, in his twentieth and twenty-first grounds for relief, Petitioner asserts that he was denied his due process rights by the peremptory challenge procedure used by the trial court and that he was denied his due process and equal protection rights because the trial court unjustifiably overruled defense challenges for cause.

## Applicable Facts

Prior to trial, the prosecution and the defense in Petitioner's case agreed that they preferred a procedure during voir dire where the peremptory strikes were not made until after an appropriate number of jurors were qualified. (R. 18:479-82). After the jurors were qualified, both sides made their peremptory strikes. Defense counsel then requested additional peremptory strikes, stating that the court had earlier erroneously overruled defense challenges for cause against eleven potential jurors. The trial court denied defense counsel's request for additional peremptory strikes for the stated reason that defense counsel had failed to name any objectionable juror on the actual jury panel. Defense counsel then argued that there were objectionable jurors on the panel, but declined to name them, and the trial court refused to give defense counsel any additional peremptory strikes. (R. 56:5402-15).

## Analysis

### Ineffective Assistance claims

Petitioner first contends that his trial counsel were ineffective in their exercise of peremptory challenges. Petitioner fails, however, to allege any particular basis for his contention that his trial counsel exercised peremptory challenges in an ineffective manner and fails to identify any juror who should have been peremptorily challenged who was not or one who should not have been who was

peremptorily challenged. Moreover, to the extent that Petitioner is arguing that trial counsel should have named an objectionable juror on the panel in an attempt to receive an additional peremptory challenge, Petitioner has failed to establish any prejudice because Petitioner has failed to argue, much less prove, that there is a reasonable probability that the outcome of the trial would have been different had Petitioner's trial counsel been granted an additional peremptory strike. Petitioner has failed to establish that his trial counsel were ineffective in this respect.

Petitioner next contends that his trial counsel were ineffective in failing to object properly to the trial court's allegedly improper peremptory challenge procedure. Petitioner alleges that the procedure was objectionable because it was not the normal procedure for capital murder cases in Texas, under which peremptory challenges are made after each side completes their individual questioning of a juror. As noted earlier, however, Petitioner's trial counsel preferred and requested this particular procedure. As noted by the government in its response, counsel cannot invite error and then complain about it. *See United States v. Baytank Inc.*, 934 F.2d 599, 606 (5ᵗʰ Cir. 1991). And, to the extent that Petitioner is asserting that trial counsel were ineffective for requesting the peremptory challenge procedure that was used in the instant case, defense counsel explained on the record that the procedure used was preferred by the defense based on a belief that this procedure . would not anger the potential jurors and therefore would inure to their client's benefit. (R. 18:481). An informed decision based on trial strategy cannot be the basis for an ineffective assistance of counsel claim unless the decision was "so ill chosen that it permeates the entire trial with obvious unfairness." *Crane v. Johnson*, 178 F.3d 309, 314 (5ᵗʰ Cir. 1999). Petitioner has failed to make such a showing, as he has failed to show how a procedure that requires both the State and the defense to wait until the end of all of the questioning of potential jurors before striking objectionable jurors

permeated his entire trial with unfairness. The state habeas court concluded that trial counsel were not ineffective in agreeing with the prosecution regarding the method for making peremptory challenges because it was a matter of trial strategy and that Petitioner had failed to establish that trial counsel were ineffective by failing to make a proper objection to the use of the peremptory challenge procedure. (State Habeas Findings at 3). These conclusions are not an unreasonable application of the *Strickland* standard.

Petitioner also asserts that his trial counsel were ineffective for failing to properly object and preserve for appeal the trial court's alleged errors in overruling defense challenges for cause. On direct appeal, Petitioner alleged that the trial court had erred in overruling his challenges for cause to two jurors. The Court of Criminal Appeals ruled that Petitioner had failed to assert that, as a result of the alleged error, he was forced to use all of his peremptory strikes, was denied additional peremptory strikes, or that an objectionable juror was seated on the jury. That court ruled that the failure to allege these facts waived error. *Wood*, slip op. at 2. Evidently, Petitioner is asserting that these grounds were denied on direct appeal because of a failure to preserve error. But, a careful reading of the opinion reveals that the claims were denied, not because error was not preserved, but because facts were not alleged to support the claims. Thus, there is no record on which to base a claim that trial counsel were ineffective with regards to this issue. The state habeas court concluded that Petitioner had failed to establish that trial counsel were ineffective for failing to preserve for appeal the trial court's alleged error in denying defense challenges for cause. (State Habeas Findings at 3). This conclusion is not contrary to federal law.

Petitioner also contends that his appellate counsel was ineffective for failing to raise properly as an issue the allegedly improper peremptory challenge procedure used by the trial court and for

failing to properly allege that the trial court erred in overruling defense challenges for cause to two particular jurors.  With regards to any failure on appellate counsel's part to allege that the peremptory challenge procedure was improper, as noted earlier Petitioner's trial counsel requested that that procedure be used and appellate counsel could not then complain about any invited error. The state habeas court concluded that Petitioner had failed to establish that appellate counsel was ineffective for failing to argue on appeal that the peremptory challenge procedure used at trial was improper. (State Habeas Findings at 3).  This conclusion is not contrary to federal law.

With regard to Petitioner's contention that appellate counsel was ineffective for failing to allege in a proper manner the claim that the trial court erred in overruling two defense challenges for cause, Petitioner has failed to establish any prejudice.  As alluded to by the Court of Criminal Appeals in its opinion on direct appeal, under Texas law, *if* a trial court erroneously overrules a defendant's challenge for cause, in a capital case a defendant must then prove that he was harmed by showing that he exhausted all of his peremptory strikes, was denied an additional peremptory strike, and that because of this denial an objectionable juror was seated on the jury *See Martinez v. State*, 763 S.W.2d 413, 415 (Tex. Crim. App. 1988).  Petitioner attempts to establish harm by alleging that Juror Hedrick, who sat on the jury, was an objectionable juror. (Petition at 57). Petitioner, however, fails to even allege, much less prove, that any defense challenge for cause that was overruled by the trial court was overruled in violation of state law.  Without such a showing, Petitioner cannot establish that, had appellate counsel more ably pled this point on appeal, it would have prevailed. Petitioner has therefore failed to establish a reasonable probability that the outcome of the appeal would have been different.  Petitioner's ineffective assistance of counsel claims with respect to the voir dire process are without merit.

40

Other Claims

Petitioner also contends that he was denied his due process rights by the peremptory challenge procedure used by the trial court and that he was denied his due process and equal protection rights because the trial court unjustifiably overruled defense challenges for cause. With respect to Petitioner's argument that his due process rights were violated by the peremptory challenge procedure itself, the Supreme Court has held that peremptory challenges are not a federal constitutional right, but are instead one state-created means to insure the constitutional right of an impartial jury and a fair trial. *Georgia v. McCollom*, 505 U.S. 42, 57 (1992). And, the Supreme Court has further noted that the right to a peremptory challenge under state law may be completely withheld without impairing the constitutional guarantee of an impartial jury. *Id.* at 57. As peremptory challenges are not a federal constitutional right, Petitioner has failed to show how any particular method for administrating peremptory strikes impacts his constitutional rights.

With respect to Petitioner's assertion that his due process and equal protection rights were violated when the trial court overruled defense challenges for cause, this Court would first note that Petitioner only alleges generally that eleven defense challenges for cause were erroneously denied by the trial court, without any supporting case law or argument. Furthermore, while Petitioner has the constitutional right to an impartial jury, *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961), in *Ross v. Oklahoma*, the Supreme Court held that any claim that a jury was not impartial or that due process was denied because a court erred in not granting a challenge for cause must focus on the jurors who sat on the jury, not jurors who were removed, even if peremptory challenges were used to remove the jurors, because the loss of a peremptory challenge is not a violation of a constitutional right. *Id.* at 85, 88-89. It follows that, even if trial counsel erred

41

in denying defense counsel's challenges for cause, Petitioner cannot establish a federal constitutional violation because he has failed to allege or prove that the jury in his capital murder trial was, in fact, not an impartial one. This claim is therefore also without merit. Petitioner's fifteenth through twenty-first grounds for relief are without merit, and it is recommended that they be denied.

### F.    False Testimony Claims

In his twenty-fourth and twenty-fifth grounds for relief, Petitioner asserts that his due process rights were violated because his conviction was obtained through false testimony given by Randy Wells and Carl Sweeney, two former cellmates of Petitioner. In his twenty-second and twenty-third grounds for relief, Petitioner alleges that his trial counsel were ineffective for failing to object to this testimony on the basis that it was false testimony. And, in his twenty-six ground for relief, Petitioner contends that the State violated his equal protection and due process rights because it obtained the testimony on Wells and Sweeney by providing them money or other benefits.

*Applicable Facts*

At Petitioner's trial, Randy Wells and Carl Sweeney testified for the State. Wells testified that he was currently on parole from prison and had been convicted of numerous offenses, including burglary, escape, and theft. (R. 65:6960-61). Wells further testified that he had an agreement with the Eastland County District Attorney's office to testify in a murder trial there and in Petitioner's trial and, if he testified truthfully in both cases, a murder charge in Eastland would be dropped and he would receive a fifteen-year sentence for a pending forgery charge. (R. 65:6962). Wells testified that he shared a cell with Petitioner in prison for about two months in February and March of 1989. Wells also testified that Petitioner spoke about the "desert murders" and spoke about "his graves." Petitioner confessed to killing several women, and Wells remembered Petitioner mentioning Desiree

42

Wheatley and Karen Baker in particular. Wells further testified that Petitioner told him that he had a brown pick-up truck and a motorcycle and would use drugs to entice the girls to go with him. Petitioner referred to the victims as "titty whores" and prostitutes and justified the murders, stating that the women had "messed over him." (R. 65:6966-69, 6971). Petitioner also told Wells that after he took the victims out to the desert, he would tie them to the truck, dig a grave, then tie them up to the pickup and a tree and rape them. Petitioner told Wells that one of the victims had scratched him and he was worried about his skin being under her fingernail. Furthermore, Wells tattooed over some of Petitioner's tattoos because Petitioner said that one of the women had escaped and she had seen his tattoos. (R. 65:6969-70, 6972-73). Wells further testified that Petitioner had not shown him any newspaper clippings, that he was not aware of any reward when he told his attorney about the information that he had, that he had given the State the names George Hall and Carl Sweeney as other inmates who might have information about Petitioner, and that he had not discussed the information with these two men while they were in the El Paso jail together. (R. 65:6975-76, 6989). On cross-examination, Wells acknowledged that he and Sweeney were in the same cell in the El Paso jail for five days and that he knew Sweeney from prison because he was a writ writer. (R. 65:6986).

Carl Sweeney testified that he was currently serving a sentence for burglary and was not eligible for parole until the next year. He testified that he had previously been convicted of forgery, burglary, DWI, and escape. (R. 65:7010-11). Sweeney further testified that he met Petitioner in the summer of 1988 in prison because Petitioner hired him as a writ writer to file a suit against the El Paso police department on Petitioner's behalf. Petitioner admitted to Sweeney that he had committed the murders of the young girls and provided Sweeney with over 100 newspaper clippings

about the murders that he had collected. Petitioner had memorized the details in the clippings and mentioned several of the victims by name and one by the nickname "Biker Girl." Petitioner never told Sweeney how he killed the girls, but did mentioned that he was concerned that the death penalty would apply if the victims were tied-up, was concerned that he might have left some rope at one of the graves, and was worried about evidence that the police seized from his sister's and his father's houses. Petitioner also told Sweeney that he wanted to cover up his tattoo of a knife so that he could not be identified. (R. 65:7034-42, 7044). Sweeney did not know about the murders before he met Petitioner and had never read about any ropes in the newspaper clippings. (R. 65:7043). Sweeney initially did not know why he was brought to El Paso along with Wells and George Hall and did not want to testify against Petitioner before the grand jury because he was concerned for himself and his family. Nevertheless, he did testify before the grand jury and agreed to testify for the State at Petitioner's trial, but he had no deal with the State and did not initially know about any reward. (R. 65:7030-33). On cross-examination, Sweeney acknowledged that he was paid $500 by Petitioner to file a civil rights suit on his behalf, that he has written several letters expressing interest in the $25,000 reward offered by the El Paso police department in this case, and that the police department gave him a total of about $100 because he requested it. (R. 65:7061-63, 7070-71). Sweeney maintained that he wanted the reward because he wanted to pay the restitution that he owed in his burglary case. (R. 65:7082).

*Analysis*

The Supreme Court has held that the presentation of false evidence at trial, as well as the admission into evidence at trial of false evidence that, although not solicited, is not corrected, violates a criminal defendant's due process rights, if the reliability of a given witness may be

44

determinative of guilt or innocence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1935). In order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, a petitioner must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *Napue v. Illinois*, 360 U.S. at 271. And the Supreme Court has also stated that a new trial is dictated only when the false testimony could, in any reasonable likelihood, have affected the judgment of the jury. *Id.*

As support for his allegation that Petitioner that Wells and Sweeney perjured themselves at trial, Petitioner first points to Wells' motivation to obtain a better deal for himself with respect to the murder charge he faced, the fact that their testimony made Wells and Sweeney possible recipients of a $25,000 reward offered by the El Paso Police Department for information in the desert murders case, and the fact that they were housed together for several days in the El Paso County jail prior to giving their testimony before the grand jury in Petitioner's case. All of these issues, however, are issues that were explored in detail by defense counsel during cross-examination of Wells and Sweeney, and they do not support a claim that the prosecution presented false testimony. *See Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002) (holding that the fact that false or perjured testimony is challenged by other evidence presented at trial or is inconsistent with prior statements does not establish that the prosecution knew or believed that testimony to be false); *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (holding that conflicting testimony does not prove perjury but instead establishes a credibility question for the jury).

Petitioner then points to a sworn affidavit from a Texas prison inmate named William Sobley, and letters from two other inmates, Buford Whitehead and George M. Hall, all of which

were attached as exhibits to his state habeas application, as further evidence that Wells and Sweeney

lied when they testified that Woods confessed to the six murders. In his affidavit, dated August 13,

1997, Sobley states that he knew Wells when both of the men were housed in the Eastland County

jail in 1997 and that Wells told him that he had lied in his testimony in Petitioner's case, that

Petitioner had never confessed to Wells, and that Wells learned about the particulars of the case from

reading Petitioner's legal papers and from conversations with another inmate. Sobley further states

that Wells told him that, in addition to receiving immunity in a murder case, Wells was to receive

$20,000 upon Petitioner's execution. (SHTr.:125-26). In his letter, the date of which is unclear, and

which is addressed to "Dear Sir," Buford Whitehead states that Randy Wells was his cellmate in the

Eastland County jail for two or three days in 1990 and that Wells told him that he "made up" the

information that he gave the District Attorney about Petitioner and that Petitioner did not commit

the murders, but that Wells needed to "cut a deal" in his own capital murder case. Whitehead also

offers to testify in the case. (SHTr.:129). In his letter, dated March 18, 1991, and addressed to

Assistant District Attorney Debra Morgan, George Hall states that he is unwilling to testify against

Petitioner at his trial because he was denied parole and is therefore unwilling to assist the State. He

further states that he is instead contemplating being a witness for the defense and reiterates that he

will not testify for the State if he remains confined in prison. In a postscript, Hall states that "for

openers," he knows that Sweeney committed perjury before the grand jury and that Wells and

Sweeney fabricated their stories together. (SHTr.:127,196).

This Court would first note that only one of these statements is a sworn statement. The

letters apparently written by Whitehead and Hall are unsworn statements. The Fifth Circuit has held

that unsworn statements submitted in support of a claim requesting habeas relief do not constitute

evidence that raises a genuine issue of fact. *Cordova v. Collins*, 953 F.2d 167, 171 n. 3 (5th Cir. 1992). Moreover, the sworn statement signed by William Sobley does not allege that the prosecution *knew* that Wells testified falsely at trial. Indeed, as this affidavit was not signed until 1997 and addresses alleged statements made by Wells in 1997, after Petitioner's trial, the State could not have known about Wells' alleged statements to Sobley. Accordingly, the hearsay statements contained in this affidavit do not support a claim under *Napue*. Moreover, Sobley's letter only addresses Wells' testimony at Petitioner's trial, not Sweeney's testimony. Petitioner has presented no sworn evidence that alleges that Sweeney, who did not have any non-prosecution agreement with the prosecution, lied when he testified at Petitioner's trial, much less that the prosecution knew that the testimony was false. Thus, Petitioner has presented no credible evidence that the State knowingly presented false testimony material to Petitioner's conviction. *See Knox v. Johnson*, 224 F.3d 470, 478 (5th Cir. 2000) (holding that any alleged perjured testimony by witness was not material because, in part, the witness' relevant testimony was corroborated by other witnesses' testimony).[10] The state habeas court concluded that this claim was without merit. (SHTr.:3-4). That conclusion is not contrary to federal law.

---

[10] Moreover, even if the unsworn letters were considered by this Court, Petitioner has not presented sufficient evidence to support a credible claim that the prosecution knowingly presented false testimony. Only one of the letters submitted by Petitioner is actually addressed to one of the prosecutors who prosecuted Petitioner's case. This letter, signed by inmate George Hall, is not a letter sent for the purposes of informing the State about any perjury on behalf of Wells and Sweeney. Rather, Hall spends the entire body of the letter stating that he will not testify against Petitioner, not because Petitioner is not guilty of the offense of capital murder, but because he has been informed that he will not be paroled if he testifies. (SHTr.:127-28). It is only in a postscript to the letter that Hall states that "for openers" he knows that Sweeney perjured himself before the grand jury and that Wells and Sweeney fabricated their stories. (SHTr.:196). An unsworn letter sent by a prison inmate, disgruntled because the State will not agree to parole him as a reward for his testimony against Petitioner, alleging in hearsay form that another inmate committed perjury when he testified to the grand jury, is not sufficient evidence to support a claim that the State knowingly presented false testimony at Petitioner's trial.

47

With regard to Petitioner's assertion that his trial counsel were ineffective for failing to object to the admission of Wells' and Sweeney's testimony into evidence on the basis that it was false, Petitioner has presented no evidence that his trial counsel had any evidence to support an objection on that basis. The only evidence Petitioner has presented to support this claim is an affidavit signed in 1997, a letter signed by Buford Whitehead, written to an unknown person, and a letter addressed to one of the prosecutors. Defense counsel would naturally have been unaware of an affidavit signed several years later, and Petitioner has not shown that defense counsel was aware of the existence of the other two letters. Defense counsel instead objected to Carl Sweeney's testimony on the basis that, because he was a writ writer, and Petitioner had hired him and paid him to file a lawsuit on Petitioner's behalf, the attorney/client privilege applied, preventing Sweeney from testifying regarding discussions he had with Petitioner regarding the lawsuit. (R. 65:7025-30). While this objection was overruled by the trial court (R. 65:7030), and the point of error denied on direct appeal, *Wood*, slip op. at 10-11, trial counsel were not ineffective for objecting on this basis, rather than on a basis for which they had no support.

Finally, with regard to Petitioner's twenty-sixth ground for relief, in which he asserts that the State violated his equal protection and due process rights because it obtained the testimony of Wells and Sweeney by providing them money or other benefits, the Fifth Circuit has specifically held that there is no due process violation where a witness for the prosecution has testified for compensation, by way of either a reduce sentence or actual financial compensation. Rather, it is the jury's role to evaluate the credibility of a compensated witness. *United States v. Garcia Abrego*, 141 F.3d 142, 152 (5th Cir. 1998); *United States v. Cervantes Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987) (en banc). The evidence presented at trial was that Wells testified in order to receive the benefit of

48

a reduced sentence in another case, Sweeney had no agreement to receive any compensation for his testimony, but both men hoped to receive reward money offered by the El Paso police department. Clearly, the jury was aware of both men's motives for testifying in the case in reaching its decision on Petitioner's guilt. However, the fact that one of the witnesses received a benefit for his testimony and both men hoped to receive a further financial reward does not render their testimony unconstitutional. Petitioner's twenty-second through twenty-sixth grounds for relief are without merit, and it is recommended that they be denied.

## G.    Fiber Evidence Claims

In his twenty-eighth through thirty-first grounds for relief, Petitioner argues that his due process rights were violated because the State introduced fiber evidence at trial that was "unreliable and potentially planted" and because the State presented expert testimony regarding a comparison of various fiber evidence. Petitioner further asserts that his trial counsel were ineffective for failing to object to the introduction of the fiber evidence and the expert testimony into evidence. Petitioner alleges that the fiber evidence that was recovered from the grave site of the victim Desiree Wheatley was "planted" there by the police during a period of several days that the grave was left unsecured. Petitioner further contends the testimony from the State's expert that the fibers found at the grave were similar in all respects to fibers found in a vacuum cleaner from Petitioner's former apartment was not "reliable enough" testimony and therefore the trial court should not have allowed the testimony into evidence at trial.

At the state habeas level, Petitioner alleged that the fiber evidence was planted at the grave site of Desiree Wheatley. The state habeas court, in denying relief, found that Petitioner had alleged no facts to support this claim and concluded that the allegation was purely speculative. (State Habeas

Findings at 4). This conclusion is not contrary to federal law, and Petitioner's other related claims are without merit.

Without any evidentiary support, Petitioner alleges that the police "potentially" planted fiber evidence at the grave site of Desiree Wheatley. Petitioner theorizes that the evidence was planted because similar fiber evidence was not found at the other grave sites. Petitioner also appears to suggest that the fiber evidence found in the vacuum cleaner at Petitioner's previous apartment was planted by the police, as well, but again provides no support for this bare allegation. The Fifth Circuit has held that mere conclusory allegations are insufficient to raise a constitutional issue. *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990); *Ross v. Estelle*, 694 F.2d 1008, 1011-12 (5th Cir. 1983). Because Petitioner has presented no more than conclusory allegations, he has failed to raise any constitutional issue regarding the admission of the fibers into evidence.

Petitioner also asserts that the testimony of the State's trace evidence expert, Steve Robertson, was not sufficiently reliable to be admitted into evidence at trial. As support for this claim, Petitioner cites the tests for the admissibility of scientific evidence set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (2003), and *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992). In *Daubert*, the Supreme Court established a two-prong test to determine whether expert testimony merits admission into evidence at trial under Rule 702 of the Federal Rules of Evidence. The testimony must: 1) be based on scientific knowledge, and 2) assist the trier of fact in understanding or determining a fact in issue. *Id.* at 592. In *Kelly*, the Court of Criminal Appeals outlined several factors in determining the admissibility of expert testimony under its analogous Rule 702, including: 1) the extent to which the underlying theory and technique are accepted as valid by the scientific community; 2) the qualifications of the testifying expert; 3) the existence of

literature either supporting or rejecting the theory and technique; 4) the potential rate of error of the technique; 5) the availability of other experts to test and evaluate the technique; 6) the clarity with which it can be explained to the court; and 7) the experience and skill of the person who applied the technique in the applicable case. *Id.* at 573.

Petitioner does not explain, however, how the testing of the fiber evidence that was conducted by Mr. Robertson fails to meet these tests. Instead, Petitioner suggests that the fiber evidence was unreliable because it was obtained from uncontrolled locations, i.e. the gravesite and the vacuum, because there was no common source admitted into evidence from which all of the fibers could have originated, and because it was not adequately explained at trial how the orange fibers found in the vacuum got there when it was the State's theory that all of the fibers originated from an orange blanket that Petitioner kept in his truck.

However, none of Petitioner's concerns about the fiber evidence address the admissibility of the evidence regarding the testing of the fibers, but rather address the weight of the evidence itself. Steve Robertson testified that he was a chemist with the Texas Department of Public Safety in Austin, Texas, that he was a trace evidence analyst, and that he had testified regarding trace evidence over 100 times and about twenty times about fiber evidence specifically   He further testified extensively about the four kinds of fibers that are found in nature, about their origins, and about the fact that fibers within the same class can be further differentiated from each other by color, size, and shape through the use of a microscope and infrared spectrophotemetry. (R. 63:6713-23, 6736). Robertson testified that he examined fibers from the shirt that had been identified as Desiree Wheatley's shirt, fibers from a vacuum bag, and fibers from her grave, and he determined that they were all orange, acrylic fibers of the same size, shape, and color composition and that such acrylic

51

fibers are typically used for fuzzy garments such as sweaters, socks, gloves, and blankets. (R. 63:6725-31). Robertson also testified that most of the fibers he analyzed were from the victim's T-shirt and that there were a large amount of the orange fibers on the shirt, indicating that they were most likely from a source she came into contact with within a few hours of her death. (R. 63:6731-32). On cross-examination, Robertson acknowledged that he could not state that all of the orange fibers came from the same source. (R. 63:6761). During its case-in-chief, the defense presented the testimony of Richard Bisbing, their own expert in trace evidence. He agreed that the fibers from the grave and the vacuum could have come from the same source, but further testified that acrylic fibers are the most common fibers, although orange was not a common color. He also agreed that most transferred fibers are lost with four to eight hours. (R. 66:7202-09).

As can be seen from the testimony given, and the fact that the defense called its own fiber expert, the testing and analysis of fiber evidence is admissible scientific evidence. Petitioner has failed to show that the fiber testing does not meet the requirements set forth in *Kelly* and *Daubert*. This claim is without merit.

Finally, Petitioner alleges that his trial counsel were ineffective for failing to object to the admission of the fiber evidence or the expert testimony regarding the fiber evidence into evidence. Petitioner has failed to establish that his attorneys were deficient. With regard to his contention that his trial counsel should have objected to the admission of the fiber evidence from the grave site and the vacuum cleaner because it was planted by the police, Petitioner has offered only conjecture regarding the alleged planting. Trial counsel were not ineffective for failing to object to the admission of evidence on the basis of conjecture. And with regard to Petitioner's claim that counsel were ineffective for failing to object to the admission of the testimony of the State's trace evidence

expert, Petitioner has not shown that such evidence was inadmissible. Moreover, the fact that the defense presented testimony from their own trace evidence expert is an indication that Petitioner's trial counsel believed that such scientific testing was reliable and admissible evidence. Petitioner's twenty-eighth through thirty-first grounds for relief are without merit, and it is recommended that they be denied.

**H.     Sufficiency of the Evidence Claim**

In his thirty-second and fortieth grounds for relief, Petitioner contends that his due process rights have been violated because the evidence is insufficient to support his conviction for capital murder. Specifically, and without supporting case law, Petitioner asserts that the evidence supporting his conviction is insufficient because the indictment against him "arguably" charged him with six separate murders, rather than capital murder, and because he has questioned the veracity of the testimony given at trial by Petitioner's former cellmates, Wells and Sweeney, and the State's fiber evidence expert.

In *Jackson v. Virginia*, 443 U.S.307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court enunciated the standard of review when a state prisoner challenges the sufficiency of the evidence in a federal habeas corpus proceeding. The Court defined the issue to be, "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 320. In applying this standard, all of the evidence is to be considered in the light most favorable to the prosecution. *Id*. The Court went further to state that, "[t]his familiar standard gives full play to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. And the *Jackson* standard, a federal

habeas court may find sufficient evidence to support a conviction even though the facts may also support another reasonable hypothesis consistent with a claim of innocence. *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

At the state level, the state habeas court concluded that Petitioner's contention that the evidence to support his conviction was insufficient was without merit, as disregarding testimony presented at trial is an improper method for testing the sufficiency of the evidence. (State Habeas Findings at 4). This conclusion is not an unreasonable application of federal law.

As this Court has discussed earlier, Petitioner was charged with murdering more than one person in different criminal transactions but using the same scheme or course of conduct. Pursuant to the jury charge, the jury found Petitioner guilty of capital murder by finding, beyond a reasonable doubt, that he murdered both Ivy Williams and at least one other individual, during different criminal transactions, but using the same scheme or course of conduct.

At trial, the State presented evidence that Petitioner knew or was seen with each of the victims shortly before she disappeared. There was testimony presented that Petitioner drove both a tan or beige pick-up truck and a red Harley Davidson motorcycle and most of the victims were seen riding in or on both of these type of vehicles shortly before their disappearances. Indeed, in the cases of Desiree Wheatley and Karen Baker, the victim was seen in or on one of these vehicles on the very evening each of them disappeared, and Angie Frausto was seen on a motorcycle of the same description shortly before she disappeared. (R. 60:6008; R. 61:6234-38, 6390-92). Furthermore, there was testimony at trial that Dawn Smith knew Petitioner and had been seen with him on his motorcycle in the past. (R. 62:6560-63, 6596-97). And, in the case of Ivy Williams, she knew Petitioner and was last seen leaving a club with Petitioner, whom she knew, shortly before she

disappeared. (R. 60:6170-74; 63:6621). Substantial fiber evidence found in the grave and on the clothes of Desiree Wheatley matched in all respects fiber evidence found in a vacuum cleaner used by Petitioner and his former girlfriend. There was testimony that Petitioner confessed to two of his cellmates, specifically mentioning Desiree Wheatley, Karen Baker, and "Biker Girl" as three of his victims. There was also testimony presented that Ivy Williams owned a Harley Davidson motorcycle and was wearing a Harley Davidson ring when her body was found. (R. 58:5789; R. 60:6153-54). The evidence, when viewed through the light most favorable to the prosecution is sufficient to establish that Petitioner murdered more than one person.

The evidence is also sufficient to establish that Petitioner murdered more than one person in different criminal transactions, using the same scheme or course of conduct. In that regard, all of the victims disappeared at different times, indicating that they were murdered in different criminal transactions. However, they were all found buried in shallow graves in the northeast desert area of El Paso, and most were either partially or fully unclothed. All lived or were seen in the northeast area of El Paso shortly before they disappeared, all were young women, and most were either topless dancers, prostitutes, runaways, and/or young women who were known to have been willing to accept rides from strange men. (R. 60:6017-18, 6168, 6180-81; R. 61:6231-32, 6244, 6301, 6342-43, 6346; R. 62:6486-89, 6503, 6526, 6554). Testimony was presented at trial that some of the victims used illegal drugs. (R. 58:5791; R. 60:6168; R. 61:6357). Moreover, testimony was presented at trial that Petitioner confessed to using drugs to lure the girls or women and then preceded to rape and murder and bury them in the desert. And, Judith Kelly testified that during the same time period in which the six murder victims disappeared, Petitioner drove her to the northeast desert in El Paso and, after digging a hole, raped her on a blanket he retrieved from his truck. Viewed in the light most

favorable to the prosecution, the evidence is sufficient to establish that Petitioner murdered more than one person using the same scheme or course of conduct.

With regard to Petitioner's contention that the evidence is insufficient because of the way the indictment was worded, as this Court discussed earlier, the indictment properly charged him with capital murder. And, concerning Petitioner's contention that this Court should discount the testimony of Petitioner's former cellmates and the fiber evidence expert in determining whether the evidence is sufficient to support his conviction, as the Government notes in its response, in *Jackson* the Supreme Court specifically stated that, in determining the sufficiency of the evidence to support a conviction, a habeas court should look at the evidence adduced at trial. *Jackson*, 443 U.S. at 319. Accordingly, Petitioner contention that this Court should determine the sufficiency of the evidence by discounting all of the evidence that he attempts to discredit is an inappropriate application of the *Jackson* standard. Petitioner's thirty-second and fortieth grounds for relief are without merit, and it is recommended that they be denied.

## I.    Extraneous Offenses Claims

In his thirty-third and thirty-four grounds for relief, Petitioner asserts that his due process rights were violated by the admission of an extraneous offense into evidence at the guilt phase of his trial and that his trial counsel were ineffective for failing to object to this testimony. Specifically, Petitioner asserts that the admission of Judith Kelly's testimony at the guilt phase of the trial was not allowed under Texas statutory and case law.[11]

---

[11]

Petitioner also references the testimony of Gina Gallegos. Ms. Gallegos, however, testified about being kidnapped by Petitioner at the punishment phase of Petitioner's trial. However, to the extent that Petitioner is complaining about the admission of her testimony at trial (or the testimony of three other rape victims of Petitioner who testified at the punishment phase of the trial), the Fifth Circuit has consistently stated that it does not violate a capital defendant's right to due process to admit unadjudicated criminal

As noted earlier, Judith Kelly testified at the guilt phase of Petitioner's trial. She testified that, while she was working as a prostitute in El Paso, she accepted a ride from Petitioner in July of 1987, but that he instead took her into the desert in northeast El Paso and raped her. The Court of Criminal Appeals addressed the admission of this extraneous act on direct appeal. That Court held that Kelly's testimony was admissible under Texas law to prove Petitioner's identity because her testimony demonstrated that Petitioner had a unique "system" of committing criminal acts and that the striking similarities between the Kelly rape and the six murders, including the proximity of the found bodies to the area where Petitioner took Kelly, the evidence of a beige truck being used in several of the offenses including the rape, the evidence of sexual abuse in several of the murders, and the blanket used during the rape which matched the description given by Petitioner's girlfriend of a blanket owned by Petitioner. Moreover, that Court pointed to the similarities between Kelly's description of her ordeal and testimony given at trial from Petitioner's cellmates that Petitioner described his victims as topless dancers or prostitutes, stated that he would tie the women to the truck while he dug a grave and would tie them to a tree when he raped them, and was concerned about his tattoos because one girl had been able to escape. *Wood*, slip op. at 4-6. Finally, the Court of Criminal Appeals held that the prejudicial effect of admitting Kelly's testimony did not substantially outweigh its probative value because identity was a hotly contested issue at trial;

---

conduct at the punishment phase of the trial. *Landry v. Lynaugh*, 844 F.2d 1117, 1121 (5th Cir. 1988); *Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir. 1987). Rather, Supreme Court precedent states that a defendant's constitutional rights are violated only where the evidence supporting an extraneous offense has been shown to be both false and unreliable. *Hernandez v. Johnson*, 213 F.3d 243, 252 (5th Cir), *cert. denied*, 531 U.S. 243 (2000). Petitioner has shown neither.

because the evidence that Petitioner committed the rape is "unassailable;"[12] because the evidence

of the rape was much less severe than the murders; because the amount of time spent in presenting

the evidence, when compared to the entire length of the trial, was minimal; and because the evidence

was extremely important to the State's case against Petitioner. *Wood*, slip op. at 7-8. This decision

is not contrary to federal law.

In federal habeas proceedings, the court does not sit in review of a state court's interpretation

of its own law. *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998), *cert. denied*, 526 U.S. 1148

(1999); *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995). The Fifth Circuit has further held that

an extraneous offense may be admitted into evidence at the guilt phase of a trial without violating

the a defendant's due process rights if the State makes a "strong showing" that the defendant

committed the offense and that the offense is rationally connected with the charged offense. *Story*

*v. Collins*, 920 F.2d 1247, 1254 (5th Cir. 1991). And even if evidence of an extraneous offense is

wrongly admitted into evidence at the guilt phase of a criminal trial, habeas corpus relief is

appropriate only if the error is of such a magnitude that it resulted in "fundamental unfairness."

*Hafdahl v. Johnson*, 251 F.3d 528, 536 (5th Cir.), *cert. denied*, 534 U.S. 1047 (2001), *citing*

*Blankenship v. Estelle*, 545 F.2d 510, 516-7 (5th Cir. 1977). Moreover, the fact that evidence that

is irrelevant may have been admitted at trial does not rise to a federal constitutional error. *Romano*

*v. Oklahoma*, 512 U.S. 1, 10-12 (1994).

With regard to the extraneous assault of Judith Kelly that was admitted into evidence at the

guilt phase of Petitioner's trial, under Texas state evidentiary law, other wrongs or bad acts are not

---

12

Petitioner was tried and convicted of raping Judith Kelly prior to being indicted and tried for the six
murders.

admissible to prove the character of the defendant, but may be admissible to prove motive, opportunity, intent, preparation, plan, or identity. *See* TEX. R. EVID. 404(b); *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990). When this issue was raised on direct appeal, the Court of Criminal Appeals conducted an extensive analysis of the Kelly testimony and Texas case law and determined that Texas law was not violated by the admission of this evidence. Petitioner has not shown that this analysis was incorrect, much less that the admission of the testimony into evidence was fundamentally unfair to him. To the contrary, given Petitioner's prior conviction for the sexual assault of Kelly, the State made a strong showing that Petitioner committed the assault, and the Court of Criminal Appeals outlined the numerous links between the extraneous offense and the murders, thus establishing a rational connection between the two. Accordingly, Petitioner has not established that his due process rights were violated.

Finally, with regard to Petitioner's assertion that his trial counsel were ineffective for failing to object to the admission of the testimony on the basis that its admission violated his due process rights, trial counsel did object to the admission of Judith Kelly's testimony on the basis that the evidence did not establish either identity and on the basis that its prejudicial effect substantially outweighed its probative value. (R. 64:6791-6800). Trial counsel was not required to lodge a further objection based upon the federal constitution, given that the objections he did make were judged to be without merit. *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (noting that the Fifth Circuit has consistently held that counsel is not ineffective for failing to make futile motions or objections). Petitioner's thirty-third and thirty-fourth grounds for relief are without merit, and it is recommended that they be denied.

J.    **Verdict Form Claims**

In his thirty-fifth and thirty-sixth grounds for relief, Petitioner asserts that he is entitled to

relief because his due process rights were violated by the verdict form used by the jurors to convict

Petitioner of capital murder and because he was denied the effective assistance of counsel because

his trial counsel did not object to the verdict form.  Specifically, Petitioner contends, without any

supporting case law, that the verdict form was insufficient because it failed to designate the specific

victim of the capital murder.

The verdict form in Petitioner's case required that, in order for the jury to find that Petitioner

was guilty of capital murder, the jury had to find beyond a reasonable doubt that, during the period

from May 30, 1987 and August 28, 1997, Petitioner, during different criminal transactions but

pursuant to the same scheme or course of conduct, intentionally or knowingly caused the death of

Ivy Williams on or about May 30, 1987, by stabbing her with a sharp instrument, *and* that Petitioner

intentionally or knowingly caused the death of one or more of the other victims charged in the

indictment. (Tr.:263-64).  This language tracks the language of the statute under which Petitioner

was tried wherein a person commits capital murder if he commits murder *and*, during different

criminal transactions but pursuant to the same scheme or course of conduct, murders more than one

individual. TEX. PENAL CODE ANN. § 19.03(a)(7)(B).  The verdict form required that the jury find

beyond a reasonable doubt that Petitioner intentionally or knowingly murdered Ivy Williams and,

in a different transaction but pursuant to the same scheme or course of conduct, murdered at least

one of the other victims.  Petitioner does not allege, much less establish, why this verdict form is

insufficiently vague insofar as it required the jury to find beyond a reasonable doubt all of the

elements of a capital murder.  Likewise Petitioner has failed to establish either any deficiency on

the part of his counsel for failing to object to a proper jury form or any prejudice from this failure. Petitioner's thirty-fifth and thirty-sixth grounds for relief.

**K.      Appointment of Experts Claim**

In his thirty-seventh ground for relief, Petitioner contends that his right to due process was denied because the Texas Court of Criminal Appeals did not authorize the appointment of experts to assist Petitioner in the preparation of his state application for writ of habeas corpus. Specifically, Petitioner asserts that the Court of Criminal Appeals violated his due process rights when it issued an order denying Petitioner's request for funds to employ a forensic anthropologist and for funds for DNA testing during the state habeas proceedings.

Petitioner raised this claim in his state habeas application. The state habeas court denied this claim, finding that the purpose of a state habeas application was to raise constitutional issues, not to investigate the possibility of contesting evidentiary issues. That court then concluded that Petitioner had failed to allege any facts that established a constitutional deprivation. (State Habeas Findings at 5). This conclusion is not contrary to federal law.

A petitioner is not entitled to federal habeas relief on a claim that he was denied due process in the state habeas court proceeding because this is an attack on a proceeding collateral to his detention and not the detention itself. *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir.), *cert. denied*, 120 S.Ct. 22 (1999); *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995). The Fifth Circuit has consistently held that a federal habeas petitioner is not entitled to relief based upon any claim that he was denied his due process rights during the state habeas process, including cases where the petitioners have claimed that they were entitled to relief because there was no evidentiary hearing held, because the state court did not consider affidavits submitted by the petitioner, because the

61

petitioner was not allowed to subpoena witnesses for an evidentiary hearing, or because the state habeas court adopted the State's proposed findings of fact and conclusions of law shortly after they were filed. *Trevino*, 168 F.3d at 1275; *McGowin v. Scott*, 67 F.3d 100, 102 (5ᵗʰ Cir. 1995); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5ᵗʰ Cir. 1992), *cert. denied*, 507 U.S. 1056 (1993); *McCoy v. Lynaugh*, 874 F.2d 954, 966 (5ᵗʰ Cir. 1989). In all such cases, the Fifth Circuit has held that a claim of an infirmity in the state habeas proceeding does not constitute a ground for relief in federal court. Therefore, Petitioner's claim that he was denied due process by the state habeas court because his request for the appointment of an expert was denied does not entitle him to federal habeas relief. Petitioner's thirty-seventh ground for relief is without merit, and it is recommended that it be denied.

**L.    Time Limit Claims**

In his thirty-eighth ground for relief, Petitioner asserts that Article 11.071 of the Texas Code of Criminal Procedure and 28 U.S.C. § 2244 are unconstitutional as applied to him because both of the statutes impose time limits for the filing of state and federal habeas petitions. Petitioner argues that these time limits prevented him from investigating certain claims.

Under Article 11.071 of the Texas Code of Criminal Procedure, the article which outlines the procedure to be used in state post-conviction attacks upon death sentences, a state habeas applicant is required to file his or her state application for habeas corpus either within 180 days of appointment of state writ counsel by the Court of Criminal Appeals or forty-five days after the State has filed its response in the applicant's case on direct appeal to the Court of Criminal Appeals, whichever is later. An applicant may obtain a ninety-day extension of the deadline upon a showing of good cause. TEX. CODE. CRIM. PROC. ANN. art. 11.071 § 4(a),(b) (Vernon 1995). Under 28 U.S.C. § 2244(d)(1)(A), a federal habeas petition must be filed within one year from when the

judgment became final after direct review of the conviction.[13]  Petitioner does not allege any particular constitutional clause or amendment that is violated by these statutory time limits, but instead contends that these time requirements prevented him from adequately completing both his state and federal habeas petitions.

Petitioner raised this issue at the state habeas level, and the state habeas court concluded that the total nine-month time limit imposed on Petitioner by Article 11.071 did not deny him due process or equal protection rights and further concluded that the federal habeas statute is not unconstitutional for imposing a one-year time limitation. (State Habeas Findings at 5-6).  These conclusions are not contrary to federal law.

Petitioner contends that, because of these statutory time limits, he has been unable to properly investigate Edward Burton, a man who evidently confessed to the FBI at one point that he had committed several murders in El Paso in 1987, an unnamed man in Mexican custody who "it is believed is responsible" for the murders of some of the victims, unspecified DNA evidence, and Petitioner's own alleged organic brain damage.  This Court would first note that the existence of Edward Burton has been known about by the defense since Petitioner's trial counsel was notified about his existence by the El Paso District Attorney's office by way of a letter dated, and received, on July 30, 1991.  Furthermore, defense counsel was provided all of the information the FBI had compiled about Edward Barton, an apparently unemployed drug dealer, who demanded to be arrested and then confessed to several unspecified murders in 1989. (SHTr.:118-124).  Nothing about the state or federal statutory time limits has prevented Petitioner from investigating this claim

---

[13]

This one-year time limit is tolled during the time period in which a state habeas application is pending. *See* 28 U.S.C. § 2244(d)(2).

adequately over the numerous years that have passed since 1991. Furthermore, as noted earlier, Petitioner has failed to show the existence of any matter available for DNA testing. The only possible avenue for such testing, a fingernail from the victim Angie Frausto, was tested prior to trial but yielded no results from either laboratory that attempted to do so. (R. 67:7311-14; R. 68:7362-63).

And, to the extent that there is any other potential relevant exculpatory evidence about which Petitioner has not yet discovered, both Article 11.071 and 28 U.S.C. § 2244 provide for the opportunity to file subsequent habeas petitions if there is a claim that has not been and could not have been presented in the initial application because the factual basis of the claim was not available at the time. *See* TEX. CODE CRIM. PROC. art. 11.071 § 5(a); 28 U.S.C. § 2244(b)(2). Petitioner has failed to establish that the statutory time limits have prevented him from investigating any known avenues or would prevent him from asserting any potential claims that might be discovered in the future.

Moreover, with regard to Texas' state habeas procedures, the United States Supreme Court has held that state collateral proceedings are not constitutionally required, and states have no constitutional obligation to provide collateral relief to state criminal defendants. *Murray v. Giarrantano*, 492 U.S. 1, 10 (1989); *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987). Because the federal constitution does not require that a state provide a criminal defendant with any state post-conviction collateral proceeding, a claim that the procedure that is provided is constitutionally inadequate cannot be a basis for federal habeas relief. Instead, as the Fifth Circuit has held, a federal habeas petitioner must establish that his conviction is itself constitutionally infirm. *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir.), *cert. denied*, 120 S.Ct. 22 (1999). And with regard to the

federal habeas procedures, the Fifth Circuit has specifically held that the one-year time limit for the filing of a federal habeas petition imposed under 28 U.S.C. § 2244(d) does not violate the Suspension Clause of the U.S. Constitution unless a petitioner can establish that the limitations period renders the habeas remedy inadequate or ineffective. *Molo v. Johnson*, 207 F.3d 773, 775 (5th Cir. 2000); *Turner v. Johnson*, 177 F.3d 390, 392-93 (5th Cir. 1999). Petitioner has not made such a showing. Petitioner's thirty-eighth ground for relief is without merit, and it is recommended that it be denied.

## RECOMMENDATION

Petitioner has failed to make a substantial showing of the denial of a federal right. Moreover, the state court adjudication on the merits on the claims presented to the state court neither resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Petitioner's petition for a writ of habeas corpus should be DENIED, except for his twenty-seventh and thirty-ninth grounds for relief, which should be DISMISSED on procedural grounds.

Signed this _4_ day of _June_, 2004.


_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a true copy of these findings, conclusions and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within ten days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE